1  COOLEY LLP
   ALI M. M. MOJDEHI (123846)
2  (AMOJDEHI@COOLEY.COM)
   JANET D. GERTZ (231172)
3  (JGERTZ@COOLEY.COM)
   4401 Eastgate Mall
4  San Diego, CA  92121
   Telephone:    (858) 550-6000
5  Facsimile:    (858) 550-6420

6  Attorneys for Judgment Creditor
   Qualcomm Incorporated
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11

12  In re                              Case No.  13-30340-DM
                                       (Case No. 13-30341)
13  GABRIEL TECHNOLOGIES CORP., et al.,
                                       CHAPTER 11
14              Debtors.
                                       (Jointly Administered)
15
                                       MEMORANDUM OF POINTS AND
16                                     AUTHORITIES IN SUPPORT OF
                                       MOTION BY QUALCOMM
17                                     INCORPORATED, PURSUANT TO 11
                                       U.S.C. § 1112 FOR CONVERSION TO
18                                     CASES UNDER CHAPTER 7 OR, IN
                                       THE ALTERNATIVE, FOR
19                                     APPOINTMENT OF A CHAPTER 11
                                       TRUSTEE, FOR CAUSE
20
                                       Date:   May 10, 2013
21                                     Time:   10:00 a.m.
                                       Court:  Courtroom No. 22
22                                             235 Pine Street, 22nd Floor
                                               San Francisco, CA
23                                     Judge:  Hon. Dennis Montali

24  / / /

25  / / /

26  / / /

27  / / /

28

# TABLE OF CONTENTS

**Page**

I. JURISDICTION AND VENUE ........................................................................... 1

II. INTRODUCTION .......................................................................................... 1

III. STATEMENT OF FACTS .............................................................................. 5

    A. The Dismal Corporate and Financial History of the Debtors ................ 6

    B. Gabriel and Trace Become Corporate Shells for Pursuit of Litigation .................. 8

    C. The Bond Hearing ........................................................................... 12

    D. The Debtors Effect a Subordination of Existing Investors to Continue the Litigation Campaign Against Qualcomm ..................................... 13

    E. The Dispute Over the Adequacy of the Debtors' Trade Secret Designation ....... 14

    F. The District Court Grants Summary Judgment in Favor of Qualcomm ............... 15

    G. The District Court Finds the Case "Exceptional" and Brought in "Bad Faith" and Awards Qualcomm $12 Million in Attorneys' Fees ........................... 16

    H. The Bankruptcy Filings and Subsequent Mismanagement of the Debtors ........... 16

IV. CAUSE EXISTS FOR CONVERSION OF THESE CASES OR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE ........................................... 19

    A. There is Substantial and Continuing Loss to and Diminution of the Estates and No Possibility of Rehabilitation of the Debtors ............................ 21

        1. The Estates Are Incurring Substantial Loss and Diminution of Value .......... 21

        2. The Estates Will Necessarily Continue to Experience Loss and Diminution of Value .................................................. 22

        3. There Is No Operating Business, So Rehabilitation of the Debtors Is Impossible ................................................ 25

        4. "Rehabilitation" Does Not Contemplate a Business that Exists Solely to Pursue Litigation ............................. 26

    B. There Has Been Gross Mismanagement of the Companies Pre-Petition, which Mismanagement Persists and Infects the Estates' Post-Petition Management and Governance ..................................... 29

V. CONVERSION TO CHAPTER 7 OR APPOINTMENT OF A CHAPTER 11 TRUSTEE ARE SUPERIOR TO DISMISSAL AND WOULD BEST SERVE THE PURPOSES OF THE BANKRUPTCY CODE ............................................. 31

VI. CONCLUSION .............................................................................................. 34

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 2 of 39

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re 3 Ram, Inc.*,
   343 B.R. 113 (Bankr. E.D. Pa. 2006) ................................................................... 22

*In re Am. Telecom Corp.*,
   304 B.R. 867 (Bankr. N.D. Ill. 2004) ................................................... 20, 27, 28

*In re Am. Telecom Corp.*,
   319 B.R. 857 (Bankr. N.D. Ill. 2004) ................................................................... 27

*Am. Telecom Corp. v. Siemens Info. & Commc'n Network, Inc.*,
   No. 04 C 8053, 2005 U.S. Dist LEXIS 19633 (N.D. Ill. Sept. 7, 2005) ............... 25

*Biltmore Assoc. LLC v. Twin City Fire Ins. Co.*,
   572 F.3d 663 (9th Cir. 2009) ................................................................................. 32

*In re Brutsche*,
   476 B.R. 298 (Bankr. D. N.M. 2012) ..................................................... 20, 21, 28

*In re BTS*,
   247 B.R. 301 (Bankr. N.D. Okla. 2000) ............................................................... 32

*In re Buckeye Countrymark Inc.*,
   251 B.R. 835 (Bankr. S.D. Ohio 2000) ................................................................. 32

*Carolin Corp v. Miller*,
   886 F.2d 693 (4th Cir. 1989) ................................................................................. 27

*In re County Seat Stores Inc.*,
   280 B.R. 319 (Bankr. S.D.N.Y. 2002) .................................................................. 32

*Hess v. Advanced Cardiovascular Sys., Inc.*,
   106 F.3d 976 (Fed. Cir. 1997) ............................................................................... 24

*In re Imperial Heights Apts., Ltd.*,
   18 B.R. 858 (Bankr. S.D. Ohio 1982) ................................................................... 28

*In re Integrated Pet Foods, Inc.*,
   No. 03-33362, 2004 Bankr. LEXIS 1503 (Bankr. E.D. Pa. Sept. 17, 2004) ......... 27, 32

*In re Landmark Atl. Hess Farm, LLC*,
   448 B.R. 707 (Bankr. D. Md. 2011) ............................................................. passim

*Loop Corp. v. United States*,
   379 F.3d 511 (8th Cir. 2004) ................................................................................. 26

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

829270 v1/SD

ii.

*Microsoft Corp. v. i4i Ltd. P'ship,*
564 U.S. ---, 131 S. Ct. 2238 (2011) ................................................................. 24

*Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.),*
374 B.R. 556 (Bankr. M.D. Pa. 2007) ............................................................... 21

*In re Original IFPC Shareholders,*
317 B.R. 738 (Bankr. N.D. Ill. 2004) ........................................................... 27, 28

*Panda Herbal International, Inc. v. Luby (In re Luby),*
438 B.R. 817 (Bankr. E.D. Pa. 2010) ................................................................ 27

*In re Prism Props.,*
200 B.R. 43 (Bankr. D. Ariz. 1996) ................................................................... 26

*Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.),*
14 F.3d 240 (4th Cir. 1994) ............................................................................... 31

*In re Sharon Steel Corp.,*
871 F.2d 1217 (3d Cir. 1989) ............................................................................ 31

*Shulkin Hutton, Inc. v. Treiger (In re Owens),*
552 F.3d 958 (9th Cir. 2009) ............................................................................. 31

*In re Silberkraus,*
253 B.R. 890 (Bankr. C.D. Cal. 2000) .............................................................. 33

*In re Staff Inv. Co.,*
146 B.R. 256 (Bankr. E.D. Cal. 1992) .............................................................. 31

*In re The Lodge at Big Sky, LLC,*
No. 10-62229-11, 2011 Bankr. LEXIS 2296 (Bankr. D. Mont. June 8, 2011) ....... 31

*Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.,*
457 F.3d 1106 (9th Cir. 2006) ........................................................................... 32

*In re Vermont Fiberglass, Inc.*
38 B.R. 151 (Bankr. D. Vt. 1984) ...................................................................... 26

*Yessenow v. Exec. Risk Indem., Inc.,*
953 N.E.2d 433 (Ill. App. 2011) ....................................................................... 32

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 4 of 39

**STATUTES**

8 Del. C. § 502(e) ................................................................................................................ 19

8 Del. C. § 510 .................................................................................................................... 19

8 Del. C. § 511 .................................................................................................................... 19

8 Del. C. § 510 .................................................................................................................... 19

Cal. Civ. Proc. Code § 2019.210 ........................................................................................ 14

11 U.S.C. § 341 ................................................................................................................... 17

11 U.S.C. § 362(a) .............................................................................................................. 27

11 U.S.C. § 1104 ........................................................................................................... 19, 31

11 U.S.C. § 1112(b) ..................................................................................................... passim

28 U.S.C. § 157 ..................................................................................................................... 1

28 U.S.C. § 1334 ................................................................................................................... 1

28 U.S.C. § 1408 ................................................................................................................... 1

28 U.S.C. § 1409 ................................................................................................................... 1

35 U.S.C. § 282 ................................................................................................................... 24

**TREATISES**

7 COLLIER ON BANKRUPTCY, ¶ 1112.04 (H. Somers & A. Resnick, 16th ed. 2009) ............ passim

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

829270 v1/SD

Judgment creditor Qualcomm Incorporated ("Qualcomm") hereby submits this Motion and Memorandum of Points and Authorities in support thereof,[1] which is brought pursuant to Section 1112(b) of Title 11 of the United States Code (as amended, the "Bankruptcy Code")[2] for (i) conversion of these chapter 11 cases to cases under chapter 7 of Title 11; or (ii) in the alternative, for the appointment of a chapter 11 trustee over each of the Debtors' estates. As discussed below, cause exists to grant either of these alternatives. In further support of the Motion, Qualcomm submits concurrently herewith (i) a Request for Judicial Notice ("RJN") and (ii) the declarations of Ali M.M. Mojdehi (the "Mojdehi Declaration"), Janet D. Gertz (the "Gertz Declaration"), Brian W. Byun (the "Byun Declaration") and Andrea K. Behrend (the "Behrend Declaration") and respectfully represents as follows:

## I. JURISDICTION AND VENUE

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and this Court has subject matter jurisdiction to enter findings of fact and conclusions of law and a final judgment. The statutory predicates for the relief sought herein are section 1112(b) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II. INTRODUCTION

The Debtors in these consolidated cases are affiliated entities that possess no tangible assets and have *de minimis* cash. The Debtors have **no** operations, **no** employees, **no** customers, and **no** products to sell. They have **no** source of operating income, and current management has apparently given **no** thought whatsoever to the Debtors' future business. The Debtors have not filed tax returns since 2004, have not completed—and have no intention to complete—an audit of their financial statements since 2006, have not complied with SEC reporting requirements since 2007, have not held a shareholders meeting in years, and are almost $400,000 delinquent in franchise taxes to the State of Delaware. The Debtors have no hope of correcting this gross

---

[1] In light of the page limitation imposed by Local Rule 9013-1(c), Qualcomm files concurrently herewith an *ex parte* application for order authorizing it to file an enlarged brief.
[2] All references to section numbers shall be to the Bankruptcy Code unless otherwise specified.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

829270 v1/SD

mismanagement post-petition. The Debtors' new CEO has no knowledge of the Debtor's business, does not understand his fiduciary duties as CEO, is beholden to one of the Directors who helped get the Debtors into this mess, and has done nothing to investigate—or correct—the Debtors' serious governance issues. At this point, the Debtors are nothing more than corporate shells being used to continue frivolous claims against Qualcomm and one of the pre-eminent scientists in his field, Dr. Norman Krasner, for alleged theft of intellectual property.

