1   COOLEY LLP
    ALI M. M. MOJDEHI (123846)
2   (AMOJDEHI@COOLEY.COM)
    JANET D. GERTZ (231172)
3   (JGERTZ@COOLEY.COM)
    4401 Eastgate Mall
4   San Diego, CA 92121
    Telephone:    (858) 550-6000
5   Facsimile:    (858) 550-6420

6   Attorneys for Judgment Creditor
    Qualcomm Incorporated
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11

12  In re                                Case No.  13-30340-DM
                                         (Case No. 13-30341)
13  **GABRIEL TECHNOLOGIES CORP., et al.,**
                                         CHAPTER 11
14              Debtors.
                                         (Jointly Administered)
15  Chapter Number:  11
                                         **REPLY IN SUPPORT OF MOTION BY**
16                                       **QUALCOMM INCORPORATED,**
                                         **PURSUANT TO 11 U.S.C. § 1112 FOR**
17                                       **CONVERSION TO CASES UNDER**
                                         **CHAPTER 7 OR, IN THE**
18                                       **ALTERNATIVE, FOR APPOINTMENT**
                                         **OF A CHAPTER 11 TRUSTEE, FOR**
19                                       **CAUSE**

20                                       Date:   May 17, 2013
                                         Time:   10:00 a.m.
21                                       Court:  Courtroom No. 22
                                                 235 Pine Street, 22nd Floor
22                                                San Francisco, CA
                                         Judge:  Hon. Dennis Montali
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. Introduction ................................................................................................ 1

II. The Bankruptcy Cases Are Infected with Incurable Conflicts of Interest ......................... 2

    A. The Debtors and Their Insiders Are Burdened with Conflicts .............................. 4

    B. The Committee Is Beset By Conflicts ...................................................... 7

III. There Is Cause Here for Conversion Where There Are Continuing Losses and No Reasonable Likelihood of Rehabilitation .................................................................. 9

    A. The Debtors Cannot, in the First Instance, "Rehabilitate" ................................ 9

        1. The Bad Faith Cases Demonstrate That Cause Exists for Conversion Here ......... 9

        2. The Pursuit of Litigation By a Debtor with No Going Concern Is Not a Valid Chapter 11 Purpose .......................................................... 12

        3. The Debtors Fail to Adequately Distinguish Cases Holding that Pursuit of an Appeal is Not a Valid Rehabilitative Purpose .................... 17

    B. Continuing Losses Are Depleting the Estates ............................................ 20

IV. Cause Is Established Because The Debtor Will Be Unable to Effectuate Substantial Consummation of a Confirmed Plan ............................................................. 23

    A. The Plan Is Not Feasible ................................................................. 23

    B. The Debtors' Appeal Is a Dead End—Dooming Their Plan to Rejection ................... 24

        1. The District Court's Rulings Were Based on an Extensive Record of Evidence, Not "Prejudice" or "Disdain." ........................................ 25

        2. The District Court Did Not Commit Error In Entering Judgment Against the Debtors ........................................................................ 27

        3. Even Success on Their Frivolous Appeal Could Not Improve Debtors' Lot .......................................................................... 31

    C. The Feasibility of the Plan Must Be Viewed In Light Of Qualcomm's Non-contingent, Liquidated, Undisputed $12 Million Judgment ................................ 32

    D. The Plan's Structure Is Otherwise Flawed ............................................... 34

    E. The Debtors' Plan Is a Plan to Benefit Equity At the Expense of True Creditors ...................................................................................... 37

V. CONCLUSION ............................................................................................ 40

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

i.

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re Am. Capital Equip., LLC,*
  688 F.3d 145 (3d Cir. 2012).................................................................23, 24

*In re Am. Telecom Corp.,*
  304 B.R. 867 (Bankr. N.D. Ill. 2004)....................................................17, 18

*In re AMC Investors,*
  406 B.R. 478 (Bankr. D. Del. 2009) .............................................................34

*Amcast Indus. Corp v. Detrex Corp.,*
  45 F.3d 155 (7th Cir. 1995)...........................................................................32

*In re Ameribuild Constr. Mgmt., Inc.,*
  399 B.R. 129 (Bankr. S.D.N.Y. 2009) .......................................................3, 16

*In re Applied Safety, Inc.,*
  200 B.R. 576 (Bankr. E.D. Pa. 1996)........................................................23, 24

*In re Boynton,*
  184 B.R. 580 (Bankr. S.D. Cal. 1995) .....................................................10, 11

*Butner v. United States,*
  440 U.S. 48 (1979) ........................................................................................34

*In re Byrd,*
  172 B.R. 970 (Bankr. W.D. Wa. 1994)..........................................................11

*Carrieri v. Jobs.com, Inc.,*
  393 F.3d 508 (5th Cir. 2004).....................................................................37, 38

*Craig Corp. v. Albano (In re Albano),*
  55 B.R. 363 (N.D. Ill. 1985) .........................................................................33

*Don King Prods. v. Thomas,*
  945 F.2d 529 (2d Cir. 1991)..........................................................................36

*In re Edwards,*
  No. 95-18405 DWS, 1996 Bankr. LEXIS 847, 1996 WL 407253
  (Bankr. E.D. Pa. June 17, 1996)....................................................................16

*Fox v. Ethicon Endo-Surgery, Inc.,*
  35 Cal.4th 797 (2005) ...................................................................................29

ii.

*In re FRGR Managing Member LLC*,
419 B.R. 576 (Bankr. S.D.N.Y. 2009) ............................................................ passim

*Grossman v. Lothian Oil Inc. (In re Lothian Oil, Inc.)*,
650 F.3d 539 (5th Cir. 2011) ................................................................ 38, 39

*Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*,
906 A.2d 218 (Del. Ch. 2006) ...................................................................... 38

*Huron Holding Co. v. Lincoln Mine Operating Co.*,
312 U.S. 183 (1941) .................................................................................... 33

*Imagine Fulfillment Servs., LLC v. DC Media Capital, LLC (In re Imagine Fulfillment Servs., LLC)*, No. 2:12-bk-20544-WB, 2013 Bankr. LEXIS 934
(Bankr. C.D. Cal., Mar. 12, 2013) .............................................................. 33

*In the Matter of Imperial Heights Apts., Ltd.*,
18 B.R. 858 (Bankr. S.D. Ohio 1982) ................................................ 16, 18

*Jolly v. Eli Lilly & Co.*,
44 Cal.3d 1103 (1988) .............................................................................. 29

*In re Keenan*,
201 B.R. 263 (Bankr. S.D. Cal. 1996) ...................................................... 33

*Loop Corp v. United States Trustee*,
379 F.3d 511 (8th Cir. 2004) ................................................... 12, 13, 14

*Marciano v. Chapnick (In re Marciano)*,
708 F.3d 1123 (9th Cir. 2012) ......................................... 34, 35, 36

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996) .................................................................................. 28

*In re Marshall*,
298 B.R. 670 (Bankr. C.D. Cal. 2003) ................................................ 9, 11

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
85 B.R. 319 (W.D. Pa. 1988) ......................................... 10, 11, 16, 24

*Nugent v. Bus. Cards Tomorrow, Inc. (In re Nugent)*,
254 B.R. 14 (Bankr. D.N.J. 1998) ............................................................ 33

Cooley LLP
Attorneys At Law
San Diego

iii.

*Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.),*
__ F.3d __, No. 11-56677, 2013 U.S. App. LEXIS 8729
(9th Cir. Apr. 30, 2013) ................................................................................. 39

*In re Pac. Express, Inc.,*
69 B.R. 112 (B.A.P. 9th Cir. 1986) ................................................................ 39

*In re Original IFPC Shareholders,*
317 B.R. 738 (Bankr. N.D. Ill. 2004) ................................................ 18, 19, 20

*Performance Plus Fund, Ltd. v Winfield & Co.,*
443 F. Supp. 1188 (N.D. Cal. 1977) .......................................................... 17, 32

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed Cir. 2005) (en banc) ...................................................... 28

*PPG Indus., Inc. v. Hartford Fire Ins. Co.,*
531 F.2d 58 (2d Cir. 1976) ............................................................................ 36

*Rand v. Porsche Fin. Servs., Inc. (In re Rand),*
2010 Bankr. LEXIS 5076 (B.A.P. 9th Cir. Oct. 22, 2010) ........................... 23

*Stern v. Marshall,*
564 U.S. ___ (June 23, 2011) ........................................................................ 11

*Thompson v. Kramer (In re Thompson),*
No. Civ.A. 92-7461, 1995 U.S. Dist. LEXIS 8175, 1995 WL 358135
(E.D. Pa. June 9, 1995) .................................................................................. 16

*In re Trenton Ridge Investors, LLC,*
461 B.R. 440 (Bankr. S.D. Ohio 2011) ......................................................... 37

*Tripati v. Henman,*
857 F.2d 1366 (9th Cir. 1988) ....................................................................... 32

*In the Matter of Winshall Settlor's Trust,*
758 F.2d 1136 (6th Cir. 1985) ....................................................................... 16

*In re Woodbrook Assocs.,*
19 F.3d 312 (7th Cir. 1994) ........................................................................... 19

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 5 of 47

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**STATUTES AND CODES**

8 Del. C.
§ 502(f)...................................................................................................... 21
§ 503(b)...................................................................................................... 22
§ 504.......................................................................................................... 21
§ 508.................................................................................................... 21, 22
§ 510.......................................................................................................... 22

11 U.S.C.
§510(b).................................................................................................... 7, 39
§§ 510(b) and (c).......................................................................................... 2
§552(b)...................................................................................................... 37
§ 1103(c)(2).............................................................................................. 4, 6
§1112.................................................................................................... passim
§1112(b)(2)........................................................................... 13, 15, 16, 23
§1129(a)................................................................................................ 23, 9
§1129(b)(2)(B)...................................................................................... 37, 32

28 U.S.C. §157 (b)(2)(C) ............................................................................ 11

Cal. Rev. & Tax Code §§ 17321 and 24451 ............................................... 39

IRC Section 385 ........................................................................................... 39

UCC Section 9-106 ...................................................................................... 36

UCC Section 9-108(e) .................................................................................. 36

**OTHER AUTHORITIES**

2-101 *Collier on Bankruptcy* ¶ 101.16. *Section* 101(16) ........................... 38

18-131 MOORE'S FEDERAL PRACTICE – CIVIL §131.30 ............................... 32

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

v.

Judgment creditor Qualcomm Incorporated ("Qualcomm") respectfully submits its Reply in Support of its Motion Pursuant to 11 U.S.C. §1112 for Conversion to Cases Under Chapter 7 or, in the Alternative, for Appointment of a Chapter 11 Trustee, for Cause (the "Motion").[1]

## I. INTRODUCTION

The Debtors beseech this Court not to grant the relief requested in Qualcomm's Motion, stating that it would be unfair and premature, and claiming that they have submitted a chapter 11 plan ("Plan") that should buy them a ticket to remain in chapter 11 for the foreseeable future. They spend a considerable amount of time trying to convince the Court of the merits of their claims, that the District Court got it wrong, and why a new and sunny day is dawning for them. There are numerous problems with these arguments. First and foremost, as discussed below, the authorities are unanimous that a debtor that has no going concern cannot confirm a plan that proposes to pay creditors with the proceeds of litigation. Such a plan is simply too ephemeral, *regardless* of the merits of the litigation. Because the Debtors here have no other assets, other than intangible claims, they have no available means to confirm a plan. Under such circumstances, conversion is mandated.

