1   COOLEY LLP
    ALI M. M. MOJDEHI (123846)
2   (AMOJDEHI@COOLEY.COM)
    JANET D. GERTZ (231172)
3   (JGERTZ@COOLEY.COM)
    4401 Eastgate Mall
4   San Diego, CA 92121
    Telephone:    (858) 550-6000
5   Facsimile:    (858) 550-6420

6   Attorneys for Creditor
    Qualcomm Incorporated
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11

12  In re                          Case No.: 13-30340-DM
    GABRIEL TECHNOLOGIES CORP., et al.,  (Case No. 13-30341)
13
                                   Chapter 11
14          Debtors,
                                   (Jointly Administered)
15
                                   **MOTION BY QUALCOMM**
16                                 **INCORPORATED FOR**
                                   **DETERMINATION OF THRESHOLD**
17                                 **ISSUES RELATING TO PLAN**
                                   **CONFIRMATION, PURSUANT TO**
18                                 **ORDER ON STIPULATION (DOC. NO.**
                                   **130), AS AMENDED.**
19
                                   Date:    July 30, 2013
20                                 Time:    1:30 p.m.
                                   Dept:    Courtroom No. 22
21                                          235 Pine Street, 22nd Floor
                                            San Francisco, CA
22                                 Judge:   Hon. Dennis Montali

23

24

25

26

27

28

**Table of Contents**

Page

I.   Introduction and Summary of Argument ................................................................. 1

II.  Procedural Posture; Burdens of Proof and Persuasion....................................... 3

III. Statement of Facts ...................................................................................................... 4

     A.   The 2007/2008 Notes ....................................................................................... 5

     B.   The Fegen Note ................................................................................................ 6

     C.   The Litigation Is Instituted and Gabriel and Trace Discontinue All Other
          Business Operations ......................................................................................... 7

     D.   The April 2009 Notes ....................................................................................... 7

     E.   August 2009 Notes ........................................................................................... 8

     F.   January 2010 Notes ........................................................................................... 9

     G.   February 2010 Notes ....................................................................................... 11

     H.   The March 2010 Notes .................................................................................... 12

     I.   Commonalities Among the Notes ................................................................. 12

     J.   The 2011 Note Purchase Agreement Transaction...................................... 14

          1.   The 2011 Notes ...................................................................................... 16

          2.   The Replacement 2007/2008 Notes ..................................................... 16

          3.   The Replacement April 2009 Notes ..................................................... 17

          4.   The Replacement August 2009 Notes .................................................. 17

          5.   The Replacement January 2010 Notes ................................................. 18

          6.   Replacement February 2010 Notes ...................................................... 18

          7.   New Senior Notes ................................................................................. 19

          8.   The NW Note ......................................................................................... 20

IV.  Recharacterization of the Notes as Equity Is Warranted ............................... 21

     A.   The Names Given to the Instruments............................................................ 24

     B.   The Presence or Absence of a Maturity Date ............................................. 27

     C.   The Source of the Payments of Principal and Interest .............................. 28

     D.   The Right to Enforce the Payment of Principal and Interest .................... 29

     E.   Participation and Management....................................................................... 29

     F.   A Status Equal or Inferior to That of Regular Corporate Creditors.......... 30

     G.   "Thin" or Adequate Capitalization................................................................ 32

     H.   Identity of Interest Between Creditor and Stockholder............................... 33

Cooley LLP
Attorneys At Law
San Diego

i.

**Table of Contents**
**(continued)**

Page

I. Payment of Interest Only Out of "Dividend" Money .......................................... 34

J. The Ability of the Corporation to Obtain Loans from Outside Lending
Institutions ................................................................................................................ 34

K. The Intent of the Parties .......................................................................................... 35

V. The Investor Claims Are Unenforceable Against the Debtors.......................................... 36

A. Usury ............................................................................................................................ 37

B. Champerty and Maintenance.......................................................................................... 38

VI. Conclusion .................................................................................................................... 40

Cooley LLP
Attorneys At Law
San Diego

ii.

Creditor, Qualcomm Incorporated ("Qualcomm") hereby files its Motion ("Motion") for Determination of Threshold Issues Relating to Plan Confirmation, Pursuant to the Stipulated Scheduling Order ("Stipulation") entered June 20, 2013, Docket No. 130, as amended.

As approved by the Court and as amended, the Stipulation among the Debtors, the Committee, and Qualcomm provides that, on or before July 1, 2013, Qualcomm was permitted to file and serve a motion seeking a determination that the Amended Plan is not confirmable, based on theories of recharacterization and/or subordination of claims. Qualcomm hereby brings such Motion, seeking a determination that the Investor Claims (as defined below) should be characterized as equity interests, or are otherwise unenforceable against the Debtors and property of the estate under applicable law. 11 U.S.C. § 502(b)(1).[1]

The statutory predicates for the Motion are 11 U.S.C. §502(b), Fed. R. Bankr. Proc. 9014, and Bankr. L.R. 9014-1. This Motion is a contested matter as defined in Fed. R. Bankr. Proc. 9014, being brought in the form of a threshold objection to the confirmability of the Debtors' Plan. Fed. R. Bankr. Proc. 3020(b)(1). This Court has jurisdiction over this Motion under 28 U.S.C. §1334(a); 11 U.S.C. §157(a) and (b)(1), and General Order No. 24 dated May 15, 2012 of the Northern District of California. This is a core proceeding arising under and arising in title 11. 11 U.S.C. §157(a). This Motion is supported by the Declaration of Janet Dean Gertz and exhibits thereto, filed concurrently herewith (the "Gertz Decl.")

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

As noted to the Court in Qualcomm's prior pleadings, the Debtors' proposed "restructuring" is an impermissible gift to equity, in breach of the Debtors' duties to true creditors. The Debtors' prepetition "lenders" are equity masquerading as creditors. Further, to the extent the Debtors may seek to argue that there were any true obligations under the instruments supporting the Investor Claims, no payment thereunder had matured as of the petition date. Indeed, the facial maturity date was a chimera put in place to try to hide the fact that the only time any payment would be due is if—and only if—there was an "IP Event" (as defined in

---

[1] In addition, Qualcomm expressly reserves rights to bring a motion for mandatory subordination of the Investor Claims under *section* 510(b), but believes that such a motion would require an evidentiary hearing and thus should be heard independent from this Motion.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

1.

the respective instruments). When the facts and circumstances of these "loans" are viewed in context, it is clear that no reasonable lender (in the traditional sense) would have extended credit. At the time the loans were made, Gabriel had not held a shareholder meeting in recent memory. Gabriel's board was acting without shareholder authority. Gabriel had long ceased filing reports with the U.S. Securities and Exchange Commission ("SEC"). Gabriel had not prepared current audited financials in years. None of the usual requirements for responsible underwriting were present. Those investing funds were not "bankers." They were investors. The inducement for these investors was not the desire to be repaid with interest. The inducement was instead the potential of multi-fold returns, as a percentage of the spoils, should the Debtors prevail in litigation. The Debtors' Plan primarily proposes to "restructure" the "notes" supporting the Investor Claims. But there is nothing to restructure. The Investor Claims are mere equity, which are subordinate in priority to creditors, who are not being paid under the Plan.

Stripped of the boilerplate and facial trappings of conformity with the Code, and viewed in respect to its true substance, the Debtors' Plan transfers real value from creditors to equity, using the Plan process to try to leverage the maximization of the investors' potential equity returns. The estates' general unsecured creditors are being asked to shoulder the downside risk of the *costs* of this speculation, which costs are chargeable to *e.g.*, any recovery on other claims held by the estate, thus diluting returns to true creditors. On the other hand, the Debtors' Plan proposes that any upside gain large enough to overcome the negative equity balance will accrue solely to the benefit of the holders of Investor Claims. The Plan is nothing more than a springboard for risky litigation, allowing the investors to "double down" on their pre-petition losses while using other peoples' money. The Debtors' Plan is neither fair nor equitable. Nor is it a discharge of the sacrosanct fiduciary duties imposed on debtors for the privilege of having access to the bankruptcy process. Equity cannot seek to obtain benefits under a plan at the expense of creditors under the rule of absolute priority.

Equally as important, the Debtors' Plan reveals that the Debtors are inherently unable to address the key issues in these cases in a trustworthy and unbiased manner, as is required by a fiduciary. The Debtors fail to address the issues regarding the obvious infirmities of the Investor

Claims, even those appearing on the face of the instruments. That should come as no surprise, where the Debtors' prepetition agreements with the hedge fund that invested in the litigation in 2011 affirmatively neuter the Debtors' ability to be a fiduciary and to assert a challenge.

As noted below, should the Investor Claims be put to even the most minimal scrutiny, it would be clear that they are not claims at all. The Investor Claims are equity and are unenforceable under applicable law. As such, the Debtors' Plan cannot achieve confirmation because it seeks to grant valuable benefits and perquisites to equity, while leaving creditors holding senior claims unpaid. The Debtors' Plan must be rejected because it violates not only *section* 1129, but also the fundamental principles of fairness, equity, and absolute priority.

## II. PROCEDURAL POSTURE; BURDENS OF PROOF AND PERSUASION

This Motion seeks a determination regarding threshold matters relating to characterization and other defenses to the claim of investors under applicable law. The Motion seeks the determination in the form of a contested matter for the limited purpose of determining the confirmability of the Debtors' Plan.[2] Stated differently, if Qualcomm's arguments are adopted by the Court, it would render the Debtors' Plan non-confirmable as a matter of law.

The Debtors bear the burdens of proof and persuasion here. The purpose of a confirmation hearing is to determine whether the plan proponent can establish each of the requirements for confirmation. The plan proponent bears the burdens of both introduction of evidence and persuasion that each subsection of *section* 1129(a) has been satisfied. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1358 (9th Cir. 1986). Where, as here, nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of *section* 1129(b) are also met. In each respect, the plan proponent bears the burden of proof by a preponderance of the evidence. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship.)*, 115 F.3d 650, 653 (9th Cir. 1997).[3]

---

[2] Although under the 9th Circuit's recharacterization principles, the statutory foundation for the characterization determination is *section* 502, the determination here, being limited to the issue of the confirmability of the Debtors' Plan, will have no *res judicata* effect on the underlying claims as would a claim objection. As such, an adversary proceeding is not required.

[3] Similarly, in a claim objection proceeding, if an objection is raised that rebuts the initial presumption of validity, then the claimant has the ultimate burden of proving the validity and amount of the claim by a preponderance of the evidence. *Stancill v. Harford Sands Inc. (In re Harford Sands Inc.)*, 372 F.3d 637 (4th Cir. 2004).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD                                    3.

The determinations to be made on this Motion are threshold to the determination of confirmation. The issues raised here regarding the characterization of the Investor Claims (as defined below) are material to the integrity of the Debtors' Plan. Specifically, the Motion raises the question whether the investors to whom the Debtors grant valuable benefits under the Plan—at the expense of Qualcomm and other general unsecured creditors—are not holders of claims, but possess mere equity interests. Under the Bankruptcy Code,

> [e]quity investment brings not a right to payment, but a share of ownership in the debtor's assets—a share that is subject to all of the debtor' payment obligations. . . . [An interest] "becomes significant only when the remaining assets of the corporate debtor are being distributed to shareholders."

*In re Insilco Tech.*, 480 F.3d 212, 218 (3rd Cir. 2007) (*quoting Crocker v. Namer (In re AVN Corp.)*, 235 B.R. 417, 423 (Bankr. W.D. Tenn. 1999)). The absolute priority rule requires that creditors be paid "before the stockholders could retain [equity interests] for any purpose whatever." *Id.* at 218 n.10 (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. North LaSalle St. P'ship*, 526 U.S. 434, 444 (1999)).

