1  COOLEY LLP
   ALI M. M. MOJDEHI (123846)
2  (AMOJDEHI@COOLEY.COM)
   JANET D. GERTZ (231172)
3  (JGERTZ@COOLEY.COM)
   4401 Eastgate Mall
4  San Diego, CA 92121
   Telephone:    (858) 550-6000
5  Facsimile:    (858) 550-6420

6  Attorneys for Creditor
   Qualcomm Incorporated
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11

12  In re                              Case No.: 13-30340-DM
    GABRIEL TECHNOLOGIES CORP., et al.,  (Case No. 13-30341)
13
                                        Chapter 11
14            Debtors,
                                        (Jointly Administered)
15
                                        **EXHIBIT 13 TO DECLARATION OF**
16                                      **JANET DEAN GERTZ IN SUPPORT OF**
                                        **MOTION BY QUALCOMM**
17                                      **INCORPORATED FOR**
                                        **DETERMINATION OF THRESHOLD**
18                                      **ISSUES RELATING TO PLAN**
                                        **CONFIRMATION, PURSUANT TO**
19                                      **ORDER ON STIPULATION**

20

21                                      Date:   July 30, 2013
                                        Time:   1:30 p.m.
22                                      Dept:   Courtroom No. 22
                                                235 Pine Street, 22nd Floor
23                                              San Francisco, CA
                                        Judge:  Hon. Dennis Montali
24

25

26

27

28

Cooley LLP
Attorneys At Law
San Diego

853511 v2/SD

# EXHIBIT 13

# NOTE PURCHASE AGREEMENT

## AMONG

### TRACE TECHNOLOGIES, LLC,
*as the Company,*

### GABRIEL TECHNOLOGIES CORPORATION,
*as the Assignor,*

and

### THE PURCHASERS PARTY HERETO

**Dated as of September 2, 2011**

GAB000258

Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 3 of 31

# TABLE OF CONTENTS

**Page**

Section 1.    Definitions ........................................................................................4

Section 2.    Assignment and Assumption; Novation. ....................................13

Section 3.    Release. ............................................................................................14

Section 4.    Issuance of the Notes. ....................................................................15

  4.1    Issuance of the Notes. ............................................................................15

  4.2    Post-Closing Issuance of Notes. ...........................................................17

  4.3    Post-Closing Issuance of Additional Notes. .......................................17

Section 5.    Sale and Purchase of Notes; Investment Commitment. ...........19

  5.1    Sale and Purchase of Notes. .................................................................19

  5.2    Investment Commitment. ......................................................................21

Section 6.    Closing. .............................................................................................23

  6.1    Location of Closing. ...............................................................................23

  6.2    Closing Deliveries. .................................................................................23

Section 7.    Grant of Security Interest; Priority. ..............................................25

  7.1    Grant of Security Interest .....................................................................25

  7.2    Lien Acknowledgement ........................................................................25

  7.3    Lien Priority............................................................................................26

  7.4    Exercise of Remedies ............................................................................26

Section 8.    Allocation of Payments; Subordination; Mandatory Prepayment. .........................26

  8.1    Allocation of Payments ........................................................................26

  8.2    Subordination.........................................................................................32

  8.3    Mandatory Prepayment........................................................................32

Section 9.    Representations and Warranties of the Loan Parties. ...............32

  9.1    Organization. ..........................................................................................32

02936/0002 220901.7                  GAB000259

# TABLE OF CONTENTS
## (Continued)

| | | Page |
|---|---|---|
| 9.2 | Authorization of Agreement, Etc. | 32 |
| 9.3 | No Conflicts. | 33 |
| 9.4 | Approvals. | 33 |
| 9.5 | Authorization of Shares. | 33 |
| 9.6 | Orders. | 33 |
| 9.7 | Subsidiaries. | 34 |
| 9.8 | Use of Proceeds. | 34 |
| Section 10. | Purchaser Representations. | 34 |
| Section 11. | Affirmative Covenants. | 36 |
| 11.1 | Maintenance of Existence. | 36 |
| 11.2 | Books and Records; Inspection Rights. | 37 |
| 11.3 | Compliance with Laws. | 37 |
| 11.4 | Notice of Default. | 37 |
| 11.5 | Information Requests. | 37 |
| Section 12. | Negative Covenants. | 37 |
| 12.1 | Merger, Consolidation, etc. | 37 |
| 12.2 | Limitation on Formation and Acquisition of Subsidiaries. | 38 |
| 12.3 | Liens. | 38 |
| Section 13. | Events of Default; Remedies. | 38 |
| Section 14. | Parties in Interest; Assignment of Notes. | 39 |
| Section 15. | Entire Agreement. | 39 |
| Section 16. | Severability. | 40 |
| Section 17. | Survival. | 40 |
| Section 18. | Notices. | 40 |
| Section 19. | Amendments. | 41 |

02936/0002 220901.7

GAB000260

Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 5 of 31

Section 20.    Counterparts.................................................................41

Section 21.    Execution by Facsimile or Other Electronic Transmission. ...................41

Section 22.    Headings. ..................................................................41

Section 23.    Governing Law. ............................................................42

Section 24.    Jurisdiction and Process...................................................42

Section 25.    WAIVER OF JURY TRIAL. ......................................................42

Section 26.    Expenses. .................................................................43

Section 27.    Reliance and Benefit......................................................43

Section 28.    No Presumption...........................................................43

Section 29.    Remedies. .................................................................43

Section 30.    No Waiver of Remedies. ....................................................43

Section 31.    Waiver of Conflicts .......................................................43

Section 32.    Additional Information. ...................................................44

ANNEX I           -           Initial Secured Purchasers

ANNEX II          -           April 2009 Purchasers

ANNEX III         -           August 2009 Purchasers

ANNEX IV          -           January 2010 Purchasers

ANNEX V           -           February 2010 Purchasers

ANNEX V-A         -           Multi-Phase Investors

ANNEX VI          -           2007/2008 Purchasers

Schedule 6.2(a)   -           Payments to be Made at Closing

Schedule 8.1(a)   -           Additional Creditors

Schedule 9.3      -           Conflicts

Schedule 9.7      -           Subsidiaries

Schedule 11.3     -           Compliance with Laws

0293€/0002 220901.7

GAB000261
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 6 of 31

# TABLE OF CONTENTS
## (Continued)

**Page**

EXHIBIT A-1 -    Form of Secured Note

EXHIBIT A-2-    Form of NW Secured Note

EXHIBIT B-1 -    Form of Replacement April 2009 Note

EXHIBIT B-2 -    Form of Replacement August 2009 Note

EXHIBIT B-3 -    Form of Replacement January 2010 Note

EXHIBIT B-4 -    Form of Replacement February 2010 Note

EXHIBIT C-1 -    Form of Replacement 2007/2008 Note

EXHIBIT C-2 -    Form of Replacement Bardsley Note

EXHIBIT D    -    Form of Replacement Warrant

EXHIBIT E    -    Form of UCC1 Financing Statement

EXHIBIT F    -    Form of Purchaser Accession Agreement

EXHIBIT G    -    Form of Additional Purchaser Accession Agreement

EXHIBIT H    -    Accredited Investor Questionnaire

EXHIBIT I    -    Form of Lost Note Affidavit

02936/\I002 220901.7

GAB000262

Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 7 of 31

**NOTE PURCHASE AGREEMENT**, dated as of September 2, 2011 (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), among (i) **TRACE TECHNOLOGIES, LLC**, a Nevada limited liability company (the "Company"), (ii) **GABRIEL TECHNOLOGIES CORPORATION**, a Delaware corporation ("Gabriel" or the "Assignor"), (iii) the parties identified on Annex I hereto, (iv) the parties identified on Annex II hereto (the "April 2009 Purchasers"), (v) the parties identified on Annex III hereto (the "August 2009 Purchasers"), (vi) the parties identified on Annex IV hereto (the "January 2010 Purchasers"), (vii) the parties identified on Annex V hereto (the "February 2010 Purchasers", and together with the April 2009 Purchasers, the August 2009 Purchasers and the January 2010 Purchasers, collectively, the "2009/2010 Purchasers"), (viii) the parties identified on Annex VI hereto (the "2007/2008 Purchasers"), (ix) the Bond Guarantors (as hereinafter defined), (x) the parties identified on Schedule 8.1(a) hereto (the "Additional Creditors"), (xi) North Water Intellectual Property Fund L.P. 3A, a limited partnership organized and existing under the laws of Delaware ("NW," and together with the Secured Purchasers, the 2007/2008 Purchasers and the 2009/2010 Purchasers (each, as hereinafter defined), collectively, the "Purchasers," the Purchasers, the Bond Guarantors and the Additional Creditors being referred to herein, collectively, as the "Creditors"), and (xii) Hughes Hubbard & Reed LLP ("HHR").