But those claims were never real. As discussed in detail below, during almost four years of litigation, two different District Judges looked at the evidence, or lack thereof, and reached the same conclusion—the claims were "unmeritorious," "objectively baseless," "frivolous," and brought in "bad faith." Accordingly, the District Court not only granted summary judgment in favor of the Defendants, but also deemed the case "exceptional" under the Patent Act, brought in "bad faith" under the Trade Secret Act, and awarded Qualcomm $12 million in attorneys' fees. The Court's various findings could not have been a surprise to the Debtors. After all, one of their own directors admitted in January 2010 that "we have no case; just a lot of talk." [*See* Gertz Decl., Ex. 1.]

After using the frivolous claims against Qualcomm to raise and then dissipate millions of dollars from lawsuit speculators, and after incurring over $12 million in debt to Qualcomm because of their frivolous claims, the Debtors now seek refuge in a Chapter 11 bankruptcy. For a debtor to remain in chapter 11, it must be able to "***rehabilitate***," that is, revive an existing business. As numerous courts have found, the mere pursuit of litigation is not a proper rehabilitative purpose. But that is all the Debtors have—a case that two District Judges found to be objectively baseless and brought in bad faith and that is now on appeal. The Debtors shuttered their existing business in 2009 to focus all of their energies on the litigation. No business remains to revive. This is not even a situation where the Debtors are in the midst of winding down their operations. The Debtors began selling off what minimal physical assets remained of their failed business in 2007 and have not had any business operations for *years*. At present, the Debtors' only substance resides in approximately 30 boxes of historical records, which are being stored in approximately 25 square feet in the offices of a board member and his personal attorney.

Not surprisingly for two companies with no real operations, the Debtors are experiencing substantial and continuing negative cash flow. The administrative expenses of these cases would be substantial. For example, the Debtors intend to seek permission from this Court to hire various firms to assist them as counsel, including one firm against whom the Debtors have made disclosures regarding potential "claims." The Debtors propose to pay for the appeal with a hefty contingency, but have no plan beyond that. The only apparent means of paying for counsel and otherwise meeting the administrative expenses of the bankruptcy cases is to obtain additional funding from speculators who invest in the Debtors in exchange for a share of the proceeds that might be obtained if the Debtors are successful in their litigation against Qualcomm. But it appears that the Debtors have already assigned away to pre-petition investors substantially all, if not all, of the percentage interests in the proceeds of the litigation. The Debtors have nothing left to leverage, making rehabilitation impossible.

Moreover, the possibility of the Debtors' succeeding in the litigation against Qualcomm is non-existent. First, the Debtors must obtain reversal of the District Court's dismissal and summary judgment orders. Given the Court's finding that the Debtors presented no evidence that the Defendants misappropriated any technology, the prospect of reversal of summary judgment on claims that require proof by clear, convincing and corroborated evidence is remote. Second, even if they did prevail on the appeal, the Debtors would still have to prove their claims in a subsequent trial. But the Debtors engaged in full discovery on their patent claims, reviewing over one million pages of documents produced by Qualcomm and deposing every named inventor and most of the Qualcomm engineers otherwise involved in the project. If Debtors had any evidence to support their claims, they would have presented it already. The fact that Debtors were not even able to present evidence sufficient to raise a triable issue of fact does not bode well for the Debtors if they actually had to prove their claims by clear, convincing, corroborated evidence at trial. The virtual certainty of the Debtors' failure on these claims will leave them burdened with additional debt. Indeed, rather than reversal of the orders on appeal, a more likely outcome is that the Debtors will be subject to additional fee-shifting penalties for pursuing a frivolous appeal.

Moreover, these cases involve what is essentially a two-party dispute. This is apparent from the Debtors' petitions and initial filings, which reflect that claims against the estates substantially fall into two general categories: (i) contingent claims of litigation speculators, nominally characterized as "debt" securities, which provided no return of principal or interest unless and until the litigation against Qualcomm was successful; and (ii) the liquidated judgment claim of Qualcomm, in the amount of approximately $11,601,014.51, before the addition of post-judgment interest.[3] The Debtors have no remaining equity, and any recoveries, even assuming they obtained any measure of success, would simply be distributed to the speculators that invested in the scheme. Bankruptcy is not needed to make such distributions.

In the end analysis, there is no actual business activity that is being protected or preserved by the Debtors' filing. The primary, if not the sole purpose for the filing of the bankruptcy cases was to enable the Debtors to continue to prosecute the bad faith litigation against Qualcomm. More specifically, the Debtors' insiders hoped to claim the benefit of the automatic stay of Qualcomm's enforcement of the District Court judgment for attorney fees, and thereby attempt to delay the triggering of guarantees made by the Debtors' insiders, without having to post an appeal bond. That guaranty obligation creates debilitating conflicts of interest for the Debtors' insiders, which render them *per se* incapable of fulfilling their fiduciary obligations or duty of good faith.

Cause being present under Section 1112(b), the only remaining question is the specific remedy that is in the best interests of creditors and the estate: conversion, dismissal, or appointment of a chapter 11 trustee. A dismissal of these bankruptcy cases would prove extremely harmful to parties in interest. The other alternatives of conversion or appointment of a chapter 11 trustee would be in the best interest of the estates and all creditors. An independent fiduciary could weigh impartially the alternatives for resolving the cases and perform the fiduciary duty to maximize the value of the estates and consider all reasonable options for resolution of these cases. Furthermore, as represented by the Debtors [*see* Application for the Employment of Hughes Hubbard & Reed LLP as Special Counsel, Doc. No. 30; Declaration of Byron Nelson in Support of Hughes Application, Doc. No. 30-1, at 6, lines 27-28], they "have

---

[3] This amount assumes that a distribution from the bond in the amount of $800,000 would be made.

Cooley LLP
Attorneys At Law
San Diego

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 9 of 39

1   considered whether they have potential claims against third parties" as a result of the Qualcomm

2   Lawsuit.  Under the bankruptcy regime, an independent trustee could fulfill the fiduciary duty of

3   analyzing such claims.  An independent fiduciary would hold the estates' attorney-client

4   privilege, and thus would have a distinct advantage in quickly ascertaining the issues and the

5   identities of persons who may be held liable for harm to the estates.  The bankruptcy regime

6   would otherwise provide a means for the preservation and the ultimate prosecution of such claims

7   by an independent and impartial trustee.  Likewise, the bankruptcy cases would facilitate the

8   ratable and equitable distribution of the proceeds of any recoveries from the aforementioned

9   claims for breach of fiduciary duties, avoidance actions, claims for negligence, and/or claims for

10  turnover.

11      The facts in these cases are the epitome of "cause" warranting their conversion to Chapter

12  7 or the appointment of a Chapter 11 trustee so that an independent fiduciary can examine the

13  Debtors' affairs and objectively decide what is in the best interests of creditors.  As such,

14  Qualcomm respectfully requests this Court to issue an order finding that cause exists to (i)

15  convert these cases to chapter 7, or, in the alternative (ii) appoint a chapter 11 trustee, as the Court

16  deems most appropriate.

17                          **III.   STATEMENT OF FACTS**

18      The Debtors arose out of the ruins of a prior bankruptcy.  A review of the Debtors'

19  historical filings with the SEC reveals that Debtor, Gabriel Technologies Corp. was formerly

20  known as Princeton Video, Inc.  [RJN, Ex. 1 at 16.[4]]  Princeton Video, Inc. emerged from chapter

21  11 on or about June 2004 and shortly thereafter, changed its name to Gabriel Technologies

22  Corporation.  [*Id.*]  It appears from the reports available on www.SEC.gov, that the company

23  never had a profitable quarter after its emergence from chapter 11.  [*See generally* RJN, Exs. 1, 5-

24  11, 13-22, 24, and 30.]

25      After reviewing unrebutted evidence and e-mail correspondence, Judge Anello held that

26  the "Court is convinced [the e-mails] create a logical inference that Gabriel has suffered a long

27

28  _____

[4] All references to page numbers of documents filed with the SEC shall be to the number in the lower right-hand corner of the page (*e.g.*, in RJN, Ex. 1, "xx/82").

history of corrupt officers and directors who are not above taking illegal and fraudulent actions to guarantee their own personal gain." [RJN, Ex. 23 at 22]. The management and control of the reorganized debtor was vested in the hands of Keith Feilmeier and Nicholas Fegen, who was hired as a consultant. Mr. Feilmeier allegedly acquired control of substantially all of the shares of Gabriel through fraudulent means, and ultimately filed personal bankruptcy in the face of judgments for fraud and other misconduct. [*See generally* RJN, Ex. 2.] Mr. Fegen, meanwhile, had a prior conviction for securities fraud. [*See* RJN, Ex. 3 at ¶ 16(c).] Mr. Feilmeier and Mr. Fegen appear to have continued their services to Gabriel even after Mr. Fegen had been indicted by a Federal Grand Jury for wire fraud.[5] [*See* RJN, Ex. 3 (indictment filed March 28, 2007); Ex. 5 at 2 (Feilmeier); Ex. 1 at 62 (Fegen).]

A.      **The Dismal Corporate and Financial History of the Debtors**

Shortly after emerging from chapter 11, on August 31, 2004, the reorganized debtor issued 1.25 million shares of stock for a 50 percent interest in a newly-formed company known as Trace Technologies, LLC ("Trace"). [RJN, Ex. 1 at 40.] The other 50 percent of Trace was initially owned by Loc8.net a/k/a Locate Networks, Inc. ("Locate"). Locate was a company organized in the late 1990s that planned to manufacture and sell a paging device with location capability (*e.g.*, GPS capability). But Locate had no ability to generate its own location technology, so it licensed the assisted-GPS technology invented by SnapTrack, Inc. ("SnapTrack"), a company that Qualcomm acquired in 2000. [*Id.* at 27 (SnapTrack license), 40 (Locate's 50% interest); Ex. 11 (Qualcomm-SnapTrack relationship).] It was the relationship between SnapTrack and Locate in the late 1990s that, years later, served as the hook for the Debtors' claims against Qualcomm.