The Debtors claim that they really don't need to "rehabilitate." They argue that all they need to demonstrate is that they can "reorganize." As such, they point to the elaborate payment restructuring scheme that they have developed under their Plan as a "purpose" and raison d'être for their expensive intended journey through chapter 11. First, the Debtors' arguments are not supported by precedent. But even assuming that their argument could hold water, the proposed "restructuring" is all a charade. As noted below, the "lenders" are nothing more than equity masquerading in creditors' costumes. Moreover, the "lenders'" liens never attached. They are inchoate. There is no collateral in existence to which they can now attach or on which they have a right to receive any "proceeds" under an after-acquired property clause. No obligation for payment had matured as of the petition date. These lenders have nothing, and there is nothing to restructure. It is all Monopoly money.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion and Memorandum of Points & Authorities in support thereof.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

Equally as important, all that the Motion requests is that there be a fair and unbiased process instituted in connection with the review and analysis of the estates' course of action. The Debtors' Plan reveals that the Debtors are inherently unable to address the key issues in these cases in a trustworthy and unbiased manner, as is required by a fiduciary. Not only do the Debtors fail to address the issues regarding the facial debilities of the "liens" and "claims" of the litigation speculators, but they also ignore the obvious issues of recharacterization, avoidance, and equitable and mandatory subordination under 11 U.S.C. §§ 510(b) and (c) that bear upon these asserted claims. Nor can the Committee be depended upon to point out or address these concerns, where the Committee is not going to be inclined to sue its own constituency. The conflicts of interest pervading these cases are reason alone to appoint a trustee.

In the end, the real problem with these cases is that they are clearly being maintained for the benefit of equity—at the expense of creditors. The Debtors seek to convince this Court to allow them to undertake risky litigation so that the speculators can "double down" on their losses. But the Debtors' request is that value should be transferred from creditors to shareholders in the course of this endeavor. The estates' general unsecured creditors are to bear the downside risk, while an upside gain large enough to overcome the negative equity balance will accrue to the benefit of equity. Gambling with other peoples' money is not a proper purpose for chapter 11. As such, courts have consistently held that, where a debtor is not a going concern, there is no "rehabilitative" purpose in maintaining the case to facilitate the goal of speculating on litigation. It simply is not an appropriate use for chapter 11, and such cases should be converted. The sooner, the better, as delay will only incur needless expense.

## II. THE BANKRUPTCY CASES ARE INFECTED WITH INCURABLE CONFLICTS OF INTEREST

One of the considerations in analyzing the merits of conversion or dismissal for cause under *Section* 1112[2] is the need to address systemic conflicts of interest that undermine the ability of the bankruptcy case to function in a manner that appropriately serves the policies of the Bankruptcy Code. That problem arises particularly often where the debtor is not a going concern,

---

[2] All reference to "section" numbers shall be to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise specified.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

2.

1  and the key question in the prosecution of the bankruptcy case is whether the debtor should

2  pursue claims and causes of action against third parties.

3      Here, there are critical decisions that urgently need to be made regarding the direction of

4  the cases. These decisions cannot wait and need to be made now. Most critically, the

5  determination must be made whether to pursue the appeal and maintain the litigation against

6  Qualcomm. In addition, it must be determined whether and how to initiate claims for, *e.g.*,

7  breach of fiduciary duty against others, such as officers and directors and/or professionals. These

8  decisions require the *prompt* appointment of a trustee.

9      In a case with substantially similar structural challenges as these cases, the Bankruptcy

10  Court for the Southern District of New York commented as follows:

11      An independent trustee, whose sole duty is to the estate and its
        creditors is needed to decide whether the litigation should be
12      pursued and whether the Debtor has claims against Citigroup or
        others from whom recoveries for the benefit of the estate and the
13      creditors can be obtained.

14  *In re FRGR Managing Member LLC*, 419 B.R. 576, 584-85 (Bankr. S.D.N.Y. 2009) [hereafter,

15  "*FRGR*"] (citing *In re Ameribuild Constr. Mgmt., Inc.*, 399 B.R. 129, 134 (Bankr. S.D.N.Y.

16  2009)).

17      The Debtors argue that appointment of a trustee would be unfair, and that to grant

18  Qualcomm's Motion is to "doom meritorious appeals adverse to Qualcomm." [Oppo. at 1, l.7.]

19  This response is puzzling and illuminating at the same time. All the Motion seeks is the

20  appointment of a neutral third-party fiduciary, so that the litigation claims and other conflict-

21  fraught matters can be independently evaluated. If the Debtors are acknowledging that an

22  independent evaluation would doom the prospects of any pursuit of the litigation (because it

23  would reveal its futility), doesn't that itself prove the point that an independent evaluation is

24  critical?

25      If the Board is concerned about where the trustee would get the funds to pursue the

26  claims, the litigation speculators could always offer the same type of funding to a trustee as they

27  have offered to the Debtors. There should be no external impediments or additional financial

28  constraints that would burden a trustee, any more than the Debtors are already burdened.

As noted below, however, the need for an independent fiduciary in these cases extends beyond the evaluation of litigation to virtually every aspect of their administration. The pressing need for independence is exacerbated in these cases, where even the Committee is burdened by conflicts and thus cannot meet its statutory obligations to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1103(c)(2).

The peculiar dynamics of these cases have produced a situation where the Debtors and the Committee are serving the interests of the speculators, who are in reality nothing more than out-of-the-money equity, at the expense of true creditors. What this means is that the interests of equity are being pursued at the true creditors' expense. Qualcomm is the most substantial creditor in these cases, and it is accurate to say that the Debtors' and the Committee's maneuvering is substantially being undertaken on Qualcomm's dime. Like a true creditor, Qualcomm's debt is capped. Qualcomm only gets a defined recovery, and no more. Every dollar spent pursuing a speculative gambit which increases administrative and other claims thus dilutes Qualcomm's potential recovery and causes Qualcomm to incur additional loss. This is inappropriate, and can't be rationalized on the grounds that the Debtors may hit a "home run." Such a rationalization can only be justified where one sits in the position of equity and has "upside," and thus the incentive for taking equity-type risks. Neither by design nor policy does bankruptcy serve the purposes of providing equity with a means of using creditors' money to obtain equity upside. But that is what is happening here.

Because of conflicts of interest, the statutory watchdog for creditors is absent here, and the foxes have taken up residence with the chickens. For at least this reason, a prompt conversion or appointment of a chapter 11 trustee is warranted here.

## A. The Debtors and Their Insiders Are Burdened with Conflicts

It is clear from the Plan proposed by the Debtors that the Debtors have an irreconcilable conflict of interest. They are unable to fulfill the duties of a fiduciary. The Debtors' Boards are each tainted by their direct connections to the pre-petition decisions made on behalf of the Debtors. The Board Members have personally speculated on the Debtors' litigation with

Qualcomm and thus are economically motivated to seek to recover their losses, even if it is at the expense of inflicting massive losses on the estates and their creditors. The Debtors face a judgment finding the Debtors liable for $12 million in sanctions for litigation misconduct and for which the Board may be found personally liable. They therefore have caused the Debtors to propose a Plan to achieve a means, at any and all cost, to appeal the dismissal of the underlying litigation to try to set aside the $12 million in sanctions.

The Debtors' insiders have a dilemma. The other potentially significant asset of the estates are the claims that lie against the officers and directors of the Debtors (*i.e.*, themselves) for maintaining meritless claims and engaging in extended litigation misconduct that resulted in a sanctions award of $12 million. The Debtors' insiders have unclean hands, in that they cannot enthusiastically pursue claims against the officers and directors without (i) putting themselves at risk; and (ii) putting at risk their theory of the case for setting aside the $12 million in sanctions.

For the Debtors' insiders, these cases present an open-and-shut decision. Each of the Debtors' insiders has absolutely nothing to lose by doubling down on the estates' assets on a speculative appeal of the dismissal of the litigation against Qualcomm. Such is inapposite to the role of a fiduciary, who must objectively assess alternatives before embarking on speculative endeavors. It is also not an appropriate use of Chapter 11, where it essentially turns this Court and the bankruptcy forum into a casino and the Plan into a bet.

Nor can the Debtors' insiders (who are speculators themselves) take responsible positions in connection with the "claims" asserted by the other litigation speculators. Their dilemma precludes them from questioning North Water's purported "lien," because they are economically dependent upon North Water to provide funding for their effort to recapture their investments. Furthermore, the Board members' own purported secured status is dependent upon the same security instrument that pertains to North Water's purported lien. They are not likely to attack it. Even worse is the failure of disclosure. They have failed to be forthright about the clear vulnerabilities of these liens and the reality that the "claims" of the speculators are textbook examples of situations warranting recharacterization. Nor can they view the "claims" of the litigation speculators with a clear and unprejudiced eye. These "claims" are in the same boat as

their own investments, and they would be loathe to attack them, on any basis. Likewise, the Debtors are dependent upon the litigation speculators to also join in with North Water to fund the litigation. These are debilitating conflicts for parties who are supposed to be acting as fiduciaries.

The Debtors and their insiders, aware of their ethical disability, offer the presence of a Jesuit priest as a cleansing remedy. The Debtors state that Mr. Bandsuch "is not a creditor or investor" in the Debtors and suggest (although do not state categorically) that he has no other direct or indirect financial interest in the outcome of the litigation against Qualcomm. [Oppo. at 4, ¶ 7.] They suggest that his "religious vow of poverty" mandates the conclusion that he is not burdened by conflicts of interest. [*Id.* at 4-5, ¶ 7.] But the Debtors clearly do not understand what it means to have a conflict of interest. Nor do they appreciate the real root of Mr. Bandsuch's disability.

Mr. Bandsuch has been a director of the Debtors since October 2010. As such, he was ultimately responsible, along with the rest of the Board, for the actions and decisions that culminated in the District Court's grant of summary judgment to Qualcomm and the rendering of $12 million in sanctions against the Debtors. Alternatively, he breached his duty by failing to keep himself informed about what was going on. As such, the existence of the $12 million sanctions judgment—which has full preclusive effect—is directly relevant to the potential claims that may be held by the estates against him. Mr. Bandsuch has a material interest in trying to ensure that the sanctions are reversed, thus motivating a self-interested desire in overturning the grant of summary judgment in the Qualcomm litigation. He is therefore conflicted and is incapable of fulfilling a proper fiduciary role nor is he capable of determining on the estates' behalf the propriety of whether the appeal should be pursued as to the underlying litigation and/or the merits of the sanctions award.

The Debtors' insiders have not taken long to reveal the contaminating effects of their conflicts of interest. Indeed, the Debtors' Plan and Disclosure Statement are replete with the evidence of fiduciary failures. A few examples follow:

- The Debtors have not questioned the priority or perfection of the North Water lien, or whether a security interest ever *attached* in the first instance. As discussed

below, the security instrument appears defective on its face.

- The Debtors have not questioned whether the "claims" of North Water or the other litigation speculators are actually equity. There has been no mention of recharacterization, although, as noted below, the "notes" call out loudly for an investigation into their proper characterization.

- The Debtors have never raised the issue of usury or unconsionability, despite the fact that the litigation speculators' notes bear interest rates of 400% and more.

- There is nary a suggestion of 11 U.S.C. §510(b), which mandates subordination of claims, *e.g.*, arising out of the purchase or sale, or damages in connection with the purchase or sale of a "security." There is no question that the "notes" here are securities. There is also no question that no right to payment has accrued under the notes, and that the only possible rights thereunder as of the petition date are contingent claims for damages.

- The Debtors make no suggestion that there may be actions for avoidance of any of the transfers of interests made to the litigation speculators. This in spite of the fact that, for example, (i) North Water put in approximately $3.3 million and received an instant "claim" of at least $15 million; and (ii) David Clark contributed $250,000, in exchange for a "multiple" aggregating approximately $1,250,000. (*See* Disclosure Statement at 16, 17 & Ex. B).

- The Debtors purport to grant themselves a discharge under the Plan.

- The Debtors purport to leave claims of creditors unpaid under the Plan but leave all equity interests intact.

### B.   The Committee Is Beset By Conflicts

The Committee, meanwhile, is the proverbial "dog that does not bark." And who could expect them to, where the Committee also labors under a debilitating conflict because it is populated entirely by litigation speculators. One could hardly expect the Committee members to sue themselves, *e.g.*, to recharacterize their "claims" as equity. Nor will they attack North Water, where they share in its security.

In truth, there are very few "real" creditors in this case. The only real general unsecured creditors are Qualcomm, which holds a non-contingent, liquidated judgment against the Debtors, and the State of Delaware and other taxing authorities for delinquent taxes. There are no trade creditors to speak of, because the Debtors have no business operations. There are no employee creditors, because the Debtors have no business operations and have not had any for a long time. There are no landlord, utility, or maintenance-related creditors, because the Debtors have no business operations and no physical place of business, nor have they had one for a long time. There are not even any legitimate claims based upon professional services, because all of the Debtors' pre-petition counsel also speculated on the results of the litigation against Qualcomm and acted on a contingency basis.