As such, the Debtors' burden here must be to demonstrate, by a preponderance of evidence, that absolute priority is satisfied under their Plan, in addition to all of the other requirements of *sections* 1129 (a) and (b) of the Bankruptcy Code.

### III. STATEMENT OF FACTS

The factual background of the Debtors' history and the events relating to the litigation against Qualcomm have been thoroughly developed in Qualcomm's Motion Pursuant to 11 U.S.C. §1112 for Conversion to Cases Under Chapter 7 or, in the Alternative, for Appointment of a Chapter 11 Trustee, for Cause (the "Trustee Motion"), Docket No. 40. Such facts are not repeated here, although they are expressly incorporated by reference. Rather, the focus here is on the facts and circumstances that have culminated in (according to the Debtors' Disclosure Statement), over $17 million in claims being asserted against the Debtors' estates by various noteholders (not counting the "percentage interests" attributable to various law firms) (such persons are collectively referred to herein as the "Investors" and the claims asserted by such Investors the "Investor Claims"). *See* Notice of Submission of Disclosure Statement, Doc. No.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

4.

Case: 13-30340   Doc# 145   Filed: 07/01/13   Entered: 07/01/13 23:50:13   Page 7 of 43

120 at 16-19.   As discussed below, each of the Investors has in common the fact that they purchased their notes to enable them to claim an interest in the "proceeds" of an "IP Event" (as such term is defined in the notes).

### A.      The 2007/2008 Notes

The Debtors' reports filed with the SEC reveal that, well before issuing the notes in question, the Debtors were experiencing a deep and serious financial decline.  The Debtors had ceased filing audited financials after fiscal year 2006 and ceased filing tax returns around that same time, due to their intractable financial downward spiral. At this time, Gabriel was not in compliance with even the most minimal corporate governance requirements, and as of the filing of this Motion, the Debtors have unearthed no records reflecting the holding of any duly noticed shareholder meetings whatsoever.

Against this background of extremely questionable credit, Gabriel began issuing "notes," substantially for the purpose of obtaining cash for the pursuit of litigation.  Gabriel's SEC reports state that it raised $5.8 million[4] through the issuance of promissory notes and concurrently-issued warrants to purchase up to 6,031,250 shares of its common stock at an exercise price of $0.50 per share between July 2007 and April 2008 (the "2007/2008 Notes").  *See* SEC 8-K filed July 1, 2007, Exhibit 1 to Gertz Decl.  An exemplar of the 2007/2008 Notes filed by the Debtors with the SEC is attached as Exhibit 2 to the Gertz Decl.

The material terms of the 2007/2008 Notes are as follows:
- The loan was "without interest" (Preamble);
- The note bore a maturity date of 10 business days after the first IP Event (Section 1);
- An IP Event required a minimum of $6,000,000 *net* proceeds;
- The holder may receive its principal investment plus an amount equal to 100% of the principal investment (Section 1);
- each holder is provided the right, at any time after a year from issuance, to exchange its note for a fixed term note payable within a year of exchange, with a principal amount equal to the amount payable under the note upon the occurrence of an IP Event;[5] and
- The notes are governed by Delaware law.

[4] The 2011 Note Purchase Agreement states, however, that only an aggregate principal amount of $4,548,958.16 was raised under these notes.
[5] Based on the lack of any public disclosures, it must be deemed that none of the holders elected to make such exchange.

Cooley LLP
Attorneys At Law
San Diego

853511 v2/SD

5.

The amounts and the identity of the holders of the 2007/2008 Notes are summarized in the **Exhibit "A"** attached hereto.

It is not disclosed in Gabriel's SEC 8-K what portion of the consideration may have been attributable to the warrants. The form of warrant issued in connection with the 2007/2008 Notes, (Exhibit 3 to the Gertz Decl.), provides that the purchase price was $0.50 per share and the expiration date for these warrants is December 30, 2009. The warrant shares were stated to be "restricted securities" which may only be sold pursuant to an effective Registration Statement under the act or pursuant to an exemption from registration under the Act.

In their capacity as holders of 2007/2008 Notes and associated warrants, Craig Bardsley and Dawn Berkvam, exercised their warrants for 1,851,042 shares of Gabriel common stock. As a result, according to the recitals in the 2011 Note Purchase Agreement (defined below) they received a replacement note dated February 12, 2009 for their 2007/2008 Note in the principal amount of $2,961,667.20, reflecting the cost of the exercise (the "Bardsley Note"). The Debtors have not produced a copy of the Bardsley Note. The terms should therefore be deemed to be the same as the 2007/2008 Note issued to Mr. Bardsley and Ms. Berkvan.[6]

### B. The Fegen Note

On February 28, 2007, Gabriel issued a promissory note in the aggregate principal amount of $350,000 to Kelly Fegen (the "Fegen Note"). Kelly Fegen is believed to be the wife of Nicholas Fegen, the indicted former principal of Gabriel, and it is not clear what consideration was given for the note. The form of the Original Fegen Note filed with the SEC is attached to the Gertz Decl. as Exhibit 4.

The material terms of the Fegen Note are as follows
- Fegen is to receive the greater of (1) $700,000 and (1) 1% of an IP Event;
- Maturity date is contingent upon an IP event (10 days after the IP Event) (Section 1);

---

[6] It bears mentioning here that Qualcomm requested a list of very basic documents from the Debtors, such as copies of the historical notes, note purchase agreements, investor representations, and the like. These documents should have been readily available to the Debtors—in that they would have been needed for even the most cursory due diligence on the part of NW and should also have been assembled by the Debtors in the course of preparing their Disclosure Statement. The Debtors have failed to produce many key requested documents. The Debtors should thus be precluded from using in their opposition to the Motion any of the previously requested materials that they have failed to produce to Qualcomm.

- An IP Event required a minimum of $6,000,000 *net* proceeds;
- The note could be exchanged for a new promissory note after the one year anniversary of the issuance, due on or before the one year anniversary of the exchange date (Section 2); and
- The note is governed by Delaware law.

## C. The Litigation Is Instituted and Gabriel and Trace Discontinue All Other Business Operations

Gabriel and Trace filed Civil Action (No. 3:08-CV-01992) against Qualcomm Incorporated, *et al.* on October 24, 2008 in the United States District Court for the Southern District of California, San Diego Division (the "Qualcomm Dispute"). The litigation was initiated subsequent to the issuance of the 2007/2008 Notes and the Fegen Note.

As of May 22, 2009, Gabriel was exploring strategic alternatives for its wholly owned operating subsidiary, Gabriel LLC, including the possible sale of some or all of its assets (as disclosed in Gabriel's Form 8-K, filed on June 9, 2009, Exhibit 5 to Gertz Decl.).[7] Effective July 14, 2009, Gabriel LLC, entered into an Asset Purchase and Sale Agreement (the "Earthstone Agreement") with Earthstone Capital, LLC, a Florida limited liability company ("Earthstone"). Pursuant to the Earthstone Agreement, Gabriel LLC sold certain tangible and intangible assets to Earthstone for a mere $185,000. *Id.* The assets sold consisted of inventory, equipment and intellectual property related to Gabriel LLC's business of developing and marketing WAR-LOK™ Security System for the transportation and shipping industries. (as disclosed in Gabriel's Form 8-K, filed on July 7, 2009). The Earthstone Agreement disposed of all remaining tangible assets and or operating business held directly or indirectly by Trace and/or Gabriel. *Id.*

## D. The April 2009 Notes

Following the institution of the Qualcomm Dispute, and under circumstances where Gabriel and Trace were in the process of divesting their tangible assets and becoming a corporate shell used for nothing other than maintaining the Qualcomm Dispute, certain investors entered

---

[7] Gabriel's press releases in 2005 made clear that Gabriel, LLC was the operating entity and that Gabriel was a holding company: "Through our wholly-owned subsidiary Gabriel Technologies, LLC of Omaha, Neb, (www.gabrieltechnologies.com) we develop, manufacture and sell a series of physical locking systems for the transportation and shipping industries collectively known as the WAR-LOK(TM) Security System." See June 08, 2005 07:30 AM Eastern Daylight Time "Gabriel Technologies Announces Distribution Contract With VIPAR Heavy Duty". Available at http://www.businesswire.com.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

7.

into a Promissory Note Purchase Agreement with Gabriel dated as of April 24, 2009 (the "April 2009 Note Purchase Agreement"). The Debtors have not produced the April 2009 Note Purchase Agreement, but Gabriel's January 6, 2009 8-K, Exhibit 6 to Gertz Decl., states that under the April 2009 Note Purchase Agreement promissory notes (the "April 2009 Notes") in the aggregate principal amount of $700,000 were issued. Annex II of the 2011 Note Purchase Agreement (defined below) lists the investors, many of whom purchased the 2007/2008 Notes.[8]

Gabriel's SEC filings disclose that the promissory notes had a face value of $700,000 and a date of May 6, 2009. *See* Gertz Decl. Exhibit 6. Gabriel's SEC filings also disclose that the issuance of the notes was "expressly conditioned upon the appointment of David B. Clark, George Tingo, John Hall, and Jack B. Manning" to Gabriel's board of directors. *See id*. at Item 1.01. Additionally, "4 of the 9 investors invested in prior placements of promissory notes by the Company in 2007 and were issued warrants in connection with the purchase of such promissory notes." *Id*. Two of the recipients of the notes, Louis Rotella III and Louis Rotella Jr., had recently entered into a Confidential Agreement of Cooperation and Covenant Not to Sue and Stock Equivalent Participation Agreements. *Id*.

The Debtors have not produced an exemplary copy of the April 2009 Notes, the form of which also was not filed with the SEC, which suggests the need for further scrutiny of these instruments. Gabriel's SEC reports state, however, that the material terms include the following:

- the holder may receive the greater of (i) the principal plus 100% of the principal; or (ii) 0.000002% of the proceeds of an IP Event for each dollar of principal;
- the maturity date is 10 business days after the occurrence of an IP Event
- an IP Event required a minimum of $6,000,000 *net* proceeds; and
- the holder had additional conditional repayment rights, to the extent the company raised additional financing in the amount of $6,000,000. In such case, the holder would only receive 0.000002% of the proceeds of an IP Event for each dollar of principal.

### E.   August 2009 Notes

Certain investors entered into a certain Promissory Note Purchase Agreement with Gabriel dated as of August 21, 2009 (the "August 2009 Note Purchase Agreement"), which was filed with the SEC. Exhibit 7 to Gertz Decl.

---

[8] There is a discrepancy, in that the Annex II suggests that the face value was $1 million.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

8.

Under the August 2009 Note Purchase Agreement, promissory notes in the aggregate principal amount of $300,000 (the "August 2009 Notes") were issued. *Id*. The investors are listed in Annex III to the 2011 Note Purchase Agreement, many of whom had invested in the earlier notes. Gabriel's August 21, 2009 8-K reveals that one of the investors, Stephen Moore, entered into a Consulting Agreement in June 2009 under which he was to be "compensated" for making introductions in connection with financing transactions. Exhibit 8 to Gertz Decl. Other investors had previously been issued warrants. *Id*.

An exemplar of the August 2009 Notes filed with the SEC is attached at Exhibit 9 to the Gertz Decl. A summary of the material terms of the August 2009 Notes is as follows:

- interest free loan (Preamble);
- a maturity date of the 10th business day after the first IP Event after receipt by the Company of the principal investment (Section 1);
- the holders were to receive principal plus 0.0000005% of the IP Event Proceeds for each dollar of principal invested (Section 1);
- an IP Event required a minimum of $10,000,000 *net* proceeds;
- the instrument bore a legend that the note had not been registered under the Securities Act of 1933 and applicable state securities laws and "may not be offered, sold, pledged, or otherwise transferred or disposed of unless and until this note is registered . . . or an exemption from such registration is available"; and
- The notes were governed by Delaware law.