## RECITALS

**WHEREAS**, on various dates in 2007 and 2008, Gabriel issued promissory notes in the aggregate principal amount of $4,548,958.16 to the 2007/2008 Purchasers (the "Original 2007/2008 Notes");

**WHEREAS**, in connection with the exercise by Craig Bardsley and Dawn Berkvam (solely in their capacities as the holder of the Original Bardsley Note or the Replacement Bardsley Note, collectively, "Bardsley") of warrants for 1,851,042 shares of common stock of Gabriel (the "Bardsley Warrants") at a price of $0.40 per share, Bardsley and Gabriel previously agreed to replace certain Original 2007/2008 Notes in the aggregate principal amount of $3,702,084.00 issued to Bardsley with an Amended and Restated Promissory Note dated February 12, 2009 in the principal amount of $2,961,667.20 (the "Original Bardsley Note"), which amount is equal to $3,702,084.00 less the aggregate cost to Bardsley to exercise the Bardsley Warrants;

**WHEREAS**, on February 28, 2007, Gabriel issued a promissory note in the aggregate principal amount of $350,000 to Kelly Fegen (the "Original Fegen Note");

**WHEREAS**, Gabriel and the April 2009 Purchasers are parties to that certain Promissory Note Purchase Agreement, dated as of April 24, 2009 (the "April 2009 Note Purchase Agreement"), pursuant to which promissory notes in the aggregate principal amount of $1,000,000 were issued to the April 2009 Purchasers (the "Original April 2009 Notes");

**WHEREAS**, Gabriel and the August 2009 Purchasers are parties to that certain Promissory Note Purchase Agreement, dated as of August 21, 2009 (the "August 2009 Note

<u>Purchase Agreement</u>"), pursuant to which promissory notes in the aggregate principal amount of $300,000 were issued to the August 2009 Purchasers (the "<u>Original August 2009 Notes</u>");

**WHEREAS**, Gabriel and the January 2010 Purchasers are parties to that certain Promissory Note Purchase Agreement, dated as of January 23, 2010 (the "<u>January 2010 Note Purchase Agreement</u>"), pursuant to which promissory notes in the aggregate principal amount of $499,999.66 were issued to the January 2010 Purchasers (the "<u>Original January 2010 Notes</u>");

**WHEREAS**, Gabriel and the February 2010 Purchasers are parties to either (i) that certain Promissory Note Purchase Agreement, dated as of February 23, 2010, or (ii) that certain Promissory Note Purchase Agreement, dated as of March 8, 2010 (as amended prior to the date hereof, collectively, the "<u>February 2010 Note Purchase Agreements</u>"), pursuant to which (i) promissory notes in the aggregate principal amount of $1,437,500 have been issued to the February 2010 Purchasers (the "<u>Original February 2010 Notes</u>") and (ii) certain of the February 2010 Purchasers have committed to purchase additional Original February 2010 Notes in aggregate amount of up to $1,062,500;

**WHEREAS**, the Board of Managers of the Company agreed at a board meeting held on March 25, 2010 to pay to David B. Clark ("<u>Clark</u>") a fee of $250,000, which fee was determined to be fair to the Company from a financial point of view in an independent fairness opinion issued to the Board of Managers of the Company by Marshall & Stevens Inc. (the "<u>Clark Guaranty Fee</u>"), in exchange for a guarantee by Clark to pay up to $2,500,000 of additional Litigation Expenses that may be incurred by the Company and Gabriel (including, without limitation, costs and expenses incurred by counsel to the Company and Gabriel) in connection with the Qualcomm Dispute in the event that the Closing under this Agreement is not consummated (the "<u>Clark Guaranty</u>");

**WHEREAS**, the Company is a wholly-owned Subsidiary of Gabriel;

**WHEREAS**, in consideration of (among other things) the Assignor's agreement to assign all of its right, title and interest in and to any and all proceeds of an IP Event (as hereinafter defined) to the Company and the Company's agreement to apply and distribute such proceeds pursuant to Section 8.1 hereof, the Assignor desires to transfer and assign to the Company, and the Company desires to acquire and assume, all rights, duties and obligations of the Assignor under the Original Note Purchase Agreements (as hereinafter defined) and the Original Notes (as hereinafter defined) (collectively, the "<u>Assigned Agreements</u>"), on the terms and conditions hereinafter set forth;

**WHEREAS**, the Assignor desires to be discharged from the performance of its obligations enumerated in the Assigned Agreements;

**WHEREAS**, each 2007/2008 Purchaser and 2009/2010 Purchaser and Bardsley is willing to release the Assignor from the Assignor's obligations enumerated in the Assigned Agreements, in each case, applicable to such 2007/2008 Purchaser or 2009/2010 Purchaser or Bardsley, and to consent to the Assignee assuming such obligations, on the terms and conditions hereinafter set forth, it being understood and agreed by the parties hereto that this Agreement, the

2

02936/0002 220901.7

GAB000264
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 9 of 31

2007/2008 Notes, the 2009/2010 Notes and the Replacement Bardsley Note shall supersede in their entirety, and shall constitute a novation of, the Original Note Purchase Agreements and the Original Notes;

**WHEREAS,** contemporaneously with the assignment from the Assignor to the Company of the Assigned Agreements and subject to the terms and conditions set forth in this Agreement, the Company desires to issue and sell to (i) each of the April 2009 Purchasers, and each April 2009 Purchaser desires to purchase from the Company, Replacement April 2009 Notes in the respective principal amount set forth opposite the name of such April 2009 Purchaser in Annex II hereto, (ii) each of the August 2009 Purchasers, and each August 2009 Purchaser desires to purchase from the Company, Replacement August 2009 Notes in the respective principal amount set forth opposite the name of such April 2009 Purchaser in Annex III hereto, (iii) each of the January 2010 Purchasers, and each January 2010 Purchaser desires to purchase from the Company, Replacement January 2010 Notes in the respective principal amount set forth opposite the name of such January 2010 Purchaser in Annex IV hereto, (iv) each of the February 2010 Purchasers, and each February 2010 Purchaser desires to purchase from the Company, Replacement February 2010 Notes in the respective principal amount set forth opposite the name of such February 2010 Purchaser in Annex V hereto, and (v) each of the 2007/2008 Purchasers, and each 2007/2008 Purchaser desires to purchase from the Company, Replacement 2007/2008 Notes in the respective principal amount set forth opposite the name of such 2007/2008 Purchaser in Annex VI hereto;

**WHEREAS,** contemporaneously with the assignment from the Assignor to the Company of the Assigned Agreements and subject to the terms and conditions set forth in this Agreement, the Company desires to issue and sell to each of the Secured Purchasers identified on Annex I hereto, and each Secured Purchaser identified on Annex I hereto desires to purchase from the Company, Secured Notes (the "Initial Secured Notes") in the respective principal amount set forth opposite the name of such Secured Purchaser in Annex I hereto;

**WHEREAS,** contemporaneously with the assignment from the Assignor to the Company of the Assigned Agreements and subject to the terms and conditions set forth in this Agreement, the Company desires to issue and sell to NW, and NW desires to purchase from the Company, the NW Secured Note (as hereinafter defined) in the maximum principal amount of up to $3,100,000, with payments of the purchase price of the NW Secured Note as provided in Section 5.1(b) hereof to be used by the Company solely (i) to pay up to $1,500,000 of the costs and expenses required to be paid by the Company or Gabriel in connection with the Qualcomm Dispute (as hereinafter defined) (including, without limitation, courts costs, expert witness fees and costs, travel and lodging costs, telephone charges, copying charges and other customary costs and disbursements incurred in connection with litigating the Qualcomm Dispute, including, without limitation, any of the foregoing incurred by HHR (as hereinafter defined) prior to or after the date hereof), but, for clarity, excluding any Administrative Expenses (the "NW Funded Litigation Expenses"), (ii) to repurchase interests in the IP Event Proceeds that have been assigned or otherwise transferred by Gabriel or the Company to HHR (provided, that the portion of such payments that may be used for such purpose shall not exceed $1,000,000), (iii) to pay, or to reimburse the Company and Gabriel for, $500,000 of certain Administrative Expenses (as hereinafter defined) incurred prior to the date hereof in connection with the Qualcomm Dispute,

02936/0002 220901.7

GAB000265
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 10 of 31

including, without limitation, reasonable legal fees payable to HHR in connection with the preparation and negotiation of this Agreement, the other Financing Documents, and any other documents relating to all proposed and/or consummated financings of Litigation Expenses (including, without limitation, any such financing transactions proposed prior to the date hereof, whether or not such transactions were consummated or became effective), and (iv) to pay up to $100,000 of NW's travel and due diligence costs incurred in connection with the transactions contemplated by this Agreement; and

**WHEREAS**, after the Closing and subject to the terms and conditions set forth in this Agreement, the Company desires to issue and sell Additional Notes (as hereinafter defined), with the proceeds from the issuance of the Additional Notes to be used solely to pay Litigation Expenses and/or Administrative Expenses of the Company or Gabriel.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1.**     **Definitions**.  As used in this Agreement, the following terms shall have the following meanings (such definitions to be equally applicable to the singular and plural forms thereof):

"Accredited Investor Questionnaire" has the meaning assigned to such term in Section 10(m) hereof.