The day following the closing, Gabriel and Trace filed suit against Locate, claiming that Locate defrauded Gabriel and Trace in the purchase agreement. [RJN, Ex. 1 at 41.] In November 2004, Gabriel and Trace's suit against Locate was voluntarily dismissed. [*Id.*] Under a settlement among the parties, Gabriel obtained 100% of Trace and assumed Locate's rights and

---

[5] Ultimately, Mr. Fegen pled guilty to wire fraud and was required, *inter alia*, to serve a sentence of 30 months imprisonment, commencing on November 11, 2009. [*See* RJN, Ex. 4.]

Cooley LLP
Attorneys At Law
San Diego

829270 v1/SD

6.

obligations under the fully-paid license with SnapTrack, which required Gabriel to make the ongoing annual support and maintenance payments to Qualcomm. [*Id.* at 27 (support & maintenance costs), 41-42 (settlement).] Apparently divested of meaningful assets, Locate went out of business. On January 16, 2006, Trace and SnapTrack entered into an amended license agreement for the aGPS technology. [*Id.* at 27].

In September of 2004, the insiders of the Debtors began consulting with an attorney named Bill Munck, who assisted in the negotiation of the amendment. [*See* Gertz Decl., Ex. 2.] In or about August 2005, the Debtors, through the agency of Munck, first approached Qualcomm with their initial assertions of claims.

Gabriel's business and finances progressively deteriorated following its emergence from bankruptcy. The company's SEC filings reflect that Gabriel reported a net loss for the quarter ended September 30, 2005 of $700,000. [RJN, Ex. 6 at 2.] As of November 15, 2006, the company anticipated a net loss for the quarter ending September 30, 2006 of $1.6 million. [*Id.*] From after the time of Gabriel's emergence from bankruptcy in 2004, the company was funding its operations largely from the issuance of debt, pursuant to short-term notes having a fixed and determinable maturity date, and repayment of principal and interest was not contingent on any event. [*See*, *e.g.*, RJN, Ex. 1 at 74.] Faced with repayment of these obligations, continuing liquidity problems and vanishing sources of capital, in or about March 2006, Gabriel entered into consulting agreements with two service providers, Pali Capital, Inc. ("Pali Capital") and Voyager Consulting LLC ("Voyager Consulting"), to assist the company in marketing and selling its securities. [*Id.* at 54, 59 (Pali Capital) and 54 (Voyager Consulting).] The consulting services were for the stated purpose of raising money for the company by arranging "introductions" to investors who might purchase the company's securities.[6] [*Id.* at 54.] Voyager Consulting was controlled by Matt Gohd, a Pali Capital member, who was appointed to the board of Gabriel in September 2006. [*Id.* at 59 (Mr. Gohd, Pali Capital principal and senior managing director) and

---

[6] Pali Capital's parent, Pali Holdings, filed for bankruptcy in February 2010. *See In re Pali Holdings*, Case No. 10-11727 (Bankr. S.D.N.Y.). Reports suggest that Pali Capital had a reputation for filing lawsuits and that its founder's "penchant for litigation helped destroy the bank he spent so many years building." *See* http://www.reuters.com/article/2010/03/10/us-pali-reifler-idUSTRE62938C20100310.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 12 of 39

61 (Mr. Gohd, Voyager managing member).]

**B.      Gabriel and Trace Become Corporate Shells for Pursuit of Litigation**

Gabriel and Trace's efforts to attract new investors occurred notwithstanding the extraordinary unraveling of the companies' corporate governance and related inability to position themselves as legitimate investment vehicles, for failure to comply with the most minimal reporting standards.  In January 2007, Gabriel entered into a separation agreement and general release with Feilmeier. [*See* RJN, Ex. 1 at 56.]  In April 2007, Feilmeier resigned as a director of Gabriel.  [*See* RJN, Ex. 1 at 56; Ex. 5 at 2].  As for Fegen, a criminal indictment against him was filed on March 28, 2007.  [*See* RJN, Ex. 3.]  Nonetheless, the companies' 10-QSB for period ended March 31, 2007, which was filed on June 15, 2007, states that

> On May 10, 2007, the Company entered into a one-year Consulting Agreement with Mr. Nicholas A. Fegen pursuant to which Mr. Fegen will provide certain consulting services to the Company. Mr. Fegen will be paid $150,000 for his services over a period of time based on the Company's receipt of proceeds from the completion of one or more financing transactions in which aggregate proceeds to the Company are at least $500,000.

[RJN, Ex. 1 at 62.]

Gabriel disclosed that, as of June 2007, its remaining cash balances amounted to just $9,165.  [*Id*. at 73.]  At that same time, it disclosed that it had received a going concern warning from its auditors, in light of negative working capital of $2.8 million and stating that $5 million was needed to continue operations.  [*Id*. at 20.]  The report filed with the SEC on June 15, 2007 was the last quarterly report ever filed by the company.  [*See* Byun Decl., ¶ 4.]  The company's last audited financials, for the period ended June 30, 2006, were contained in that quarterly report.  Shortly thereafter, Gabriel fired its auditor.  [RJN, Ex. 7 at 2.]  Later SEC filings by the company disclosed that they "cannot verify as accurate the previously filed financial statements of Gabriel."  [RJN, Ex. 22 at 2.]  Accordingly, these public reports may actually have substantially understated the actual financial distress, and/or the companies' SEC reporting may have been fraudulent.

Something had gone seriously amiss at Gabriel and Trace, neither of which appears to have had a viable business plan.  In or about mid-2007, the companies appear to have begun the

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 13 of 39

process of selling off any remaining tangible assets. Because the companies did not have any reasonable prospects for income from operations and because Gabriel lacked the fundamental requirement of audited financials, the companies had no ability to attract *legitimate* investment capital. Under Mr. Ghod's leadership and direction, however, and apparently still assisted by Feilmeier and Fegen, the companies began a substantial change in their mode and manner of attracting capital, focusing their efforts on obtaining what most charitably may be described as "litigation speculation capital."

Beginning in at least May 2007, the company began to solicit investments in notes that had no set date of maturity and which were contingent upon the occurrence of an "IP Event" (the "IP Event Notes"). [*See* RJN, Ex. 8 at 2, 4; *see also* RJN, Ex. 9.] The initial IP Event Notes provided, in general, for a right to participate in the proceeds of an IP Event, which was defined somewhat ambiguously as some form of transaction with a third party involving intellectual property.[7] Between July 2007 and April 2008, Gabriel had issued IP Event Notes in an aggregate amount of $5.8 million to twenty-five lenders. [*See* RJN, Ex. 8 at 2, 4.] This was an extraordinary accomplishment for a company having no audited financials and a dearth of corporate governance.

As stated earlier, Gabriel and Trace had begun consulting with Mr. Munck as early as 2004. At some point in time, the Debtors formally retained the firm of Munck Carter, P.C., of Dallas, Texas ("Munck Carter"), as litigation counsel, apparently on a contingency fee basis, to litigate the asserted claims against Qualcomm and the other defendants. The claims were informally presented to Qualcomm in late 2005. In late 2007, the Debtors and the defendants in the Qualcomm litigation began entering into a series of tolling agreements, which ultimately expired in September 2008. [RJN, Ex. 23 at 10 n.6.]

In October of 2008, Munck Carter filed a complaint on behalf of the Debtors in the District Court against Qualcomm, SnapTrack and Norman Krasner containing eleven causes of action and seeking over $1 billion in damages. The complaint was substantially based upon

---

[7] Unlike the later notes that were issued to fund the Qualcomm Lawsuit (defined below), the instruments issued at this point in time did not mention claims against Qualcomm specifically and also provided the lenders with a right to exchange for a fixed term note of twice the original principal.

Cooley LLP
Attorneys At Law
San Diego

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 14 of 39

allegations that Qualcomm and its predecessors in interest had misappropriated Locate's intellectual property and technology and asserting that patent applications filed by defendants Norman Krasner and Qualcomm should list Locate employees as the sole inventors or joint inventors (Case No. 08-CV-1992-AJB-MDD) (the "Qualcomm Lawsuit").  [RJN, Ex. 10 at 2; RJN, Ex. 11 at 1-2.]  The complaint was not served on the defendants until approximately four months later, in February 2009.  [RJN, Ex. 12.]

By April 2009, the investors in the IP Event Notes appear to have become impatient with the existing Board's management of the litigation against Qualcomm.  Perhaps the Board also became concerned over Mr. Gohd's close connections to Mr. Feilmeier, who had filed for personal bankruptcy in light of fraud charges [*see* RJN, Ex. 2 at 2 (identifying main bankruptcy case number)]; and Mr. Fegen, whose criminal past had been revealed and who was by then facing another criminal indictment on numerous charges [*see* RJN, Ex. 3.  But rather than clean house, the Board appears to have been content to continue the prior path of corporate wrongdoing that had initially been set in place.

SEC records reveal that, as of April 2009, Gabriel entered into a Note Purchase Agreement with then-current Board members, Clark, Hall, Manning and others, pursuant to which such persons would loan the company $1 million to fund the continued maintenance of the Qualcomm Lawsuit, in exchange for an interest in the proceeds and control of the Debtors.  [RJN, Ex. 13 at 3.]   Under the Note Purchase Agreement, the closing was conditioned on the appointment of Mssrs. Clark, Tingo, Hall, and Manning to the Board and the tendering of the resignations of the company's then-existing officers and directors.  [*See id.* at 4.]  The Note Purchase Agreement closed in June 2009.  [*Id.* at 3.]

In May 2009, the new Board—substantially the same individuals that remain in control of the Debtors today—discontinued the business operations of Gabriel's wholly-owned operating subsidiary, Gabriel Technologies LLC, ultimately selling its assets for $185,000, completing the ongoing transformation of the companies into nothing but a shell.  [RJN, Ex. 14 at 2; RJN, Ex. 15 at 2; RJN, Ex. 16.]  Then, rather than liquidating by filing a petition under chapter 7 for the protection of creditors, the new Board continued to "roll the dice," utilizing the empty corporate

shell for maintenance of the Qualcomm Lawsuit, by issuing additional "interests" in the proceeds to "investors."  At about this point in time, the Debtors began issuing IP Event Notes containing the following terms and conditions concerning their maturity and right to receive a return:

> ***The Company shall pay Lender*** (i) _[___] Dollars ($_____.00) (which is the Principal plus an amount equal to 100% of the Principal), and (ii) [___]_% of the proceeds of an IP Event (as defined below)(which is .000005% of the IP Event proceeds for each Dollar of Principal represented hereby), ***on the 10th business day after the first IP Event to occur*** after receipt by the Company of the Principal. For purposes of this Note, an "IP Event" is defined as the receipt by the Company or any of its subsidiaries of a minimum of $10,000,000 in net proceeds (in cash or the fair market value of non-cash consideration) from (i) a licensing, sale, transfer, settlement or other transaction with one or more third parties relating to intellectual property of the Company or its subsidiaries, or (ii) a merger, consolidation, share exchange or sale of all or substantially all of the stock or assets of the Company or any of its subsidiaries.[8]

[RJN, Ex. 18 at 1 (emphasis added); *see also* RJN, Ex. 17 at 2.]