Moreover, the litigation speculators who comprise the Committee are not "innocent creditors" who extended credit to the Debtors in an ongoing relationship with a going concern. In fact, there is serious question whether they are "creditors" at all. They bear all of the indicia of equity. They were to receive a rate of return that shocks the conscience—as much as 400%.

Each of these individuals knew that the Debtors had no means of repaying them, except if the litigation against Qualcomm was successful. They gambled on the outcome of the litigation, made a bad bet, and they are now out of the money. Their vision for these bankruptcy cases is to be able to make one last bet, in the hopes of drawing a winning hand. An example of a gamblers' calculation is instructive. Here, North Water invested approximately $3.3 million. *See* Doc. No. 91 (Decl. of J. Piurko in support of Oppo.) at ¶ 3). It asserts that it is now entitled to receive $15 million, having sunk costs of approximately $3.3 million. *Id.* The bet North Water is making is that with an additional $500,000 investment—an option in essence—it will someday be able to realize more than $15 million. The rest of the litigation speculators share this same mentality. They are already out of the money, so they have no downside to risking it all (that is, *other* people's money) to get their equity payout. As such, the Committee and its constituents, just like the Debtors' insiders, are unable to fulfill the role of a fiduciary.

### III. THERE IS CAUSE HERE FOR CONVERSION WHERE THERE ARE CONTINUING LOSSES AND NO REASONABLE LIKELIHOOD OF REHABILITATION

#### A. The Debtors Cannot, in the First Instance, "Rehabilitate"

The Debtors' Opposition is centered on a consistent theme – that merely filing a plan gives them a free ticket to remain in chapter 11. They strenuously argue that it does not matter that they have no business to reorganize, because they have "fully funded" their Plan. In fact, it matters quite a bit that they have no business operations. It is also fatal to the Debtors' prospects that they have no assets other than a possibility to recover on speculative litigation with which to fund the Plan. They cannot establish that they will rehabilitate under such circumstances.

#### 1. The Bad Faith Cases Demonstrate That Cause Exists for Conversion Here

As to the posture of this case generally, the cases discussing bad faith dismissals under *Section* 1112 are relevant with respect to the propriety of the Debtors' use of bankruptcy to obtain a cheap substitute for a *supersedeas* bond. In this respect, the Debtors candidly admit that the purpose of their filing was limited to: (i) preventing enforcement of the Fee Order; and (ii) "restructur[ing] the Debtors' obligations in a manner that permits the Debtors to obtain new financing and continue prosecution of the appeal and the underlying Qualcomm Litigation." [Oppo. at 17-18.] In other words, they admit that the substantial purpose for these cases is to obtain an appeal bond substitute. The Debtors then point to the law governing dismissal of bad faith filings[3] to argue that, based on those precedents, it is appropriate to file a chapter 11 petition as a substitute for an appeal bond to stay enforcement of a judgment, where a debtor is "really in need of reorganization." [*Id*. at 18 (quoting *In re Marshall*, 298 B.R. 670, 681 (Bankr. C.D. Cal. 2003)).]

The Debtors are correct that the precedents discussing dismissal of cases filed as a litigation tactic are instructive. But closer scrutiny of *Marshall* and other precedents reviewing cause for dismissal reveals that the Debtors have missed the point of the precedents. A finding of

---

[3] It is important to note that the Bankruptcy Code contains two independent provisions where a debtor's good faith is tested. The first is under *Section* 1112, where the test is whether the filing was in bad faith. The Code tests good faith again in connection with the requirements for plan confirmation. Thus, *Section* 1129(a)(3) requires that the "plan has been proposed in good faith and not by any means forbidden by law." It goes without saying that a debtor that evades the axe of dismissal under *Section* 1112 has no assurance that it will not fall under *Section* 1129(a)(3).

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 15 of 47

bad faith requires "an objective showing of the futility of rehabilitation and a subjective showing of bad faith." *In re Boynton*, 184 B.R. 580, 583 (Bankr. S.D. Cal. 1995) (discussing pivotal impact of lack of business to reorganize).

As to the first point, "futility of rehabilitation," the Debtors ignore the essence of what it means to be *really* in need of *rehabilitation*. The "rehabilitation" that is referred to is the preservation of a going concern, as it is in the cases discussing conversion. As noted by the bankruptcy court in *Boynton*, there are cases on both sides of the issue of whether it constitutes bad faith to file a bankruptcy case as an appeal bond substitute. In summarizing the cases, the *Boynton* court noted that the tactic is allowed only where the bankruptcy permits the debtor to save an on-going business, which would otherwise be destroyed if the judgment was enforced, that is, "preserving a viable company that provides jobs as an operating business." *Id*. at 583; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 85 B.R. 319 (W.D. Pa. 1988) (instructing that where a debtor had no business and was merely a corporate shell, such facts constitute an inability to effectuate a plan, and conversion or dismissal is proper). Here, the Debtors have no going concern to preserve. All the Debtors wish to preserve here is a speculative cause of action. They have used the bankruptcy as an appeal bond substitute, and bad faith is self-evident.

Nor does the fact that the Debtors have now proposed a chapter 11 liquidating plan change the analysis. In *Boynton*, the debtors had proceeded with the chapter 11 process and had actually obtained approval of a disclosure statement and had solicited votes for their plan. The court noted that this was not sufficient reason to keep the debtors in chapter 11 where there was no going concern involved. The bankruptcy process had no permissible reorganization purpose where the debtors had only passive income "not dependent upon a factory producing widgets or a company providing services to customers, thereby earning new revenues into the future." *Id*.

Moreover, the bankruptcy court also noted the subjective bad faith that exists under such circumstances, which presents a "heads I win, tails you lose" dynamic. Like the Debtors here, the debtors in *Boynton* also had no downside. If they lost their appeal, they did not have the assets to pay the judgment from current assets, so the judgment creditor would be left standing out in the rain. Relevant to feasibility, discussed below, if the Debtors lose the appeal here, they would

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 16 of 47

have little choice but to convert to chapter 7. If the debtors in *Boynton* won the appeal, the reason for the filing no longer existed, and they could dismiss the bankruptcy case. Similarly here, there are no "real" creditors other than Qualcomm, and a sophisticated distribution mechanism for the litigation speculators is already provided for under the Note Purchase Agreement. Under such circumstances, in *Boynton*, the court found that the bankruptcy process was being used as a means to disadvantage the litigation counterparty and to coerce a settlement. The case was dismissed for bad faith. *Id.* Likewise here, the Debtors have no valid purpose for the bankruptcy and are acting in subjective bad faith.

Other than *Marshall*, there appears to be no case that has allowed a debtor without a going concern to use the bankruptcy laws as a substitute for a *supersedeas* bond. The facts in *Marshall* were, however, very unusual[4] and, in any event, are decidedly different from the facts here. The question in *Marshall* was whether the case should be dismissed, not whether a trustee should be appointed. In particular, in *Marshall* the bankruptcy court placed substantial emphasis on the fact that a "viable" plan had been proposed by the debtors that "provides for the payment of 100% of all filed claims." That is not the case here. The plan proposed by the Debtors has no source of recovery for creditors other than litigation. It may result in <u>no</u> recovery <u>at all</u> to general unsecured creditors in Classes E1 and E2.

Also relevant to the issue of bad faith is whether the posting of an appeal bond would have been possible, or whether the debtor had absolutely "no alternative to stay [a] … judgment other than by Chapter 11." *In re Byrd*, 172 B.R. 970, 973 (Bankr. W.D. Wa. 1994). *In Boynton*, for example, the bankruptcy court noted that it was impossible to make this determination, because the debtors had never even tried to obtain a bond. Here, it is likewise impossible to say that the Debtors had no other alternative. One of two things has happened: Either the Debtors have not

---

[4] *Marshall* is a companion case to the, "Vickie Lynn" case, involving Playboy Playmate and celebrity Anna Nicole Smith (whose legal name was Vickie Lynn Marshall). The "Vickie Lynn" case was a celebrated debacle (if there can be such a thing) that culminated in *Stern v. Marshall*, 564 U.S. ___ (June 23, 2011), in which the Supreme Court held that a bankruptcy court, as a non-Article III court (*i.e.* courts without the independence and protection of life tenure) lacked constitutional authority under Article III to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim, even though they are granted statutory authority under 28 U.S.C. §157 (b)(2)(C). *In re Marshall*, 298 B.R. 670, was also the subject of an ugly recusal dispute. The *Marshall* line of cases are, quite candidly, factually extreme. They therefore provide a very questionable basis for the Debtors' theories.

Cooley LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

11.

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 17 of 47

tried to secure investments to purchase a bond, or they did inquire as to available funding, but the market rejected the Debtors' valuation of the appeal. If the market rejected the Debtors' prospects, then it is very damning. The Debtors' Disclosure Statement asserts that the likely recoveries, should they be successful, may amount to $1 billion. [*See* Doc. No.[5] 82-2 at 19 of 22 (Ex. B).] As a practical matter, the likely cost of an appeal bond here would be around $12 million. By that math, the amount of the appeal bond is thus approximately 1% of the total claimed potential recoveries. Self-evidently—if the Debtors' case is as sound as they contend— the Debtors would have been able to find investor(s) willing to contribute the cost of the appeal bond in exchange for such a rich potential return on the investment. The Note Purchase Agreement[6] is proof in itself that there are hedge funds willing to fund litigation, where they are provided with equity-like returns. Otherwise, the market has rejected the Debtors' valuation, which is telling in itself.

Therefore, either (i) the Debtors rejected readily-available funding options for securing a bond, choosing instead to file bankruptcy, thinking it cheaper and more convenient to misuse the bankruptcy process to obtain a stay; or (ii) the market declined to participate, informing them that this dog would not hunt, *i.e.*, that the claim was worthless. Either way, bad faith is demonstrated by the Debtors' use of bankruptcy to obtain an appeal bond, and cause exists. Where there is cause for dismissal, most certainly there is cause for the less drastic remedy of conversion.

### 2. The Pursuit of Litigation By a Debtor with No Going Concern Is Not a Valid Chapter 11 Purpose

The Debtors assert that Qualcomm's contention that "numerous courts" have held that the pursuit of litigation does not constitute a proper chapter 11 purpose because it is not "rehabilitation" is unsupported "hyperbole" and an "unusual argument." [Oppo. at 24.] The Debtors then try to distinguish the cases cited in the Motion for this principle. But numerous precedents do, in fact, hold that pursuit of litigation is not rehabilitation.

Starting with the Eighth Circuit's very clear holding in *Loop Corp v. United States*

---

[5] All references to "Doc. No. __" shall be to the docket in the above-captioned jointly administered bankruptcy cases.
[6] The "Note Purchase Agreement" refers to Exhibit A to the Declaration of Byron Nelson in support of the Opposition [Doc. Nos. 92-1 and 92-2].

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

12.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 18 of 47

*Trustee*, 379 F.3d 511 (8th Cir. 2004), there is overwhelming authority that a debtor without a going concern and suffering diminution of its assets has no place as a debtor in possession in chapter 11. As stated by the Eighth Circuit,

> Likewise, the bankruptcy court did not err in concluding that a liquidating debtor who had no intention of restoring its business ***had no reasonable likelihood of rehabilitation***. Courts have ***consistently*** understood "rehabilitation" to refer to the debtor's ability to restore the viability of its business. Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.

*Id.* at 516 (emphasis added) (internal citations omitted).

The Debtors argue that *Loop* does not apply here because the Eighth Circuit actually converted the case due to the committee's loss of faith in the debtor's ability to confirm a plan. Not so. First of all, the Eighth Circuit did not "convert" the case. It reviewed and affirmed the findings of both the bankruptcy court and the district court, which had found that cause existed under what is currently codified as *Section* 1112(b)(4)(A) ("substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"), because the debtor (i) had no going concern; (ii) was burning through what finite cash it had; and (iii) had no reasonable likelihood of rehabilitation. The opinions of the committee were simply mentioned by the bankruptcy court as a factor with respect to whether conversion was merited under what was then an express factor for conversion: inability to effectuate a plan. However, because the parties disputed whether the bankruptcy court explicitly found cause for inability to effectuate a plan, and because a finding of cause under what is now *Section* 1112(b)(4)(A) was a sufficient basis for affirmance, the district court did not even examine this potential alternative ground for conversion. The Eighth Circuit relegated it to a footnote. *See id.* at 515 n.2.