**F.     January 2010 Notes**

Certain investors entered into a Promissory Note Purchase Agreement with Gabriel dated as of January 23, 2010 (the "January 2010 Note Purchase Agreement"). A copy of the January 2010 Note Purchase Agreement is filed as Exhibit 10.3 to Gabriel's 8-K filed on January 27, 2010. Gertz Decl. Exhibit 10.

A corporate disclosure document was attached to the January 2010 Note Purchase Agreement filed with the SEC. *Id*. at 14 ("January 2010 Disclosure). The January 2010 Disclosure disclosed among other things, the lack of historical financial statements and lack of required SEC reports and the company's inability to hold a shareholder meeting due to the failure to file current financials with the SEC. Gabriel admitted there that its inability to hold a shareholder meeting had "hampered[ed] Gabriel's efforts to raise financing for the Company, since additional Gabriel stock cannot be authorized by Delaware State authorities without such a

shareholders meeting approving such additional stock authorization." Gabriel candidly admitted this condition caused Gabriel to issue notes instead of new shares, *i.e.*, that **[t]his requires the Gabriel directors to continue to rely on the possible proceeds, if any, of Gabriel's action against Qualcomm to obtain needed financing for the Company**" *Id*. at 16 (emphasis added).

The January 2010 Disclosure also noted the prior assignments that had been made in the proceeds of the Qualcomm lawsuit, which "is expected to exceed fifty percent (50%) after the engagement of new attorneys in the Qualcomm lawsuit" and that "[t]here also can be no assurance that Gabriel will be able financially to continue to prosecute the Qualcomm lawsuit or, if so, that it will achieve a favorable outcome or receive any significant proceeds." *Id*. at 14.

Under the January 2010 Note Purchase Agreement, promissory notes (the "January 2010 Notes") in the aggregate principal amount of approximately $500,000. The investors are identified on Annex IV to the 2011 Note Purchase Agreement, many of them earlier investors. A form of the January 2010 Notes was filed with the SEC. Gertz Decl. Exhibit "11".

A summary of the material terms of the January 2010 Notes is as follows:
- interest rate of 6% per annum (Section 1);
- a conditional maturity date of December 31, 2010 (Section 1);
- the holders may receive principal plus interest (Section 1), plus Additional Benefits of 1% of the Proceeds of an IP Event for each $100,000 contributed (Section 2.2);
- payment on the maturity date was conditioned on the fact that the payment would not render the company insolvent;
- any payment of principal and interest was limited to funds are available from the Net Proceeds of an Event (as defined therein to include an IP Event or a Whittle Settlement) (Section 2);
- an IP Event required a minimum of $10,000,000 *net* proceeds;
- any payment of principal and interest was subordinate to, among other things, All Company Obligations Required To Be Paid By The Company (as defined therein to include "company debts") and to "all current and future indebtedness of the Company to banks and other financial institutions;
- the investor was to have a "lien" on claims and causes of action;
- the instrument bore a legend that the note had not been registered under the Securities Act of 1933 and applicable state securities laws and "may not be offered, sold, pledged, or otherwise transferred or disposed of unless and until this note is registered . . . or an exemption from such registration is available"; and
- The notes were governed by California law.

## G. February 2010 Notes

Certain investors entered into a certain Promissory Note Purchase Agreement with Gabriel dated as of February 23, 2010 (the "February 2010 Note Purchase Agreement"), which was not produced by the Debtors. Apparently, the Debtors also entered into a substantially similar agreement Promissory Note Purchase Agreement, in March 2010, filed as Exhibit 10.1 to Gabriel's 8-K filed on March 26, 2010 ("March 2010 Note Purchase Agreement"). *See* Gertz Decl. Exhibit 12. Absent disclosure by the Debtors, the terms of these two agreements must be deemed the same. Among other things, the March 2010 Note Purchase Agreement contained terms that if any "Investor" in the notes failed to "fund" any successive closing of its Total Investment Amount, then "any IP Interest previously acquired by the Investor" (as such term is defined in the note) "shall as of that date be irrevocably and unconditionally relinquished and automatically forfeited by the Investor and shall automatically revert back to the Company." *Id.* at 2. This provision was however subject to Gabriel obtaining new trial counsel. *Id.* at 20. The March 2010 Note Purchase Agreement also included a corporate disclosure statement, (the "March 2010 Disclosure"), in which Gabriel again noted the lack of financial statements, and even put in question the integrity of those previously filed. *Id.* at 23. Gabriel noted at this point that the percentage interests previously committed by Gabriel to third parties "may be as much as ninety-five percent" and that "there can be no assurance that Gabriel will be able financially to continue to prosecute the Qualcomm lawsuit or, if so, that it will achieve a favorable outcome or receive any significant proceeds from that lawsuit." *Id.* at 24. Again, Gabriel disclosed that it was issuing debt only because it could not issue additional authorized shares, due to its failure to file current audited financials with the SEC. *Id.* at 25.

The face value of the notes issued in February 2010 (the "February 2010 Notes") is not made clear by the Debtors' SEC filings, which speak of the February and March issuances without distinguishing between them. The investors in the February 2010 Notes are identified on Annex V of the Agreement, many of them the same earlier investors.

Gabriel did not disclose the material terms of the February 2010 Notes in its SEC disclosures, and the Debtors have not produced an exemplar of the February 2010 Notes.

Cooley LLP
Attorneys At Law
San Diego

Because it is the Debtors' burden to prove confirmation, in the absence of the note, it must be deemed that there were no notes or that the March 2010 Notes' terms were the same as the February 2010 Notes and that the disclosures and facts and circumstances were identical to those provided in the March 2010 Note Purchase Agreement.

**H.    The March 2010 Notes**

As noted, certain investors entered into a Promissory Note Purchase Agreement with Gabriel dated as of March 8, 2010. Under the March 2010 Note Purchase Agreement, promissory notes in the aggregate principal amount of not less than $1 million and not less than $2,500,000 were to be issued to such investors (the "March 2010 Notes"), although this is likely the combined value of the March 2010 and February 2010 Notes. An exemplar of the March 2010 Notes is attached as an exhibit to the March 2010 Note Purchase Agreement, Gertz Decl. Exhibit 12 at page 15.

A summary of the material terms of the March 2010 Notes is as follows:
- interest rate of 6% per annum  (Section 1);
- a maturity date of the funding of an IP Event (Section 1);
- subject to limitations, the holder may receive the principal, interest at 6% per annum, and "Additional Benefits" of 0.80% of the Net Profit on an IP Event for every $100,000 contributed;
- payment was "[t]o the extent funds are available from the Net Proceeds" of an IP Event (as defined therein), and only *after* deduction of all Expenses. Expenses was defined to include, without limitation "all company debts" (Section 2);
- the payment to the holder is "subordinate in priority and right of payment to all current and future indebtedness of the Company to banks and other financial institutions which may be required for secured financing in the future. . . .;"
- to the extent the net proceeds of an IP Event were less than $150,000,000, the holder's right to any recovery was also subordinate and subject to all "percentage/contingent attorneys fees;"
- the investor was to have a "lien" on claims and causes of action;
- the instrument bore a legend that the note had not been registered under the Securities Act of 1933 and applicable state securities laws and "may not be offered, sold, pledged, or otherwise transferred or disposed of unless and until this note is registered . . . or an exemption from such registration is available"; and
- The notes were governed by Delaware law.

**I.    Commonalities Among the Notes**

Although issued at different times, the 2007/2008 Notes, Bardsley Note, Fegen Note, April 2009 Notes, August 2009 Notes, January 2010 Notes, February 2010 Notes, and March

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 15 of 43

2010 Notes (collectively, the "Original Notes") had certain commonalities. For example, neither Gabriel nor Trace appear to have ever at any time made any payments of principal or interest on the Original Notes. The sole source of repayment for the Original Notes, which was contingent upon an IP Event, was the proceeds of such IP event. None of the Original Notes disclose the "value" that may have been received by Gabriel for their issuance, which may have been something other than cash consideration.

Each of the Original Notes was expressly admitted by the parties to be a "security." The parties to the Original Notes attempt to rely upon an exception to the registration requirements for securities of Securities Act of 1933 and applicable state securities laws. The 2011 Note Purchase Agreement represents that each of the holders of the Original Notes represented that it was an "accredited investor" as defined in Rule 501(a) of Regulation D, under the Securities Act of 1933. Note Purchase Agreement Among Trace Technologies, LLC, Gabriel Technologies Corporation and the Purchasers Party Hereto Dated as of September 2, 2011 (2011 Note Purchase Agreement"), Exhibit 13 to Gertz Decl. at 34.[9] The 2011 Note Purchase Agreement also represents that each of the holders of the Original Notes was required to provide Gabriel with a duly executed accredited investor questionnaire (each an "Original Investor Questionnaire" and collectively, the "Original Investor Questionnaires"), in connection with their purchase of the Original Notes, in the form of the Exhibit H to the agreement. *Id.* at 36. The Debtors have not produced the Original Investor Questionnaires given by the Investors.

Under each of the Original Notes—as well as the Replacement Notes (defined below), an IP Event was defined (with some minor variations) as

> The recovery and/or receipt . . . of any amount paid by or on behalf of any Person, defendant or third party, or the amount of other value received, including the present fair market value of any business/non-monetary consideration, which amounts relate directly or indirectly to the Qualcomm dispute, regardless of whether such payments are made in cash, stock, by payment or assumption of liabilities of Gabriel or [Trace], or otherwise, and regardless of

---

[9] These investors, and the investors that have followed them, clearly are sophisticated, well-heeled individuals and fully understood the significant risk of their investment. Many are known names in professional sports. Others are successful business owners. Qualcomm suspects, but has not been able to verify, that these persons are also substantial equityholders of Gabriel and invested additional monies in order to preserve their equity positions. Many, if not all, are insiders of the Debtors.

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 16 of 43

whether such payment is styled as an amount paid in settlement, a royalty, a licensing fee, a purchase price for the sale or transfer of stock or assets of Gabriel or [Trace] or any of their respective Subsidiaries, merger consideration or otherwise

2011 Note Purchase Agreement (Definitions) at 7.

Each of the holders of the Original Notes relied on the occurrence of an IP Event and did not rely on the business operations of Gabriel and/or Trace in respect to their purchase of the applicable notes issued in connection with the Agreement and their expectation of repayment thereunder. Nor could they, because Gabriel had no business.

### J.     The 2011 Note Purchase Agreement Transaction

On September 16, 2011, Gabriel and Trace entered into the Note Purchase Agreement, dated as of September 2, 2011, with North Water Intellectual Property Fund L.P. 3A, a Delaware limited partnership ("NW"), and other purchasers and parties named in the Agreement. The Debtors also executed a term sheet with NW prior to the execution of the 2011 Note Purchase Agreement, attached to the Gertz Decl. as Exhibit 14 ("Term Sheet"). It is significant that the Debtors covenanted in the Term Sheet that they would "not undertake any activity designed to undermine the terms of this Funding Proposal or the binding transactions agreements contemplated hereby in an attempt to avoid payments due hereunder." *Id.* Bates No. GAB000625. This impairment of the board's fiduciary judgment was not disclosed in Gabriel's SEC disclosures. *See* Form 8-K dated September 16, 2011, Gertz Decl. Ex. 15. Nor has it previously been disclosed to this Court, although highly relevant to, *e.g.*, the Trustee Motion and the Disclosure Statement.