"Additional Benefits" means (i) with respect to an April 2009 Purchaser, the amount set forth in Section 1(ii) of the Replacement April 2009 Note(s) issued to such April 2009 Purchaser, (ii) with respect to an August 2009 Purchaser, the amount set forth in Section 1(ii) of the Replacement August 2009 Note(s) issued to such August 2009 Purchaser, (iii) with respect to a January 2010 Purchaser, "Additional Benefits" as such term is defined in the Replacement January 2010 Notes, and (iv) with respect to a February 2010 Purchaser, "Additional Benefits" as such term is defined in the Replacement February 2010 Notes.

"Additional Creditors" has the meaning assigned to such term in the preamble hereto.

"Additional Investors" means any Person that acquires from the Company a portion of the IP Event Proceeds or Net IP Event Proceeds after the date hereof and, in connection therewith, does not purchase an Additional Note.

"Additional Notes" means any unsecured promissory notes issued by the Company after the date hereof in accordance with Section 4.3 hereof, in form and substance satisfactory to the Company.  For clarity, the Lien of the Secured Parties granted hereunder shall not extend to any Obligations of the Company under any Additional Notes that may be purchased by a Secured Party.

GAB000266
Case: 13-30340     Doc# 149     Filed: 07/02/13     Entered: 07/02/13 11:29:34     Page 11 of 31

"Additional Purchaser Accession Agreement" has the meaning assigned to such term in Section 4.3(b) hereof.

"Administrative Expenses" means the costs and expenses required to be paid by the Company, Gabriel or any of their respective officers or directors in connection with administering the Company or Gabriel, including, without limitation, insurance, employee wages and benefits, attorney's fees, taxes, and any other general and administrative costs and expenses of the Company or Gabriel.

"Affiliate" means, at any time, with respect to any Person (including, without limitation, the Company), any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person.

"April 2009 Note Purchase Agreement" has the meaning assigned to such term in the Recitals hereto.

"April 2009 Purchasers" has the meaning assigned to such term in the preamble hereto and, for the avoidance of doubt, shall include Kelly Fegen.

"Assigned Agreements" has the meaning assigned to such term in the Recitals hereto.

"Assignor" has the meaning assigned to such term in the preamble hereto.

"August 2009 Note Purchase Agreement" has the meaning assigned to such term in the Recitals hereto.

"August 2009 Purchasers" has the meaning assigned to such term in the preamble hereto.

"Bardsley" has the meaning assigned to such term in the Recitals hereto.

"Bardsley Warrants" has the meaning assigned to such term in the Recitals hereto.

"Bond Collateral Guaranty Agreement" means that certain Bond Collateral Guaranty Agreement, dated as of March 31, 2011, by and among Gabriel, the Company and the Bond Guarantors.

"Bond Guarantors" means the individuals who provided cash collateral or other credit support required to obtain and post a bond in the aggregate amount of $800,000 in the Qualcomm Dispute pursuant to the terms of the Bond Collateral Guaranty Agreement.

"Business Day" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York City are required or authorized by law to be closed.

"Closing" has the meaning assigned to such term in Section 6.1 hereof.

"Clark" has the meaning assigned to such term in the Recitals hereto.

02936/0002 220901.7

GAB000267
Case: 13-30340   Doc# 149   Filed: 07/02/13   Entered: 07/02/13 11:29:34   Page 12 of 31

"Clark Guaranty" has the meaning assigned to such term in the Recitals hereto.

"Clark Guaranty Fee" has the meaning assigned to such term in the Recitals hereto.

"Collateral" has the meaning assigned to such term in Section 7.1 hereof.

"Commitment Notice" has the meaning assigned to such term in Section 4.3(b) hereof.

"Company" has the meaning assigned to such term in the preamble hereto.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlling" and "Controlled" shall have correlative meanings.

"Creditors" has the meaning assigned to such term in the preamble hereto.

"Default" means an event that, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" has the meaning assigned to such term in Section 13(a) hereof.

"Event of Reversion" has the meaning assigned to such term in Section 5.2(b) hereof.

"February 2010 Note Purchase Agreements" has the meaning assigned to such term in the preamble hereto.

"February 2010 Purchasers" has the meaning assigned to such term in the preamble hereto.

"Financing Documents" means this Agreement, the Notes and any other document or certificate executed by any Loan Party or any other provider of credit support in respect of the Notes, for the benefit of any Purchaser in connection with this Agreement or any other Financing Document.

"Gabriel" has the meaning set forth in the preamble hereto.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"HHR" has the meaning assigned to such term in the preamble hereto.

6

GAB000268
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 13 of 31

"HHR Fees" means all attorneys' fees and expenses (including, but not limited to, Litigation Expenses) payable to HHR in connection with HHR's representation of the Loan Parties in the Qualcomm Dispute, including, but not limited to, an amount equal to 35.0% of the IP Event Proceeds, provided, that the parties hereto acknowledge and agree that, pursuant to the terms of Gabriel's and the Company's engagement of HHR and subject to the restrictions on the use of the proceeds of the issuance of the Secured Notes and the NW Secured Note set forth in the Recitals to this Agreement, the Company may pay an amount of up to $1,000,000 (or such higher amount as HHR may, in its sole discretion, agree in writing from time to time) of such proceeds to HHR in exchange for HHR's percentage interest in the IP Event Proceeds being reduced by 0.000005% for each dollar paid to HHR by the Company (such that, after HHR has received $1,000,000 of the proceeds of the Secured Notes and/or NW Secured Note, HHR's percentage interest in the IP Event Proceeds will have been reduced to 30.0% thereof).

"HHR IP Interest Holder" means any Person to whom the Company sells, issues, assigns or otherwise transfers percentage interests in the IP Event Proceeds after the date hereof, which percentage interests shall have been repurchased by the Company from HHR, but shall not include any percentage interests in the IP Event Proceeds repurchased by the Company from HHR using the proceeds of any Secured Note or the NW Secured Note as set forth in the definition of "HHR Fees" contained in this Section 1.

"IP Event" means the recovery and/or receipt by Gabriel, the Company or any of their respective Subsidiaries of any amount paid by or on behalf of any Person, defendant or third party, or the amount of other value received, including the present fair market value of any business/non-monetary consideration, which amounts relate directly or indirectly to the Qualcomm Dispute, regardless of whether such payments are made in cash, stock, by payment or assumption of liabilities of Gabriel or the Company, or otherwise, and regardless of whether such payment is styled as an amount paid in settlement, a royalty, a licensing fee, a purchase price for the sale or transfer of stock or assets of Gabriel or the Company or any of their respective Subsidiaries, merger consideration or otherwise.

"IP Event Proceeds" means the aggregate amount of the proceeds or other consideration received by any Loan Party with respect to an IP Event.

"IP Interest" means, subject to the terms and conditions of the applicable February 2010 Note, the right of a February 2010 Purchaser to receive eight tenths of one percent (0.80%) of the Net Profit (as such term is defined in the February 2010 Notes) from an IP Event.

"Issuance Effective Date" has the meaning assigned to such term in Section 4.3(a) hereof.

"January 2010 Note Purchase Agreement" has the meaning assigned to such term in the Recitals hereto.

"January 2010 Purchasers" has the meaning assigned to such term in the preamble hereto.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property to

02936/0002 220901.7

GAB000269
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 14 of 31

secure payment of a debt or performance of an obligation, option, proxy, or other priority or preferential arrangement of any kind or nature whatsoever.

"Litigation Expenses" means the costs and expenses required to be paid by the Company, Gabriel or any of their respective officers or directors in connection with litigating the Qualcomm Dispute, including, without limitation, courts costs, transcript costs, eDiscovery costs, expert witness fees and costs, travel and lodging costs, telephone charges, copying charges and other customary costs and disbursements incurred in connection with such litigation (including, without limitation, the HHR Fees), including the reasonable travel and lodging expenses of George Tingo incurred in connection with the Qualcomm Dispute.

"Loan Party" means each of the Company and Gabriel.

"Lost Note Affidavit" means a lost note affidavit and indemnity, in the form of Exhibit I attached hereto, delivered to the Company pursuant to the terms of this Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, affairs, financial condition, assets or properties of the Loan Parties, taken as a whole, (b) the ability of the Loan Parties, taken as a whole, to perform their respective obligations under the Financing Documents or (c) the validity or enforceability of any of the Financing Documents.

"Maturity Date" means October 11, 2020.

"Multi-Phase Investor" means each February 2010 Purchaser set forth on Annex V-A.

"Net IP Event Proceeds" shall mean all proceeds of an IP Event received by the Company or Gabriel less all Litigation Expenses.

"Notes" means, collectively, (i) the Secured Notes, the NW Secured Note, the 2007/2008 Notes, the 2009/2010 Notes and the Replacement Bardsley Note, in each case issued to the applicable Purchasers pursuant to the terms of this Agreement, and (ii) any Additional Note issued after the date hereof by the Company.

"Notice of Issuance" has the meaning assigned to such term in Section 4.3(a) hereof.

"NW" has the meaning set forth in the preamble hereto.

"NW Funded Litigation Expenses" has the meaning assigned to such term in the Recitals hereto.

"NW Secured Note" means a promissory note, in substantially the form of Exhibit A-2 attached hereto, issued to NW pursuant to the terms of this Agreement in the maximum principal amount of $3,100,000.