In approximately November 2009, the Board appears to have decided that a change of counsel was called for.  [*See* Gertz Decl., Ex. 2.]  This presented a dilemma, in that a sizeable contingency fee had previously been promised to Munck Carter.  With no source of ongoing cash from operations, during the next nine months, Gabriel and Trace issued additional IP Event Notes—that is, granting additional "interests" in the litigation proceeds—in order to attract new counsel and fund the ever escalating costs of maintaining the litigation against Qualcomm. Unable to issue shares, the Board apparently deemed it had no other available options to keep the companies' financing scheme going.  They apparently either did not consider, or rejected, the idea of filing chapter 7 petitions or voluntarily placing the companies into a receivership.

The Board's creative funding scheme soon hit a wall.  In a report filed with the SEC dated March 8, 2010, Gabriel disclosed that, by December 2009: (i) it had issued all of its authorized shares, (ii) it had issued additional Shareholder Equivalency Units of an unknown amount, (iii) it had not held a shareholders' meeting in three years, (iv) it could not hold a shareholders' meeting until it filed audited financials; and (v) because it could not issue audited financials and hold a

---

[8] Later versions of the IP Event Notes made express the fact that the "IP Event" referred specifically to the companies' litigation against Qualcomm. *See*, *e.g.*, RJN, Ex. 19 at 2.  The investors in these earlier notes were, however, well aware that they were speculating in the Qualcomm Lawsuit, in exchange for a cut of the proceeds.

shareholders' meeting, it could not issue more stock. Gabriel thus needed to rely on additional assignments in interests in the Qualcomm Lawsuit for ongoing funding. [RJN, Ex. 20 at 24.] At that same time, however, Gabriel disclosed in SEC filings that its assignment of interests in the proceeds of the Qualcomm lawsuit *may be as much as 95%* and "effectively reduce the amount of such proceeds, if any, that will be available to Gabriel and its shareholders." [*Id.* at 23.]

In an extraordinary *non-sequitur* to that announcement, the Board of the Debtors (*i.e.*, the same individuals currently in control of the Debtors) announced in an SEC filing that, the Debtors had no intention of providing audited financials. The filing explained that the companies did not have financial resources to prepare audited financial statements and that the company "believes its resources are better spent in the Qualcomm litigation." [RJN, Exs. 21 and 22 at 2.] Although the company suggested in later filings that audited financials may be provided, none ever were.

## C. The Bond Hearing

Meanwhile, the Debtors were experiencing devastating losses in the trial court. In September 2009, the District Court dismissed six of a total of eleven claims, with prejudice, and dismissed one claim with leave to amend. After several failed attempts to amend, in December 2009, the District Court also dismissed that claim with prejudice, leaving only four remaining claims: (i) for breach of the 2006 license agreement; (ii) for correction of inventorship; (iii) for declaration of ownership; and (iv) misappropriation of trade secrets pursuant to California's Uniform Trade Secrets Act.

In September 2010, following the dismissals of seven out of eleven claims, the District Court issued an order (the "Bond Order") requiring the Debtors to post a bond in the amount of $800,000 to secure the fees that Judge Anello anticipated awarding at the end of the case (the "Bond"). The Bond was a condition to the Debtors' continued pursuit of the litigation. [*See* RJN, Ex. 23 at 23-24; *see also* RJN, Ex. 22 at 1.]

In the Bond Order, District Judge Anello reviewed the available evidence and concluded that "Defendants have presented significant, unrebutted evidence that Plaintiffs' lawsuit is likely unmeritorious, and brought in bad faith to salvage Gabriel." Judge Anello also stated that he was "troubled by Plaintiffs' inability to draw any meaningful connection between Locate's technology

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 17 of 39

and the allegedly misappropriated information found in more than 92 patents. . . . By now, Plaintiffs should have more than mere allegations to support their theory." [RJN, Ex. 23 at 22]. The Court also noted that Gabriel was "admittedly a non-operating company that appears to be financing [the] litigation by soliciting money from investors." [*Id.* at 23, lines 16-17.]

Apparently to facilitate ongoing fees and to enable the posting of the bond, in January 2011, Trace contemplated entering into new senior secured notes in the amount of $4 million, secured by proceeds from the Qualcomm Lawsuit, which it disclosed would be "partially guaranteed by a director." [RJN, Ex. 22 at 3-4.] Gabriel also announced that the individuals providing funds for the bond would receive 4% of net proceeds of the Qualcomm Lawsuit. [*Id.* at 4.] Ultimately, the bond was paid for and guaranteed by three individuals – Gary Elliston, David Clark and Jack Manning (together, the "Guarantors") – all of whom were either directors of Gabriel or significant long-time investors in Gabriel and the Qualcomm Lawsuit or both. [*See* Mojdehi Decl., Ex. 2 ("Bond Collateral Guaranty Agreement" and Ex. A thereto re: identity of Guarantors); *id.*, Ex. 3 ("Warrant Reinstatement Agreement" with Elliston showing investment dating back to 2007); RJN Ex. 13 at 3 (Guarantors as lenders under Apr. 24, 2009 Note Purchase Agreement); *id.* at 4 (Hall and Manning appointed to Gabriel board in May 2009).] The release of the Bond triggers the Guarantors' obligations under the Bond Collateral Guaranty Agreement. [*See generally* Mojdehi Decl., Ex. 2; *see also* RJN Ex. 28 at 21 (noting that "$800,000 bond posted by Plaintiffs and any accrued interest will be distributed to Defendants when [Attorney Fee Order] becomes final").]

**D.    The Debtors Effect a Subordination of Existing Investors to Continue the Litigation Campaign Against Qualcomm**

Predictably, by the fall of 2011, once again, the Debtors ran out of funds needed to pay for their litigation campaign, which was being faced with defeat after defeat. In September 2011, the Debtors entered into a note purchase agreement with North Water Intellectual Property Fund, L.P. 3A ("North Water"), under which North Water was issued a senior secured promissory note in the principal amount of $3.1 million, with the initial advance being $1.9 million. [RJN, Ex. 24 at 2.] Under this agreement, Trace assumed and received assignment of each of the pre-existing note

purchase agreements of Gabriel in the principal amount of $12.071 million in exchange for replacement notes by Trace. [*Id.*] The pre-existing notes issued by Gabriel and/or Trace were subordinated to the senior secured position of North Water. [*Id.*] The note purchase agreement provided for a "waterfall," under which the initial advances and any additional advances made by North Water, up to the principal amount of $3.1 million, would subordinate existing noteholders of IP Event Notes, and the remaining proceeds of the litigation (if any) would be distributed to equity, following payment in full of the existing noteholders. [*Id.*] It appears that the initial advance by North Water was made for purposes of payment of costs to new trial counsel, Hughes Hubbard & Reed ("Hughes" or "HHR"). At or about the same time, Trace entered into a priority litigation expense provider note purchase agreement, allowing Trace to issue an additional $1 million of notes for expenses in excess of North Water's funding, which Trace apparently issued to several of the investors who had received the subordinated IP Event Notes. [*Id.* at 2 and 3.]

**E.     The Dispute Over the Adequacy of the Debtors' Trade Secret Designation**

One of the Debtors' claims that remained after the motions to dismiss was a claim for trade secret misappropriation. Under applicable law, a trade secret plaintiff must first identify its alleged trade secrets with particularity before it is entitled to any discovery on the claim. *See* Cal. Civ. Proc. Code § 2019.210.

Over the span of almost two years, the parties disputed whether the Debtors had met the bare minimum standard of identifying their alleged trade secrets with reasonable particularity. Despite seven tries, Magistrate Judge Dembin found that the Debtors' trade secret designation was "condemn[ed] to intolerable vagueness" and failed to meet the minimum standard required for discovery. [RJN, Ex. 25 at 8.] In other words, Magistrate Judge Dembin found that Debtors were not even able to articulate any protectable trade secret—let alone prove that it was a trade secret or that the Defendants misappropriated it. Following an objection to the Order from Judge Dembin, Judge Battaglia affirmed this ruling on March 13, 2012. [RJN, Ex. 26.]

**F.     The District Court Grants Summary Judgment in Favor of Qualcomm**

As noted above, on October 4, 2010, the District Court had issued the Bond Order requiring the Debtors to post a bond in the amount of $800,000, as a condition precedent to the

continuance of the Qualcomm Lawsuit. In December 2010, the Debtors posted the bond. [*See* RJN, Ex. 22 at 1, ¶ 3(A); Ex. 27; *see also* Mojdehi Decl., Ex. 2.] On August 10, 2012, the defendants filed a motion for summary judgment, which was granted by the District Court. [*See* RJN, Ex. 28 (Order Granting Summary Judgment).] In its order, the District Court, the Honorable Anthony Battaglia presiding, noted that the Debtors' three remaining claims each hinged on one core contention: that Locate was the true inventor of certain patents, which had issued in the names of the defendants. Judge Battaglia began his discussion by noting that Gabriel and Trace would need to overcome the presumption under the Patent Act that a patent names the correct inventor. Furthermore, the effect of this presumption is not just to shift the initial burden of proof, but to affect the *quantum* of evidence that is required to prevail. Gabriel and Trace were thus required to establish their claims of ownership by clear, convincing and corroborated evidence. [*See* RJN, Ex. 28 at 6-7.]

On September 28, 2012, Judge Battaglia looked at the evidence presented and granted Defendants' motion for summary judgment on the patent claims.[9] In doing so, he repeatedly found that the Debtors had "***no evidence***" to support their claims that Qualcomm took any ideas from anyone affiliated with the Debtors' predecessor. [*See, e.g.,* RJN, Ex. 28 at 8 ("Plaintiffs have no evidence that they conveyed their ideas to Dr. Krasner and Sheynblat before SnapTrack's invention in October 1999."); at 9 ("Plaintiffs have no evidence that anyone at Locate conceived of the '277/'639 invention" because "the Locate system was very different from the '277 patent …"); at 12 ("Plaintiffs have no evidence to back up the allegation that Dr. Krasner, Dr. Wolf, and Sheynblat wrote the '195 patent using information from Clise and Crowson.").] Judge Battaglia further noted that, for the various patents at issue, the Debtors' alleged omitted inventors had never even met the individuals that allegedly took the Debtors' ideas and patented them, "did not even think of certain technologies that the '050 patent addresses," "could not say 'with any reliability who did what when'," and did not even understand one of the patents, dismissing it as "a lot of technical jargon," [*Id.* at 7, 8, 10, and 11.]