In respect to the discussion in *Loop* regarding the debtor's continuing loss and diminution, the Debtors argue that because, unlike in *Loop*, here, there is "no pot of money ready for distribution to creditors," that somehow makes this case less suitable for conversion. [Oppo. at 24.] The fact that the Debtors have no ready cash on hand actually makes the situation much *worse* for them. The concern in *Loop* was that in the context of a debtor who has ceased business

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 19 of 47

1  operations and had liquidated virtually all of its assets, any negative cash flow—including that

2  resulting only from administrative expenses—effectively comes straight from the pockets of the

3  creditors. *See* 379 F.3d at 516. Here, as well, the administrative expenses relating to the Debtors'

4  futile efforts to "restructure" are proposed to come straight from the creditors' already empty

5  pockets, bearing the very real risk that the estates are rendered administratively insolvent from

6  their inception.

7  　　　Here, the Debtors seem to be suggesting that because the administrative professionals

8  have now jumped onto the litigation-speculator bandwagon, agreeing to defer payment of their

9  fees in exchange for up to a 400% "multiple" return on fees and expenses in case of a

10  "Qualcomm Event," that this negates a finding of continuing loss and diminution. The Debtors

11  are wrong about that. All one has to do is to look at the Debtors' proposed Plan to see that the

12  administrative professionals are _not_ waiving their right to be paid out of the estates—regardless of

13  whether they have elected to receive an equity bonanza return on their investment under a

14  "Qualcomm Event." Under Section 7.11 of the Plan, any "Other Event Distributions" are to be

15  net of all administrative expenses incurred by Hourly Professionals[7] in the "implementation of the

16  Plan," to the extent not already paid under other provisions of the Plan. The intent is clear—if

17  there is no Qualcomm Event, all of the fees and costs of such professionals will instead be taken

18  out of the estates' other assets, that is, potential recoveries on claims against directors and

19  officers. These are assets that otherwise would have accrued to the benefit of general unsecured

20  creditors. At least in *Loop*, there was a pot of cash that was being diminished. Here, there is no

21  operating business to replenish the assets, and there is no available cash on hand—except for

22  borrowed funds. The administrative expenses of this futile exercise are running the Debtors

23  deeper and deeper into the red as every day passes.

24  　　　It also bears correcting the Debtors' implication that the Eighth Circuit is in the minority

25  on the meaning of "rehabilitation" under *Section* 1112(b). Contrary to the Debtors' depiction of

26  the holding as "unusual," the authority on this point is consistent. *See, e.g.*, *FRGR*, 419 B.R. at

27  582-85 (collecting cases). To be clear, Qualcomm does not contend that a debtor without a going

28

---

[7] This definition excludes only the compensation agreed to be paid on contingent events.

Cooley LLP
Attorneys At Law
San Diego

838513 v5/SD

14.

concern can *never* confirm a chapter 11 plan. That said, a debtor without ongoing operations cannot seek to fund distributions under a plan with speculative recoveries, such as proceeds of causes of action. There is a very practical basis for this rule. There has to be some other source of funds to satisfy the claims of creditors, in order for a plan to be confirmable in the first instance. The law is very well summarized in *FRGR*, discussed *supra*, as follows: "A lawsuit's outcome . . . is *always* speculative. Without a solid basis for believing litigation is highly likely to generate large sums of money *quickly*, it cannot provide a sufficiently reliable source of income to support confirmation." 419 B.R. at 583 (emphasis added).

In *FRGR*, similar to this case, the debtor had no operating assets or business. Nor did the debtor have any cash flow to speak of. The debtor's monthly operating reports for the months shortly after the filing reflected that the debtor had aggregate receipts of $0 and aggregate disbursements of $0. The debtor was administratively insolvent. The debtor's insiders sought to use the bankruptcy to enable the debtors' litigation against Citibank, the debtor's pre-petition lender. The U.S. Trustee brought a motion to convert, on two grounds, *Section* 1112(b)(4)(A) and *Section* 1112(b)(4)(M).

As to satisfying the first prong under *Section* 1112(b)(4)(A), continuing diminution of the estate, the court found it satisfied where the debtor continued to incur quarterly U.S. Trustee fees as well as legal fees, causing a continuing loss to the estate.

As to the second prong, reasonable likelihood of rehabilitation, as here, the debtor in *FRGR* used a substantial amount of ink trying to sell the court on the merits of the litigation. The debtor argued that because its case was extremely meritorious, the debtor should be allowed to pursue it in the spirit of "rehabilitation." The debtor argued that the state court had preliminarily concluded that it had established a probability of success and likelihood of irreparable injury, entitling it to injunctive relief, but that the debtor had been unable to post the $5 million bond required to secure the injunction. The debtor thus argued that the preliminary findings of fact from the state court action supporting injunctive relief demonstrate "a reasonable likelihood of rehabilitation." *See id.* at 581.

In reviewing the debtor's arguments, the court undertook a detailed review of the relevant

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 21 of
47

precedents to determine if a finding that the litigation was meritorious could establish a proper rehabilitative purpose. In reviewing the authorities,[8] the court found overwhelming authority that no plan that was dependent upon litigation recoveries could demonstrate a reasonable likelihood of rehabilitation, because even meritorious litigation was simply too speculative to support a plan. It is too speculative because there is no reasonable possibility of a successful reorganization within a reasonable time where the funding of the payments to be made under a plan of reorganization is dependent on the success of litigation. Even if the claims held by the estate may be "substantial," any success on the claims would likely be far away and hotly contested. *See id.* at 582-84.

The court summarized the governing law as follows:

> In general, courts look to what capital and other actual assets a debtor possesses which can be used in his Plan of Reorganization, however, *potential recovery from a lawsuit is insufficient to create a reasonable likelihood of rehabilitation*. Since there is no way to establish the feasibility of a plan which is to be funded solely from the possibility of a lawsuit, bankruptcy courts will convert or dismiss such Chapter 11 cases.

*Id.* at 583 (quoting *Moody*, *supra*, 85 B.R. at 345 (itself citing *In the Matter of Imperial Heights Apts., Ltd.*, 18 B.R. 858 (Bankr. S.D. Ohio 1982) and *In the Matter of Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir. 1985))).

Here, it is very clear that any resolution of the Qualcomm litigation is years and many, many attorney billable hours away. The litigation would be hotly contested and difficult. A confirmable plan may not, therefore, be dependent upon the results of that litigation to fund

---

[8] Among the cases cited were *Ameribuild Const. Mgt.*, *supra*, 399 B.R. at 131 n.3 ("[w]hen it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition may be frivolous."); *In re Edwards*, No. 95-18405 DWS, 1996 Bankr. LEXIS 847, 1996 WL 407253, at *7 (Bankr. E.D. Pa. June 17, 1996) (funding a reorganization plan out of the proceeds of a pending litigation was not a feasible way of completing a plan); *Thompson v. Kramer (In re Thompson)*, No. Civ.A. 92-7461, 1995 U.S. Dist. LEXIS 8175, 1995 WL 358135, at *3-4 (E.D. Pa. June 9, 1995) (same); *In re Bendig*, 74 Bankr. 47 (D. Conn. 1987) (dismissing Chapter 11 petition where debtor's only assets were potential claim for malpractice against his former attorneys and questionable equity in his residence); *In re Roma Group, Inc.*, 165 Bankr. 779, 780 (Bankr. S.D.N.Y. 1994) (dismissing case where "debtors had no property, no businesses, no employees and no assets other than the causes of action asserted in their adversary proceeding"); *In re Bock*, 58 Bankr. 374, 379 (Bankr. M.D. Fla. 1986) (holding there is no way to establish the feasibility of a plan based on speculative litigation); *In re Golden Ocala Partnership*, 50 Bankr. 552 (Bankr. M.D. Fla. 1985) (dismissing Chapter 11 petition and attendant adversary proceeding where debtor's only asset was potential claim for fraudulent conveyance); *In re Thompson*, 1995 U.S. Dist. LEXIS 8175 (E.D. Pa. June 9, 1995) (proposal to fund a reorganization plan out of the proceeds of a pending litigation was not a feasible way of completing a plan).

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 22 of 47

distributions to creditors. Nor does the Debtors' vague suggestion that, if they succeeded in the litigation, that they might come up with a business to operate hold water. That proposal qualifies as a pipedream, under any reasonable standard. The assertion is also belied by the Debtors' prior statements. The waterfall structure that is contained in the Note Purchase Agreement is very clear that the Debtors' intent and contractual obligation is to wind up their operations promptly following any recovery that may be received as the result of recoveries against Qualcomm. [*See* Note Purchase Agreement, Section 8.1(vi) (referring to amount payable in connection with the "winding-up of the business" of both Debtors)].

The Debtors simply have no ability or intent to truly rehabilitate. The Debtors cannot make that fact disappear, simply by repeating the mantra that they "have a desire and ability to reorganize under chapter 11." [Oppo. at 18.] We question their desire to reorganize, where the agreement with North Water specifically contemplates that the Debtors will wind down their operations immediately after an IP Event. We are also highly skeptical of their ability to do so. It is elementary that the Debtors will not be able to reorganize where they have no practical means to *fund* a plan. As a result, they are incapable of "rehabilitating."

### 3. The Debtors Fail to Adequately Distinguish Cases Holding that Pursuit of an Appeal is Not a Valid Rehabilitative Purpose

The Debtors, in their attempt to distinguish the relevant authorities, fail to appreciate the legal basis set forth in *FRGR*, *supra*, 419 B.R. at 583, and the cases cited therein for why a plan proposed to be funded with the proceeds from litigation is not "rehabilitative." Such a plan is not confirmable. Similar to the cases cited in *FRGR*, the Debtors' reorganization prospects are equally "speculative," "conjectural," and "ephemeral." *Id.*

For example, in *In re Am. Telecom Corp.*, 304 B.R. 867 (Bankr. N.D. Ill. 2004), the court found it significant that the debtor was a "corporate shell" that had not conducted any business activity for two years. *See id.* at 873. Like here, the debtor in *American Telecom* sought to convince the court that the proper purpose for the case was "preservation of the estate property," that is, a dismissed cause of action against a creditor, which was pending appeal. They argued that the "purpose" of the case was properly to distribute ratably the proceeds of litigation

838513 v5/SD

17.

Cooley LLP
Attorneys At Law
San Diego

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 23 of 47

recoveries to creditors. *See id.* at 874. The court found that the case was not even suitable for chapter 7. The Debtors try to distinguish *American Telecom* by suggesting that, unlike that case, here there are "creditors" to whom to make distributions. As noted below, here, the *real* creditors of this case are very few. In fact, one of the serious impediments to these cases is that they appear to be controlled by out-of-the-money equityholders, who have nothing to lose by betting the fortunes of the estates at the expense of true creditors, such as Qualcomm. As noted below, like *American Telecom*, this case is being driven by insiders and fellow speculators seeking to serve their own interests. Like *American Telecom*, this case is a liquidation, albeit in chapter 11. Bankruptcy is not to be used for gifting strategies among out-of-the-money equity. There is very little difference between this case and *American Telecom,* other than the chapter under which it was filed.

The Debtors are similarly unsuccessful in distinguishing the holding in *In re Imperial Heights Apts., Ltd.*, 18 B.R. 858 (Bankr. S.D. Ohio 1982). In claiming that the court in *Imperial Heights* was simply concerned about the lack of funding of the lawsuit [*see* Oppo. at 20], the Debtors miss the point the court was making—and the same issue that makes conversion appropriate here—which is that there were *no assets available to fund distributions under a plan*, other than speculative recoveries of litigation proceeds. The court held that "such absence of an economic entity reflected both upon 'the reasonable likelihood of rehabilitation' and the 'inability to effectuate a plan'" factors of *Section* 1112. 18 B.R. at 864. The same situation pertains here. The fact that here the Debtors may receive a loan to fund administrative expenses does not qualify as "funding" the Plan. What is at issue is how the Debtors propose to *pay* claims of creditors under the Plan. Conversion is mandated where the only assets the Debtors purport to be in a position to distribute under the Plan to claimants are the proceeds of litigation that may never be realized or received.