Pursuant to the 2011 Note Purchase Agreement, Gabriel assigned and contributed to Trace and Trace assumed from Gabriel all rights and obligations under the Original Notes (as defined herein and therein) and the Original Note Purchase Agreements (as defined therein), as well as all of Gabriel's right title and interest in and to any and all proceeds of an IP Event (as defined therein).

In connection with the assignment and assumption of the Assigned Agreements (as defined therein), the holders of the Original Notes surrendered their notes (which had been issued

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

14.

by Gabriel) and Original Warrants for Trace's issuance to them of replacement promissory notes and/or replacement warrants.

Some of the more salient provisions of the 2011 Note Purchase Agreement are as follows:

- Section 8 of the Agreement provides for a waterfall structure for any distributions to the investors. The waterfall makes clear that the payments will be made from "IP Event Proceeds and other monies . . . arising from any recovery . . . with respect to an IP Event." Agreement §8.1(a); *see also* §8.1(b). The Agreement does not provide for any distributions to be made from any other source than recoveries from an IP Event.
- The waterfall provides that all distributions to the investors are subordinate to the Priority Litigation Expense Providers (for litigation expenses) and to the interests of contingency fee attorneys. Agreement §§8.1(a)(i) & (b)(i).
- The investors expressly agree that the Debtors may dilute their interests by bringing in Additional Investors "at any level of priority" and "in the sole discretion of the Board of Managers" of Trace. Agreement §8.1(d).
- The holders of the Replacement Notes also expressly subordinate their interests to NW and the holders of the Senior Notes, as well as "any Additional Investor and/or under any Additional Note that the Board of Managers of the Company, in its sole discretion, determines should receive priority ahead" of them. Agreement §8.2.
- Section 10 of the Agreement provides, among other things, that each investor's investment "is highly speculative in nature and involves a high degree of risk," that the repayment obligations are "solely and exclusively dependent on the final determination of the Qualcomm Dispute," and that Gabriel and Trace have both "limited assets and limited operating history." Further, Gabriel and Trace, "may not receive or be awarded any IP Event Proceeds or any other amounts in connection with the Qualcomm Dispute, which may result in the inability. . . to pay any of the Obligations" (as defined under the Agreement).
- Each of the note holders were required to provide an executed Accredited Investor Questionnaire (in substantially the form of Exhibit H to the Agreement) on or before the date of execution of the Agreement. These have not been produced. The Questionnaire refers to the transaction as the acquisition of "securities," and requires the investor to affirm that it has adequate assets, "more than sufficient so that Investor could bear the risk of the entire investment in the Securities." *Id*. at Bates No. GAB000162.
- Releases were given by the Purchasers (as defined under the Agreement) as to, among other things, prior securities law violations and/or material misrepresentations made in connection with the purchase or sale of a security by Gabriel and/or Trace. Agreement §3(a).
- Section 8.3 of the Agreement provides a mandatory prepayment "upon the recovery or receipt by Gabriel and/or the Company of any IP Event Proceeds in connection with the occurrence of an IP Event" and that 100% of such IP Event Proceeds must be immediately paid in case of such event
- Under the Agreement, the Purchasers received IP Interests (as defined in the Agreement) and rights to acquire IP Interests.

- Each of the investors expressly acknowledged and agreed that Gabriel's or Trace's management could settle the Qualcomm Dispute "for any amount that, in its business judgment, it believes is appropriate, regardless of whether there are sufficient IP Event Proceeds to pay any or all of the Purchaser hereunder." Agreement at §8.1(e).

A Common Interest Agreement was entered into in conjunction with the 2011 Note Purchase Agreement. Gertz Decl. Exhibit 16. The Common Interest Agreement provided NW the right to "observe" settlement discussions and to have two representatives "participate" in meetings of the board of Gabriel and the managers of Trace "relating to the settlement or prosecution of the Qualcomm Dispute." Common Interest Agreement at 1.7.[10]

### 1. The 2011 Notes

Pursuant to the 2011 Note Purchase Agreement, notes were issued in tranches, both to existing noteholders and to new investors, as follows:

### 2. The Replacement 2007/2008 Notes

Pursuant to the 2011 Note Purchase Agreement, the 2007/2008 Noteholders agreed to surrender their 2007/2008 Notes for replacement notes (the "Replacement 2007/2008 Notes"). The Replacement 2007/2008 Notes replace and supersede the 2007/2008 Notes in their entirety, and have an aggregate principal amount of $4,648,958.16 (Annex VI to the Agreement). An exemplar of the Replacement 2007/2008 Notes is attached as Exhibit C-1 to the 2011 Note Purchase Agreement.

A summary of the material terms of the Replacement 2007/2008 Notes is as follows:

- interest free loan (Preamble);
- subject to the mandatory prepayment provisions of the 2011 Note Purchase Agreement, a maturity date of the earlier of (1) October 11, 2020 and (2) the date the final payment in respect of the proceeds of an IP Event is received and/or recovered by Gabriel, Trace, or any of their respective subsidiaries in connection with the final resolution of the Qualcomm Dispute (Section 1); and
- the holder is to receive principal investment plus an amount equal to 100% of the principal investment (if they elect to receive a Replacement Warrant) or 200% of the principal investment (if the holder elects to not receive a warrant) (Section 1).

---

[10] The Term Sheet had made clear that the Board "will take into account the input of the NW Representatives . . . ." Gertz Decl. Exhibit 13 at Bates GAB000624.

Cooley LLP
Attorneys At Law
San Diego

853511 v2/SD

16.

### 3. The Replacement April 2009 Notes

Pursuant to the 2011 Note Purchase Agreement, the April 2009 Noteholders agreed to surrender their April 2009 Notes for replacement notes (the "Replacement April 2009 Notes"). These replace and supersede the April 2009 Notes in their entirety, having an aggregate principal amount of $1,350,000[11] (Annex II to the Agreement). An exemplar of the Replacement April 2009 Notes is attached to the 2011 Note Purchase Agreement as Exhibit B-1.

A summary of the material terms of the Replacement April 2009 Notes is as follows:
- interest free loan (Preamble);
- subject to the mandatory prepayment provisions of the 2011 Note Purchase Agreement, a maturity date of the earlier of (1) October 11, 2020 and (2) the date the final payment in respect of the proceeds of an IP Event is received and/or recovered by Gabriel, Trace, or any of their respective subsidiaries in connection with the final resolution of the Qualcomm Dispute (Section 1);
- the holders are to receive $2,700,000 plus a percentage of the proceeds of the IP Event (Section 1); and
- the holders have the right to receive deeply subordinated Additional Benefits (additional percentage interests in the proceeds of an IP Event).

### 4. The Replacement August 2009 Notes

Pursuant to the Agreement, the August 2009 Note holders agreed to surrender their August 2009 Notes for replacement notes (the "Replacement August 2009 Notes"). The Replacement August 2009 Notes replace and supersede the August 2009 Notes in their entirety, with the aggregate principal amount of these loans being $300,000 (Recital of 2011 Agreement Note Purchase Agreement). An exemplar of the Replacement August 2009 Notes is attached as Exhibit B-2 to the 2011 Note Purchase Agreement.

A summary of the material terms of the Replacement August 2009 Notes is as follows:
- interest free loan (Preamble);
- subject to the mandatory prepayment under the 2011 Note Purchase Agreement, a maturity date of the earlier of (1) October 11, 2020 and (2) the date the final payment in respect of the proceeds of an IP Event is received and/or recovered by Gabriel, Trace, or any of their respective subsidiaries in connection with the final resolution of the Qualcomm Dispute (Section 1);
- the holders are to receive $600,000 plus a percentage of the proceeds of the IP Event (Section 1); and

---

[11] The April 2009 Notes were stated in Gabriel's SEC filings to have been in the face amount of $1,000,000. The Fegen Note, which was issued in 2007 in the amount of $350,000, was included by the Debtors in the Replacement April 2009 tranche, increasing the amount to $1,350,000. There is no reason given for this, which raises concern.

- the holders have the right to receive deeply subordinated Additional Benefits (additional percentage interests in the proceeds of an IP Event).

### 5. The Replacement January 2010 Notes

Pursuant to the Agreement, the January 2010 Note holders agreed to surrender their January 2010 Notes for replacement notes (the "Replacement January 2010 Notes"). The Replacement January 2010 Notes replace and supersede the January 2010 Notes in their entirety, with the aggregate principal amount of these loans in the amount of $499,999.66 (Recital of 2011 Note Purchase Agreement). An exemplar of the Replacement January 2010 Notes are attached to the 2011 Note Purchase Agreement as Exhibit B-3.

A summary of the material terms of the Replacement January 2010 Notes is as follows:
- interest rate of 6% per annum (Section 1);
- subject to the mandatory prepayment in the 2011 Note Purchase Agreement, a maturity date of the earlier of (1) October 11, 2020 and (2) the date the final payment in respect of the proceeds of an IP Event, as defined therein is received or recovered by Gabriel, Trace, or any of their respective subsidiaries in connection with the final resolution of the Qualcomm Dispute (Section 1);
- the holders were to receive "principal" of $499,999.66, "interest" at 6% per annum;
- the holders were to receive deeply subordinated Additional Benefits of 1% of net proceeds of an IP Event for each $100,000 face value (Section 2); and
- to the extent that funds are available from the proceeds of the Whittle Settlement or from proceeds of an IP Event, Gabriel should use these funds to pay the principal and interest of the note (Section 2).

### 6. Replacement February 2010 Notes

Pursuant to the 2011 Note Repurchase Agreement, the February 2010 Note holders agreed to surrender their February 2010 Notes for replacement notes (the "Replacement February 2010 Notes"). The Replacement February 2010 Notes replace and supersede the February 2010 Notes in their entirety. The aggregate principal amount of these loans was $2,402,500 (Annex V to the 2011 Note Purchase Agreement). An exemplar of the form of Replacement February 2010 Notes is attached to the 2011 Note Purchase Agreement as Exhibit B-4.

A summary of the material terms of the Replacement February 2010 Notes is as follows:
- interest rate of 6% per annum (Section 1);
- subject to the mandatory prepayment provisions of the 2011 Note Purchase Agreement, a maturity date of the earlier of (1) October 11, 2020 and (2) the date the final payment in respect of the proceeds of an IP Event, as defined therein is

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

18.

Case: 13-30340   Doc# 145   Filed: 07/01/13   Entered: 07/01/13 23:50:13   Page 21 of 43

received or recovered by Gabriel, Trace, or any of their respective subsidiaries in connection with the final resolution of the Qualcomm Dispute (Section 1);

- the holders were to receive $2,402,500, interest at 6% per annum, and
- the holders have the right to receive deeply subordinated Additional Benefits of 0.80% of the IP Interest, for every $100,000 loaned by lender, subject to certain limits (Section 2).

### 7. New Senior Notes

On or about September 2, 2011, contemporaneously with the assignment from Gabriel to Trace and subject to the terms and conditions set forth in the Agreement, Trace issued to each of the holders listed on Annex I (the "Annex 1 Purchasers") various senior notes (the "Senior Notes") in the aggregate principal amount of $920,000. There is no explanation in the 2011 Note Purchase Agreement why the Annex 1 Purchasers received a senior position to other noteholders. No disclosures were made in Gabriel's SEC filings on this subject. The "purchase price" of the Senior Notes was represented to be the amount equal to the principal amount shown on the note. Agreement Section 5.1(a).

There were approximately six Annex 1 investors, R.C. Buford, Jack B. Manning, J. Douglas Rippeto, Stephen Moore, Russell Walker, and Clifford Holloway. Each of them is prior note investor. Mr. Manning is Gabriel's Secretary, Director and Member of Compensation Committee.