"Obligations" means, collectively, (a) all principal of and interest, if any, on the Notes, (b) in respect of the Replacement February 2010 Notes, the amount of any IP Interests payable

02936/0002 220901.7

GAB000270
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 15 of 31

thereunder, (c) the aggregate amount of the IP Event Proceeds or Net IP Event Proceeds, as applicable, payable by any Loan Party to the Additional Creditors (as set forth in Schedule 8.1(a) hereto), and (d) all other monetary obligations of any Loan Party to the Purchasers under the Notes and the other Financing Documents, including, without limitation, obligations to pay fees, costs, expenses and indemnification payments, whether primary, secondary, direct, contingent, fixed or otherwise.

"Offeree" (i) with respect to Additional Notes, has the meaning assigned to such term in Section 4.3(b) hereof and (ii) with respect to any purchase of a Replacement February 2010 Note pursuant to Section 5.2(b)(iii) hereof, any Person that has been approached by the Company to purchase such Replacement February 2010 Note(s).

"Orders" has the meaning assigned to such term in Section 9.6 hereof.

"Original Notes" means, collectively, the Original Bardsley Note, the Original Fegen Note, the Original 2007/2008 Notes, the Original April 2009 Notes, the Original August 2009 Notes, the Original January 2010 Notes and the Original February 2010 Notes.

"Original Note Purchase Agreements" means, collectively, the April 2009 Note Purchase Agreement, the August 2009 Note Purchase Agreement, the January 2010 Note Purchase Agreement and the February 2010 Note Purchase Agreements.

"Original April 2009 Notes" has the meaning assigned to such term in the Recitals hereto.

"Original August 2009 Notes" has the meaning assigned to such term in the Recitals hereto.

"Original Bardsley Note" has the meaning assigned to such term in the Recitals hereto.

"Original February 2010 Notes" has the meaning assigned to such term in the Recitals hereto.

"Original Fegen Note" has the meaning assigned to such term in the Recitals hereto.

"Original January 2010 Notes" has the meaning assigned to such term in the Recitals hereto.

"Original 2007/2008 Notes" has the meaning assigned to such term in the Recitals hereto.

"Original Warrants" means each of the warrants of Gabriel issued to the 2007/2008 Purchasers in connection with, and at the time of, the issuance of the Original 2007/2008 Notes.

"Person" means any individual, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority or other entity of whatever nature.

02936/0002 220901.7

GAB000271
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 16 of 31

"Principal" means, in respect of any Note, the initial principal amount thereof as set forth in the first paragraph of such Note (and defined as "Principal" therein).

"Priority Litigation Expense Providers" means, collectively, each Person that agrees, pursuant to an agreement in form and substance satisfactory to the Company, to fund any and all Litigation Expenses in excess of the NW Funded Litigation Expenses, not to exceed $1,000,000 in the aggregate.

"Pro Rata Share" means, (i) with respect to a 2009/2010 Purchaser, a percentage determined by dividing the amount of the 2009/2010 Obligations payable by the Company to such 2009/2010 Purchaser by the sum of (A) the aggregate amount of all outstanding 2009/2010 Obligations plus (B) the aggregate amount of the IP Event Proceeds payable by any Loan Party to the Additional Creditors (as set forth in Schedule 8.1(a) hereto), and (ii) with respect to an Additional Creditor, a percentage determined by dividing the amount of the IP Event Proceeds payable by any Loan Party to such Additional Creditor (as set forth in Schedule 8.1(a) hereto) by the sum of (A) the aggregate amount of all outstanding 2009/2010 Obligations plus (B) the aggregate amount of the IP Event Proceeds payable by any Loan Party to the Additional Creditors (as set forth in Schedule 8.1(a) hereto).

"Purchasers" has the meaning assigned to such term in the preamble hereto, and shall include Bardsley and any Person who hereafter becomes a "Purchaser" pursuant to a Purchaser Accession Agreement or a Secured Purchaser Accession Agreement (it being understood and agreed that until any Person listed in the Annexes hereto becomes a party to this Agreement, such Person shall be deemed not to constitute a Purchaser for any purpose hereunder).

"Purchaser Accession Agreement" has the meaning assigned to such term in Section 4.2(a) hereof.

"Qualcomm Dispute" means, without limitation, all claims asserted by Gabriel and the Company in Civil Action No. 3:08-CV-1992 pending in the United States District Court for the Southern District of California, San Diego Division, including any successor claim or any claim related thereto, derived therefrom or arising thereunder commenced or continued in any jurisdiction.

"Released Matters" has the meaning assigned to such term in Section 3(b) hereof.

"Released Party" has the meaning assigned to such term in Section 3(a) hereof.

"Releasors" has the meaning assigned to such term in Section 3(a) hereof.

"Replacement April 2009 Note" means a promissory note, in substantially the form of Exhibit B-1 attached hereto, issued to a April 2009 Purchaser pursuant to the terms of this Agreement in the principal amount set forth opposite such April 2009 Purchaser's name on Annex II.

Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 17 of 31

"Replacement August 2009 Note" means a promissory note, in substantially the form of Exhibit B-2 attached hereto, issued to a August 2009 Purchaser pursuant to the terms of this Agreement in the principal amount set forth opposite such August 2009 Purchaser's name on Annex III.

"Replacement Bardsley Note" means a promissory note, in substantially the form of Exhibit C-2 attached hereto, issued to Bardsley pursuant to the terms of this Agreement in the principal amount of $2,961,667.20.

"Replacement February 2010 Note" means a promissory note, in substantially the form of Exhibit B-4 attached hereto, issued to a February 2010 Purchaser pursuant to the terms of this Agreement (i) in the case of a February 2010 Purchaser that is not a Multi-Phase Investor, in the principal amount set forth opposite such February 2010 Purchaser's name on Annex V and, (ii) in the case of a Multi-Phase Investor, set forth opposite such Multi-Phase Investor's name on Annex V-A and (x) in the case of Replacement February 2010 Note to be issued at the Closing, under the column titled "Principal Amount of Initial Notes" and (y) in the case of a Replacement February Note issued on a Successive Closing, under the applicable column therefor.

"Replacement January 2010 Note" means a promissory note, in substantially the form of Exhibit B-3 attached hereto, issued to a January 2010 Purchaser pursuant to the terms of this Agreement in the principal amount set forth opposite such January 2010 Purchaser's name on Annex IV.

"Replacement 2007/2008 Note" or "2007/2008 Note" means a promissory note, in substantially the form of Exhibit C-1 attached hereto, issued to a 2007/2008 Purchaser pursuant to the terms of this Agreement in the principal amount set forth opposite such 2007/2008 Purchaser's name on Annex VI.

"Replacement Warrant" means, with respect to a 2007/2008 Purchaser, a warrant, in substantially the form of Exhibit D hereto, for the purchase of the number of shares of common stock of Gabriel set forth opposite the name of such 2007/2008 Purchaser in Annex VI.

"Repurchased HHR IP Interest" means the percentage interests in the IP Event Proceeds repurchased by the Company from HHR using the proceeds of the NW Secured Note and/or any Secured Note as set forth in the definition of "HHR Fees" contained in this Section 1.

"Required Holders" means, at any time, the holders of greater than 50% of the aggregate principal amount of the Notes at the time outstanding.

"Second Closing" has the meaning assigned to such term in Section 5.2(d) hereof.

"Secured Note" means a promissory note, in substantially the form of Exhibit A-1 attached hereto, issued to a Secured Purchaser pursuant to the terms of this Agreement in the principal amount set forth (i) opposite such Secured Purchaser's name on Annex I or (ii) in the Commitment Notice delivered by such Secured Purchaser pursuant to Section 4.3(b) hereof, as the case may be.

11

GAB000273
Case: 13-30340   Doc# 149   Filed: 07/02/13   Entered: 07/02/13 11:29:34   Page 18 of 31

"Secured Parties" means, collectively, the Secured Purchasers, NW and the Priority Litigation Expense Providers.

"Secured Purchasers" means, collectively, the parties identified on Annex I hereto.

"Securities" means, in respect of any Loan Party, (i) limited liability membership interests, common stock or other equity interests (as the case may be) of such Loan Party and (ii) any securities convertible into limited liability membership interests, common stock or other equity interests (as the case may be) of such Loan Party.

"Securities Act" has the meaning assigned to such term in Section 6(a) hereof.

"Senior Financial Officer" means the chief executive officer, chief financial officer, principal accounting officer, treasurer or comptroller of the Company.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person Controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"Successive Closing" and "Successive Closings" have the meaning assigned to such terms in Section 5.2(d) hereof.

"Third Closing" has the meaning assigned to such term in Section 5.2(d) hereof.

"Total Investment Amount" means the amount set forth opposite a Multi-Phase Investors name on Annex V-A and under the column "Total Investment Amount."

"2007/2008 Purchasers" has the meaning assigned to such term in the preamble hereto.

"2009/2010 Notes" means, collectively, the Replacement April 2009 Notes, the Replacement August 2009 Notes, the Replacement January 2010 Notes and the Replacement February 2010 Notes.