---

[9] Judge Battaglia had previously granted the Defendants' motion for summary judgment on the trade secrets claim on the same day he affirmed Judge Dembin's ruling that the Debtors had failed to articulate any protectable trade secret.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 20 of 39

### G. The District Court Finds the Case "Exceptional" and Brought in "Bad Faith" and Awards Qualcomm $12 Million in Attorneys' Fees

On February 1, 2013, Judge Battaglia considered the merits of the Debtors' claims again—this time in the context of a motion for attorneys' fees filed by the defendants. The Court concluded that the Debtors' case was "exceptional" under the patent act and brought in bad faith under the Trade Secret Act. For example, Judge Battaglia found that "[o]n the whole, the Court concludes that the lack of evidence supporting Plaintiffs' patent claims was so obvious that it should been known by Plaintiffs." [RJN, Ex. 29 at 7.] Judge Battaglia then noted that "the e-mails suggest that Plaintiffs knew there was no evidentiary basis for the claims in early 2010 …." [*Id.*] Based on those and other findings, the Court "concludes that Plaintiffs brought ***objectively baseless*** patent claims in ***subjective bad faith***." [*Id.* (emphasis added)] In addition, the Court stated that it "is further persuaded by Defendants' arguments regarding Plaintiffs' litigation misconduct." [*Id.*] The Court stated that "Plaintiffs brought and maintained claims without knowing the identity of the allegedly omitted inventors, the most basic prerequisite for a successful correction of inventorship patent claim." [*Id.* at 8.] The Court found that this, along with various other instances of litigation misconduct, further supported the claim for attorneys' fee. [*See*, *e.g.*, *id.* at 8 n.3.] As a result, the District Court granted judgment on all claims in favor of Qualcomm and Dr. Krasner and ordered the Debtors to pay more than $12 million in attorneys' fees to Qualcomm (the "Attorney Fee Order").

### H. The Bankruptcy Filings and Subsequent Mismanagement of the Debtors

The Debtors filed their bankruptcy cases concurrently on February 14, 2013, primarily to stay execution on the Attorney Fee Order and attempt to forestall a distribution on the bond that had been guaranteed by the Guarantors. At or about the same time that they filed their petitions, the Debtors accepted the resignation of the pre-petition President and Chairman of the Board, Mr. Tingo. Mr. Tingo was replaced with a certain Byron Nelson ("Nelson"), who has assumed the title of Interim Chief Executive Officer for the Debtors. [*See* RJN, Ex. 30 at 2.] On March 1, 2013 the Debtors filed an Application to Designate Byron Nelson as Responsible Individual for

the Debtors, [Docket No. 26], and, on March 5, 2013, an order was entered granting the Application. [Docket No. 29].

The Meeting of Creditors under Section 341 of the Bankruptcy Code, held in these Bankruptcy Cases on March 12, 2013 (the "Meeting of Creditors"), revealed the following facts concerning Nelson and the current management of the Debtors.

- Nelson was requested by current Board member and substantial litigation investor, David B. Clark ("Clark"), to take on the role of the management of the Debtors; [*See* RJN Ex. 31 at 5.]

- Nelson appears to be an economic captive of Clark, having described Clark as one of his "main clients" and that 85 to 90 percent of his business is devoted to Clark and his business entities; [*Id*. at 5 ("client"), 23 and 25 ("main client"), 26 (85-90%).]

- Nelson testified that he is donating his time as a "favor" to Clark; [*Id*. at 25.]

- Nelson's law office space is in the offices of a business entity of Clark, Rivera Finance, Inc., which Clark occupies for free and as to which there is no signed lease; [*Id*. at 16-17, 25-26.]

- Nelson testified that he is a close personal friend of Clark; [*Id*. at 25.]

- When Nelson was asked if he ever served on a board of directors, he said he had served on Rivera Capital's board "some years back." [*Id*. at 23.] In fact, public records searches show that he is currently an officer or director of several of Clark's affiliated entities: Rivera Finance of Oregon, Inc; Rivera Finance of Phoenix, Inc.; and Rivera Finance, Inc. Public records also reflect that Nelson serves as the officer or director of numerous entities, several of which have had their state charters suspended or permanently revoked. [*See* Gertz Decl., ¶ 4.]

- Nelson testified that he has spent approximately 60 hours on the bankruptcy cases since he came on board on February 14 [RJN, Ex. 31 at 31-32], but he has very little understanding of the Debtors' affairs. For example: (i) he stated that the SEC reporting was delinquent, but that he did not know why [*id*. at 10]; (ii) Nelson

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

829270 v1/SD

17.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 22 of 39

received a 2004 tax return from Clark but did not ask why there were no subsequent returns filed [*id.* at 45, 46]; (iii) Nelson had not checked the companies' SEC filings [*id.* at 47]; (iv) Nelson obtained his familiarity with the Debtors' Schedules and Statement of Financial Affairs from talking to "the board" but he can't remember with whom, and he is not certain the filings are accurate [*id.* at 4-5]; (v) Nelson had no idea where the company's servers were or who had custody of them and whether Tingo still had control of them [*id.* at 41-42]; (vi) although he knew that North Water had "advanced" $160k for Debtors' bankruptcy counsel and for creditors' committee counsel, Nelson had no idea who was negotiating on behalf of the Debtors with North Water to fund the lawyers' fees—it certainly was not *him* that was negotiating with them [*id.* at 12-13, 20, 30-31]; (vii) Nelson had no understanding of the statement in the Debtor's application seeking appointment of prior counsel, HHR, as appellate counsel, that "the Debtors have considered whether they have potential claims" against certain third parties [*id.* at 36-41]; and

- Nelson is a practicing lawyer, but he could not explain what his role as a fiduciary was in connection with the Debtors, the estates, and creditors. [*Id.* at 23 (practicing lawyer) and 47-48 (fiduciary).]

Nelson's testimony also established beyond question that "the Debtors have no ongoing business" [*id.* at 6], and that Gabriel is "inactive at this time" and has "no day-to-day operations." [*Id.* at 7.] The Debtors have no IP, other than the alleged IP involved in the litigation against Qualcomm. [*Id.* at 8.] Furthermore, he testified that the IP at issue in the Qualcomm Lawsuit was "antiquated" and had no use. [*Id.* at 14.] Neither Gabriel nor Trace has any employees. [*Id.* at 15.] The companies together occupy about 25 square feet of Nelson's office, which is located in the building occupied by board member Clark's entity, Rivera Finance. [*Id.* at 16-17.] At the time of the filing, the companies together had $252.00 in the bank. [*Id.* at 8.] Administrative expenses are apparently being funded out of the "additional advance" provisions of the noteholders' pre-petition loan agreements. [*Id.* at 17.] Nelson admitted that if the appeal of the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

829270 v1/SD

18.

Case: 13-30340   Doc# 41   Filed: 04/03/13   Entered: 04/03/13 14:02:19   Page 23 of 39

District Court judgments in the Qualcomm Lawsuit were successful, the company would need to retry the case. Beyond that, he knew of no other goal or business objective of the Debtors. [*Id.* at 13-14.]

Public records demonstrate that the Debtors post-petition management is likely to be unwilling or unable to rectify the mismanagement. Indeed, Gabriel can do nothing but liquidate, where the records of the Delaware Secretary of State reveal that its corporate charter is "void, and all powers conferred by law upon the corporation are declared inoperative." [8 Del. Laws § 510; *see* RJN, Ex. 32.] Nor is it likely that Gabriel will be able to revive its charter at any point. Gabriel has not filed an annual franchise tax report since 2011, and, as of March 1, 2013, it appears to owe approximately $360,000 to the State of Delaware in corporate franchise taxes, which it does not have the wherewithal to pay. [*See* RJN, Ex. 32.] The result under Delaware law is that its charter is automatically voided. 8 Del. C. §502(e). Other penalties can include the enjoining of further conduct of business (*id.* at § 508), or the appointment of a receiver (*id.* at § 509).[10]

## IV.    CAUSE EXISTS FOR CONVERSION OF THESE CASES OR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

Under Section 1112(b) of the Bankruptcy Code, upon the request of a party in interest, after notice and a hearing

> the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter; whichever is in the best interests of creditors and the estate, **for cause** unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. §1112(b) (emphasis added). A movant bears the initial burden to establish cause for dismissal or conversion. Once that burden is met, however, the debtor may still—with the notable exception for cause proved under Section 1112(b)(4)(A)—attempt to set aside the consequences of a showing of cause by demonstrating that it will be able to confirm a plan in a "reasonable" amount of time and otherwise that the "unusual circumstances" described in Section 1112(b)(2) exist. Unusual circumstances will be found where a debtor may show that its actions

---

[10] Delaware law provides for the continuation of a corporation for three years after its charter has become void for purposes of winding up its affairs. *See* 8 Del. C. §§ 510, 511.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 24 of 39

were justified, that a cure is possible, and that conversion or dismissal would not be in the best interest of creditors. 11 U.S.C. §1112(b)(2)(B).

Cause is generally present where there is "a failure to present a bankruptcy case implicating any of the policies underlying the chapter in which the debtor seeks protection." *In re Am. Telecom Corp.*, 304 B.R. 867, 873 (Bankr. N.D. Ill. 2004) (dismissing case with prejudice where the bankruptcy was "merely … a litigation tool for two sole shareholders holding onto a corporate shell that ha[d] not conducted any business activity for two years" and was "primarily a tool for thwarting the collection efforts of a single creditor holding a disputed money judgment") (citations omitted). Likewise, in evaluating the existence of cause for dismissal or conversion, the two recognized policies of chapter 11 reorganization, "preserving going concerns and maximizing property available to satisfy creditors," should be given close consideration. *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 713 (Bankr. D. Md. 2011) (quoting 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[5][a] (Henry Somers & Alan Resnick, 16th ed. 2009) (hereafter, "Collier") (other citations and internal quotation marks omitted)).