The Debtors also try to distinguish *In re Original IFPC Shareholders*, 317 B.R. 738 (Bankr. N.D. Ill. 2004), but because the facts are so similar, simply cannot do so. Instead, they merely assert that it is just too early in these cases to dismiss them, and that "the Debtors believe that the Plan is feasible and confirmable." [Oppo. at 35.]. But the Debtors' belief that their plan

is feasible and confirmable does not make it so.  The Debtors also suggest that, so long as they file their operating reports every month, showing *de minimis* income and *de minimis* outlay, that no one should be heard to complain about the cases languishing in chapter 11.  But bankruptcy is about maximization, not erosion, of value.  There is a need for constant diligence to ensure that the rights of creditors are not jeopardized needlessly where no purpose can be served by Chapter 11.  *See In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) ("Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired. … The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless.") (internal citations omitted).

As pointed out by the court in *Original IFPC Shareholders*, the costly and complex provisions of Chapter 11 are neither beneficial nor necessary for accomplishing the task of litigating a cause of action through to judgment and distributing the proceeds.  *See* 317 B.R. at 752-53 ("[T]his outcome will normally hold true regardless of whether the suit is conducted in the context of a Chapter 11 case, or a Chapter 7 case, or of state-court litigation that is free from any pending bankruptcy case.")  It is much better to pull the plug on needless administrative expenses sooner rather than later.  Here, there is also a need to quickly bring in an independent fiduciary to ensure proper decisions are made, free of conflicts of interest.

The Debtors next contend that *Original IFPC Shareholders* is distinguishable because there "the debtor had not presented any evidence of any investors having committed to the funding required under the plan." [Oppo. at 36.]  The Debtors are incorrect.  That statement was reserved for the court's feasibility determination under *Section* 1129.  *See* 317 B.R. at 743-44.  In connection with the separate inquiry on whether there was cause for dismissal, the court found the evidence regarding the investor contribution irrelevant, where there was no rehabilitative purpose, stating as follows:

> IFPC is … optimistic about its prospect for "rehabilitation," maintaining that new investors have committed $250,000 to permit pursuit of the second appeal in state court.  However, the "rehabilitation" label could be loosely attached to virtually any type of activity in a bankruptcy case, even through the absence of any true business activity would not warrant a traditional reorganization analysis of preserving going-concern value to benefit creditors and

Cooley LLP
Attorneys At Law
San Diego
838513 v5/SD

employees in the long run. It is true that liquidation may require post-petition financing in certain situations such as the one at bar … *The need for financing to maximize the value of the estate, though, does not equate with a need for "rehabilitation" or "reorganization" under Chapter 11*. Here, a single intangible asset of speculative value may require re-liquidation, and no need for reorganization exists *per se*.

*Id.* at 752 (emphasis added).

In the end, the Debtors can only try to distinguish the cases cited by Qualcomm; they have not been able to rally any cases that actually *support* their position. Nor can the Debtors evade the unambiguous majority rule stated in *FRGR*, *supra*, 419 B.R. at 576, as supported by the ample authority cited therein. The principle stated in *FRGR* is a sensible one on policy grounds, and it cannot be disputed under these facts: The potential recovery from a lawsuit is insufficient to create a reasonable likelihood of rehabilitation and is woefully inadequate to fund a confirmable plan.

### B. Continuing Losses Are Depleting the Estates

The Debtors next argue that, even if they have no rehabilitative purpose for chapter 11, that the case still should not be dismissed because there are no continuing losses or diminution of value. [*See* Oppo. at 33-35.] The Debtors' confidently assert that "there are no material losses or negative cash flow." [*Id.* at 34.] What follows that statement in their Opposition is perhaps the best evidence for why this factor is overwhelmingly established. First, the Debtors inform the Court that their cash flow has been "positive," by $54.00. [*Id.*] This figure does not, however, include the "accrual of postpetition attorney' fees. [*Id.*] When those amounts are included, there is plenty of red ink. The Debtors reveal that the Plan "is the product of early and intense negotiations among all creditor groups other than Qualcomm." [*Id.* at 22.] The Debtors' Disclosure Statement reveals that the estimated "unpaid administrative expenses to be incurred through the Effective Date will total approximately $600,000 in the aggregate … net of retainers." [Doc. No. 82-1 (Disclosure Statement) at 15.] But, there's more. "The foregoing estimate of administrative expenses may be significantly greater, however, if confirmation of the Plan is contested." [*Id.*] We can assure them, it will be.

Moreover, the franchise taxes from the state of Delaware are running at the rate of

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

20.

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 26 of 47

1   $15,000 per month. The Debtors take great umbrage at the Motion's statement that they have a
2   huge debt to the State of Delaware, which grows larger with each passing month. They state,
3   with wounded sensibilities, that they *only* owe $179,006.80 to the State of Delaware. They also
4   contend that they can reduce the taxes retroactively by calculating them under alternative
5   methods.

6        What the Debtors state is a half truth, at best. First of all, the Debtors are wrong that they
7   only "owe" $179,006.80. An additional amount of $180,000 is reflected as due March 1, 2013, as
8   is currently reflected on the Delaware Secretary of State website. According to 8 Del. C. § 504,
9   this amount will become delinquent if it is not paid in quarterly installments (*i.e.* 40% or $72k) by
10  June 1, 2013, (2) 20% of the estimated tax on September 1, 2013; and (3) 20% of the estimated
11  tax on December 1, 2013.

12       The Debtors otherwise quibble about the difference between "void," "delinquent" and
13  "revoked" status. We agree that their charter has not been officially "revoked"—yet. But,
14  Gabriel is clearly delinquent. What this means is that any corporate actions by Gabriel are
15  potentially *void*, because they are not in good standing. The Debtors are correct that if they do
16  not cure the delinquent status by March 1, 2014, but for the stay, their charter would be
17  automatically revoked, which presents some interesting questions regarding their ability to
18  litigate. The Debtors admit, but try to downplay the importance of their corporate status currently
19  being delinquent. In fact, while in delinquent status, the Debtors are unable to obtain a certificate
20  of good standing from the State of Delaware. *See* 8 Del. C. § 502(f).  8 Del. C. § 508 also
21  provides that the attorney general of the State of Delaware may obtain an injunction to restrain
22  such a corporation from "the exercise of any franchise or the transaction of any business within
23  the State," until the tax is paid, "with interest due thereon and the cost of the application."

24       Moreover, it is very unlikely that the Debtors will be able to reduce the taxes payable.
25  Although it is true that it is *possible* to calculate the Debtors' franchise taxes under an alternative
26  method, the Debtors decline to tell this Court what doing that would specifically require. We will
27  fill in the blanks: It would require them to submit "a statement setting forth the number of shares
28  of each class of stock actually issued, if any, and the amount of the *total gross assets* of the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD                                    21.

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 27 of
47

corporation, as of the nearest date on which the amount is obtainable, including in the statement its goodwill valued at the same amount at which it is valued in the books of account of the corporation." 8 Del. C. § 503(b) (emphasis added). The Debtors can't do that. As stated on the Delaware State web site, the "Total Gross Assets shall be those 'total assets' reported on the U.S. Form 1120, Schedule L (Federal Return) relative to the company's fiscal year ending the calendar year of the report." *See* http://corp.delaware.gov/frtaxcalc.shtml.

As noted in the Motion, Debtors have not filed a federal or state tax return in many years. Nor do they appear inclined to do so now. Their Plan states that they will file delinquent tax returns "[a]s soon as practicable following the Effective Date." [Plan at 18]. The Debtors have been promising to do so, as soon as practicable, for years. The Debtors' Plan is silent on how they will get the funds to pay for these services. While their Operating Reports do not contain a budget, they do strongly suggest that the Debtors have no intention of accomplishing the important task of filing their delinquent state and federal tax returns. They do not recognize *any* tax claim by the State of Delaware or any other governmental authority or unit. [*See* Doc. Nos. 75 and 76 at 7 (Sch F) for each of the reports – no "Priority Tax Claims" listed). Gabriel's corporate charter status is a substantial obstacle to confirmation.[9] One would have thought that such an important issue would have been thoroughly explained in the Debtors' Disclosure Statement. The absence of this explanation, and the vagueness of the Plan regarding the means and timing of filing both the delinquent tax returns and SEC filings is just one more proof that the Debtors cannot be trusted as fiduciaries.

Nor does the fact that the Debtors have obtained post-petition financing from the speculators to cover certain (but certainly not all) administrative expenses allow the Debtors to claim that the estates are not continuing to experience losses. To the contrary, the fact that the estates must take on more debt simply to pay the professional fees is a *per se* indication of diminution of value.

---

[9] 8 Del. C. § 508 provides for an injunction proceeding by the Delaware attorney general against Gabriel and/or the voiding of Gabriel's charter by the state of Delaware under 8 Del. C. § 510 (for failure to pay, *e.g.*, pre-petition 2012 franchise taxes). Assuming that the Debtors are correct that revocation of the charter would be barred by the automatic stay, even they admit that they would be required to bring these amounts current immediately upon confirmation. Unfortunately for them, their Plan does not provide a means for that.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

The fact of continuing losses and diminution of assets is established here beyond any doubt. The estates are administratively insolvent, and the earlier the needless running of administrative expenses of the estates is stopped, the better.

## IV. CAUSE IS ESTABLISHED BECAUSE THE DEBTOR WILL BE UNABLE TO EFFECTUATE SUBSTANTIAL CONSUMMATION OF A CONFIRMED PLAN

The Debtors argue that the requirement for "rehabilitation" as used in the cases cited above may otherwise be satisfied by the ability to confirm a plan. There is no support for that argument, which is clearly rejected by the authorities. "The issue of rehabilitation for purposes of §1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *Rand v. Porsche Fin. Servs., Inc. (In re Rand)*, 2010 Bankr. LEXIS 5076, *14 (B.A.P. 9th Cir. Oct. 22, 2010) (internal citation and quotation marks omitted).

There is another, equally compelling reason why the Debtors arguments fail. That is because the Debtors will be unable to confirm a plan that is feasible under *Section* 1129.

### A. The Plan Is Not Feasible

As noted above, courts view the inquiry for cause under *Section* 1112(b)(4)(A) to be closely related to the issue of a plan's feasibility. In this respect, most courts do not find it necessary to inquire into the merits of the underlying claim to determine that such a plan is not feasible. As noted in *FRGR*, the reasoning for this approach is based in the historical requirement that established "inability to effectuate a plan" as cause to warrant dismissal or conversion. 419 B.R. at 582 (citing historical 11 U.S.C. §1112(b)(2)).

Feasibility under the Bankruptcy Code means that the plan "is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §1129(a)(11). The standard for evaluation is that the plan must be "reasonably likely [to] succeed[ ] on its own terms without a need for further reorganization on the debtor's part." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (quoting *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996)).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

23.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 29 of 47

In evaluating the test of whether the plan is feasible under such circumstances, the courts look at the "capital and other actual assets a debtor possesses" that can be used to pay creditors under a plan. Where a plan is to be funded[10] solely from the possibility of proceeds of a lawsuit, there is "no way to establish the feasibility" of such a plan. *See FRGR*, 419 B.R. at 583 (quoting *Moody*, *supra*, 85 B.R. at 345).

The Third Circuit has recently reiterated that a plan funded by speculative litigation cannot be confirmed as feasible, because it cannot possibly meet the "reasonably likely to succeed" standard:

> Feasibility requires that the plan must be "reasonably likely [to] succeed[ ] on its own terms without a need for further reorganization on the debtor's part." In considering feasibility "a bankruptcy court must evaluate the possible impact of the debtor's ongoing civil litigation.' ***A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely***.

*Id.* at 156 (quoting *Applied Safety*, *supra*, 200 B.R. at 584) (emphasis added).

As noted above, *any* litigation is speculative, whether meritorious or not. Thus, in order to confirm a plan that is feasible here, the Debtors would create a plan that is *not contingent on the receipt of the proceeds of future litigation*. Such proceeds cannot be the basis for a plan's distribution scheme. Here, because the Debtors have no operations, no employees, no real property, no intellectual property, no cash, and no source of income from anything other than litigation, it is clear that it will be impossible for them to propose a plan that is not contingent on the receipt of the proceeds of future litigation. There really are no practical and available options left to the Debtors. (A plan funded on the prospect of winning the lottery is also not an available option under chapter 11.) The case must therefore be converted or dismissed.