An exemplar of the Senior Notes is attached as Exhibit A-1 to the 2011 Note Purchase Agreement. A summary of the material terms of the Senior Notes is as follows:

- interest free loan (Preamble);
- subject to the mandatory prepayment provisions of the 2011 Note Purchase Agreement, a maturity date of the earlier of (1) October 11, 2020 and (2) the date the final payment in respect of the proceeds of an IP Event is received or recovered by Gabriel, Trace, or any of their respective subsidiaries in connection with the final resolution of the Qualcomm Dispute (Section 1); and
- the holders were to receive $3,680,000 (Section 1)
- the notes state that they are "secured," but, under the 2011 Note Purchase Agreement, the lien is on the "recovery, whether by settlement, award, verdict, judgment or other order, with respect to an IP Event (including, without limitation, all IP Event Proceeds, and all Accounts, Chattel Paper, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory and Investment Properties (as such terms are defined in Article 9 of the UCC) . . . ." There is no lien on the claim asserted in the Qualcomm Litigation.

### 8. The NW Note

On or about September 2, 2011, contemporaneously with the assignment from Gabriel to Trace and subject to the terms and conditions set forth in the Agreement, Trace issued to NW a note granting a security interest (the "NW Note") in the maximum principal amount of $3,100,000, which may be made in the form of additional advances. A true and correct copy of the NW Note is attached as Exhibit A-2 to the 2011 Note Purchase Agreement.

A summary of the material terms of the NW Secured Note is as follows:

- interest free loan (Preamble);
- subject to the mandatory prepayment provisions of the 2011 Note Purchase Agreement, a maturity date of the earlier of (1) October 11, 2020 and (2) the date the final payment in respect of the proceeds of an IP Event is received or recovered by Gabriel, Trace, or any of their respective subsidiaries in connection with the final resolution of the Qualcomm Dispute (Section 1);
- the holder is to receive $15,000,000 (Section 1);
- Gabriel was to use proceeds from this note for litigation expenses and administrative expenses related to Qualcomm Dispute, repurchase interests in the IP Event Proceeds that have been transferred to Hughes, Hubbard & Reed LLP ("HHR") and to pay up to $100,000 of NW travel expenses and diligence costs incurred in connection with the transactions contemplated by the Agreement (Recital of Agreement);
- NW is subordinate only to Priority Litigation Expense Providers, Munck Carter, LLP, Wang, Hartmann, Gibbs & Cauley, PLC and HHR (Section 7.2 of Agreement); and
- the notes state that they are "secured," but, under the 2011 Note Purchase Agreement, the lien is on the "recovery, whether by settlement, award, verdict, judgment or other order, with respect to an IP Event (including, without limitation, all IP Event Proceeds), and all Accounts, Chattel Paper, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory and Investment Properties (as such terms are defined in Article 9 of the UCC) . . . ." Agreement Section 7.1. There is no lien on the claims asserted by the Debtors in the Qualcomm Litigation.

The payment of the consideration for the NW Secured Note is governed by the Common Interest Agreement, referenced above. The Debtors have represented that the consideration given by NW for the NW Secured Note was approximately $3.091 million. See Gertz Decl. Exhibit 17.

The disclosures appended as the Schedule 11.3 of the 2011 Note Repurchase Agreement placed the parties on notice that, among other things: (i) neither of the Debtors had filed state or federal tax returns since fiscal year 2006; (ii) neither of the Debtors had filed reports with the SEC, including historical financial statements, since 2006.

Each of the notes issued in conjunction with the 2011 Note Purchase Agreement contains the following prominent legend, in bold face caps:

> THIS NOTE HAS BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND HAD NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY APPLICABLE STATE SECURITJIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED OR DISPOSED OF UNLESS AND UNTIL THIS NOTE IS REGISTERED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE . . .

The 2011 Note Purchase Agreement and the notes issued thereunder make clear that each of the investors under the Agreement were relying on the occurrence of an IP Event and did not rely on the business operations of Gabriel and/or Trace in respect to their purchase of the applicable notes issued in connection with the Agreement and their expectation of repayment.

## IV. RECHARACTERIZATION OF THE NOTES AS EQUITY IS WARRANTED

In *Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l)*, 714 F.3d 1141 (9th Cir. 2013), the Ninth Circuit eliminated any uncertainty regarding a bankruptcy court's power and authority "to recharacterize claims in bankruptcy proceedings." *Id*. at 1148. In doing so, the Ninth Circuit discredited *In re Pacific Express, Inc.*, 69 B.R. 112 (B.A.P. 9th Cir. 1986), which had held that the Code did not authorize courts to characterize claims as equity or debt, but limited courts to the statutory remedy of equitable subordination under 11 U.S.C. § 510. Instead, the Ninth Circuit adopted the Fifth Circuit's approach to recharacterization, as expressed in *In re Lothian Oil*, 650 F.3d 539 (5th Cir. 2011), which holds that bankruptcy courts "are required to recharacterize purported 'debt' as equity where state law would treat the asserted interest as an equity interest." 714 F.3d at 1147. The Ninth Circuit held that in order to determine whether a particular obligation owed by the debtor is a "claim" for purposes of bankruptcy law, it is first necessary to determine whether that obligation gives the holder of the obligation a "right to payment" under state law. *Id*. An equity holder has no right to payment. All equity has is, "a share of ownership in the debtor's assets—a share that is subject to all of the debtor's payment obligations. . . . relegated to the end of the line,

1   where any recovery is unlikely." *In re Insilco Tech., Inc.*, 480 F.3d 212, 218 (3d Cir. 2007)

2   (Ambro, C.J.).

3         As noted by the Fifth Circuit, recharacterization extends beyond insiders and is "part of

4   the bankruptcy courts' authority to allow and disallow claims under 11 U.S.C. §502." *Lothian*

5   *Oil*, 650 F.3d. at 542.  As such, recharacterization has its source, not in the Court's equitable

6   powers under *section* 105, but rather in its power to *disallow*, either in whole or in part, a debt

7   that is contrary to state law.  *Id.* at 543.  Thus, if a debt should be recharacterized as equity under

8   applicable state law, then such a claim must also be disallowed under *section* 502 of the

9   Bankruptcy Code.

10        Here, California law[12] expressly provides for recharacterization of "indebtedness" as

11  stock.  California has specifically adopted IRC Section 385 ("Treatment of certain interests in

12  corporations as stock or indebtedness").  *See* Cal. Rev. & Tax. Code §§ 17321 and 24451

13  ("Subchapter C of Chapter 1 of Subtitle A of the Internal Revenue Code, relating to corporate

14  distributions and adjustments, shall apply, except as otherwise provided.").  California courts

15  have generally looked to federal precedents for the factors to be considered in determining

16  whether an interest is stock or indebtedness.  *See, e.g., Educational Employees Credit Union v.*

17  *FTB*, 2006 Cal. App. Unpub. LEXIS 248 (Cal. App. 3d Dist. Jan. 11, 2006) (unpublished).

18  Similarly, California State Board of Equalization has applied a facts and circumstances, "factor"

19  test, based on the federal tax precedents.  *See In the Matter of the Appeal of Dynatech Fluid Tech.*

20  *Corp., formerly P M America, Inc.*, 87-SBE-028, Cal. State Board of Equalization (April 7,

21  1987); *see also In the Matter of the Appeal of Hinshaw's Dept. Stores, Inc.*, 84-SBE-090, Cal.

22  State Board of Equalization, (June 27, 1984).

23        Federal tax precedents adopt a substance-over-form approach.  The Ninth Circuit has held

---

[12] In light of the fact that the Ninth Circuit has only recently given guidance that "applicable" state law applies, the choice of law analysis has not yet been fully developed.  Here, there would be three choices – (i) California law, because California is the place with the most significant relationship to the dispute in that the bankruptcy case is pending here and the Debtors' operations are here; (ii) Delaware law, which was the governing law agreed to in connection with the Original Notes; or (iii) New York law, because the 2011 Note Purchase Agreement and each of the notes issued in connection contained a New York choice of law provision.  In the end, it does not matter, because like California, Delaware and New York each approve the use of recharacterization, and use the federal tax law factors as the basis for the determination.  *See Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 2006 Del. Ch. LEXIS 125 (Del. Ch. 2006).

Case: 13-30340   Doc# 145   Filed: 07/01/13   Entered: 07/01/13 23:50:13   Page 25 of
43

that in conducting the recharacterization analysis for tax purposes, it is necessary to look at the parties' true or actual intent at the time of the transaction. *Wilbur Security Co. v. Comm'r of Internal Revenue*, 279 F.2d 657 (9th Cir. 1960). The inquiry should be to ascertain the "actual relationship" between the maker and holder of the notes, despite the form that may have been attributed to the transaction. Moreover, the Court is to be on guard against chicanery or attempts by the parties to hide the true nature of the transaction. "Pure gimmicks of form to shield the real essence of a transaction cannot control. . . ." *A.R. Lantz Co. v. U.S.*, 424 F.2d 1330, 1334 (9th Cir. 1970). Although the parties' intent may be inferred from the contract, the "substance and reality" of the transaction is key. *Id.*

Although federal tax cases have adopted various multi-factor balancing tests, the key component of all of the factors used is to measure the amount of risk of nonpayment that is borne by the purported lender-*qua*-investor: "[T]he important intent is whether you feel that your advance is to be at the risk of the business or is to be a definite obligation payable in any event." *Id.* at 1333-34. As eloquently articulated by Circuit Judge Ambro, "Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). *In re Submicron Sys. Corp.*, 432 F.3d 448, 456 (3rd Cir. 2006) (Ambro, C.J.).

With that said, a multi-factor balancing test is typically the manner in which courts approach the issue, while also stating that "no one factor is determinative." The Ninth Circuit has identified eleven factors that influence the debt/equity determination under federal tax law. The factors are: (1) the names given to the instruments; (2) the presence or absence of a maturity date; (3) the source of the payments of principal and interest; (4) the right to enforce the payment of principal and interest; (5) participation and management; (6) a status equal or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stock holder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions. *A.R. Lantz Co.*, 424 F.2d at 1333. We use those factors here for purposes of

Cooley LLP
Attorneys At Law
San Diego

853511 v2/SD

23.

discussion. Where the *Lantz* factors are similar to the factors discussed in *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir. 2001), the *Autostyle* elements are also discussed.

In connection with the discussion below, Qualcomm is required to address (i) the Original Notes and the Replacement Notes issued in connection with the 2011 Note Purchase Agreement; (iii) the Senior Notes issued in connection with the 2011 Note Purchase Agreement; and (iv) the NW Note issued in connection with the 2011 Note Purchase Agreement. It is Qualcomm's position, however, that the Replacement Notes do not purge history, but are burdened by the Original Notes and their terms. This is because the question of recharacterization is based on the parties' true or actual intent at the time of the transaction. *Wilbur Security Co.*, 279 F.2d at 660 (court's objective is to ascertain the "actual relationship" between the maker and holder of the notes); *see also Autostyle*, 269 F.3d at 747-48 ("Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution … *ab initio*.'") (*quoting In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)). The analysis of recharacterization in connection with the Original Notes as of the inception of the original transaction is thus dispositive of the recharacterization of the Replacement Notes, which are derivative of the Original Notes. If the Original Notes are equity, so are their replacements.

### A. The Names Given to the Instruments

The instruments in question here state that they are "promissory notes" and that the holder of the note is a "Lender." But, that is not the end of the question. "The nomenclature adopted . . . will not be decisive. Nor will the form of the transaction be exalted at the expense of the transaction's substance." *Lasker v. McDonnell & Co., Inc.*, 175 Del. Ch. LEXIS 233 (1975).