"2009/2010 Obligations" means, with respect to a 2009/2010 Purchaser, all sums payable by the Company with respect to Additional Benefits under the Replacement 2009/2010 Note(s) issued to such 2009/2010 Purchaser.

"2009/2010 Purchasers" has the meaning assigned to such term in the preamble hereto.

12

GAB000274
Case: 13-30340   Doc# 149   Filed: 07/02/13   Entered: 07/02/13 11:29:34   Page 19 of 31

"UCC" means, with respect to the Company, the Uniform Commercial Code of the State of Nevada and, with respect to Gabriel, the Uniform Commercial Code of the State of Delaware, together, in each case, any other applicable law of any state or states, which has jurisdiction with respect to all, or any portion of, the Collateral, from time to time.

"UCC1 Financing Statement" has the meaning assigned to such term in Section 6.2(b)(ii) hereof.

"Unfunded Closing" has the meaning assigned to such term in Section 5.2(d) hereof.

"Whittle Settlement" has the meaning assigned to such term in the Replacement January 2010 Notes.

Section 2.     **Assignment and Assumption; Novation**.

(a)     Subject to subsection (b) below, (i) the Assignor sells, transfers, assigns, conveys, grants and sets over to the Company, its successors and assigns forever, all of the Assignor's rights, title and interest as of such date in and to all and any of the Assignor's rights and obligations under, pursuant to and arising out of each of the Assigned Agreements, as fully and entirely as the same would have been held and enjoyed by the Assignor as if this assignment had not been made, (ii) the Company accepts, assumes, takes over and succeeds to all of the Assignor's rights, title and interest as of such date in and to all and any of the Assignor's rights and obligations under, pursuant to and arising out of each of the Assigned Agreements, (iii) the Company covenants and agrees to discharge, perform and comply with, and to be bound by, all of the terms, conditions, provisions, obligations, covenants and duties of the Assignor in connection with all and any of the Assignor's rights and obligations under, pursuant to and arising out of each of the Assigned Agreements, as the same may have been amended from time to time prior to the date of this Agreement, as if the Company were an original party thereto, and (iv) the Company covenants and agrees to indemnify, defend and hold harmless Gabriel from and against any and all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, orders, damages, dues, penalties, fines, costs, amounts paid in settlement, taxes, liens, losses, expenses and fees, including court costs and attorney's fees and expenses, sustained or incurred by Gabriel relating to, arising out of, resulting from, or otherwise by virtue of the Assigned Agreements.

(b)     The Loan Parties and each of the 2007/2008 Purchasers and 2009/2010 Purchasers and Bardsley hereby agree that this Agreement shall constitute a novation of the obligations of Gabriel under the Assigned Agreements. Accordingly, all of the rights, duties and obligations of the Assignor under the Assigned Agreements are hereby released and extinguished. The 2007/2008 Purchasers, the 2009/2010 Purchasers and Bardsley (i) recognize the Company as Gabriel's successor in interest in and to all of Gabriel's rights, duties and obligations in, to and under the Assigned Agreements, (ii) acknowledge and agree that this Agreement, the 2007/2008 Notes, the 2009/2010 Notes and the Replacement Bardsley Note supersede the Assigned Agreements in their entirety and (iii) agree that, effective as of the date such Purchaser becomes a party hereto, the Assigned Agreements relating to such Purchaser shall be deemed terminated, discharged and of no further force or effect.

13

02936/0002 220901.7

GAB000275
Case: 13-30340     Doc# 149     Filed: 07/02/13     Entered: 07/02/13 11:29:34     Page 20 of 31

(c)     As additional consideration for the Company's assumption of all of the Assignor's obligations under, pursuant to and arising out of each of the Assigned Agreements, the Assignor hereby assigns to the Company all of the Assignor's right, title and interest in and to all IP Event Proceeds and agrees that, in the event the Assignor shall receive any IP Event Proceeds, it shall promptly (and in any event within two (2) Business Days after receipt thereof) pay and deliver such IP Event Proceeds to the Company for application pursuant to Section 8.1 hereof.

**Section 3.     Release.**

(a)     Each of the 2007/2008 Purchasers, the 2009/2010 Purchasers and Bardsley (collectively, the "Releasors") (i) releases and discharges Gabriel, the Company and their respective current and former officers, directors, shareholders, members, agents, advisors, representatives, employees, attorneys, successors and Affiliates (each, a "Released Party") from any and all claims in law or in equity, demands, actions, causes of action, obligations, Liens, contracts, damages, liabilities, losses, costs or expenses of every nature and kind whatsoever, whether known or unknown, suspected or unsuspected, which any of the Releasors has ever had up to and including the date of this Agreement, in each case, (A) based on any misrepresentation, false statement of fact or fraud by a Released Party in connection with the Assigned Agreements or the Original Warrants, or (B) based on the reliance of a Releasor on any written or oral representations, warranties or statements made by a Released Party or any representative thereof in connection with the Assigned Agreements or the Original Warrants (including, without limitation, any representations, warranties or statements related to the Qualcomm Dispute, any likelihood of success by any Loan Party with respect thereto, and any likelihood of the occurrence of an IP Event), (ii) waives any defaults or events of default that have occurred and are continuing under any of the Assigned Agreements or the Original Warrants, and (iii) consents to the assignment by the Assignor to the Company of the Assignor's rights and obligations under, pursuant to and arising out of each of the Assigned Agreements.

(b)     The Releasors' release under this Agreement includes, but is not limited to, claims for declaratory relief, injunctive relief, violation of public policy, breach of any express or implied contract, breach of any implied covenant, fraud, intentional or negligent misrepresentation, or any other claims known or unknown relating to, arising out of, or based on the matters set forth in clauses (A) and (B) of Section 3(a) hereof. The matters that are the subject of the release and discharge referred to in this Agreement, as described above, shall be referred to as the "Released Matters".

(c)     Each of the Releasors represents and warrants that no portion of any of the Released Matters has previously been assigned or transferred to any other Person, in any manner, including by way of subrogation or operation of law or otherwise. If any claim, action, demand or suit should be made or instituted against any Released Party because of any such purported assignment, subrogation or transfer, the assigning or transferring party agrees to indemnify and hold harmless the Released Parties against such claim, action, suit or demand.

(d)     Each of the Releasors and the Secured Parties confirms that it has, independently and without reliance upon Gabriel, the Company or any other Released Party and

14

02936/0002 220901.7

GAB000276
Case: 13-30340     Doc# 149     Filed: 07/02/13     Entered: 07/02/13 11:29:34     Page 21 of 31

based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and its own determination as to the likelihood of the Loan Parties' success in the Qualcomm Dispute and of the occurrence of an IP Event. It is acknowledged and agreed by the Releasors and the Secured Parties that no Released Party has made any representation or warranty as to such likelihood of success or as to the likelihood of the occurrence of an IP Event or the receipt of any IP Event Proceeds. Notwithstanding the above language, the provisions of this subparagraph (d) shall not apply to Gary D. Elliston.

(e)     Each of the Releasors and the Secured Parties (i) acknowledges that Gabriel has commenced legal action against certain purported owners of interests in the IP Event Proceeds seeking to reclaim all or a portion of such interests, and (ii) acknowledges and agrees that (A) as a result of such legal action, (A) the percentage interests in the IP Event Proceeds (or Net IP Event Proceeds, as the case may be) set forth on Schedule 8.1(a) hereto are subject to change and (B) except as expressly agreed by Gabriel and the Company herein, nothing herein shall be deemed to create, or constitute an acknowledgement of, an obligation by Gabriel or the Company to such purported owners (including, without limitation, the Persons listed on Schedule 8.1(a) or any other Additional Creditor).

(f)     It is the intent of each Releasor that the provisions of this Section 3 shall be effective as a general release of all Released Matters. In furtherance of this intention (and notwithstanding anything in Section 23 hereof that would cause California law to be inapplicable), each Releasor acknowledges that it is familiar with and expressly waives any and all rights that might be claimed by the undersigned by reason of Section 1542 of the California Civil Code, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MIGHT HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

(g)     Each of the February 2010 Purchasers acknowledges and consents to the use by Gabriel and/or the Company of a portion of the aggregate proceeds of the Original February 2010 Notes to pay costs, fees and expenses (including, without limitation, attorney's fees) associated with the Qualcomm Dispute, and agrees that neither Gabriel nor the Company shall be required to replace such portion in its general bank deposit accounts upon receipt by the Company of the proceeds of the Secured Notes or the NW Secured Note or any other amount received by the Company or Gabriel hereunder.

**Section 4.**    <u>**Issuance of the Notes.**</u>

4.1    <u>Issuance of the Notes.</u>

(a)     Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to the Secured Purchasers of Secured Notes in the respective principal amounts set forth opposite the name of each Secured Purchaser on <u>Annex I</u>

02936/0002 220901.7

GAB000277
Case: 13-30340   Doc# 149   Filed: 07/02/13   Entered: 07/02/13 11:29:34   Page 22 of 31

hereto, in each case due on the Maturity Date (or on such earlier date as set forth in the Secured Notes).