Section 1112(b)(4) of the Bankruptcy Code provides a non-exclusive list of enumerated examples of "cause."[11]   As noted above, however, the first statutory example of cause, "**substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation**," imposes a type of strict liability, to which the debtor has no defense of "unusual circumstances."   In other words, if a court finds cause exists under § 1112(b)(4)(A), then the debtor is *per se* unable to argue that its remaining in possession of the estate would accrue to the best interest of creditors, and the court may not refuse to convert the case.   *See In re Brutsche*, 476 B.R. 298, 306 (Bankr. D. N.M. 2012).   Instead, the debtor's continued management and control is deemed inherently harmful to the estate, and the imperative of one of the three alternative remedies: conversion, dismissal, or appointment of a chapter 11 trustee is made mandatory under the statute.

---

[11] Courts are free to determine other factors on a case-by-case basis.  For example, bad faith is also a recognized basis to establish cause.  *See generally* Collier at ¶ 1112.07.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 25 of 39

**A.    There is Substantial and Continuing Loss to and Diminution of the Estates and No Possibility of Rehabilitation of the Debtors**

Section 1112(b)(4)(A) provides that cause exists for dismissal or conversion or appointment of a chapter 11 trustee if both of the following conditions are proven: (i) substantial or continuing loss to or diminution of the estate; and (ii) the absence of a reasonable likelihood of rehabilitation. Here, the facts of these cases clearly establish that both of these conditions exist.

**1.    The Estates Are Incurring Substantial Loss and Diminution of Value**

Section 1112(b)(4)(A) requires a showing of "substantial or continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." *Collier* states that this tests two things: First, whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, has declining asset values. Second, it tests whether there is any reasonable likelihood that the debtor, or some other party, will be able to rehabilitate, that is, to stem the debtor's losses and place the debtor's business enterprise back on a solid financial footing within a reasonable amount of time. *See* Collier at ¶ 1112.04[6][a].

Negative cash flow and an inability to pay current expenses as they come due can satisfy the test for continuing loss or diminution of the estate under § 1112(b)(4)(A). *See Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007). The administrative expenses of the bankruptcy case are considered in measuring the amount of loss and diminution. *See Brutsche*, *supra*, 476 B.R. at 305.

As noted above, the Debtors have no operating business and have existed for at least the last six years as a litigation shell, financed by the Debtors' issuance of interests in speculative litigation against Qualcomm. Moreover, there is no equity in these Debtors. Gabriel's March 8, 2010 SEC reporting admitted that Gabriel has issued all of its authorized shares. It has also issued additional Shareholder Equivalency Units of an unknown amount. As of March 2010, it had not held a shareholder's meeting in three years, which condition has continued to the present. Indeed, Gabriel *is unable* to hold a shareholders' meeting because it has not filed audited financials since June 2006. For the same reason, it may be unable to issue additional shares and

thus has must to rely on the assignments in interests in the Qualcomm Lawsuit to obtain funding. As of March 2010, however, Gabriel admitted that its assignment of interests in the proceeds of the Qualcomm lawsuit *may be as much as 95%* and "effectively reduce the amount of such proceeds, if any, that will be available to Gabriel." Moreover, because the Debtors do not have the financial resources to prepare audited financial statements,[12] they will not be able to remedy this situation post-petition, any more than they were pre-petition. As such, the continued accrual of fees and expenses in the Qualcomm Lawsuit necessarily continues to produce substantial loss and diminution of value—to an equity in the enterprise by the Debtors that is *non-existent* in the first place.

### 2. The Estates Will Necessarily Continue to Experience Loss and Diminution of Value

The "loss and diminution" prong is otherwise satisfied if the debtor is not an operating company but merely holds an intangible asset. Collier at ¶ 1112.04[6][a] (citing *In re 3 Ram, Inc.*, 343 B.R. 113, 118 n.14 (Bankr. E.D. Pa. 2006)); *see also Landmark Atl. Hess Farm*, *supra*, 448 B.R. at 714 & n.18. The existence of a non-operating debtor having no source of income that attempts to utilize the bankruptcy proceedings to try to monetize litigation (here, by reversing on appeal a decision that was decidedly unfavorable to them) presents a textbook case of continuing loss and diminution.

The administrative expenses to be incurred in connection with the Debtors' scheme to engage in extensive litigation while in chapter 11 will be very costly, burdensome, and, more likely than not, extremely wasteful.[13] Nelson testified that the Debtors will seek permission from this Court to retain at least *three* sets of counsel to perform services on behalf of the estates: Debtors' counsel, appellate counsel in connection with the orders of dismissal and summary judgment, and separate appellate counsel in connection with the judgment awarding attorney fees. In addition, a committee counsel will need to be paid.

---

[12] This would likely be a cost-prohibitive endeavor, in that the companies' pre-2006 audited financials are also subject to serious question and would likely need to be restated.

[13] The District Court noted in its Bond Order that the average cost through trial of a trade secret misappropriation case where more than $25 million is at stake is just under $6 million. [RJN, Ex. 23 at 21, n.9.] To date, the Debtors appear to have run up over $12 million in debt to fund the Qualcomm Lawsuit, before consideration of the sizeable contingency fee that has been promised to the lawyers.

Cooley LLP
Attorneys At Law
San Diego

829270 v1/SD

22.

Case: 13-30340   Doc# 41   Filed: 04/03/13   Entered: 04/03/13 14:02:19   Page 27 of 39

The Debtors' plan for financing these expenses otherwise appears to be a visionary scheme, with no basis in sound reason. Although the Hughes Application contends that their fees for the appeal would be based upon the pre-petition contingency arrangement providing for 30 percent of the recovery [*see* Hughes App. at 5], that only tells part of the story and leaves unfinished business. The Hughes Application reveals that their fee arrangement is limited to prosecution of the appeal, and the engagement "will not extend to the resumed prosecution of the Qualcomm Lawsuit, in the event of a successful outcome" of the appeal. [*Id.* at 5, lines 6-8.] *Query*: where will the Debtors find the funds for the "resumed prosecution," where (i) they have already traded away substantially all of the "interests" in the Qualcomm Lawsuit; and (ii) where Hughes would by that time already have earned rights to receive 30 percent of the proceeds? Creditors are apparently supposed to take it on blind faith that the Debtors will ultimately come up with a solution that will enable them to finish what they have started.

Moreover, Nelson testified at the 341 Meeting of Creditors that the funds to pay expenses, such as costs, are contemplated to be advanced by pre-petition creditors, pursuant to the additional advance obligations under pre-petition loan agreements. [*See* RJN, Ex. 31 at 17.] None of these are satisfactory sources of capital. The Debtors are in default of these agreements, where they have filed for bankruptcy. The IP Event Notes provide that any fees and costs that are incurred by the lenders as a result of the Debtors' bankruptcy are to be borne by the Debtors. And, under the terms of the North Water note, any additional advances made to fund litigation would further subordinate other IP Event Note holders, harming them in the process.

Added to all of that, the end of the Debtors' yellow brick road to success in the Qualcomm Lawsuit is nowhere to be found. As noted above, "success" in the litigation would require: (i) success on appeal of the summary judgment and dismissal orders of the District Court; (ii) success on appeal of the order awarding attorney fees; (iii) retrial of the complaint (assuming any claims remain technically viable after appeal upon remand); and (iv) subsequent appeal of the determination of the District Court, following a trial. This would be an extraordinarily expensive proposition—and all for nothing given the facts of the underlying case.

Indeed, the most likely outcome in the first step is not success, but rather sanctions for

Cooley LLP
Attorneys At Law
San Diego

pursuing an appeal from the disposal of claims that two District Judges found to be "objectively baseless" and brought in "bad faith." Harkening back to the analysis of each of the Honorable Anthony Battaglia and Honorable Michael Anello, this is not a case where the Debtors' evidentiary support for their theories fell only slightly below the required burden of proof. Rather, in this instance, the Debtors did not come even close to pulling their case over the goal line. Although the Debtors had been investigating the claims since as early as 2004, the Debtors were unable to come up with any credible evidence of their claims. Indeed, the shocking dearth of evidence supporting the Debtors' claims was reflected in the Court's determination in its order assessing attorney fees that the litigation had been maintained in subjective bad faith.

Additionally, the importance of the requisite *quantum* of evidence that is required in this case cannot be understated. As noted by the District Court, a patent is presumed to name the correct inventors. [*See* RJN, Ex. 28, at 6 (citing *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)]. Accordingly, to prevail on their inventorship-based claims, the Debtors would need to prove that the patents owned by Qualcomm were not, in fact, invented by Qualcomm employees—not merely by the preponderance of the evidence—but by *clear and convincing, and corroborated* evidence. *Id.; cf. Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. ---, 131 S. Ct. 2238, 2242 (2011) (reaffirming the heightened burden of proof that is required in light of the presumption established the first paragraph of § 282 of the Patent Act, 35 U.S.C. §282, that a patent names the correct inventors). *Id.* at 2244-2249.

It is a virtual certainty that summary judgment will not be reversed here where the Debtors did not come anywhere close to "clear and convincing" evidence of their claims. The Debtors' claims were described variously by district court Judge Battaglia, who himself took note of Judge Anello's prior analysis of the claims in his bond decision, as, among other things, (i) "objectively baseless," with "no reasonable expectation of success," (ii) "brought in subjective bad faith," (iii) brought with a "significant lack of evidentiary support" and "nothing more than 'mere allegations' to support" them, (iv) "frivolous, (v) "unethical", (vi) "unsubstantiated," (vii) "made for an improper purpose," (viii) "objectively specious," and (ix) constituting "litigation misconduct." [*See* RJN, Ex. 29 at 6-9, 11-13.] It would be hard to find a more damning narrative

Cooley LLP
Attorneys At Law
San Diego

829270 v1/SD

24.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 29 of 39

as to the Debtors' chances for success down the road.  Furthermore, this is not just the opinion of one judge on the issue.  As noted in Judge Battaglia's order, the objectively specious nature of the Debtors' claims had also been duly noted by one other District Court judge, Judge Anello, and by a magistrate judge, Judge Dembin.  [*See id.* at 6-8, 12, 13 ("Plaintiffs received more than sufficient notice regarding the flaws in their claims from Defendants, Magistrate Judge Dembin, and Judge Anello.").]

Setting aside all of the difficulties, and even assuming *arguendo* that the Debtors might work a miracle and be successful, both on appeal and at any subsequent trial, it would still not fulfill any bankruptcy purpose for the Debtors to remain in possession in these cases.  *See Landmark Atl. Hess Farm*, *supra*, 448 B.R. at 715.  The Debtors have no equity.  Their prior SEC filings admit that substantially all of the Debtors' assets have been encumbered by the litigation speculators who have received "interests" in the proceeds of the Qualcomm Lawsuit.  On the other hand, assuming (what is much more likely), that the Debtors fail in their litigation gambit, the petition would have served only as an initially "inexpensive appeal-bond substitute," *Am. Telecom Corp. v. Siemens Info. & Commc'n Network, Inc.*, No. 04 C 8053, 2005 U.S. Dist LEXIS 19633, *9 (N.D. Ill. Sept. 7, 2005), which ultimately turned out in the end to be very, very costly indeed.[14]  The continuing diminution and erosion of value is an inescapable fact in each of these cases.