## B. The Debtors' Appeal Is a Dead End—Dooming Their Plan to Rejection.

Because a plan cannot be contingent upon the outcome of speculative litigation, even under the best of circumstances and where the case is meritorious, the Court need not analyze the

---

[10] The Debtors appear to confuse the case references to a plan being "funded" to refer to outside funding of the costs of the litigation. That is not what the cases are referring to. By questioning the sources of "funding," the cases are referring to how the plan proposes to pay creditors.

Cooley LLP
Attorneys At Law
San Diego

838513 v5/SD

24.

merits of the "frivolous" and "objectively baseless" litigation against Qualcomm. *See FRGR*, 419 B.R. 576 at 582. That said, if the Court assesses the merits, it would have to reject the Debtors' Plan because the Debtors have no realistic hope of prevailing on the appeal, and even less hope of prevailing in any litigation after a remand. In short, any plan that puts all its eggs in prevailing in a litigation that the District Court has already found to be "frivolous," "objectively baseless" and brought in "subjective bad faith" is not feasible.

### 1. The District Court's Rulings Were Based on an Extensive Record of Evidence, Not "Prejudice" or "Disdain."

In the opposition and appellate briefs, the Debtors' key theme is that Qualcomm's improper "invective" and "*ad hominem* attacks" led the District Court, with its "technical expertise lacking," to issue "dubious," "prejudiced," "injudicious," "one-sided," and "disdainful" decisions that "barred legitimate discovery," "rejected pivotal affidavits under inapplicable doctrines," and "ignored legal precedent and the opinions of four highly credentialed experts." The District Court allegedly did this "to make short shrift of the Debtors."[11] Nothing could be further from the truth.

First, the District Court is not as naïve or gullible as the Debtors would have this Court believe. The District Court did not simply accept without question Qualcomm's alleged "invective" and "*ad hominem* attacks" portraying the Debtors as a shady outfit. Rather, in every instance, the Court relied on admissible evidence presented by Qualcomm to establish that the Debtors were pursuing the claims for improper reasons and in bad faith. Among other things, the evidence included:

- Written admissions from a director of Gabriel, who happened to be a twice convicted felon, that "*the cupboard is bare*" and "*we have no case; just a lot of talk.*" (Doc. No. 44, Ex. 1).

- Written admissions from the litigation consultant who claims to have developed the entire case for Gabriel likening Locate's documentary evidence to an empty bag. (Mojdehi Decl., Ex. 1, at 4).

The District Court reviewed the evidence that Qualcomm submitted and reached its own

---

[11] The quotes in this paragraph attacking the District Court are all taken from the Debtors' Opposition brief at pages 1 and 30.

Cooley LLP
Attorneys At Law
San Diego

conclusions based on that evidence, not some unwarranted "prejudice" or "disdain."

Second, the portrayal of the District Court as "prejudiced" and "disdainful" towards Gabriel is even more implausible given the way this case was passed around the Southern District's Docket. Four different judges issued decisions in this case and all were consistent with one another. Magistrate Judge Porter reviewed the Debtors' first trade secret designation and found it insufficient. [*See* Mojdehi Decl., Ex. 2.] The case was then transferred to Magistrate Judge Dembin who considered the subsequent designations. Like Judge Porter, he found the Debtors' designations "intolerabl[y] vagu[e]"—a decision then affirmed by District Judge Battaglia. [Doc. No. 47, Ex. 25, at 8]. With respect to the merits, District Judge Anello first considered the merits of the case in ruling on the Bond Motion. Judge Anello concluded that the Debtors' claims were "likely unmeritorious, and brought in bad faith." [*Id.*, Ex. 23, at 22.] Judge Anello then transferred the case to Judge Battaglia, who granted summary judgment in favor of Qualcomm on all claims and awarded Qualcomm $12 million in attorneys' fees because the Debtors had pursued claims that were "frivolous," "objectively baseless," and brought in "subjective bad faith." [*Id.*, Ex. 29, at 7.] In light of this procedural history, the Debtors' allegation that Qualcomm, somehow, improperly prejudiced four different judges "to make short shrift of the Debtors" and deprive them of due process in a "rush to judgment" is meritless. [Oppo. at 1 and 26, respectively.]

Finally, the District Court did not reach its decisions "hastily" after having "barred legitimate discovery." [Oppo. at 1.] The Debtors were given more than a fair opportunity to take discovery and develop whatever evidence they could to support their claims. Collectively, the parties conducted 26 individual depositions over 40 days. [*See* Mojdehi Decl., ¶ 6.] Of the 26 depositions, the Debtors noticed 16 of them that consumed over 20 days of testimony. [*Id.*] Those depositions included every single inventor on the patents-in-suit and virtually every key player involved in the SnapTrack/Locate relationship. In addition to depositions, Qualcomm produced over 1.2 million pages of documents. [*Id.*] In sum, it was not a lack of discovery or prejudice that led to the District Court's findings against the Debtors—it was the utter lack of merit of Debtors' claims.

Cooley LLP
Attorneys At Law
San Diego

838513 v5/SD

26.

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 32 of 47

2.      **The District Court Did Not Commit Error In Entering Judgment Against the Debtors.**

The Debtors spend substantial time arguing the merits of the appeal in an effort to convince this Court that it is worth pursuing. In doing so, the Debtors repeatedly and grossly misstate the events and rulings below. If this Court, or a Trustee, examines the true record, it will reach the same conclusion that the District Court did—that the underlying claims were "frivolous" and "objectively baseless" and that the appeal is a hopeless dead end that provides no legitimate prospects for a brighter future for the Debtors.

a.      **The District Court's Patent Inventorship Ruling Was Correct.**

The entire crux of the Debtors' case against Qualcomm was that Qualcomm stole ideas from Locate Networks and incorporated them into various Qualcomm patents. In its last summary judgment ruling, the District Court rejected the Debtors' inventorship claim in its entirety. [*See* Doc. No. 47, Ex. 28.]

The Debtors first assert that the District Court applied the wrong legal standard in deciding the summary judgment motion and improperly based its decision on credibility determinations. The District Court's opinion shows otherwise:

- '050 Patent: "Clise admitted that he did not even think of certain technologies that the '050 patent addresses" and "had **no answer** when asked to identify specific information that he provided to Dr. Krasner that could qualify Clise as the true inventor." [Doc. No. 47, Ex. 28, at 7.]

- '958 Patent: Clise "could not say 'with any reliability who did what when'" and "Plaintiffs **have no evidence** that they conveyed their ideas to Dr. Krasner and Sheynblat before SnapTrack's invention in October 1999." [*Id.* at 8.]

- '277 and '639 Patents: "Plaintiffs **have no evidence** that anyone at Locate conceived of the '277/'639 invention" because "the Locate system was very different from the '277 patent because the UE did not store nor send a position estimate." (Patents SJ Order, Dkt. 328, at 9). In addition, "Plaintiffs **have no evidence** that the named inventors . . . took information from Locate" because all of the allegedly omitted inventors "testified that they had never met Burroughs, Edge or Fisher." [*Id.* at 10.]

- '249 Patent: Finding that Plaintiffs "**have not presented any evidence** that Dr. Gaal's invention was derived from Clise's ideas" and "**provide[d] no evidence** to support" the allegation that Dr. Gaal received material from Locate and built on it. [*Id.* at 11.]

- '195 Patent: "Plaintiffs **have no evidence** to back up the allegation that Dr. Krasner, Dr.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 33 of 47

Wolf, and Sheynblat wrote the '195 patent using information from Clise and Crowson." [*Id.* at 12.]

As these excerpts demonstrate, the District Court based its summary judgment ruling on complete lack of evidence presented by the Debtor. That is the appropriate standard and the Debtors' argument will fail.

Second, Gabriel has presented no basis on which to reverse the District Court's claim constructions.[12] In its appellate brief, Gabriel argues that the District Court misconstrued the claims, but does nothing to support that argument. The Debtors fail to provide any alternative claim constructions, fail to cite any relevant evidence, fail to distinguish the evidence submitted by Qualcomm in the summary judgment briefing, and fail to address the evidence cited by the District Court in reaching its conclusions. Instead, the Debtors' appellate argument is limited to a bald assertion that the District Court read limitations from the specification into the claims. [*See* Doc. No. 94-3, Ex. C, at 65-66.] That is not enough to obtain reversal of the summary judgment order, especially in light of the Federal Circuit's *en banc* decision requiring the District Court to interpret the claims in light of the specification.[13] *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed Cir. 2005) (en banc). In that case, the Federal Circuit variously stated that:

- Claims "must be read in view of the specification, of which they are a part." *Id.* at 1315 (citations omitted).

- "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

- "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." *Id.* at 1316.

- "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317.

Qualcomm repeatedly submitted uncontradicted evidence supporting the meaning of the claims in

---

[12] Claim construction here refers to the process by which the court determines the meaning of various words and phrases in the claims of the patents at issue. *See generally Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996).
[13] Tellingly, the Debtors do not cite any cases in their argument regarding the claim construction for the patents in suit. *See* Doc. No. 94-3, Ex. C, at 65-66.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1   the patents-in-issue, from the claims, the specification, and the prosecution history.  [*See* Doc.

2   No. 47, Ex. 28, at 7, 9 n.5, 11-12 (citing evidence submitted as part of the Teter Declaration in

3   support of claim construction).]  Gabriel did not, and any argument that the District Court failed

4   to construe the claims properly is unsupported and meritless.[14]

5                   **b.      The Trade Secret Summary Judgment Ruling Was Correct.**

6           The Debtors also claim that they are likely to obtain reversal of the District Court's

7   decision on the trade secrets claim.  The Debtors are wrong again.

8                   **(1)      The Statute of Limitations Ruling Was Correct.**

9           In its opposition brief, the Debtors misstate the record on the summary judgment motion.

10  The District Court did not base its decision that the claim was time barred on "two lines of an

11  email" from 2003.  [Oppo. at 10.]  Instead, the District Court found two entirely independent

12  bases on which to find that the claim was time barred:  (1) the e-mail to which the Debtors refer,

13  *and* (2) statements from Gabriel's CFO regarding his suspicions and actions in 2004.  As to the

14  latter, the Debtors never even mention that basis for the summary judgment order in their

15  Opposition brief, and for good reason.  The testimony of the Debtors' former CFO establishes

16  that he first talked to Gabriel's original lead trial counsel about the claims asserted in this case in

17  September 2004—long before the critical date.  That testimony, and the citation to corroborating

18  documents, is recited by the District Court in detail in its summary judgment order.  [*See*, *e.g.*,

19  Doc. No. 94-3, Addendum 4 to Ex. C, at 12-15.]  Debtors' failure to even attempt to explain away

20  this basis for the summary judgment order is telling.

21          Moreover, the District Court's decision regarding the 2003 e-mail will also be affirmed.

22  That e-mail establishes that William Clise subjectively believed that Snaptrack "ripped off"

23  Locate's technology in January 2003.  [*Id.* at 8.]  Clise then admitted that he did nothing to

24  investigate his suspicion.  [*Id.*]  This is fatal to the claim, as California law requires a person who

25  has a *subjective* belief of the existence to investigate the alleged claims.  *Jolly v. Eli Lilly & Co.*,

26  44 Cal.3d 1103, 1111 (1988).  Only if it would have been impossible for the person to have

27  discovered the claim is the failure to investigate excused.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35

28  ---

[14] Indeed, Qualcomm believes that the Debtors have waived any argument regarding claim construction on appeal.

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 35 of
47

Cal.4th 797, 808 (2005). The fact that Clise concluded almost a decade later that his subjective belief in 2003 was wrong—thus acknowledging that SnapTrack did not steal anything from Locate—does not save his admitted failure to investigate.