Starting with first principles, the word "promissory note" is defined as "an *unconditional* written promise, signed by the maker, to pay *absolutely* and in any event a *certain* sum of money either to, or to the order of, the bearer or a designated person." BLACK'S LAW DICTIONARY 1086 (7th Ed. West 1999). Here, reading past the pre-printed form title, the instruments shout out that they were not "promissory notes."

Although under the Securities and Exchange Act of 1934, "[t]he term security means any

Case: 13-30340   Doc# 145   Filed: 07/01/13   Entered: 07/01/13 23:50:13   Page 27 of 43

note…." (15 U.S.C. § 78c(a)(10)), "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Act." *Reves v. Ernst & Young*, 494 U.S. 56, 62-63 (1990). The essence of the *Reves* analysis is to determine whether the note in question is more like an investment or more like a commercial or consumer loan. *Id*. at 63 ("A majority of the Courts of Appeals that have considered the issue have adopted, in varying forms, 'investment versus commercial' approaches that distinguish, on the basis of all of the circumstances surrounding the transactions, notes issued in an investment context (which are 'securities') from notes issued in a commercial or consumer context (which are not).").[13]

Here, neither the Original Notes, nor the notes issued under the 2011 Note Purchase Agreement provide an unconditional promise to pay. The Original Notes are expressly made contingent on the occurrence of an IP Event. Although the notes issued in 2011 modify the structure somewhat, they still do not provide for an unconditional payment obligation. Under the 2011 Note Purchase Agreement (to which the notes are subject), payment of the notes issued thereunder is contingent on a host of things, including the Debtors' success in the Qualcomm Dispute, the Debtors' receipt of sufficient IP Event Proceeds, lack of dilution by new investors, whether the Debtors settle the Qualcomm Dispute for enough money to still make payment, and whether litigation expenses exceed the amount of any recoveries from the Qualcomm Dispute.

There is no provision for payment of a sum certain under any of the notes. To the contrary, both the Original Notes and the notes issued in connection with the 2011 Note Purchase Agreement enabled the Investors to receive a percentage recovery on the Debtors' recoveries on the Qualcomm Dispute. The Investors' return depended upon the amount of IP Event Proceeds,

---

[13] The Court in *Reves* then went on to hold that the notes at issue – promissory notes sold by an agricultural Co-Op, that paid a variable rate of interest and which were uncollateralized and uninsured – were securities because they did not resemble any of 7 enumerated exceptions, nor did they pass any of four specified factors. *Id*. at 67-70. As to the first factor, the Court noted that "[t]he Co-Op sold the notes in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit… From both sides, then, the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction." *Id*. at 67-68. As to the second factor, the Court noted that the notes were offered and sold to a broad segment of the public, and it did not matter that they were not tradable on an exchange. *Id*. at 68. As to the third factor, the notes were marketed as an "investment," meaning the public had reason to assume it was an investment. *Id*. at 68-69. Finally, since the notes were uncollateralized and uninsured, and there was no federal regulation governing them, this also pointed towards a finding that the notes were securities. *Id*. at 69.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

25.

less litigation expenses, and was *not capped* at any maximum amount.  Likewise, the Investors' returns could be eroded by new investors.

Similarly, as in *Reves*, the Investors purchased the notes to earn a profit and were expressly marketed as an "investment."  The Investors' lack of security is also noteworthy.  None of the Original Noteholders received liens.  Although NW and certain of the investors purported to receive "security," in fact, the Debtors' had no assets to secure.  Moreover, the 2011 Note Purchase Agreement did not provide a lien in the underlying litigation claims.  The so-called "security" relied on by these Investors was the ability to be first in line to receive a shockingly high percentage of the profits from litigation, which profits were quite likely to never occur, as noted in the disclosures made at the time of the various note purchases.  The Original Notes and the notes issued in connection with the 2011 Note Purchase Agreement also bore a prominent legend stating that the issuance and any transfer of the instrument was subject to compliance with applicable federal and state securities laws.  This demonstrates that the notes were securities, not true promissory notes.

Finally, the documentary evidence reveals that the label "promissory note" was used for a purpose—to skirt legal compliance issues.  The January 2010 Disclosure and March 2010 Disclosure each admitted that the reason that the instruments were denominated as "notes" was because Gabriel could not issue further shares, due to its failure to file audited financials with the SEC.  *See* Gertz Decl., Ex. 10 at 14 & Ex. 12 at 23.  Although the notes issued in connection with the 2011 Note Purchase Agreement were not issued with a similarly candid disclosure, it must be noted that the Debtors did disclose that they still had no audited financials, and thus their inability to issue further authorized shares has not been solved.  *See* Schedule 11.3 (disclosing that "[n]either Loan Party has filed reports with the Securities and Exchange Commission, including historical financial statements, since 2006.")  As a result, the same condition necessarily prevailed at the time of the 2011 transaction.  Similarly, the notes issued in 2011 were equities dressed up as notes, in order to get around the Debtors' legal compliance challenges.  Each of these factors is strongly supportive of recharacterization of the instruments as equity.

Cooley LLP
Attorneys At Law
San Diego

853511 v2/SD

26.

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 29 of 43

## B.     The Presence or Absence of a Maturity Date

The absence of a fixed maturity date and a fixed obligation to repay "is an indication that the advances were capital contributions, not loans. *Autostyle*, 269 F.3d at 750. Here there is no fixed obligation to repay the notes on a date certain. None of the Original Notes had a *fixed* maturity date or *fixed* obligation to repay. As for the Replacement Notes, the Senior Notes and the NW Note, the purported maturity date of 2020 is illusory.

As for the Original Notes, the "maturity" of the note was *after* the occurrence of an IP Event. If the IP Event never occurred, the purported obligations under the note would not come due. The holder would be out of the money they had invested, just like any other equityholder. Nor can the holders of the Original Notes try to elevate their equity position shortly before the Debtors' bankruptcy by obtaining a Replacement Note, which states that it matures in October 2020. This "maturity date" is illusory. Viewed in the context of the transaction and the Debtors' capital structure, this does not translate into a fixed obligation to repay the principal amount, or any other amounts, at any particular time—other than whenever the Debtors obtain recoveries from the Qualcomm Dispute.

The fact that the due date is so far in the future is telling. Here, as in *A.R. Lantz Co*, the maturity date is "extended and principal [is] paid only in exceptional circumstances." 424 F.2d at 1333. Likewise, here, the defined Maturity Date serves no real purpose. The practical mechanics of repayment are actually contained in Section 8.3 of the 2011 Note Purchase Agreement, which requires that, upon receipt, any recovery of IP Event Proceeds must be immediately paid over in full to the "Loan Parties." The purported maturity date in October 2020 appears to be, using the phrasing of the Ninth Circuit, a "gimmick of form" to shield the true intent of the parties that the occurrence of an IP Event was to be the real triggering event for payment. *Id.*

The Maturity Date and any substantive fixed obligation to repay is further negated by the statements in the 2011 Note Purchase Agreement that the repayment obligations are "**solely and exclusively** dependent on the final determination of the Qualcomm Dispute," and that Gabriel and Trace have both "limited assets and limited operating history." The practical reality is that the Debtors were nothing more than a corporate shell used for litigating the Qualcomm Dispute. This

Case: 13-30340     Doc# 145     Filed: 07/01/13     Entered: 07/01/13 23:50:13     Page 30 of 43

known fact made it inconceivable that there could be any means of repaying the notes, absent (i) success in the Qualcomm Dispute; and (ii) sufficient recoveries to pay the investors following all attorney fees and expenses. Moreover, each of the investors gave the management of the Debtors full authority to settle the Qualcomm Dispute, regardless of the fact that there would be no IP Event Proceeds with which to pay the notes. As such, not only was there no "fixed" maturity date—there was no underlying "fixed" obligation. This factor strongly militates towards recharacterization.

### C. The Source of the Payments of Principal and Interest

Federal tax precedents as well as the bankruptcy precedents are in agreement that "[i]f the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *Autostyle*, 269 F.3d at 751.

The fact that the purported notes were to be paid from "royalties and 'equity placements'" which "depended upon the success of Lothian's business, instead of a prescribed interest rate" was the cornerstone for the Fifth Circuit's affirmation of the bankruptcy court's recharacterization determination in *Lothian Oil*, *supra*, 640 F.3d. at 544. The situation is the same here. With respect to the Original Notes, the notes made repayment expressly contingent on the happening of an IP Event, and the notes expressly provided that the holder was to be repaid *from the proceeds*. As such, the Original Notes were in the form of a capital contribution, not a loan. The fact that the Original Notes were replaced with Replacement Notes does not change the form of the transaction, which should be analyzed as of the inception of the Original Notes.

With respect to the Senior Notes and the NW Note, this factor is directly addressed by the admission in the 2011 Note Purchase Agreement that that the "Loan Parties" had been advised that the Debtors' repayment obligations are "**solely and exclusively *dependent*** on the final determination of the Qualcomm Dispute," and that Gabriel and Trace have both "limited assets and limited operating history." Agreement at 35 (emphasis added). If the repayment of the notes is dependent upon the determination of the Qualcomm Dispute in the Debtors' favor, then necessarily the repayment depends solely on the success of the litigation, and the transaction was

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

28.

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 31 of 43

in the form of a capital contribution.[14]

As noted by the Delaware Chancery Court in *Lasker*, this factor bears on the question of the holders' "reasonable expectation of being repaid irrespective of the fortunes of the company." Where, as here, the holders are "dependent upon the continuing success of the venture to secure full repayment,"—here, the "venture" being the Qualcomm Dispute—it is a "clear characteristic of equity securities." *Lasker,* 175 Del. Ch. LEXIS 233 at *26.

### D.     The Right to Enforce the Payment of Principal and Interest

The question of the right to enforce payment is closely related to whether the payments to be made depend entirely on the earnings of the maker of the instrument.  Here, the holders of the Original Notes had no right of enforcement of payment of any amount unless and until the happening of a contingent event—success in the Qualcomm Litigation and the receipt of proceeds.  Likewise, the holders of each of the notes issued in connection with the 2011 Note Purchase Agreement have no right of enforcement, where they have acknowledged and agreed, among other things, that the Debtors' repayment obligations are "**solely and exclusively dependent on the final determination of the Qualcomm Dispute.**"  Agreement at 35 (emphasis added).  As noted above, any right of enforcement is also diluted by the various other express contingencies to the Debtors' obligation of payment that are contained in the 2011 Note Purchase Agreement, including dilution by new investors, whether the Debtors settle the Qualcomm Dispute for enough money to still make payment to all of the investors in the waterfall, and whether there are any proceeds left over after payment of litigation expenses.

Any facial right of enforcement contained in the notes is negated by these provisions. This factor also strongly supports recharacterization of the notes as equity.

### E.     Participation and Management

Whether a holder of a note is able to participate in management of the borrower is also taken into account in the analysis whether the interest is in the form of equity.  In respect to the

---

[14] The Debtors may try to argue that NW is not an insider and that this factor pertains to insider transactions.  Setting aside the fact of whether NW is an insider, as defined under the Bankruptcy Code (a determination that Qualcomm expressly reserves all rights to litigate in connection with the Plan confirmation hearing), "recharacterization extends beyond insiders" *Lothian Oil*, *supra*, 650 F.3d at 542.

Original Notes, many of the persons to whom the Original Notes were issued were officers or directors of the Debtors. For example, Jack B. Manning currently sits on the board of Gabriel. In connection with the April 2009 Notes, for example, their issuance was specifically conditioned upon the Investors being appointed to Gabriel's board. Another Investor, Kelly Fegen, is believed to be the wife of the indicted past-officer and director, Nicholas Fegen.