(b)      Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to NW of the NW Secured Note in the maximum principal amount of $3,100,000, due on the Maturity Date (or on such earlier date as set forth in the NW Secured Note).

(c)      Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to the April 2009 Purchasers of Replacement April 2009 Notes in the respective principal amounts set forth opposite the name of each April 2009 Purchaser on Annex II hereto, in each case due on the Maturity Date (or on such earlier date as set forth in the Replacement April 2009 Notes).

(d)      Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to the August 2009 Purchasers of Replacement August 2009 Notes in the respective principal amounts set forth opposite the name of each August 2009 Purchaser on Annex III hereto, in each case due on the Maturity Date (or on such earlier date as set forth in the Replacement August 2009 Notes).

(e)      Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to the January 2010 Purchasers of Replacement January 2010 Notes in the respective principal amounts set forth opposite the name of each January 2010 Purchaser on Annex IV hereto, in each case due on the Maturity Date (or on such earlier date as set forth in the Replacement January 2010 Notes).

(f)      Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to the February 2010 Purchasers of Replacement February 2010 Notes in the respective principal amounts set forth opposite the name of each February 2010 Purchaser on Annex V hereto, in each case due on the Maturity Date (or on such earlier date as set forth in the Replacement February 2010 Notes).

(g)      Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to the 2007/2008 Purchasers of Replacement 2007/2008 Notes in the respective principal amounts set forth opposite the name of each 2007/2008 Purchaser on Annex VI hereto, in each case due on the Maturity Date (or on such earlier date as set forth in the 2007/2008 Notes).

(h)      Upon the terms and subject to the conditions contained in this Agreement, the Company has authorized the issuance to Bardsley of the Replacement Bardsley Note in the principal amount of $2,961,667.20, due on the Maturity Date (or on such earlier date as set forth in the Replacement Bardsley Note). Under the Replacement Bardsley Note, subject to the terms and conditions thereof, on the Maturity Date (or on such earlier date as set forth in the Replacement Bardsley Note), Bardsley shall be entitled to receive the outstanding principal amount of such Note plus an amount equal to $518,291.76, which amount is equal to the difference between the aggregate price paid by Bardsley to exercise the Bardsley Warrants at

16

GAB000278
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 23 of 31

$0.40 per share and the aggregate price Bardsley would have paid at the time of such exercise had the exercise price of the Bardsley Warrants been equal to $0.12 per share, which is the exercise price set forth in the Replacement Warrants.

(i)    At the Closing, each of the 2007/2008 Purchasers, the 2009/2010 Purchasers and Bardsley shall (i) surrender to the Company for cancellation its executed original Original Note(s) or (ii) if such Original Note has been lost or destroyed or such Purchaser has been unable to locate such Original Note after having made a diligent search, deliver to the Company a Lost Note Affidavit duly executed by such Purchaser.

4.2    Post-Closing Issuance of Notes.

(a)    Any holder of an Original Note that does not execute and deliver a counterpart to this Agreement at the Closing may thereafter become a Purchaser hereunder upon the execution by such holder of an accession and amendment agreement in substantially the form of Exhibit F hereto (a "Purchaser Accession Agreement") pursuant to which such holder shall agree to be bound by the terms of this Agreement as a Purchaser and shall make the representations and warranties set forth in Section 10 hereof. Upon (i) the receipt by the Company of a Purchaser Accession Agreement duly executed by the holder of an Original Note and (ii) compliance by such holder with the provisions of Section 4.1(h)(i) or (ii), the Company shall sell to such holder, and such holder shall purchase from the Company, the applicable type of Note (other than a Secured Note) corresponding to such holder's Original Note in a principal amount equal to the principal amount of such holder's Original Note. The consideration for the Note to be issued to such holder shall be, among other things, the surrender and cancellation of such Original Note issued to such holder (or the delivery of a Lost Note Affidavit pursuant to Section 4.1(h)(ii)). The Note issued to a Person pursuant to this Section 4.2 shall replace and supersede in its entirety the Original Note issued by Gabriel to such Person.

(b)    Notwithstanding anything else contained herein, the transactions contemplated by this Agreement and the provisions hereof (other than any rights to payment pursuant to Section 8.1(b)(viii) hereof in respect of any outstanding Original Notes) have no effect with respect to any Person, any Original Note owned by such Person or any Original Note Purchase Agreement entered into by such Person unless and until such Person becomes a Purchaser hereunder either by such Person's execution and delivery of (i) this Agreement at the Closing or (ii) a Purchaser Accession Agreement after the Closing.

4.3    Post-Closing Issuance of Additional Notes.

(a)    The Company may at any time and from time to time after the Closing, on one or more occasions, offer to issue and sell to any Person, including, without limitation, any Purchaser, Additional Notes without the consent of any party hereto and in the sole discretion of the Company's Board of Managers, provided that the aggregate principal amount of all Additional Notes issued pursuant to this Agreement shall at no time exceed $1,000,000. Each offer to issue and sell Additional Notes shall be made on notice given by the Company to each existing Secured Purchaser no later than fifteen (15) Business Days prior to the date of the proposed issuance and sale of the Additional Notes. The notice (a "Notice of Issuance") shall

17

GAB000279
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 24 of 31

specify the date of the proposed issuance and sale of the Additional Notes (an "Issuance Effective Date"). It shall be a condition precedent to the sale of Additional Notes that, as of the Issuance Effective Date, (i) no Event of Default shall have occurred and be continuing, and (ii) after giving effect to the issuance and sale of the Additional Notes, all representations and warranties of the Loan Parties contained herein shall be true and correct in all material respects (except for any such representations and warranties expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

(b) Each Secured Purchaser approached by the Company to purchase the Additional Notes pursuant to subsection (a) above shall have until 3:00 p.m. (New York, New York time) on the tenth Business Day preceding the Issuance Effective Date to commit in writing to purchase all or a portion of the aggregate amount of the Additional Notes ("Commitment Notice"). Any Secured Purchaser not responding within such time period shall be deemed to have declined to purchase an Additional Note. If Secured Purchasers deliver commitments to purchase Additional Notes in an aggregate amount in excess of the aggregate principal amount of the offered Additional Notes, then the Company shall allocate the principal amount of the Additional Notes to such Secured Purchasers on a pro rata basis in accordance with the outstanding amount of the Obligations owed by the Company to each such Secured Purchaser. If the Secured Purchasers deliver commitments to purchase Additional Notes in an aggregate amount less than the aggregate principal amount of the offered Additional Notes, then the Company may also approach one or more other Purchasers or third parties (together with any Secured Purchasers that have delivered a Commitment Notice, the "Offerees") to purchase Additional Notes in the amount of the remaining aggregate principal amount of the offered Additional Notes; provided, that, in such event, if commitments to purchase Additional Notes are delivered in an aggregate amount in excess of the aggregate principal amount of the offered Additional Notes by (x) Secured Purchasers and other Offerees or (y) only non-Secured Purchaser Offerees, then the Company shall allocate the principal amount of the Additional Notes (i) first, to each such Secured Purchaser, if any, in the full amount of its commitment (subject to the third sentence of this subsection (b)) and (ii) second, to the non-Secured Purchaser Offerees pro rata based on their respective commitments. On the Issuance Effective Date, each Offeree committing to purchase a portion of the aggregate principal amount of the offered Additional Notes shall execute an accession and amendment agreement in substantially the form of Exhibit G hereto (an "Additional Purchaser Accession Agreement") pursuant to which such Offeree shall agree to be bound by the terms of this Agreement as a Purchaser (to the extent that such Offeree is not an existing Purchaser) and shall make (or repeat, as the case may be) the representations and warranties set forth in Section 10 hereof. If the commitments of the Offerees to purchase Additional Notes are less than the aggregate principal amount of the offered Additional Notes, none of the Offerees providing such commitments shall have any obligation to commit to purchase the uncommitted portion of such Additional Notes. On each Issuance Effective Date, upon (i) the satisfaction of the conditions set forth in Section 4.3(a) hereof and (ii) the receipt by the Company of an Additional Purchaser Accession Agreement duly executed and delivered by each Offeree that has committed to purchase Additional Notes, the Company shall issue and sell to each such Offeree, and each such Offeree shall purchase from the Company, the aggregate principal amount of the Additional Notes set forth in such Offeree's

02936/0002 220901.7

GAB000280
Case: 13-30340   Doc# 149   Filed: 07/02/13   Entered: 07/02/13 11:29:34   Page 25 of 31

Commitment Notice. The purchase price for each Additional Note shall be equal to the Principal amount thereof.

(c) <u>Post Closing Sale of Additional Portions of IP Event Proceeds or Net IP Event Proceeds</u>. The Company may at any time and from time to time after the Closing, on one or more occasions, sell and assign to any Person, including, without limitation, any Purchaser, a percentage interest in IP Event Proceeds or Net IP Event Proceeds without the consent of any party hereto and in the sole discretion of the Company's Board of Managers, and such Person shall thereafter become and constitute an Additional Investor. It shall be a condition precedent to any such sale and assignment that, as of the date of such sale and assignment, (i) no Event of Default shall have occurred and be continuing, and (ii) after giving effect to such sale and assignment, all representations and warranties of the Loan Parties contained herein shall be true and correct in all material respects (except for any such representations and warranties expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

**Section 5.** **Sale and Purchase of Notes; Investment Commitment.**

5.1 <u>Sale and Purchase of Notes</u>.