### 3.    There Is No Operating Business, So Rehabilitation of the Debtors Is Impossible

The second requirement for proving cause under Section 1112(b)(4)(A) is that there is the "absence of a reasonable likelihood of rehabilitation."  This condition may be established where "the debtor has no profitable core around which to structure its reorganization effort, [and otherwise] where the debtor cannot or will not formulate a reasonable business plan."  Collier at ¶ 1112.04[6][a][ii].  Importantly, "rehabilitation," required to satisfy Section 1112(b)(4)(A), is ***not*** the same as "reorganization."  Although a plan under chapter 11 can be a liquidating plan, the requirement of rehabilitation—applicable to the analysis of whether there is cause of conversion

---

[14] Which perhaps renders the famous advice by Will Rogers pertinent here: "*If you find yourself in a hole, stop digging.*"  And again, "*The quickest way to double your money is to fold it and put it back in your pocket.*"

Cooley LLP
Attorneys At Law
San Diego

829270 v1/SD

25.

or dismissal—means to *reestablish a business*. It therefore does not include liquidating debtors. *Loop Corp. v. United States*, 379 F.3d 511, 515-16 (8th Cir. 2004). "[R]ehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis." *Landmark Atl. Hess Farm*, *supra*, 448 B.R. at 715. The test is "whether a debtor has sufficient business prospects." *Id.*

Here, the Debtors have no 'business prospects." They have no operations. They have no business. They have no employees. They have no cash, or other means of acquiring an operating business. Moreover, the Debtors have not only recently arrived on hard times and are in the process of liquidating their assets. This is business that has been moribund for a long, long time. The Debtors have not had a profitable business since they emerged from chapter 11 in 2004. They have not had any legitimate operations *since at least 2009*, when they disposed of their last remaining "unprofitable" assets.

Moreover, Gabriel has failed to file its annual reports and pay its annual franchise taxes with the State of Delaware, rendering its charter void. The void status of Gabriel's corporate charter presents a substantial obstacle to their remaining as debtor in possession. This is a liquidating case. Although there is a split of authority on whether a debtor with a void charter is able to be a chapter 11 debtor in the first instance, the authority is clear that such a debtor can only liquidate. *See In re Prism Props.*, 200 B.R. 43, (Bankr. D. Ariz. 1996); *see also In re Vermont Fiberglass, Inc.* 38 B.R. 151 (Bankr. D. Vt. 1984) (case to be converted to chapter 7 because corporate debtor, whose charter had been revoked upon filing for chapter 11 relief, had no authority under state law to conduct itself as a going concern, and therefore could not use bankruptcy court for purpose of reorganization). Rehabilitation of these Debtors is impossible, not only from a practical, but also from a legal, perspective.

### 4. "Rehabilitation" Does Not Contemplate a Business that Exists Solely to Pursue Litigation

The case law is generally unanimous in the view that, where a debtor enters bankruptcy having no operating business and seeking to conduct the chapter 11 proceedings for the sole purpose of conducting litigation, it is cause for conversion or dismissal under Section

1112(b)(4)(A). Such a scheme does not provide for the reestablishment of a business and does not satisfy the requirement that the debtor will be rehabilitated. "[T]raditional analysis and rationale for bankruptcy relief does not work as well when the debtor does not hold any tangible property, and the only intangible property it does hold is something as unique as a dismissed [proceeding] against the primary non-insider creditor." *Am. Telecom Corp.*, *supra*, 304 B.R. at 874. Moreover, bankruptcy policy considerations dictate that litigation against a major creditor by a debtor in possession should never be the *raison d'etre* for a chapter 11 case. *In re Integrated Pet Foods, Inc.*, No. 03-33362, 2004 Bankr. LEXIS 1503, *30 (Bankr. E.D. Pa. Sept. 17, 2004).[15]

One policy underlying this general principle is that, under such circumstances, the bankruptcy process can be turned into a vehicle for inequity and inappropriate conduct. *See In re Am. Telecom Corp.*, 319 B.R. 857, 863 (Bankr. N.D. Ill. 2004) ("the use of § 362(a) in a liquidation case like ATC's is potentially subject to manipulation in favor of the debtor's insiders without any substantial corresponding benefit to noninsider creditors."). The rationale is closely-related to the question of whether the debtor has acted in subjective bad faith at the inception of the case. *See, e.g., Carolin Corp v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989).

In this respect, the cases at hand are largely on all-fours with the facts of *In re Original IFPC Shareholders*, 317 B.R. 738 (Bankr. N.D. Ill. 2004). In *IFPC*, the debtor had incorporated for the sole purpose of prosecuting a trade secret misappropriation claim against AT&T and Hughes Network Systems in state court. After years of expensive litigation, two state court judgments were entered against the debtor, and the debtor filed a chapter 11 bankruptcy case, as well as a judgment of costs rendered in the defendants' favor. The debtor in that case had cash on hand of $17,000 and investments of $1.75 million to finance an appeal and a subsequent trial, should the verdict be reversed in the appeal. The proceeds from any successful litigation were to finance payment of all allowed claims, plus administrative expenses. The U.S. Trustee filed a motion under Section 1112(b), seeking conversion or dismissal. *See id.* at 741-42.

---

[15] It is also relevant here that the Debtors were found to have engaged in subjective bad faith litigation. This is a modern analogue to "vexatious incitement to litigation"—known as barratry, and a crime at common law. A judicial finding of bad faith litigation tactics is a basis for objection to an individual debtor's discharge. S*ee Panda Herbal International, Inc. v. Luby (In re Luby)*, 438 B.R. 817 (Bankr. E.D. Pa. 2010). It is thus inconceivable that the same conduct could serve as the basis for an entity's "rehabilitation" in a chapter 11 case.

Cooley LLP
Attorneys At Law
San Diego

829270 v1/SD

The bankruptcy court determined that the continued administrative costs, U.S. Trustee fees, and costs of legal representation would require the debtor to gather post-petition investors to make additional loans or buy additional stock in the debtor in order to finance the venture. The court found that the negative cash flow would result in a decrease in value, where there was no definite source of income. *Id.* at 742. The bankruptcy court otherwise held that the "reasonable likelihood of rehabilitation" test could not be satisfied where "aside from the unwieldy task of acquiring and then taking a third bite at the [litigation] apple, the debtor has no other 'business plan' that would reverse the negative cash flow." *Id.* at 743. The court noted that the debtor's plan entailed "significant risk to creditors" with no countervailing benefit that the debtor would be reinvesting in jobs and the economy by virtue of a continuing business venture. *Id.* The bankruptcy court placed great weight on the fact that the debtor had failed twice in the litigation, prior to the bankruptcy, in its conclusion that the debtor's rehabilitation was unlikely. *Id.* The bankruptcy court also reasoned that the road to success would entail an appeal, and if that was successful, a re-trial, and if that was successful, probably yet another appeal. *Id.* As such, the bankruptcy court deemed the debtor's plan to be sheer folly and a waste of time and effort. The bankruptcy court determined that "cause" had been established under Section 1112(b)(1). *Id.*

Other courts have similarly held that a debtor whose substantial asset is contingent litigation cannot be rehabilitated and thus has no proper place as a debtor-in-possession. *See, e.g., In re Imperial Heights Apts., Ltd.,* 18 B.R. 858, 863-64 (Bankr. S.D. Ohio 1982) ("[a]t best, the estate consists only of an alleged cause of action for a lawsuit claiming a tenuous equity"); *Am. Telecom Corp.*, *supra*, 304 B.R. at 870 (bankruptcy case served merely as an "inexpensive, substitute appeal bond staying enforcement of" judgment); *Brutsche*, *supra*, 476 B.R. at 302 (the core of Debtor's rehabilitation is now litigation and pure speculation); *Landmark Atl. Hess Farm, supra*, 448 B.R. at 716 (bankruptcy filed to seek to defeat court order, not "rehabilitative").

As in *IFPC Shareholders*, the Debtors negative cash flow would result in a decrease in value, where there is no definite source of income. The Debtors' plan entails significant risk to creditors with no countervailing benefit that the Debtors would be reinvesting in jobs and the economy by virtue of a continuing business venture. The Debtors have experienced numerous

Case: 13-30340   Doc# 41   Filed: 04/03/13   Entered: 04/03/13 14:02:19   Page 33 of 39

prior failures in making their case, and three different judicial officers found that their claims were objectively baseless. The road to success would entail an appeal, and if that was successful, a re-trial, and if that was successful, probably yet another appeal. Cause is established.

**B.** **There Has Been Gross Mismanagement of the Companies Pre-Petition, which Mismanagement Persists and Infects the Estates' Post-Petition Management and Governance**

As another enumerated basis for cause, Section 1112(b)(4)(B), provides that gross mismanagement of the estate is an alternative basis for conversion or dismissal. Although generally pre-petition management failures are not a sufficient basis to invoke conversion or dismissal, mismanagement that carries over to the post-petition period will be. Failure to maintain an effective corporate management team has been held to constitute gross mismanagement. *See* Collier at ¶1112.04[6][a][2].

The Debtors also have no wherewithal to provide the missing audited financials, which span from 2007 to the present. Likewise, they have no practical ability to remedy their failure to file income tax returns for almost a decade, where they do not have the rudimentary financial records needed to do so. The Debtors current management has made repeated promises in their public SEC filings that they would provide audited financials, but they have never delivered on those promises. Rather, they have stated that they preferred to instead devote all of the company's capital to pursuit of litigation and otherwise appear unwilling to disclose to public scrutiny the true financial picture of Gabriel and Trace. The Board's decision to perpetuate and exacerbate the absence of proper financial accounting cannot possibly receive the benefit of the business judgment rule and was otherwise a breach of the duty of good faith. The Debtors' lapses in corporate governance and mismanagement are therefore highly certain to persist for the foreseeable future, where the Debtors' pre-petition board remains in place, with the exception of Mr. Tingo, who has resigned.[16]

Nor does the presence of an ostensible "new face" modify this analysis. The Responsible Individual for the Debtors, Nelson, is an economic captive of pre-petition board member, Mr.

---

[16] Notwithstanding that Tingo may still have possession and control of certain of the books and records and computer servers of the Debtors.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 34 of 39

David B. Clark ("Clark"), who also serves as one of six managing officers of Trace.[17]  In addition to Nelson's testimony at the Meeting of Creditors, the Debtors' filings made with the SEC upon their filing of the bankruptcies discloses that "a majority of his work has been for entities owned by and/or affiliated with David B. Clark, a director of Gabriel and manager of Trace, such as Riviera Finance of Texas, Inc., a private company."  [RJN, Ex. 30 at 2.]