Regardless, the Debtors' argument on this e-mail suffers from another insurmountable defect. Debtors assert that if Clise had investigated his suspicion in 2003, he would have concluded that his belief regarding the presentation was erroneous because the presentation does not actually disclose the broadcast of acquisition assistance data. This is the exact argument that the Debtors made to the District Court below. [Doc. No. 94-3, Addendum 4 to Ex. C, at 10.] Relying on a prior declaration from Gabriel's own expert, in which he defines "acquisition assistance data" broadly, the District Court found that the presentation did disclose Gabriel's alleged trade secret. [*Id.* at 9-10.] It is highly unlikely that the Debtors will have any more luck convincing the Federal Circuit that the expert testimony it submitted was wrong.[15]

Finally, the Debtors argue that the District Court erred by misapplying the "sham affidavit" rule and disregarding virtually all of Gabriel's declarations. This argument is misleading. While the District Court did disregard the affidavits of De Carlo and Angus as "shams," it also found that they were inadmissible for other reasons. Specifically, the District Court disregarded the Angus and De Carlo affidavits as speculative and unsupported by personal knowledge—decisions that were absolutely correct. [*Id.* at 9 n.9, 11.] And with respect to the Clise, Sahai, and Shanley affidavits, the District Court did not find that they contradicted sworn testimony from other witnesses. Instead, the District Court found that those witnesses contradicted their own prior sworn testimony—the exact situation the "sham" affidavit rule was intended to prevent. [Doc. No. 94-3, Addendum 4 to Ex. C, at 9-11, 14.]

---

[15] The Debtors also assert that the District Court erred because when Clise accused SnapTrack of "ripping off" Locate ideas, he did not mean "stealing," he meant "imitating." [*See* Oppo. at 27, citing the Urban Dictionary.] This argument is so flawed it is difficult to know where to start. First, the Debtors never raised this argument below, meaning it has been waived. [*See* Doc. No. 94-3, Addendum 4 to Ex. C, at 8-12.] Second, Debtors presented no evidence to support its assertion that Clise meant something other than the normal connotation of the word "rip off." [Oppo. at 27.] Third, Clise's deposition testimony makes clear that he understood "rip off" to describe the alleged conduct in this case—not mere imitation. [*See* Mojdehi Decl., Ex. 3, 8/26/11 Clise Depo. Tr. (Vol. I) 34:21-35:5.]

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

30.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 36 of 47

**(2)      The Discovery Ruling Is Irrelevant to the Debtors' Prospects on Appeal.**

Finally, the Debtors devote a substantial portion of the Opposition brief and appellate brief (Doc. No. 94-3, Ex. C), to arguing that the lack of discovery into the trade secrets claim somehow deprived them of due process. This argument is a red herring. The District Court dismissed the trade secrets claim because it was barred by the statute of limitations. The lack of discovery into the merits of the trade secrets claim did not prevent the Debtors from defending that summary judgment motion. The Debtors did not need discovery from *Qualcomm* to argue when the *Debtors* first concocted the claims they asserted. As the statute of limitations ruling was correct, reversal on the sufficiency of the trade secret designation is meaningless.[16]

**3.      Even Success on Their Frivolous Appeal Could Not Improve Debtors' Lot.**

The Debtors also assert that this Court should consider the rather lenient standard of review applicable to the appeal. But even if the Debtors could prevail on the appeal, which they will not, such success gets them nowhere. The Debtors did not move for summary judgment. As a result, success on the appeal means only remand for further proceedings. The Debtors must still prove their underlying claims by clear and convincing evidence. Nothing suggests that they can do so. To the contrary, the District Court's findings foretell the ultimate outcome of this case. The District Court based its decision on an extensive record. (*See* Section IV.B.1 above). Not only did it conclude that Debtors had no evidence to support their claims, but that it was so *not* close that it was "exceptional" and "bad faith" for the Debtors to even assert the claims. These are not claims that have any real prospects for success.[17]

Moreover, even if the Debtors were able to revive their claims at the Federal Circuit, it would be prohibitively costly and time-consuming to litigate them on remand to the District Court. As the Court is aware, Qualcomm spent $13 million litigating the claims through

---

[16] To be clear, the District Court's ruling on the sufficiency of the trade secret designation was correct. However, Qualcomm will not spend additional time arguing a point that is irrelevant to the outcome of this Motion.

[17] In fact, the only result of further litigation of the merits of the trade secrets claim will be additional evidence for another fee motion by Qualcomm. The Debtors have no hope of proving their trade secrets claim in a case where Locate filed *and then abandoned* a patent application that, according to Clise, disclosed everything a person of ordinary skill would need to build the Locate system. Trade secrets that are disclosed publicly in a filed and abandoned patent application are not trade secrets.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

31.

summary judgment. Gabriel admitted that it expected to spend $10 million "all in" on the litigation. [Doc. No. 44, Ex. 1]. Yet the Debtors have no plan to pay for those future litigation costs, which will include expert fees and other costs not covered by any contingent fee agreement, through a lengthy remand and appeal. In sum, even if the Debtors won on appeal, that win is meaningless because it does not provide any remedy (other than more litigation cost and fees) or improve Debtors' bleak future.

### C. The Feasibility of the Plan Must Be Viewed In Light Of Qualcomm's Non-contingent, Liquidated, Undisputed $12 Million Judgment

Because a plan cannot be contingent upon the outcome of speculative litigation, even under the best of circumstances and where the case is meritorious, most courts reject the need to even perform an evaluation of the merits of a debtor's litigation claims in deciding whether there is cause under *Section* 1112 to dismiss or convert. *See FRGR*, 419 B.R. at 582.

But equally important to the question of feasibility is the other side of the equation—Qualcomm's $12 million claim. Where here there is a final judgment on the merits in Qualcomm's favor, the Court must consider the impact of Qualcomm's $12 million judgment and the Debtors' ability to pay that judgment in the full amount, on, or shortly after the effective date of the Plan. The only alternative to not paying the judgment in full is to eliminate all other claims and interests that are subordinate to that claim. *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

Stated simply, the Debtors' Plan must respect claim and issue preclusion.[18] A federal district court judgment has full *res judicata* effect when it is set forth in a separate document and entered on the civil docket by the clerk. 18-131 MOORE'S FEDERAL PRACTICE – CIVIL §131.30; *see also Amcast Indus. Corp v. Detrex Corp.*, 45 F.3d 155, 158-160 (7th Cir. 1995) ("A final judgment by a district court has preclusive effect [as to both claim and issue preclusion] even though the judgment is pending on appeal.); *Tripati v. Henman*, 857 F.2d 1366, 1367 (9th Cir. 1988) (denying preclusion would lead to absurd results and tangles of duplicative litigation). The

---

[18] Federal claim preclusion law applies to determine the preclusive effect to be given a prior federal court judgment. *See Performance Plus Fund, Ltd. v Winfield & Co.*, 443 F. Supp. 1188, 1190 (N.D. Cal. 1977). Claim preclusion applies if (1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related. *See id.* at 1189.

reason for this latter rule is that a decision rendered by a court of competent jurisdiction is presumptively correct. Likewise, even a stay and *supersedeas* will suspend execution of a judgment but not the preclusive effect of the judgment. *Huron Holding Co. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941).

The claim preclusive effect of a federal judgment is binding on a bankruptcy court. Thus, for example, courts looking at the nature of claims for determining if a judgment creditor has standing to file an involuntary petition have held that a claim that has been reduced to judgment against a debtor before an involuntary petition is filed "is neither contingent nor unliquidated," even if the debtor has filed an appeal of the judgment. *Craig Corp. v. Albano (In re Albano)*, 55 B.R. 363, 368-69 (N.D. Ill. 1985). Likewise, a judgment creditor's claim is not contingent or unliquidated for purposes of determining solvency under *Section* 547. *Imagine Fulfillment Servs., LLC v. DC Media Capital, LLC (In re Imagine Fulfillment Servs., LLC)*, Case No. 2:12-bk-20544-WB, 2013 Bankr. LEXIS 934 (Bankr. C.D. Cal., Mar. 12, 2013).

Principles of res judicata dictate that Qualcomm's claim is neither contingent, nor is it unliquidated. *In re Keenan*, 201 B.R. 263 (Bankr. S.D. Cal. 1996). The claim is not subject to estimation under Section 502(c). It will need to be allowed in the full amount. *Nugent v. Bus. Cards Tomorrow, Inc. (In re Nugent)*, 254 B.R. 14 (Bankr. D.N.J. 1998). Estimation contemplates that the bankruptcy court will put itself in the place of a non-bankruptcy court or jury to estimate whether a debtor is liable to the claimant and, if so, to estimate the amount of the debt. In either instance, § 502(c) presupposes that a nonbankruptcy court has not already done so. "It would stand comity on its head and misuse the limited scope of § 502(c) for a bankruptcy court to proceed as if a nonbankruptcy court or jury had not acted at all when a case has already proceeded to judgment." *Keenan*, 201 B.R. at 266.

Nor can Qualcomm's judgment claim be disputed by the Debtors or any other party in interest. The Ninth Circuit has held the claim of a judgment creditor is not a "disputed" claim. Specifically, the Ninth Circuit held that to ignore the preclusive effect of a judgment would violate full faith and credit and be "contrary to the basic principles respecting, and would effect a radical alteration of, the long-standing enforceability of unstayed final judgments to hold that the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

33.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 39 of 47

pendency of the debtor's appeal created a 'bona fide dispute.'" *Marciano v. Chapnick (In re Marciano)*, 708 F.3d 1123, 1126 (9th Cir. 2012) (quoting *In re AMC Investors*, 406 B.R. 478, 484 (Bankr. D. Del. 2009)). The Ninth Circuit also noted that a final judgment vests the creditor with a property right, which must be respected in bankruptcy. *Id*. at 1127 (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)). In *Marciano*, the Ninth Circuit specifically rejected the debtor's argument that the bankruptcy court should evaluate the merits of their appeal, stating that allowing the bankruptcy court to inquire further as to the validity of the judgment creditor's claims, 'turns the court into an odds maker on appellate decision-making'" *Id*. at 1127 (quoting *AMC Investors*, 406 B.R. at 485).

Here, the Debtors have no readily available assets in the estates, nor will they have any such assets at the time of confirmation to pay Qualcomm's claim even in small part, much less in full. The Plan evinces no real intent to ever pay *anything* on Qualcomm's claim. The Plan's "hypothetical" payment exhibits provide no hypothetical where Qualcomm is paid. As evidence of the Debtors' extreme bad faith, Qualcomm is expressly excluded as a beneficiary of the proposed Litigation Trust, despite the fact that Qualcomm is the only true creditor.[19] As noted below, absent some means with which to pay Qualcomm's fully liquidated, undisputed, non-contingent claim in full on the effective date of the Plan, there is a virtual certainty that the Plan will result in the liquidation of the Debtors. It thus cannot possibly be deemed feasible.

### D. The Plan's Structure Is Otherwise Flawed

The Debtors' Plan sets out groups of purported "secured" creditors, each of whom are supposed to share in any proceeds of a Qualcomm Event. The Debtors make much of the fact that the Plan provides for "shared sacrifice." Indeed, the Debtors and the Committee try to lead this Court to believe that the Plan results in a "more favorable return on unsecured claims." [Oppo. at 23.] In this respect, the Debtors seek to create an illusion of magnanimity, pointing to the fact that a purported senior secured creditor, North Water, "has agreed to share its priority position under the 2011 Agreement with other creditors, and particularly with general unsecured

---

[19] Apparently, the Debtors wish to make absolutely certain that the trustee will not have a fiduciary duty to Qualcomm. This is just one more outrageous fact that evidences the unreasonable animus and serious conflicts of interest that beset the Debtors and the Committee, and the pressing need to bring in a trustee.

creditors, in order to enhance any recovery by unsecured creditors in the event of recovery in the Qualcomm Litigation, and has agreed to forego its lien, and any claim whatsoever, against all assets of the Debtors other than any recovery from Qualcomm." [Oppo. at 13-14.] The Debtors state that this is true because $20 million of secured debt encumbers all of the assets of the Debtors.

This sounds very nice and generous, but there is no substance to the argument. The Plan is, respectfully stated, a farce. Much less than a magnanimous offer, the Plan represents an improper attempt by North Water and their bedfellows, the litigation speculators, to improve their position at the expense of creditors. They do not have an encumbrance on _any_ of the assets of the Debtors, much less all of them. In this respect, it is important to go back to first principles to inquire: What is the "security" that these supposed Class A through Class C claimants hold?