Many, if not all of the Investors, also appear to hold substantial equity interests in Gabriel and/or warrants that would give them substantial equity upon exercise, although Qualcomm has not been provided with the underlying data on the investors' other holdings in the Debtors. For example, Gabriel's August 21, 2009 8-K discloses that "[b]etween July 2007 and April 2008 Craig Bardsley invested in several promissory notes issued by the Company in private placements and was issued warrants in connection with the purchase of such promissory notes." Gertz Decl. Ex. 8. It is not known the extent to which the interests held by these persons may provide a modicum of control.

Furthermore, NW has been granted an extraordinary amount of control—well exceeding the reasonable bounds of a true "lender." As noted above, under the Common Interest Agreement, NW is provided two seats on the Debtors' board and/or LLC management committee, "relating to the settlement or prosecution of the Qualcomm Dispute." Common Interest Agreement at 1.7. NW doubtless sought this provision because, in light of the fact that its entitlement to any payment was "solely and exclusively dependent" upon the outcome of the Qualcomm Dispute, it wanted to have a direct say in all of the decisions that related to the preservation and enhancement of the return on its investment. This factor strongly supports recharacterization to equity.

F.    A Status Equal or Inferior to That of Regular Corporate Creditors

Where notes are "quickly subordinated" to other creditors, recharacterization to equity is warranted. *A.R. Lantz Co.*, 424 F.2d at 1334. Subordination destroys the right to share with general creditors in the assets in the event of a liquidation or dissolution. Thus, "full subordination is a characteristic of equity interests." *Lasker*, 175 Del. Ch. LEXIS 233 at *29.

Here, the holders of the Original Notes expressly limited their right of recovery to only the

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 33 of 43

IP Event Proceeds—thus limiting their rights to share with general creditors in all of the Debtors'
assets (to the extent there were any) in the event of liquidation. The 2007/2008 Notes, the Fegen
Note, the April 2009 Notes, the August 2009 Notes, the January 2010 Notes, required an IP Event
with a threshold amount of "net" proceeds to occur (*i.e.*, net of expenses and costs) before they
became payable. The effect of this provision is to limit these investors' rights *vis-à-vis* the
general rights to the proceeds by other creditors, who would be subject to no such limitations.

Additionally, the holders of the January 2010 Notes conditioned payment of the notes on
the fact that the payment would not render the Company insolvent and expressly subordinated
their claims to "All Company Obligations Required To Be Paid By The Company," which was
defined to include "company debts." Similarly, the holders of the February 2010 Notes and
March 2010 Notes subordinated their right to payment to payment of all "Expenses," which also
was defined to include "all company debts." These notes thus had no right of payment unless and
until all general unsecured creditors had been paid in full.

Subordination—both at the time of the Agreement and as to future creditors—is also
present under the 2011 Note Purchase Agreement. First of all, the waterfall for distributions
makes clear that the distributions are to be made solely from "IP Event Proceeds and other
monies . . . arising from any recovery . . . with respect to an IP Event." Agreement at 26. As with
the Original Notes, this language limits the holders' rights to share with general creditors in all of
the Debtors' assets (to the extent there were any other assets) in the event of liquidation. All
distributions are otherwise subordinate to creditors that front litigation expenses and to the
contingency fees of the attorneys. The investors also permit the Debtors to bring on additional
investors and to subordinate/dilute the existing investors' interests to such new investors.

Furthermore, although the Senior Notes and the NW Note are characterized as "secured,"
in fact, there is no security. The lien is only on the recovery with respect to an IP Event. There is
no security given on the claim itself. There were no corporate assets in existence in which to take
a lien on in any event. The Debtors disposed of all other assets in 2009, well prior to the 2011
Note Purchase transaction. As such, the lien is inchoate unless and until there are proceeds
received from an IP Event. *See, e.g., PPG Indus., Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58, 62

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

31.

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 34 of
43

(2d Cir. 1976); *cf. Don King Prods. v. Thomas*, 945 F.2d 529, 534 (2d Cir. 1991) (assigned right to receive income from prize fight purse was contingent on future event and remained inchoate until proceeds came into existence upon occurrence of prize fight). Furthermore, such after-acquired proceeds of the tort claims are excluded from the operation of the security agreement under 11 U.S.C. §552(b), which preserves after-acquired property for the benefit of the estate. The "security" does not elevate the interests of the holders of the Senior Notes or the NW Note.

In sum, the requirement that distributions to these investors be made from the proceeds of an IP Event—*something that had not occurred as of the petition date*—should serve to effectively subordinate the rights of the investors to the claims of all general unsecured creditors, if not to eliminate the "claim" altogether. *See* 11 U.S.C. § 502(b) (a claim is determined "as of the date of the filing of the petition").[15]

The provisions for subordination contained in the Original Notes and the notes issued pursuant to the 2011 Note Purchase Agreement are yet another reason that these "claims" should be characterized as equity interests.

### G. "Thin" or Adequate Capitalization

Inadequate capitalization is also a factor as to whether an instrument is debt or equity. This is because "[t]he essential purpose of equity securities is to provide sufficient capital to sustain normal operations of the corporation." *Lasker*, 175 Del. Ch. LEXIS 233 at *29. Although the facts here are not the same as in *Lasker*, where former partners had transformed their capital accounts into stock and debentures in a new corporation, here the facts also support characterization of the investments as equity.

Here, the paper thin nature of the Debtors' capitalization, from well before the first notes at issue here were issued, is demonstrated by the fact that the Debtors did not have the funds to have audited financials or tax returns prepared since 2006. As noted above, this caused the Debtors to encounter a "catch-22." The Debtors used the vehicle of promissory notes as the means of obtaining new capital only because the Debtors were _unable_ to raise needed capital

---

[15] An equity interest, unlike a claim, can "float" with the Debtors' post-petition fortunes and is not fixed as of the petition date. This is yet another reason that the investors' notes are more properly characterized as equity. They can only receive anything as a result of the post-petition improvement of the Debtors' fortunes.

Cooley LLP
Attorneys At Law
San Diego

853511 v2/SD

32.

1   through issuance of stock. Gabriel had issued all of its authorized shares and it could not issue
2   further shares, due to its inability to hold a shareholders' meeting, due to its failure to file audited
3   financials with the SEC. The Debtors' disclosures in this respect are a tacit admission that the
4   notes that they issued as "debt" really *ought* to have been issued in the form of shares, but for
5   regulatory compliance issues. The Debtors still have no audited financials, and thus this
6   condition prevails to date. This factor is an extraordinarily strong reason for recharacterization of
7   all of the notes as equity.

### H.    Identity of Interest Between Creditor and Stockholder

9       Where debt is issued to stockholders in proportion to their holdings or in exchange for
10  their capital holdings, it is evidence that the instrument is equity. *Lasker*, 175 Del. Ch. LEXIS
11  233 at *27. As noted above, many, if not all of the investors, also appear to hold substantial
12  equity interests in Gabriel and/or warrants that would give them substantial equity upon exercise,
13  although Qualcomm has not been provided with the underlying data on the investors' prior equity
14  holdings in the Debtors. Here, it must be the Debtors' burden to prove that an identity of interest
15  does *not* exist between the noteholders and such persons' existing holdings in Gabriel and/or
16  warrants. The fact that such an identity does exist as to a substantial amount of the investors here
17  is strongly suggested by the fact that the 2011 Note Purchase Agreement (i) preserved the existing
18  warrant rights of the holders of the 2007/2008 Note and of the Bardsley Note, at an adjusted
19  strike price and (ii) allowed the holders of the 2007/2008 Notes to elect to exchange their warrant
20  for the return of principal plus "an amount equal to 200% of the initial principal amount" of the
21  note. *See* Agreement Section 5.1(g).

22      Furthermore, the extraordinary participation by NW under the Common Interest
23  Agreement, *i.e.*, to place its representatives on the board of the Debtors to vet decisions relating to
24  the Qualcomm Dispute, indicates that its interests are strongly identified with those of a
25  shareholder. Its primary purpose is not the proper objective of a lender to be repaid its principal
26  and interest. Rather, the objective of NW is the preservation and enhancement of the return on its
27  investment, which is the objective of an equity holder. This factor also strongly supports
28  recharacterization to equity. Additionally, an absolute identity of interest with the claimants

under the Investor Notes is demonstrated by the Debtors' pre-transaction covenant to never sue to avoid the transaction under the 2011 Note Purchase Agreement or the payments provided for thereunder. *See* Term Sheet, Gertz Decl. Exhibit 14 at Bates GAB000625.

## I.     Payment of Interest Only Out of "Dividend" Money

Where the source of payment is dependent upon the earnings of the borrower, it is deemed a "participation aspect . . . clear[ly] characteristic of equity. *Lasker*, 175 Del. Ch. LEXIS 233 at *28. Here, there is really no need to say anything more than to point to the Purchaser Representations of Section 10 of the Agreement, where each Purchaser "individually represents and warrants" that

> It has been called to the attention of such Purchaser in connection with such Purchaser's investment in the applicable Loan Party that such investment is highly speculative in nature and involves a high degree of risk, [and that the] repayment of the Obligations by the Loan Parties is ***solely and exclusively dependent on the final determination of the Qualcomm Dispute***; and . . . the Loan Parties have both "limited assets and limited operating history. . . . and . . . the Loan Parties may not receive or be awarded any IP Event Proceeds or any other amounts in connection with the Qualcomm Dispute, which may result in the inability. . . to pay any of the Obligations. (as defined under the Agreement).

Agreement Section 10(e). The nature of the investments here were entirely dependent upon the earnings of the Debtors, which themselves were contingent upon a contingent event—success in litigation. Part and parcel of this structure were the shockingly high returns demanded by these investors, which were really just a "piece of the action." These investments (to the extent they were not otherwise a wager and void on that basis) were equity participations, not loans.

## J.     The Ability of the Corporation to Obtain Loans from Outside Lending Institutions

No reputable bank would have lent to the Debtors under these facts and circumstances. The Debtors are a corporate shell that exists only to maintain litigation. They have no assets to pledge, they have no earnings, nor do they have any other basis to obtain a loan from a reputable bank or other traditional financing organization. The Debtors had not held shareholders' meeting in recent memory. There were no financials at all prepared for years, much less audited ones. The Debtors were scofflaws and ignored the requirement to file tax returns (not to mention the

Cooley LLP
Attorneys At Law
San Diego

853511 v2/SD

34.

Case: 13-30340     Doc# 145     Filed: 07/01/13     Entered: 07/01/13 23:50:13     Page 37 of 43

1    requirement to pay taxes).

2         Under these circumstances, the only means the Debtors had of obtaining funding was to

3    entice investors who hoped to receive *percentage* returns—not on the amount of their

4    investment—but rather on the *amount of the proceeds* of litigation. As noted below, a traditional

5    lender is highly unlikely to venture into such a transaction, which invites a host of defenses to

6    enforceability under applicable state law, including potential criminal liability.

7         **K.    The Intent of the Parties**

8         Finally, courts look at the intent of the parties. In fact, the question of the true intent of

9    the parties pervades each of the factors discussed above. The limitations of the above factors,

10   however, is that they generally inquire of the four corners of the instrument as to the parties'

11   objective intent. As expressed by the Ninth Circuit, however, it is necessary to focus on

12   substance, not form. Thus, the analysis also must subject the transaction as a whole to scrutiny to

13   determine if the essence of the transaction was to create equity rather than debt. The question to

14   be answered here is whether, regardless of the form of the instrument, the investor actually

15   intended that the advance "is to be at the risk of the business or is to be a definite obligation

16   payable in any event." *A.R. Lantz Co*, 424 F.2d at 1334.