(a) At the Closing, upon the satisfaction of the conditions set forth in Section 6.2 hereof, the Company shall sell to each Secured Purchaser, and each Secured Purchaser shall purchase from the Company, the aggregate principal amount of the Secured Notes set forth opposite such Secured Purchaser's name on <u>Annex I</u> hereto. The purchase price for each Secured Note shall be equal to the Principal amount thereof.

(b) At the Closing, upon the satisfaction of the conditions set forth in Section 6.2 hereof, the Company shall sell to NW, and NW shall purchase from the Company, the NW Secured Note in the maximum principal amount of $3,100,000. The purchase price for the NW Secured Note shall be paid in installments from time to time in accordance with and subject to the terms of Section 2.1 of the Common Interest Agreement dated as of the date hereof by and among Gabriel, the Company and NW.

(c) At the Closing, upon the satisfaction of the conditions set forth in Section 6.2 hereof, the Company shall sell to each April 2009 Purchaser, and each April 2009 Purchaser shall purchase from the Company, the aggregate principal amount of the Replacement April 2009 Notes set forth opposite such April 2009 Purchaser's name on <u>Annex II</u> hereto. The consideration for each Replacement April 2009 Note to be issued to a April 2009 Purchaser shall be, among other things, the surrender and cancellation of the Original April 2009 Notes issued to such April 2009 Purchaser (or the delivery of a Lost Note Affidavit pursuant to Section 4.1(h)(ii)). The Replacement April 2009 Notes issued to a April 2009 Purchaser shall replace and supersede in their entirety the Original April 2009 Notes issued by Gabriel to such April 2009 Purchaser.

(d) At the Closing, upon the satisfaction of the conditions set forth in Section 6.2 hereof, the Company shall sell to each August 2009 Purchaser, and each August 2009

02936/0002 220901.7

GAB000281
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 26 of 31

Purchaser shall purchase from the Company, the aggregate principal amount of the Replacement August 2009 Notes set forth opposite such August 2009 Purchaser's name on <u>Annex III</u> hereto. The consideration for each Replacement August 2009 Note to be issued to a August 2009 Purchaser shall be, among other things, the surrender and cancellation of the Original August 2009 Notes issued to such August 2009 Purchaser (or the delivery of a Lost Note Affidavit pursuant to Section 4.1(h)(ii)). The Replacement August 2009 Notes issued to a August 2009 Purchaser shall replace and supersede in their entirety the Original August 2009 Notes issued by Gabriel to such August 2009 Purchaser.

(e)     At the Closing, upon the satisfaction of the conditions set forth in Section 6.2 hereof, the Company shall sell to each January 2010 Purchaser, and each January 2010 Purchaser shall purchase from the Company, the aggregate principal amount of the Replacement January 2010 Notes set forth opposite such January 2010 Purchaser's name on <u>Annex IV</u> hereto. The consideration for each Replacement January 2010 Note to be issued to a January 2010 Purchaser shall be, among other things, the surrender and cancellation of the Original January 2010 Notes issued to such January 2010 Purchaser (or the delivery of a Lost Note Affidavit pursuant to Section 4.1(h)(ii)). The Replacement January 2010 Notes issued to a January 2010 Purchaser shall replace and supersede in their entirety the Original January 2010 Notes issued by Gabriel to such January 2010 Purchaser.

(f)     At the Closing, upon the satisfaction of the conditions set forth in Section 6.2 hereof, the Company shall sell to each February 2010 Purchaser, and each February 2010 Purchaser shall purchase from the Company, (i) in the case of a February 2010 Purchaser that is not a Multi-Phase Investor, the aggregate principal amount of the Replacement February 2010 Notes set forth opposite such February 2010 Purchaser's name on <u>Annex V</u> hereto, and (ii) in the case of a Multi-Phase Investor, set forth opposite such Multi-Phase Investor's name on <u>Annex V-A</u> and under the column titled "Principal Amount of Initial Notes". The consideration for each Replacement February 2010 Note to be issued to a February 2010 Purchaser shall be, among other things, the surrender and cancellation of the Original February 2010 Notes issued to such February 2010 Purchaser (or the delivery of a Lost Note Affidavit pursuant to Section 4.1(h)(ii)). The Replacement February 2010 Notes issued to a February 2010 Purchaser shall replace and supersede in their entirety the Original February 2010 Notes issued by Gabriel to such February 2010 Purchaser.

(g)     (i) At the Closing, upon the satisfaction of the conditions set forth in Sections 5.1(f)(ii) and 6.2 hereof, the Company shall sell to each 2007/2008 Purchaser, and each 2007/2008 Purchaser shall purchase from the Company, the aggregate principal amount of the Replacement 2007/2008 Notes set forth opposite such 2007/2008 Purchaser's name on <u>Annex VI</u> hereto. The consideration for each Replacement 2007/2008 Note to be issued to a 2007/2008 Purchaser shall be, among other things, the surrender and cancellation of the Original 2007/2008 Notes issued to such 2007/2008 Purchaser (or the delivery of a Lost Note Affidavit pursuant to Section 4.1(h)(ii)). The Replacement 2007/2008 Notes issued to a 2007/2008 Purchaser shall replace and supersede in their entirety the Original 2007/2008 Notes issued by Gabriel to such 2007/2008 Purchaser.

02936/0002 220901.7

GAB000282
Case: 13-30340     Doc# 149     Filed: 07/02/13     Entered: 07/02/13 11:29:34     Page 27 of 31

(ii)    It shall be a condition precedent to the issuance of each Replacement 2007/2008 Note that the applicable 2007/2008 Purchaser (i) surrenders for cancellation each of its Original 2007/2008 Notes (or delivers a Lost Note Affidavit pursuant to Section 4.1(h)(ii)) and Original Warrants to Gabriel at the Closing and (ii) elects to either (A) accept a Replacement Warrant (at a strike price of twelve cents ($0.12) per share) or (B) on the date that all Obligations under the applicable Replacement 2007/2008 Note are due and payable by the Company, receive the sum of the outstanding principal amount of such Replacement 2007/2008 Note plus an amount equal to 200% of the initial principal amount thereof in full satisfaction of such Obligations.  Each 2007/2008 Purchaser shall make its election on its executed signature page to this Agreement.

(h)    At the Closing, upon the satisfaction of the conditions set forth in Section 6.2 hereof, the Company shall sell to Bardsley, and Bardsley shall purchase from the Company, the Replacement Bardsley Note in the principal amount of $2,961,667.20.  The consideration for the Replacement Bardsley Note shall be, among other things, the surrender and cancellation of the Original Bardsley Note (or the delivery of a Lost Note Affidavit pursuant to Section 4.1(h)(ii)).  The Replacement Bardsley Note shall replace and supersede in its entirety the Original Bardsley Note issued by Gabriel to Bardsley.

5.2    Investment Commitment.

(a)    Investment Schedule.    Each Multi-Phase Investor is unconditionally bound to and shall invest the Total Investment Amount pursuant to Annex V-A, which shall be funded on the date of each Successive Closing pursuant to subsection (d) below.

(b)    IP Interest; Event of Reversion.

(i)    Each Multi-Phase Investor shall obtain their IP Interest in a proportionate amount to the Total Investment Amount listed for such Multi-Phase Investor on Annex V-A, at each Successive Closing, which shall be specifically set forth in the Replacement February 2010 Note for that particular Successive Closing.

(ii)    In the event that a Multi-Phase Investor fails to fund its required investment amount on any Successive Closing pursuant to subsection (d) below (each failure to fund, an "Event of Reversion"), then any IP Interests previously acquired by such Multi-Phase Investor shall as of that date, at the option of the Company in its sole and absolute discretion, be irrevocably and unconditionally relinquished and automatically forfeited by such Multi-Phase Investor and shall automatically revert back to the Company as of the date of the applicable Unfunded Closing.  Such Multi-Phase Investor, however, shall still have the obligation to fund any and all additional required investment amounts pursuant to subsection (d) below on each Successive Closing(s) and shall have the right to acquire any IP Interest associated with any such Successive Closing(s) (but only such IP Interest associated therewith).  Notwithstanding any such failure to fund by a Multi-Phase Investor, a Multi-Phase Investor shall still be entitled to receive payments of principal and interest pursuant to Sections 2 and 2.a of the applicable Replacement February 2010 Note, with respect to all funds received by the Company from such

02936'0002 220901.7

Multi-Phase Investor regardless of when the funding occurs. By its execution and delivery of this Agreement, each Multi-Phase Investor hereby acknowledges and agrees that there shall be no excuse of performance of such Multi-Phase Investor's obligation to fund its required investment amounts on any and all Successive Closings, time being of the essence. Each Multi-Phase Investor further acknowledges and agrees that the Company shall have no obligation to send any notices to perform under this Agreement, it being specifically understood and agreed that it is each Multi-Phase Investor's responsibility to perform and fund its required investment amounts on all Successive Closings as agreed to in this Agreement without any further notice from the Company. In the event that any Multi-Phase Investor (other than Gary D. Elliston) fails to fund its required investment amount on any Successive Closing(s), such Multi-Phase Investor shall be liable for all actual, compensatory and consequential damages, not to exceed three (3) times such Multi-Phase Investor's Total Investment Amount.