Moreover, Nelson appears to be unconcerned about and is taking no steps whatsoever to rectify the sorry state of the corporate governance of the Debtors:  the delinquent SEC filings; close to 10 years of delinquent state and federal tax returns; the void corporate charter of Gabriel and delinquent corporate franchise taxes; and the Debtors' unaudited financials, which reach back to 2006.  Nelson's marching orders appear to be to continue the *status quo* of the Debtors' pre-petition course of misconduct and to take no efforts to correct the results of the officers' and directors' gross mismanagement.[18]  Indeed, Nelson appears to serve at the pleasure of Clark, whom Nelson testified even paid his airfare and travel expenses to attend the Meeting of Creditors.  [RJN, Ex. 31 at 29.]  As a result, gross mismanagement pervades the Debtors' post-petition corporate affairs.

Likewise, there is no possibility that the Debtors will be able to prove that there is reasonable justification for these lapses of corporate governance or that the failures by management will be "cured."  The record reflects that the members of the Board have each invested heavily in the Debtors' prepetition litigation and they have a substantial personal stake in trying to rescue a lost investment.  Such a condition incapacitates their ability to act in good faith and with proper business judgment on the proper course of action.  The record also reflects that at least two of the individuals who provided the funds and guaranteed the pre-petition bond – the distribution of which was triggered by the Attorney Fee Order – are Board members.

Furthermore, there can be no cure by virtue of the "new face," Nelson.  Nelson is an economic captive and servant of Clark.  Clark is not only a Board member (against whom claims

---

[17] The Nevada Secretary of State records reflect that as of a filing made on April 30, 2012, the "officers" of Trace were David Clark, Tom Alesio, Mark Bandsuch, Jack Manning, Jerry Suess, and George Tingo.  [*See* RJN at Ex. 33.]

[18] Consistent with this, the Debtors' filing with the SEC dated March 1, 2013 stated affirmatively that the resignation of Mr. Tingo was "not the result of a disagreement with Gabriel on any matter relating to our operations, policies or practices."  [RJN, Ex. 30 at 2.]

for breach of fiduciary duty may lie for the abusive litigation conduct), but, perhaps more than any other member of the Board, he is a substantial speculator in the litigation, having been a key "investor" in the pre-petition IP Event Notes and expects to benefit from a substantial share of any proceeds of the Qualcomm Lawsuit. As such, Nelson—*qua* Clark—is rendered incapable of fairly and impartially evaluating the Debtors' courses of action in connection with respect to, among other things, the appeal of the Qualcomm Lawsuit and undertaking a diligent and dispassionate investigation of claims against insiders (including, without limitation, Mr. Clark) and others, relating to the pre-petition events. As a result, it will be impossible for Nelson to faithfully execute his fiduciary duties to the estate and to creditors in general. The only possible "cure" to this untenable situation would be to bring in an independent fiduciary that has no such ties to the Debtors' past.

## V. CONVERSION TO CHAPTER 7 OR APPOINTMENT OF A CHAPTER 11 TRUSTEE ARE SUPERIOR TO DISMISSAL AND WOULD BEST SERVE THE PURPOSES OF THE BANKRUPTCY CODE

Section 1112(b) provides that once "cause" has been demonstrated, the Court has three options: (i) conversion; (ii) dismissal; or (iii) the appointment of a chapter 11 trustee or examiner. The standard to be used for the selection of the alternative is, "the best interests of creditors and the estate."[19] In weighing the best interests of the creditors, a court must consider the interests of all of the creditors. *Shulkin Hutton, Inc. v. Treiger (In re Owens)*, 552 F.3d 958, 961 (9th Cir. 2009) (citing *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994)). A balancing of interests is applied, and the interests of one significant creditor, such as a judgment creditor, may be dispositive. *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1992). The element of the best interest of the *estate* focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy. *Id.* (noting the value of preserving avoidance actions under bankruptcy law).

---

[19] The appointment of a chapter 11 trustee is otherwise provided for, either "for cause" or, in the alternative, if such appointment is in the "interests of creditors, any equity security holders, and other interests of the estate" under Section 1104(a). Under the 2005 amendments to the Bankruptcy Code, when section 1104 and Section 1112(b) are each implicated, "courts have latitude on deciding whether to convert the case to chapter 7, appoint a chapter 11 trustee or dismiss the case." *In re The Lodge at Big Sky, LLC*, No. 10-62229-11, 2011 Bankr. LEXIS 2296, *20 (Bankr. D. Mont. June 8, 2011). The "strong presumption" against appointment of a trustee that arises under Section 1104, as discussed in cases such as *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989), does not apply.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 36 of 39

When the assets of the estate are causes of action that must be fixed and liquidated, generally it is the view that it is in the best interest of creditors to appoint a disinterested trustee so the merits can be evaluated dispassionately and the fruits of a successful litigation preserved for creditors. *See Integrated Pet Foods*, *supra*, 2004 Bankr. LEXIS 1503 at *33 (citing *In re BTS*, 247 B.R. 301 (Bankr. N.D. Okla. 2000)). The administration of the estate by a bankruptcy trustee would give creditors the benefit of an independent fiduciary who would use "appropriate business judgment" in the evaluation of the pending litigation, as well as whether other claims that should be asserted for the benefit of creditors, such as the assertion of claims against officers and directors. *Id.*

Moreover, the appointment of a trustee—whether chapter 7 or chapter 11—is imperative here in order to preserve value for creditors. Here, a substantial unmonetized asset is likely to reside in the claims held by the estates against the Debtors' officers and directors, *e.g.*, for avoidance, negligence and/or breach of fiduciary duties and breach of the duty of good faith. Any action by the Debtors—as debtors in possession—implicating the directors and officers liability insurance policy (the "D&O policy") would create defenses to coverage and thus severely impair this valuable estate asset.

Ninth Circuit authority holds that coverage is not available for an action by one insured against another under the type of D&O policy held by the Debtors. *Biltmore Associates, LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663, 671 (9th Cir. 2009) (pre-filing company and debtor in possession are the same entity for purposes of the insured versus insured exclusion). Under *Biltmore*, it is also made clear that neither a debtor in possession nor a creditors' committee would be able to bring, *e.g.*, derivative-type actions. *Id.* at 669. That said, courts generally hold that a court-appointed trustee is a separate entity from the debtor in possession, is not subject to an insured versus insured exclusion under an insurance policy, and may therefore initiate and maintain negligence and other actions implicating insurance coverage. *See, e.g., Yessenow v. Exec. Risk Indem., Inc.*, 953 N.E.2d 433, 444 (Ill. App. 2011) (citing *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1116-17 (9th Cir. 2006)). Here, of course, there is no need to inquire into the law pertaining to a trustee's standing where the policy makes expressly

Cooley LLP
Attorneys At Law
San Diego

829270 v1/SD

32.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 37 of 39

clear that a bankruptcy trustee would _not_ be subject to the insured versus insured exclusion.

The Debtors' D&O policy provides for a $5 million policy amount and a $2 million excess coverage amount. The policy also contains an insured versus insured exclusion. [*See* Mojdehi Decl., Ex. 1 at 26 and 38, § III.] But the D&O policy also contains an express exclusion to the insured versus insured exclusion, as to any claim that "is brought by the Bankruptcy Trustee or Examiner of the Company, or any assignee of such Trustee or Examiner, any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company." [*See id*. at 26 and 38-39, § III(G).] Thus, the appointment of a bankruptcy trustee in these administratively consolidated cases would be in the interest of creditors and the estate, by maximizing value through the preservation of causes of action, which claims may turn out to be a major, if not the only, source of recovery for creditors.

Finally, a dismissal is not in the "best interests of creditors and the estate," in that a dismissal of the cases would have the untoward effect of simply playing into the Debtors' improper scheme of obstruction and delay:

> Chapter 11 bankruptcy is not supposed to be like a "7-11" convenience store, where the debtor merely drops in and picks up that which the debtor wants (here obstruction and delay of the state court litigation), and then, after having the protection of the bankruptcy court, leaves bankruptcy, at will, as soon as the debtor has obtained its goal (obstruction and delay) but without the creditors obtaining any of the protections and benefits . . . which the Bankruptcy Code gives to creditors.

*In re Silberkraus*, 253 B.R. 890, 903 (Bankr. C.D. Cal. 2000).

Here, the Debtors have themselves chosen to file voluntary petitions to obtain the protections of the Bankruptcy Code, in particular, the benefit of the automatic stay of the judgments of the District Court.[20] By the same token, however, having made that voluntary choice, the Debtors and their officers and directors must now be willing to be made subject to the rigors of equity that are imposed by the Bankruptcy Code. The Debtors and their current management are incapable of doing so, in light of the Debtors' serious pre-petition misconduct,

---

[20] Indeed, the primary purpose of the filing is likely to have been an attempt by the Debtors' directors (who are guarantors of the bond posted by the Debtors), to "buy time," where a distribution on the bond was triggered by the entry of the judgment awarding attorney fees.

gross mismanagement, and disabling conflicts of interest. An independent fiduciary will "clean house" by, among other things, subjecting the many years of gross mismanagement, nondisclosure, and other misdeeds by the Debtors and its insiders to the scrutiny of creditors and of the Court. An independent fiduciary in these cases can thus play a *very* meaningful role and can effect much good, in connection with such an investigation. Finally, by the appointment of an independent fiduciary, this Court will ensure that these bankruptcy cases will fulfill one of the primary policies of the Bankruptcy Code, that is, to foster equality of treatment among creditors.

## VI.    CONCLUSION

For each of the reasons stated above, Qualcomm respectfully requests the Court to issue an order, in the alternative: (i) converting the Debtors' chapter 11 cases to cases under chapter 7, under the administration of a chapter 7 trustee; or (ii) appointing a chapter 11 trustee, who would oust the Debtors' management and faithfully oversee the Debtors' estates, in accord with the ethical requirements that are incumbent upon an independent fiduciary appointed under title 11.

Dated: April 3, 2013

COOLEY LLP
ALI M. M. MOJDEHI (123846)
JANET D. GERTZ (231172)


By:    /s/ Ali M. M. Mojdehi
Ali M. M. Mojdehi (123846)

Attorneys for Judgment Creditor
Qualcomm Incorporated

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

829270 v1/SD

34.

Case: 13-30340    Doc# 41    Filed: 04/03/13    Entered: 04/03/13 14:02:19    Page 39 of 39