Each of the purported "secured creditors" claims their security position under that certain Note Purchase Agreement Dated September 2, 2011. The grant of the security interest in that agreement provides as follows, in relevant part for a lien in the following collateral:

> any **recovery**, whether by settlement, award, verdict, judgment or other order, with respect to an IP Event (including without limitation, all IP Event Proceeds), **and** all Accounts, Chattel Paper, Documents, Equipment, Fixtures, **General Intangibles**, Goods, Instruments, Inventory and Investment Properties (as such are defined in Article 9 of the UCC) of Gabriel and [Trace]."

Note Purchase Agreement, Section 7.1

The Security Agreement also contained an after-acquired property clause, asserting a lien, "whether presently owned or existing or hereafter acquired or coming into existence, wherever situated, and all additions and accessions thereto and all substitutions and replacements thereof; and all proceeds, products and accounts thereof and of insurance covering the same, including, without limitation, a pledge by Gabriel of all of the membership interests in [Trace]." _Id_. Importantly, there was no lien asserted in the litigation claim against Qualcomm nor was there a lien asserted in any commercial tort claims (as defined in the UCC). The Obligations secured by the security interest are the principal and interest on the Notes, the IP Interests payable, the IP

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 41 of
47

Event Proceeds[20] payable, and "all other monetary obligations under the Notes and the other Financing Documents. *Id.* at 8 ("Obligations" defintion). The only "obligations" arising under the Financing Documents, other than those related to payment of proceeds from an IP Event, are fees that may be incurred in collection of those amounts. Nothing is presently due under the Notes, so no "Obligations" have been triggered.

Under the Uniform Commercial Code, tort claims may be attached. That being said, a description of collateral in a security agreement as "all tort claims" is insufficient to meet the requirement for attachment. *See* UCC Section 9-108(e). Second, no security interest attaches under an after-acquired property clause to a tort claim. *See id.* Section 9-204(b). Moreover, a security interest or lien in the proceeds of a pending lawsuit does not become choate until a settlement or judgment is obtained because the property to which the lien is attached is not "in existence" until that time. *See, e.g., PPG Indus., Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58, 62 (2d Cir. 1976); *cf. Don King Prods. v. Thomas*, 945 F.2d 529, 534 (2d Cir. 1991) (assigned right to receive income from prize fight purse was contingent on future event and remained inchoate until proceeds came into existence upon occurrence of prize fight).

Here, all that is subject to the lien was any "recovery," from an IP Event, but *not the underlying tort claim*. The inclusion of General Intangibles in the grant of the security interest did not capture the litigation claim against Qualcomm (or for that matter any claims against directors and officers), because the definition of General Intangibles under the UCC expressly excludes commercial tort claims. UCC Section 9-106. Clearly, the lien and the security interest would not attach to recoveries unless and until is a judgment or settlement in this case. *See id.* Section 9-203. What does this mean? The lien had not attached to any collateral as of the petition date.

Nor can the so-called secured creditors depend upon the after-acquired property clause in the Note Purchase Agreement to attach "proceeds" that occur post-petition. "Proceeds" under the

---

[20] An "IP Event" is defined in pertinent part as "the ***recovery*** and/or ***receipt*** by Gabriel … of any amount paid by or on behalf of any Person, defendant or third party, or the amount of other value ***received***, … which amounts relate directly or indirectly to the Qualcomm Dispute … ." "IP Event Proceeds," meanwhile, are defined as "the aggregate amount of the ***proceeds*** or other ***consideration received*** by any Loan Party with respect to an IP Event." Thus, the collateral is the same – *i.e.*, the recovery, ***not*** the claim itself.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 42 of 47

UCC only apply to proceeds of collateral. The security agreement purports to assert a lien in "recoveries," and there were no recoveries in existence at the time the petition was filed. As stated earlier, the *claims* against Qualcomm itself are not part of the collateral. As such, any recoveries that are earned post-petition on the unencumbered claim or other tort claims would be property acquired *after* the petition and would be proceeds of property (the tort claims) that is not encumbered by the pre-petition lien and security interest. Furthermore, such after-acquired proceeds of the tort claims are excluded from the operation of the security agreement under 11 U.S.C. §552(b), which preserves after-acquired property for the benefit of the estate. The "lenders" are not secured in the proceeds of a Qualcomm Event, nor are they secured in the proceeds of any other tort claims or claims for breach of fiduciary duty held by the Debtors' estates.

The result is that the Debtors' Plan, the game of musical chairs among the litigation speculators, and the "restructuring" which they contend will benefit the estates, are all a charade. It is also an exercise in futility, where the plan cannot be confirmed. The Debtors' Chapter 11 vision and the elaborate Plan are a waste of time and money. Demonstrating their fiduciary failures, neither the Debtors nor the Committee disclose these issues, which render the intended structure for their Plan a nullity. Conversion is the only solution.

### E. The Debtors' Plan Is a Plan to Benefit Equity At the Expense of True Creditors

The Debtors' Plan is otherwise not confirmable, on its face. Under the absolute priority rule, if creditors are not paid in full under the plan, equity interests must be terminated upon confirmation. *See Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 522-23 & n.16 (5th Cir. 2004). Here, the Debtors' Plan proposes to keep equity in place, while leaving unpaid Qualcomm's fully liquidated, uncontingent, undisputed claim. Such a plan is not fair and equitable, and the Debtors will be unable to "cram-down" the plan over Qualcomm's objection. *See* 11 U.S.C. §1129(b)(2)(B) (requiring the plan to either provide value, as of the effective date of the plan, of the allowed amount of the creditor's claim or to eliminate all classes junior to such claim); *see also In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 510 (Bankr. S.D. Ohio 2011) ("[T]he

Cooley LLP
Attorneys At Law
San Diego

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 43 of
47

Plans violate the absolute priority rule even if, as the Debtors contend, the Member Noteholders stand to receive no cash until other creditors are paid in full.").

Furthermore, there is serious question whether the Debtors' purported "lenders" are creditors at all. As reflected by the notes, they have no lien that has attached to anything. *See* Note Purchase Agreement, Exs. A-1 through C-2. They also had no right to payment on the Petition Date. Furthermore, the litigation speculators actually appear to be equity hiding in creditors' clothing. Although the term "claim" is broad, if an interest of a person in or against property constitutes an equity security, then that interest will not qualify as a claim." 2-101 *Collier on Bankruptcy* ¶ 101.16. *Section* 101(16) defines "equity security" as "a share in a corporation, whether or not transferable or denominated "stock" or similar security." It also includes any right "to purchase, sell, or subscribe to a share, security, or interest" in a share of a corporation or interest in a limited partnership. Generally, where "certainty of payment is missing, the security is equity, not debt." *Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 230 (Del. Ch. 2006). For example, warrants with redemption provisions are equity interests until the right to receive a cash payment properly matures on or before the petition date. *See Carrieri*, *supra*, 393 F.3d at 522.

Here, the litigation speculators had no certainty of payment. They gambled on the right to share equity returns in a share of the Debtors' potential earnings from litigation proceeds. Indeed, the stated returns here were classic equity-type returns—upwards of 400%. Nor does the fact that the replacement Notes generated in connection with the Note Purchase Agreement stated a maturity date of October 11, 2010 modify the analysis. Each of the litigation speculators knew that the Debtors had no possible means to repay the funds advanced under the notes, much less the four and five-fold of the principal amount. The maturity date appears to have been a ruse to seek tax benefits and/or try to obfuscate that the "notes" were nothing more than shares in a speculative venture.

Indeed, the notes, which bear all the earmarks of equity, appear to be ripe targets for recharacterization. For example under *Grossman v. Lothian Oil Inc. (In re Lothian Oil, Inc.)*, 650 F.3d 539 (5th Cir. 2011), the Fifth Circuit considered the circumstances under which a claim

Case: 13-30340   Doc# 107   Filed: 05/10/13   Entered: 05/10/13 22:52:25   Page 44 of 47

asserted against a debtor's estate may be recharacterized as an equity investment. *Lothian Oil* holds that the bankruptcy court has power to recharacterize debt as part of the claims allowance process, looking to state law to determine whether the purported claims at issue should be recharacterized. In *Lothian Oil*, for example, the claimant had entered into loan agreements with the debtors. The agreements provided for the claimant's transfer of funds to the debtors, in exchange for a percentage royalty of the debtors' gross oil and gas production. The agreements required repayment from the proceeds of an equity placement. The Fifth Circuit, looking to state tax law, found that the "claims" were equity, notwithstanding that the claimant was not an insider of the debtors. *Id.* at 544. Critical to the Court's ruling "was the inclusion of a royalty payment, which depended on the success of Lothian's business, instead of a prescribed interest rate." *Id.* Recently, the Ninth Circuit has followed the Fifth Circuit, opening the door to recharacterization claims where such is provided under state law. *See Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, __ F.3d __, No. 11-56677, 2013 U.S. App. LEXIS 8729 (9th Cir. Apr. 30, 2013), *overruling In re Pac. Express, Inc.*, 69 B.R. 112, 115 (B.A.P. 9th Cir. 1986)). Moreover, California, like Texas, has adopted IRC Section 385 ("Treatment of certain interests in corporations as stock or indebtedness") and thus clearly provides for recharacterization. *See* Cal. Rev. & Tax Code §§ 17321 and 24451. But nary a word is mentioned of this by the Debtors under the Plan or Disclosure Statement. The Board is in no rush to recharacterize their own claims.

Even assuming *arguendo* that the notes may be a "claim" under the Bankruptcy Code, the holders of such notes will be unable to establish a priority over the claims of general unsecured creditors. This is because no right to payment vested as of the petition date on these notes. As such, the only possible claim the holders may have is a "claim arising from . . . a purchase or sale of a security of the debtor . . . [or] for damages arising from the purchase or sale of such a security." Such a claim must be mandatorily subordinated to the claims of general unsecured creditors under *Section* 510(b). As such, the speculators are subordinate to Qualcomm's claim. Unless the Debtors' Plan provides a means of payment of the Qualcomm Claim in full on its effective date, the Debtors' Plan cannot be confirmed unless all such subordinate holders' claims

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

39.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 45 of
47

1   and/or interests are eliminated.

2       The Debtors Plan—and indeed any plan that the Debtors may attempt to propose—will be

3   unconfirmable, in light of (i) the unworkable nature of the Debtors' capitalization and the limited

4   assets available to fund the Plan; and (ii) the facial defects under *Section* 1129.  The Debtors will

5   be unwilling and/or unable to cure these defects.  As such, the Debtors' cases should be converted

6   for cause.

7   **V.      CONCLUSION**

8       In summary, there is nothing but good that would result from the prompt conversion of

9   these cases to chapter 7.  The presence of a true fiduciary with no debilitating conflicts of interest

10  would quell the contentious nature of this case, would bring sunlight into the decision-making

11  process, would ensure that the right questions are asked vis-à-vis the relative rights and priorities

12  of the parties in interest in this case, and would ensure that the policies of the Bankruptcy Code

13  are adhered to in the prosecution of these cases.  At the end of the day, Qualcomm's Motion asks

14  for nothing more than a fair process to be implemented in respect to the important decisions that

15  need to be made in these cases.  If an independent fiduciary determines, after an unbiased

16  evaluation, that the litigation against Qualcomm is merited, then justice will have been served.

17  But, it is critical that the decision-making process not be tainted by conflicts of interest or other

18  improper motivations.

19      For all of the reasons set forth above, and in the Motion, Qualcomm respectfully requests

20  that the Court would convert the cases to cases under chapter 7, or in the alternative, would

21  appoint a chapter 11 trustee, with either choice being available to the Court in its discretion,

22  pursuant to *Section* 1112(b)(1).

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

838513 v5/SD

40.

Case: 13-30340    Doc# 107    Filed: 05/10/13    Entered: 05/10/13 22:52:25    Page 46 of
47

1   Dated: May 10, 2013

2                                              COOLEY LLP
                                               ALI M. M. MOJDEHI (123846)
3                                              JANET D. GERTZ (231172)

4

5                                              By: /s/ Ali M.M. Mojdehi
                                                        Ali M. M. Mojdehi (123846)
6

7                                              Attorneys for Creditor
                                               Qualcomm Incorporated

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28