17        Here, one of the most telling facts that the instruments are equity is that each of the

18   Investors really had no concern about any underlying ability by the Debtors to pay any amounts

19   under the notes. As noted above, the question generally boils down to whether the transaction

20   was entered into with the mindset of a banker or as an investor. Bankers underwrite a loan based

21   on the borrower's present ability to repay. Clearly, each Investor was aware, based upon the

22   express disclosures made at the time of the 2011 Note Purchase Agreement, as well as at the time

23   of their initial investment, that Gabriel had divested itself of all of its operations. More important,

24   they were fully aware that the Debtors were in dire financial straits, in that they did not have

25   sufficient capital to have audited financials prepared or file the necessary reports with the SEC.

26   Clearly, the investors were not concerned about the Debtors' capitalization or financial health.

27   The ability to be repaid on a debt, plus a legal rate of interest, over a fixed term, was not the point

28   of the transaction.

Rather, the point of the transaction was, depending upon the tranche at issue, (i) to receive warrants that would entitle them to a percentage share of the proceeds of an IP Event in exchange for the exercise price (Replacement 2007/2008 Notes); (ii) to receive a percentage of the proceeds of an IP Event along with the Additional Benefits (that is, an additional deeply subordinated interest in the proceeds of an IP Event) (Replacement April 2009 Notes, Replacement August 2009 Notes, Replacement January 2010 Notes, and Replacement February 2010 Notes, and (iii) to receive back their investment plus a 400% return, immediately upon the occurrence of the Debtors' receipt of any proceeds from an IP Event, whether that took two months or two years from the date of investment (Senior Note and NW Note).

In light of the opportunity to participate in the spoils of victory, these investors did not care that it was a certainty that they would receive nothing if the hoped for victory against Qualcomm never occurred. To the contrary, these investors intended that their investment was to be *completely at the risk* of the success in litigation, rather than a definite obligation payable in any event. In fact, this is one of those unusual cases where the parties were candid and the face of the document itself reflects the parties' intent that the investment was to be deemed as something else than a fixed obligation to pay:

> repayment of the Obligations by the Loan Parties is **solely and exclusively dependent on the final determination of the Qualcomm Dispute**. . . .

Here, the Debtors' ability to repay was clearly dependent upon the fortunes of the Debtors' in the litigation. The investors were investing in the litigation, just as much as if they had received an assignment of a percentage of the underlying claim and/or shares or membership interests in the Debtors. The investments are properly characterized as equity.

## V. THE INVESTOR CLAIMS ARE UNENFORCEABLE AGAINST THE DEBTORS

As noted above, section 502(b)(1) requires that a claim that is unenforceable against the debtor or property of the estate under "applicable law" should be disallowed. Here, characterization of the claims as equity is only one of several state law bases for disallowance. Other grounds for disallowance are briefly noted here as well.

As discussed above, the first question to answer in respect to state law issues is, "what is

the applicable law." The Ninth Circuit has held that a bankruptcy court should utilize federal common law choice of law provisions. *Lindsay Enters., Inc. v. Beneficial Reins. Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir. 1995). Federal common law requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161 (1946). Federal common law defers to the Restatement, which respects the parties' contractual choice of forum. *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006).

### A. Usury

To the extent the investors seek to avoid the Scylla of recharacterization (by arguing that the investment is a "loan"), they will likely run aground on the Charybdis of usury. Here, the parties to the 2011 Note Purchase Agreement chose New York law to govern. The parties' choice of law should be honored, where they were all sophisticated individuals and corporations.

Under New York law, the elements of usury are (i) a loan, (ii) an absolute requirement for repayment; (iii) with interest in excess of the legal maximum; and (iii) an unlawful or corrupt intent on the part of the lender to contract for or to take, and on the part of the borrower to give, usurious interest. 72 *N.Y. Jur. Interest and Usury* §§61-119. Under New York law, the rate of interest upon the loan or forbearance of any money, goods, or things in action may not exceed 16% per year. N.Y. Gen. Oblig. Law § 5-501(1); N.Y. Banking Law § 14-a(1). N.Y. Gen. Oblig. Law § 5-511 renders void any transaction taking interest in excess of that allowed by N.Y. Gen. Oblig. Law § 5-501. Further, any person who has paid interest in excess of the (16%) rate authorized by N.Y. Gen. Oblig. Law § 5-501 may bring a civil lawsuit against the usurer to recover the amount of money paid above that lawful rate. N.Y. Gen. Oblig. Law § 5-513. Moreover, N.Y. Penal Law § 190.40 renders it a class E felony knowingly to charge, take, or receive interest at a rate exceeding 25% per year. In other words, in New York, charging, taking, or receiving interest of 25% or more per year is criminal usury.

Loans or forbearances of $250,000 or more generally are exempt from the (16%) civil usury statutes, but remain subject to the (25%) criminal usury statute. Loans or forbearances of

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

37.

Case: 13-30340   Doc# 145   Filed: 07/01/13   Entered: 07/01/13 23:50:13   Page 40 of 43

1  $2,500,000 or more are exempt from all of New York's usury statutes.

2        The Investors are seeking much higher than a 16% return on their investment.  As such, it

3  would appear that should the Investors seek to maintain that their investments are, in fact, a loan,

4  with an absolute requirement for repayment, they would have a substantial problem getting past

5  the fact that the loan was usurious and therefore void, if not also a criminal transaction.

6        The Investors fare no better under California law.  First of all, the Investors do not appear

7  to comply with the California Finance Lenders law.[16]  As such, the Investors here are not exempt

8  from California's usury statutes, which provide a maximum rate that is the greater of 10 percent

9  per annum or 5 percent over the discount rate in effect for the San Francisco Federal Reserve

10  Bank[17] on the 25th day of the month preceding the earlier of 1) the execution of the contract, or 2)

11  the making of the loan.  Although California law does not void the underlying obligation, the

12  party to whom the interest is to be paid under the terms of the usurious agreement may not

13  maintain an action at law to recover that interest in any sum.  Deering's Annot. Uncod. Measures

14  1919-1 § 2; West's Civ. Code § 1916-2; *Gibbo v. Berger*  123 Cal. App. 4th 396 (2004); *Winnett*

15  *v. Roberts* 179 Cal. App. 3d 909 (1986).  Plus, the debt may not be declared to be due until the

16  full period of time for which it was contracted has elapsed. Deering's Annot. Uncod. Measures

17  1919-1 § 2; West's Annot. Civ. Code § 1916-2.  The loans here were for much more than a 10%

18  return.  The loans are not due until October 2020.  Thus, the loan is usurious, the acceleration

19  clause under the notes is unenforceable, and no obligation of the Debtors is enforceable until

20  October 2020.  There is presently no "claim" that may be asserted against the estates.

21        **B.    Champerty and Maintenance**

22        The investor notes are otherwise tainted with another state law defect.  Here, the parties to

23  the 2011 Note Purchase Agreement affirmatively selected New York law and must be held to its

24

25  [16] Cal. Fin. Code §§ 22000 et seq ("CFLL").  This not only is problematic from the standpoint of usury.  Commercial lenders who willfully violate any provision under the CFLL, or any rule or order adopted pursuant to the CFLL, face criminal liability of a fine of up to $10,000 and/or imprisonment for up to one year in a county jail.  § 22780.  The

26  Court could also void the transaction.  See 18 Cal.Ops.Atty.Gen 170, 177 (1951) (stating that a court may declare a transaction with a lender void in violation of lenders laws).  But, as noted above, the Debtors (unlike a trustee) have

27  promised NW and the other investors that they would not bring up these type of issues.
[17] For purposes of reference, the San Francisco Federal Reserve Bank discount rate for primary borrowers has been

28  set at 0.75% since February 2010.  See http://www.frbdiscountwindow.org/primarysecondary.xls.

standards. New York law in particular does not bode favorably for the Investors in light of the provisions of N.Y. Jud. Law § 489. Specifically, *section* 489 prohibits assignment of a "claim or demand." New York Judiciary Law § 489 has been interpreted by New York courts to preclude the "acquisition of a cause of action by a stranger to the underlying dispute . . . in consideration of a bargain for some part of the thing involved." *FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 679 F.Supp.2d 312, 329 n.9 (E.D.N.Y. 2010) (quoting *Richbell Info. Servs., Inc. v. Jupiter Partners*, 280 A.D.2d 208 (N.Y. App. Div. 1st Dep't 2001)). Violation can result in the dismissal of an otherwise legitimate legal claim.

Important for the analysis here, the recent decisions on this statute make clear that the hallmark of having a "claim" is acting to enforce a right, which implies control. This language is particularly treacherous for NW. In 1996 the Appellate Division gently chided the New York federal courts for missing the point of the law: "§ 489's prohibition is not on the bringing of an action after the assignment of a claim; it is on the assignment of a claim for the purpose of bringing an action 'thereon.'" *Ehrlich v. Rebco Ins. Exch.*, 225 A.D.2d 75, 77 (N.Y. App. Div. 1st Dep't 1996). As noted above, here the Common Interest Agreement gives NW substantial control over the Qualcomm Dispute and the determinations to be made in connection with any enforcement of the claim. The assignments of the interests in litigation in the 2011 Note Purchase Agreement and in the notes issued thereunder are therefore likely champertous, resulting in a basis for dismissal of the action and negation of the underlying claim to which the investors are claiming a right to proceeds.

Nor is it helpful to the investors in the Original Notes that such were governed by Delaware law. Delaware is another jurisdiction in which the doctrines of champerty and maintenance have great vitality. *See, e.g., Hall v. State*, 655 A. 2d 827, 830 (Del. Super. Ct. 1994), *aff'd*, No. 383 1994, 1995 Del. LEXIS 395 (Del. Oct. 27, 1995) (noting that champerty "continues to have vitality in this State," and that "[i]t is the duty of [this Delaware] court to dismiss a case in which the evidence discloses that the assignment of the cause of action sued upon was tainted with champerty").

Where there can be no cause of action maintained in the first instance under applicable

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 42 of
43

law, there also can be no claim for recovery by the Investors, whose rights to any recovery on their investment is, as they have admitted, solely and exclusively dependent upon an IP Event and the Debtors' receipt of proceeds from the Qualcomm Dispute.

**VI.   CONCLUSION**

In light of all of the foregoing, Qualcomm respectfully requests this honorable Court to find that the Debtors' Plan is not confirmable because the note Investors hold a claim that is junior to the claims of general unsecured creditors and still "receive or retain under the plan on account of such junior claim or interest . . . property." 11 U.S.C. §1129(b).

As noted by Circuit Judge Ambro in the context of assessing the need for recharacterization, "[e]ven in the flexible world of Chapter 11 reorganizations, the absolute priority rule . . . requires that equity holders receive nothing unless all creditors are paid in full." *In re Insilco Tech.*, 480 F.3d at 218.   Equity interests cannot be retained "for any purpose whatever," *id.*, including for purposes of speculating on an appeal of dismissed litigation.   The Investors are always free to throw their hats in the ring and can continue their financing of an appeal of the litigation that was dismissed by the District Court.   Nothing is stopping them.   What they can't do, however, is to pervert the goals of chapter 11 in order to serve their litigation strategy and in the process trample on the rights of creditors who hold fully liquidated, non-contingent rights against the Debtors' estates and with priority superior to the Investors.

Qualcomm respectfully requests this court to attribute the proper characterization of the Investor Claims and, accordingly, deny confirmation of the Debtors' Plan at the threshold.

Dated: July 1, 2013

COOLEY LLP
ALI M. M. MOJDEHI (123846)
JANET D. GERTZ (231172)


By: s/s Ali M.M. Mojdehi
        Ali M. M. Mojdehi (123846)

Attorneys for Creditor
Qualcomm Incorporated

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

853511 v2/SD

40.

Case: 13-30340    Doc# 145    Filed: 07/01/13    Entered: 07/01/13 23:50:13    Page 43 of 43