        (iii)    Notwithstanding anything else contained herein, upon the occurrence of an Event of Reversion, the Company in its sole and absolute discretion may approach one or more Purchasers (other than any non-performing Multi-Phase Investor) or third parties to purchase one or more Replacement February 2010 Notes in an aggregate principal amount equal to the principal amount of the Replacement February 2010 Note that would have been sold by the Company to the applicable non-performing Multi-Phase Investor on the applicable Successive Closing had such non-performing Multi-Phase Investor funded its required investment amount; provided, that, in such event, if commitments to purchase such Replacement February 2010 Notes are delivered in an aggregate amount in excess of the aggregate principal amount of the offered Replacement February 2010 Notes, then the Company shall allocate the principal amount of the Replacement February 2010 Notes to the Offerees pro rata based on their respective commitments. Each Offeree committing to purchase a portion of the aggregate principal amount of the offered Replacement February 2010 Notes shall execute a Purchaser Accession Agreement pursuant to which such Offeree shall agree to be bound by the terms of this Agreement as a February 2010 Purchaser (to the extent that such Offeree is not an existing February 2010 Purchaser) and shall make (or repeat, as the case may be) the representations and warranties set forth in Section 10 hereof. If the commitments of the Offerees to purchase Replacement February 2010 Notes are less than the aggregate principal amount of the offered Replacement February 2010 Notes, none of the Offerees providing such commitments shall have any obligation to commit to purchase the uncommitted portion of such Replacement February 2010 Notes. On the date selected by the Company for the purchase and sale of the applicable Replacement February 2010 Notes, upon receipt by the Company of a Purchaser Accession Agreement duly executed and delivered by each Offeree that has committed to purchase the applicable Replacement February 2010 Notes, the Company shall (A) issue and sell to each such Offeree, and each such Offeree shall purchase from the Company, the aggregate principal amount of the Replacement February 2010 Notes that such Offeree has committed to purchase from the Company in writing. The purchase price for such Replacement February 2010 Note shall be equal to the Principal amount thereof.

        (c)    <u>Event of Termination</u>. In the event that the Qualcomm Dispute is fully and finally resolved or settled, or in the event of a final, non-appealable judgment in the Qualcomm Dispute, or in the event of dismissal of the Qualcomm Dispute for any reason

02936/0002 220901.7

GAB000284

Case: 13-30340   Doc# 149   Filed: 07/02/13   Entered: 07/02/13 11:29:34   Page 29 of 31

pursuant to a final, non-appealable judgment, no Multi-Phase Investor shall thereafter have any further right or obligation to loan any additional funds to the Company on any Successive Closing or pursuant to any Replacement February 2010 Note.

(d)  Sale and Issuance of Replacement February 2010 Notes at Second and Third Closings.  Sale and Issuance of Replacement February 2010 Notes at Second and Third Closings.  On February 23, 2011 (the "Second Closing"), the Company sold to each Multi-Phase Investor, and each Multi-Phase Investor purchased from the Company, a Replacement February 2010 Note, in each case, at a purchase price equal to the amount set forth opposite such Multi-Phase Investor's name on Annex V-A and under the column "Second Closing".  On August 23, 2011 (the "Third Closing" and, together with the Second Closing, each a "Successive Closing" and, collectively, the "Successive Closings"), the Company shall sell to each Multi-Phase Investor, and each Multi-Phase Investor shall purchase from the Company, a Replacement February 2010 Note, in each case, at a purchase price equal to the amount set forth opposite such Multi-Phase Investor's name on Annex V-A and under the column "Third Closing."  In the event a Multi-Phase Investor fails to make a purchase pursuant to this Section 5.2(d) on or before the date of any Successive Closing (an "Unfunded Closing"), the provisions of Section 5.2(b) shall apply.  The representations and warranties of each Multi-Phase Investor set forth in Section 10 hereof shall be deemed reaffirmed and in full force and effect as of each Successive Closing.

**Section 6.**   **Closing.**

6.1   Location of Closing.

The closing of the transactions contemplated by this Agreement (the "Closing") shall take place simultaneously with the execution and delivery of this Agreement by all parties hereto at the offices of TroyGould PC, 1801 Century Park East, Suite 1600, Los Angeles, California 90067, or at such other time and place as may be agreed upon between the Loan Parties and the Purchasers.

6.2   Closing Deliveries.

(a)  At the Closing, upon the satisfaction of the conditions precedent set forth in subsection (b) below, (i) the Company shall deliver (A) to each Secured Purchaser, a Secured Note registered in the name of such Secured Purchaser in the principal amount set forth opposite the name of such Secured Purchaser on Annex I hereto, (B) to each April 2009 Purchaser, a Replacement April 2009 Note registered in the name of such April 2009 Purchaser in the principal amount set forth opposite the name of such April 2009 Purchaser on Annex II hereto, (C) to each August 2009 Purchaser, a Replacement August 2009 Note registered in the name of such August 2009 Purchaser in the principal amount set forth opposite the name of such August 2009 Purchaser on Annex III hereto, (D) to each January 2010 Purchaser, a Replacement January 2010 Note registered in the name of such January 2010 Purchaser in the principal amount set forth opposite the name of such January 2010 Purchaser on Annex IV hereto, (E) to each February 2010 Purchaser, a Replacement February 2010 Note registered in the name of such February 2010 Purchaser (x) in the case of a February 2010 Purchaser that is not a Multi-Phase Investor, in the principal amount set forth opposite such February 2010 Purchaser's name on

23

GAB000285
Case: 13-30340    Doc# 149    Filed: 07/02/13    Entered: 07/02/13 11:29:34    Page 30 of 31

Annex V and, (y) in the case of a Multi-Phase Investor, set forth opposite such Multi-Phase Investor's name on Annex V-A and under the column titled "Principal Amount of Initial Notes", (F) to each 2007/2008 Purchaser, a Replacement 2007/2008 Note registered in the name of such 2007/2008 Purchaser in the principal amount set forth opposite the name of such 2007/2008 Purchaser on Annex VI hereto, (G) to Bardsley, the Replacement Bardsley Note in the principal amount of $2,961,667.20, and (H) to NW, the NW Secured Note in the maximum principal amount of $3,100,000.00 and receipts or invoices evidencing the Administrative Expenses to be paid or reimbursed at Closing from amounts loaned by NW under the NW Secured Note; (ii) Gabriel shall deliver to each 2007/2008 Purchaser that has elected to receive a Replacement Warrant pursuant to Section 5.1(f)(ii) hereof, a Replacement Warrant; (iii) each Secured Purchaser shall pay to the Company by cashier's check or wire transfer of immediately available funds an aggregate amount equal to the purchase price of the Secured Notes to be purchased by such Secured Purchaser, as provided in Section 4.1(a); and (iv) NW shall pay to the Company by cashier's check or wire transfer of immediately available funds an aggregate amount equal to the sum of (A) $1,500,000 plus (B) the amount of NW Funded Litigation Expenses for which invoices have been provided to NW, to be applied for the purposes set forth in the Recitals to this Agreement pursuant to such procedures as may be separately agreed in writing by NW and the Company and paid pursuant to the terms of Schedule 6.2(a).

(b) The obligation of NW, the Secured Purchasers, the 2007/2008 Purchasers, the 2009/2010 Purchasers and Bardsley to purchase the Notes from the Company on the date of the Closing is subject to the fulfillment of the conditions precedent that each Purchaser shall have received the following, each dated such day (except as otherwise specified below):

(i) this Agreement, duly executed by the Company, Gabriel and the Purchasers;

(ii) in the cases of NW, the Secured Parties and HHR only, UCC1 financing statements, each in substantially the form of Exhibit E hereto, naming the Company as debtor and each of NW and the Secured Purchasers as secured party, to be filed in the offices of the respective Secretaries of State of the States of Delaware and Nevada under the Uniform Commercial Code as in effect on the date hereof in such State (each, a "UCC1 Financing Statement");

(iii) the NW Secured Note, the Secured Notes, the 2007/2008 Notes, the 2009/2010 Notes and the Bardsley Note to be issued to such Purchaser, respectively, duly executed by the Company;

(iv) Replacement Warrants to be issued to each 2007/2008 Purchaser that has elected to receive a Replacement Warrant pursuant to Section 5.2(f)(ii) hereof, duly executed by Gabriel.

(v) certified copies of (1) the resolutions of the Board of Managers or Board of Directors (or equivalent), as applicable, of each Loan Party authorizing such Loan Party to enter into this Agreement and the other Financing Documents to which it is, or is to be, a party, and (2) the certificate of incorporation, articles of organization, by-laws, limited liability

02936/0002 220901.7

GAB000286
Case: 13-30340   Doc# 149   Filed: 07/02/13   Entered: 07/02/13 11:29:34   Page 31 of 31