1  LARRY W. GABRIEL – Bar No. 68329
   COREY R. WEBER – Bar No. 205912
2  JASON B. KOMORSKY – Bar No. 155677
   BRUTZKUS GUBNER
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone: (818) 827-9000
   Facsimile: (818) 827-9099
5  Email: lgabriel@brutzkusgubner.com
          cweber@brutzkusgubner.com
6          jkomorsky@brutzkusgubner.com

7  Special Litigation Counsel for
   Kavita Gupta, Chapter 7 Trustee
8

9              UNITED STATES BANKRUPTCY COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12 | In re:                          | Case No. 13-30340-DM

13 | GABRIEL TECHNOLOGIES            | (Jointly Administered with Case No. 13-30341)
   | CORPORATION *et al.*,
14 |                                 | Chapter 7 Proceedings
   |               Debtors.
15 |                                 | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT**
16 |                                 | **OF: (1) TRUSTEE'S MOTION FOR APPROVAL**
   |                                 | **OF SETTLEMENT WITH HUGHES HUBBARD &**
17 | E.I.N. 22-3062052; 20-1711149   | **REED LLP AND, (2) TRUSTEE'S MOTION FOR**
   |                                 | **GOOD FAITH SETTLEMENT DETERMINATION**
18 |                                 | **REGARDING THE SETTLEMENT BETWEEN**
   |                                 | **KAVITA GUPTA, AS CHAPTER 7 TRUSTEE**
19 |                                 | **FOR CONSOLIDATED ESTATES, AND HUGHES**
   |                                 | **HUBBARD & REED LLP**
20 |
21 |                                 | Hearing:
   |                                 | Date: September 16, 2016
22 |                                 | Time: 10:00 a.m.
   |                                 | Place: Courtroom 17
23 |                                 |        United States Bankruptcy Court
   |                                 |        450 Golden Gate Avenue, 16th Floor
24 |                                 |        San Francisco, California 94102
25

26

27

28

1 **TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY COURT**

2 **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL PARTIES IN**

3 **INTEREST:**

4       Kavita Gupta, the chapter 7 trustee (the "Trustee") for the bankruptcy estates of Debtor

5 Gabriel Technologies Corporation, Bankruptcy Case No. 13-30340, and Debtor Trace Technologies,

6 LLC, Bankruptcy Case No. 13-30341 (collectively, the "Estates") by and through her counsel of

7 record, hereby requests, pursuant to Federal Rule of Evidence 201, that the Court take judicial notice

8 of the following Exhibits in support of her concurrently filed: (1) *Motion for Approval of Settlement*

9 *with Hughes Hubbard & Reed LLP*; and, (2) *Motion for Good Faith Settlement Determination*

10 *Regarding the Settlement Between Kavita Gupta, as Chapter 7 Trustee for Consolidated Estates, and*

11 *Hughes Hubbard & Reed LLP*:

12       1.    *Plaintiff's Fourth Amended Complaint,* [United States District Court, Southern

13 District of California, San Diego Division, Case 3:08-cv-01992-AJB-MDD, Docket No. 53].

14       2.    *Order Granting in Part and Denying in Part Defendants' Motion for Bond* [United

15 States District Court, Southern District of California, San Diego Division, Case 3:08-cv-01992-AJB-

16 MDD, Docket No. 110].

17       3.    *Order Granting in Part and Denying in Part Defendants' Motion for Attorneys' Fees*

18 *as to Plaintiffs and Non-Party Wang, Hartman, Gibbs & Cauley, PLC* [United States District Court,

19 Southern District of California, San Diego Division, Case 3:08-cv-01992-AJB-MDD, Docket No.

20 371].

21       4.    *Gabriel Technologies Corp. v. Qualcomm Inc.*, 560 Fed.Appx. 966 (2014).

22

23 Dated: August 10, 2016              BRUTZKUS GUBNER

24

25                     By: /s/ Larry W. Gabriel
                        Larry W. Gabriel

26                     Special Litigation Counsel for Kavita Gupta,
                    Chapter 7 Trustee for the bankruptcy estates

27                     of Gabriel Technologies Corporation and
                    Trace Technologies, LLC

28

1   John van Loben Sels (State Bar No. 201354)
    jvanlobensels@whgclaw.com
2   **WANG, HARTMANN, GIBBS & CAULEY, P.L.C.**
3   2750 W. El Camino Real, Suite 440
    Mountain View, California 94040
4   Telephone: (650) 209-1230
    Facsimile: (650) 209-1231
5

6

7

8                    **UNITED STATES DISTRICT COURT**
                    **SOUTHERN DISTRICT OF CALIFORNIA**
9                          **SAN DIEGO DIVISION**

10
    **GABRIEL TECHNOLOGIES**              **CIVIL ACTION NO. 3:08-cv-01992-MMA-POR**
11  **CORPORATION and TRACE**
    **TECHNOLOGIES, LLC,**
12                          Plaintiffs,   **PLAINTIFFS' FOURTH AMENDED**
                                          **COMPLAINT**
13           vs.

14
    **QUALCOMM INCORPORATED,**            **DEMAND FOR JURY TRIAL**
15  **SNAPTRACK, INC., and NORMAN**
    **KRASNER,**
16                          Defendants.

17
         Pursuant to the Court's Orders dated September 3, 2009 and October 8, 2009, Plaintiffs
18
    Gabriel Technologies Corporation and Trace Technologies, LLC (collectively, "Gabriel") and
19
    file their Third Amended Complaint against Defendants Qualcomm Incorporated ("Qualcomm"),
20
    SnapTrack, Inc. ("SnapTrack"), and Norman Krasner ("Krasner") (collectively, "defendants"), as
21
    follows:
22

23                          **I.   INTRODUCTION**

24
         1.      Gabriel files this lawsuit to hold technology thieves responsible for their wrongful
25
    conduct.  The chief thief is Krasner, who on paper appears to be a prolific inventor with over 60
26
    published domestic patents mostly related to global positioning satellite systems.  As Gabriel
27

28

would find out the hard way, Krasner's prolific inventions are often based on the work of others, and Krasner has made a career out of preparing, prosecuting, and procuring domestic and foreign patents based on work done by others.

2. Krasner and SnapTrack entered into a license agreement with Loc8.net a/k/a Locate Networks, Inc. ("Locate"), a predecessor-in-interest to Gabriel, ostensibly to jointly develop technology for their mutual benefit. As it would turn out, SnapTrack and Krasner used the relationship to obtain millions of dollars from Locate to keep SnapTrack afloat while negotiating a billion dollar buyout. Unaware of the sinister intentions of SnapTrack and Krasner, Locate brought to the table real technological value, which SnapTrack and Krasner stole for themselves and for SnapTrack's eventual purchaser, Qualcomm. Over time, Krasner, SnapTrack, and Qualcomm surreptitiously misappropriated Locate's valuable enabling technology and other disruptive intellectual property rights.

3. Although it paid more than a billion dollars for SnapTrack's technology, Qualcomm did not pay the true owner of much of that technology. Qualcomm took no steps to correct ownership or inventorship of the patents with the United States Patent & Trademark Office. Instead, Qualcomm wrongfully continued to file patents and patent applications based on Locate's technology and failed to pay Gabriel, the true owner, for its many inventions and patents.

4. Gabriel brings this suit to obtain payment for the technology unlawfully acquired and used and to correct ownership and inventorship on what should be its patents.

## II.  <u>PARTIES</u>

5.      Plaintiff Gabriel Technologies Corporation is a corporation organized pursuant to the laws of the State of Delaware with its principal place of business in Omaha, Nebraska.

6.      Plaintiff Trace Technologies, LLC is a limited liability company organized pursuant to the laws of the State of Nevada.  Trace Technologies, LLC is a wholly-owned subsidiary of Gabriel Technologies Corporation.

7.      Defendant Qualcomm is a corporation organized pursuant to the laws of the State of Delaware.  Qualcomm's principal place of business and United States headquarters is located in San Diego, California.  Qualcomm may be served by serving its counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909.

8.      Defendant SnapTrack is a corporation organized pursuant to the laws of the State of California.  SnapTrack's principal place of business is located in California.  Since its acquisition by Qualcomm in 2000, SnapTrack is a wholly owned subsidiary of Qualcomm.  SnapTrack may be served by serving its counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909.

9.      Defendant Krasner is an individual who is a citizen of and resides in the State of California.  Krasner may be served by serving his counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909.

## III.  <u>JURISDICTION AND VENUE</u>

10.     This Court has subject matter jurisdiction over this action and Gabriel's claims for correction of inventorship, patent ownership, declaratory judgment, and equitable patent infringement pursuant to 28 U.S.C. §§ 1331 and 1338, as well as 28 U.S.C. §§ 2201 and 2202.

In addition, this Court has supplemental jurisdiction over the related state law claims asserted herein pursuant to 28 U.S.C. § 1367.

11.     Venue in this Court is proper under 28 U.S.C. §§ 1391 and 1400(b).

## IV.   FACTS APPLICABLE TO ALL COUNTS

**Gabriel, Trace, and Locate.**

12.     Gabriel Technologies Corporation is a publicly-traded corporation focused on two rapidly growing segments of the homeland security market: asset tracking and physical security. Through its wholly-owned subsidiary, Gabriel Technologies, LLC, a Nebraska limited liability company, the company designs, develops, manufactures, and sells a series of physical locking systems for the transportation and shipping industries collectively known as the War-Lok™ security system.  Gabriel Technologies Corporation's other wholly-owned subsidiary, Trace Technologies, LLC ("Trace"), was formed to develop location based services to enable customers to track assets and personnel worldwide.

13.     Locate, a Washington corporation, was formed to focus on location determining devices and location-based services.

14.     Trace was developed as a joint venture entity between Locate and Gabriel.  Trace subsequently acquired substantially all of the assets of Locate, including Locate's rights under the License Agreement with SnapTrack.  Gabriel then acquired all of Locate's rights in Trace, which today operates as a wholly-owned subsidiary of Gabriel.

**Krasner and SnapTrack.**

15.     In late 1998, the founders of Locate, Richard Crowson and William Clise, started discussing joint development projects with SnapTrack.

16.     Although Locate was seeking opportunities to develop its existing business, Krasner saw Locate as providing access to two resources he wanted: (1) funds to keep

SnapTrack running while he was attempting to sell SnapTrack and (2) valuable enabling technology that he could steal and wrongfully add to SnapTrack's patent portfolio.

17.     While negotiating the terms of a potential venture, SnapTrack and Locate discussed their intellectual property and how the parties could best work together.

18.     Unlike SnapTrack, Locate negotiated in good faith and shared its experience in the field of narrowband telecommunication networks for the purpose of collaborating with SnapTrack.

19.     At this time, SnapTrack was focused on broadband networks and assisted Global Positioning System ("aGPS") technology and the development of related intellectual property.

20.     Although SnapTrack was not as interested in narrowband networks because it was concentrating its investment in broadband networks, SnapTrack liked the opportunity that Locate presented.  SnapTrack could continue to focus on broadband networks and sell itself to a company focusing on broadband.  At the same time, Krasner and SnapTrack could obtain patents based on valuable enabling technology that Locate had already conceived of and was implementing in the narrowband field.

21.     SnapTrack hoped to find potential purchasers in the aGPS field who needed a significant aGPS patent portfolio.  In the aGPS market, such a patent portfolio would provide incredible licensing opportunities to the owner of the patent portfolio and would create significant barriers to entry for competitors.

**SnapTrack and Locate Enter Into the License Agreement.**

22.     Prior to the entry of the License Agreement, representatives of Locate, including Crowson and Clise, discussed in early 1999 the intellectual property ownership rights with representatives of SnapTrack, including Stephen Poizner, then Chief Executive Officer of

SnapTrack, and Krasner.   SnapTrack assured Locate that Locate's rights in its existing intellectual property would not be affected by entering into the License Agreement.  With respect to Program Technology, Poizner represented that it would be jointly-owned and that the parties would set up a process to protect such joint ownership rights.   These statements where untrue or misleading when made because, as discussed below, Krasner, SnapTrack, and Qualcomm (i) did not respect and separately safeguard Locate's existing intellectual property rights; (ii) did not work with or otherwise provide Locate any joint ownership rights; and (iii) failed to disclose and affirmatively misrepresented the existence of Program Technology.   Had Locate known that these representations were false and were not going to be complied with, Locate would have not entered into the License Agreement.

23.    On August 20, 1999, SnapTrack and Locate entered into a License Agreement (the "License Agreement").   Although titled a "License Agreement," the agreement was more akin to a joint development agreement because the parties agreed to jointly develop and own "Program Technology," as discussed below.

24.    The stated purpose of the License Agreement was to allow Locate to obtain (i) a license to use SnapTrack's aGPS software to develop location pager devices and related location services and (ii) technical support and engineering services from SnapTrack related to its software.

25.    Locate agreed to pay SnapTrack millions of dollars in license and royalty fees in exchange for the rights to use, make, or have made the SnapTrack Server Software and the SnapTrack Client Software required for provisioning aGPS location-based services to Locate customers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

26.     As part of the License Agreement, Locate expressly protected its existing intellectual property rights.  To that end, Section 8, entitled "Proprietary Rights," provided:

> Each party shall retain ownership of its respective patents, trade secrets, copyrights, and other Intellectual Property Rights that are in existence as of the Effective Date.

27.     Because SnapTrack realized the value that Locate brought to the table, SnapTrack agreed that "Program Technology," or items of work carried out by the parties in connection with the License Agreement, would be jointly owned by Locate and SnapTrack.

28.     In clear and unambiguous terms, section 8(b) of the License Agreement stated:

> All Program Technology shall be jointly owned by and between the parties, with each party owning an undivided, equal ownership interest in any such Program Technology, and all rights therein shall be vested in [SnapTrack] and [Locate] as joint and equal owners.

29.     In addition to setting forth the parties' joint ownership interest, the License Agreement further provided that this joint ownership interest was to be protected by the parties. Section 8(b)(i) of the License Agreement stated:

> The parties shall establish a process for identifying all Program Technology Intellectual Property Rights.  With respect to all such Program Technology so identified, the parties shall establish a process for determining (1) which intellectual property filing to make with respect to such Program Technology (including but not limited to patent applications, reissues, and reexaminations, copyright and trademark registrations, and similar intellectual property registrations), (2) which party shall be responsible for such filings.

30.     Because of the proprietary nature of the information the parties were exchanging, SnapTrack and Locate further expressly provided for confidential treatment of that information. Specifically, paragraph 9(a) of the License Agreement states:

> Nondisclosure.  Each party shall treat as confidential all Confidential Information of the other party, shall not use such Confidential Information except as set forth herein and in order to allow the parties to meet their obligations under this Agreement, and shall use reasonable efforts not to disclose such Confidential Information to any third party. Without limiting the foregoing, each of the parties shall use at least the same degree of care which it uses to prevent the disclosure of

Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 9 of 88

**9**

its own confidential information of like importance to prevent the disclosure of Confidential Information disclosed to it by the other party under this Agreement. Each party shall promptly notify the other party of any actual or suspected misuse or unauthorized disclosure of the other party's Confidential Information.

31. Thus, Locate endeavored from the outset to set up a process to protect intellectual property rights pertaining to the Program Technology, trade secrets, and other confidential information by requiring: (i) a process for identifying all Program Technology Intellectual Property Rights; (ii) determination of the type of intellectual property filings needed, *e.g.*, patent, copyright, etc.; (iii) determination of which party would be responsible for obtaining such intellectual property protection; and (iv) protection of each party's confidential information.

32. As it would turn out, Krasner and SnapTrack (and later Qualcomm) had no intention of recognizing Locate's joint ownership of Program Technology or protecting Locate's joint ownership interest.

**SnapTrack Finds a Buyer: Qualcomm.**

33. Although Qualcomm is no stranger to intellectual property disputes, a brief history of Qualcomm's patent portfolio and business is necessary to understand Qualcomm's acquisition of SnapTrack's—but in reality, Locate's—intellectual property.

34. Qualcomm was founded in 1985 to develop and patent a wireless technology system known as Code Division Multiple Access (CDMA).

35. Instead of manufacturing its own cell phones, Qualcomm made money by obtaining a large patent portfolio relating to CDMA and then licensing those CDMA patents to cell phone manufacturers like Samsung, Ericsson, and Motorola.

36. In 1999, the year CDMA was included as standard technology for phones, Qualcomm's licensing deals generated more than $400 million in revenue.

37.     Although still highly lucrative, many of Qualcomm's fundamental CDMA patents were approaching expiration. To diversify its revenue sources, Qualcomm sought to strengthen its patent portfolio by investing in certain disruptive technologies, including aGPS.  Acquisition of the SnapTrack patent portfolio was intended to allow—and actually did allow—Qualcomm to dominate the aGPS market just as it had the CDMA market.

38.     Qualcomm decided to acquire SnapTrack and its intellectual property and technology and conducted due diligence with respect to that proposed acquisition.

39.     Bruce Greenhaus, a Qualcomm vice president and registered United States patent attorney, led a team of Qualcomm engineers and inventors involved in the SnapTrack due diligence.  At times, Greenhaus has falsely claimed that he alone was responsible for the due diligence related to SnapTrack's intellectual property.

40.     Initially, Qualcomm offered to make a sizeable investment in SnapTrack, but rejected that offer and insisted that Qualcomm acquire SnapTrack outright.

41.     On January 26, 2000, Qualcomm announced that it was acquiring SnapTrack for $1 billion. In its press release, Qualcomm announced the acquisition as follows:

> In a move designed to enable broad new applications for mobile location-based services and wireless Internet systems, Qualcomm Incorporated (Nasdaq: QCOM) today announced that it will acquire SnapTrack, Inc. of San Jose, Calif., a leader in wireless position location technology. Combining SnapTrack's technology with Qualcomm's innovative gpsOne™ technology will accelerate the introduction of powerful location-enabled mobile phones and other devices utilizing Wireless Assisted GPS™ (Global Positioning System) technology. The acquisition provides Qualcomm with an even stronger patent portfolio covering Wireless Assisted GPS. *SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS system.* Under the agreement, SnapTrack will become a wholly owned subsidiary of Qualcomm, and will continue its work on position location technology and meeting its customer commitments. Qualcomm will pay $1 billion in stock for the acquisition of SnapTrack. Completion of the agreement, which is subject to regulatory approval and other customary closing conditions, is expected by mid-March of this year.

PLAINTIFFS' FOURTH AMENDED COMPLAINT
PAGE 9 of 33
Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 11 of 88

11

42.     Focusing on SnapTrack's patent portfolio, Dr. Irwin Mark Jacobs, then chairman and CEO of Qualcomm, stated, "SnapTrack's impressive technology strengths and patent portfolio will provide Qualcomm with increased position location capabilities."

43.     In describing SnapTrack's patent portfolio, Qualcomm acknowledged the existence of the relationship and the License Agreement between Locate and SnapTrack, as follows:

> SnapTrack has nearly 50 patents, either issued or pending, that are critical to the efficient, cost-effective deployment of Wireless Assisted GPS. SnapTrack has royalty-bearing licensing agreements with Denso, DSPC/Intel, Loc8.net/Glenayre, Motorola and Texas Instruments for patents and technology that cover the deployment of assisted GPS-based wireless location systems, and an agreement with Microsoft to integrate SnapTrack's solution into the Microsoft Mobile Explorer smart phone platform.

44.     At the time Qualcomm announced the acquisition, Locate had no reason to believe that its technology had been misappropriated by Krasner and SnapTrack or that any of its technology was involved in the acquisition.  Even after the acquisition, Locate continued to perform under the License Agreement.

45.     During its due diligence (and after its acquisition of SnapTrack), Qualcomm and, in particular, Greenhaus and his due diligence team ignored or disregarded both the intellectual property provisions of the License Agreement and Locate's contributions to Program Technology.

46.     On March 2, 2000, Qualcomm announced that it had completed the acquisition of SnapTrack, which became a wholly owned subsidiary of Qualcomm.  Again, Qualcomm focused on and touted "SnapTrack's patent portfolio of nearly 50 patents, either issued or pending, that are critical to the efficient, cost-effective deployment of Wireless Assisted GPS systems."

47.     As part of the acquisition, Krasner's SnapTrack stock was converted into Qualcomm stock.  Upon information and belief, Krasner and his wife received approximately 300,000 shares of Qualcomm stock then valued at $139.56 per share.  In connection with the acquisition, Krasner became a "key employee" of Qualcomm.

48.     In its press releases and SEC filings relating to the acquisition of SnapTrack, Qualcomm never mentioned any other SnapTrack assets or even SnapTrack's revenues.  Upon information and belief, none of these items played a role in Qualcomm's acquisition of SnapTrack.  Instead, the sole value to Qualcomm and reason for the $1 billion acquisition of SnapTrack was the valuable intellectual property.

49.     In acquiring SnapTrack, Qualcomm willfully ignored the fact that SnapTrack did not solely own all of the intellectual property SnapTrack and Krasner sold to Qualcomm for $1 billion.

50.     After acquiring SnapTrack's patent portfolio, Qualcomm set its sights on achieving market dominance in the aGPS market as it had done with CDMA.

51.     In 2002, Qualcomm announced that its gpsOne™ technology, which features SnapTrack technology, "is the world's most widely developed personal location system for mobile handsets."

52.     From 2002 to 2005, the number of gpsOne™-enabled devices in use in the world skyrocketed from 5 million to 150 million.  Qualcomm claimed that it is "the most widely-developed GPS technology in the world."

**Krasner, SnapTrack, and Qualcomm Misappropriate Gabriel's Trade Secrets and Confidential Information.**

53.     Unbeknownst to Locate, Krasner decided to take Locate's intellectual property and inventions and patent them as if he were the actual inventor.  Locate's intellectual property

Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 13 of 88

and confidential information derived independent economic value from not being generally known to the public.  For example, such confidential information and trade secrets had value as patentable technology.

54.    Although SnapTrack was focused on aGPS and the broadband market, Krasner filed patent applications directed to narrowband innovations upon which Locate was focused and that had valuable application within the broadband market upon which SnapTrack was focused.

55.    One example of Krasner filing patents based on enabling technology developed by Locate occurred in March 1999.  During the negotiations culminating in the License Agreement, Locate discussed its past experience in narrowband and solutions to problems it had encountered and which were applicable to telecommunications more broadly.  This information was Locate's solely-owned know how, intellectual property, and confidential information.

56.    Krasner, without telling Locate's founders that he was doing so, filed a provisional patent application incorporating Locate's technology under his own name while excluding the actual inventor prior to the execution of the License Agreement, Krasner had no right to do so because (i) he was not one of the true inventors and (ii) Locate was supposed to retain ownership of its own existing pre-agreement intellectual property rights.

57.    Upon information and belief, Krasner filed the provisional patent application to add value to SnapTrack's patent portfolio for a potential purchaser (like Qualcomm) as well as to put additional arrows in its quiver for future battles with its competitors. Of course, Locate had no reason to believe that Krasner was improperly filing patent applications for which he was not the inventor.  Despite SnapTrack's representations regarding the parties' existing intellectual property rights, Krasner did not disclose to Locate the decision to pursue and file this patent application, which incorporated Locate's solely-owned technology.  Had Locate known that

**14**

1   Krasner and SnapTrack were going to take Locate's solely-owned technology for themselves in
2   direct contravention of the prior representations, Locate would not have entered into the License
3   Agreement.
4
5       58.    After entering into the License Agreement, Krasner continued his practice of
6   "ghost writing" patents by filing patent applications relating to Program Technology and naming
7   either Krasner as a sole inventor or Krasner and other SnapTrack engineers as joint inventors.
8   No Locate employees were listed as inventors.
9
10      59.    While filing these patent applications beginning in 1999, Krasner and SnapTrack
11  failed to disclose to Locate that Program Technology existed or follow the procedures required
12  by the License Agreement regarding Program Technology and intellectual property filings.
13  Because these patent applications were not disclosed to Locate, Locate was not aware of Krasner
14  and SnapTrack's clandestine filings relating to technology solely owned or jointly owned by
15  Locate.
16
17      60.    Following Krasner's lead, Qualcomm filed patent applications relating to Program
18  Technology and named San Diego-based Qualcomm engineers as inventors instead of Locate (or
19  Gabriel) employees.  Again, because these patent applications were not disclosed to Locate,
20  Locate was not aware of these unpublished filings relating to technology solely owned or jointly
21  owned by Locate.
22
23      61.    Locate's jointly-owned Program Technology was misappropriated by Krasner,
24  SnapTrack, and Qualcomm in multiple ways:
25
26          i)     Krasner, SnapTrack, and Qualcomm filed new patent applications that
27  incorporated Program Technology;
28

ii)   Krasner, SnapTrack, and Qualcomm included the Program Technology in continuation-in-part patent applications;

iii)   Krasner, SnapTrack, and Qualcomm broadened patent claims in pending patent application to encompass the Program Technology; and

iv)   Krasner, SnapTrack, and Qualcomm failed to credit Locate as an assignee or Locate employees as co-inventors.

62.   At least ninety-two (92) U.S. and foreign patents and patent applications filed by Krasner, SnapTrack, and Qualcomm are based upon—in whole or in part—Program Technology, Locate's sole intellectual property, or both.   These patents and patent applications can be grouped into at least thirteen (13) core inventions.

63.   Nine (9) of at least thirteen (13) core inventions are embodied in the following U.S. patents (and related foreign patents or applications):

i)   Patent Nos. 6,377,209 and 6,583,757 ("the '209 and '757 Patents") and six (6) related PCT/foreign patents, including WO2000057203, EP1171779, MXPA01009528, CN1344372, CA2367032, and AU773464;

ii)   Patent No. 6,661,372 ("the '372 Patent");

iii)   Patent No. 6,799,050 ("the '050 Patent");

iv)   Patent No. 6,861,980 ("the '980 Patent") and six (6) related PCT/foreign patents, including AU2005250882, BRPI0511499, CN1957264, EP1749215, JP2008500543, and WO2005119287;

v)   Patent No. 6,895,249 ("the '249 Patent") and ten (10) related PCT/foreign patents, including AU777646B, AU7689401, BR0106971, CA2383685, CN1201627, EP1302081, HK1050606, JP2004504614, MXPA02002692, and WO0207458;

vi)     Patent No. 7,254,402 ("the '402 Patent") and ten (10) related PCT/foreign patents, including AU1534202, AU2002215342, CA2425547, CN1608211, EP1330662, IL155206, JP4018535B2, JP2007306588, MXPA03003208, and WO0231526;

vii)    Patent No. 7,289,786 ("the '786 Patent") and U.S. Application Serial No. 11/538,436 ("the '436 Application") and six (6) related PCT/foreign patents, including CN1762173, EP1588578, JP2007521712, KR20050090461, MXPA05007633, and WO2004066665;

viii)   Patent No. 7,319,876 ("the '876 Patent") and ten (10) related PCT/foreign patents, including AU2003270026, BR0313697, CA2496460, CN1689365, EP1532833, JP2005537709, KR20050040131,MXPA05002231, RU2005108595, and WO2004019650; and

ix)     Patent No. 7,421,277 ("the '277 Patent") and related U.S. Application Serial No. 11/377,856 ("the '856 Application").

64.    The remaining four (4) core inventions are embodied in the following U.S. patent applications (and related foreign patents or applications):

i)      Application Serial No. 10/418,799 ("the '799 Application") and ten (10) related PCT/foreign patents, including AU2003301350, BR0315350, CA2501268, CN1705894, EP1552323, JP2006504110, KR20050051695, MXPA05003921, RU2005114912, and WO2004036240;

ii)     Application Serial No. 10/792,062 ("the '062 Application") and nine (9) related PCT/foreign patents, including BRPI0408017, CA2517800, CN1778127, EP1600020, JP2006521767, KR20050104420, MXPA05009417, RU2005130765, and WO2004080096;

iii)    Application Serial No. 10/956,409 ("the '409 Application) and two (2) related PCT/foreign patents, including BRPI0512122 and WO2006009712; and

iv)     Application Serial No. 10/961,986 ("the '986 Application) and seven (7) related PCT/foreign patents, including CA2463543, CN1602636, EP1435184, IL161315, JP2005537690, KR20050035147, and WO03032662.

65.     These patents and patent applications should name Locate employees as the sole inventors or, at the very least, as joint inventors.

66.     By filing these patent applications and obtaining these patents, Krasner, SnapTrack, and Qualcomm obtained valuable technology without paying for it.    The procurement of these issued patents has unfairly allowed SnapTrack and Qualcomm to create barriers of entry to third-party competition in the aGPS market that was not rightfully theirs to use and from which to benefit.  Upon information and belief, Qualcomm licenses these patents to industry leaders as part of its patent portfolio and lucrative business model.  Because Gabriel did not—and still does not—have access to Qualcomm's license agreements, it was not aware of any licensing of patents that should have listed Locate employees as sole or joint inventors.

67.     In addition to filing patents based on Locate's inventions, upon information and belief, Krasner has filed patents relating to wireless network technology which was likely developed by companies other than SnapTrack or Qualcomm.  Examples of such suspicious patents include U.S. Patent Nos. 6,937,872 and 6,665,541.

68.     Qualcomm's clandestine activities in obtaining the patents have forced aGPS users and providers to either obtain a license from Qualcomm or attempt to design around these patents.  Thus, Qualcomm was able to represent ownership of and control barriers to entry in the marketplace that were not its own.

**The Specific Patents and Patent Applications.**

69.     Krasner, SnapTrack, and Qualcomm filed the patents and patent applications listed above without listing Locate or any of its employees as having any inventorship or ownership rights.  As summarized below, Locate employees contributed to each of these patents and patent applications and, in most cases, were the sole inventors.

The '209 Patent and the '757 Patent

70.     The '209 Patent and the '757 Patent list Krasner as the sole inventor.

71.     In January and February 1999, during preliminary discussions between SnapTrack and Locate, Locate identified its experience with latency problems in networks like the ReFLEX paging network, which latencies are significantly greater than the latencies in any other type of wireless transmission network.

72.     These problems were not known to Krasner or SnapTrack until these discussions with Locate, and Locate even provided the solution to these latency issues.

73.     As part of his efforts to make SnapTrack's patent portfolio as valuable as possible to potential buyers, Krasner took Locate's technology and patented it under his own name.

The '372 Patent

74.     The '372 Patent only lists Richard Girerd and Krasner as inventors.

75.     The '372 Patent was broadened during prosecution to cover new types of acquisition assistance information having reduced satellite information payloads.

76.     The new types of acquisition assistance information were contributed as Program Technology by Locate engineers.

77.     Rather than amending the patent application of the '372 Patent, the new acquisition assistance technique should have been included in either a new patent application or,

if possible, in a continuation-in-part (CIP) patent application, which should have named Locate employees as inventors.

The '050 Patent

78.     The '050 Patent lists Krasner as the only inventor.

79.     The '050 Patent resolves conflicts between transmission to a terrestrial network and reception from GPS satellites.

80.     The Locate location pager implements a mechanism that resolves similar conflicts to those addressed in the '050 Patent.

81.     In addition, the user-initiated conflict resolution mechanism is illustrated and discussed in multiple Locate documents that pre-date the filing of the '050 Patent by more than a year.

The '980 Patent

82.     Claim 1 of the '980 Patent is directed to a method for messaging position-based information in an assisted wireless position determination system.   Qualcomm employees Rowitch and Patrick are listed as inventors.

83.     The elements of Claim 1 are disclosed in the Locate document entitled "Location Message Handling Protocol" (LMHP), dated November 2002, and in the Locate document entitled "Sputnik Software Functional Specifications" ("Sputnik"), dated December 2000.  Both of these documents pre-date the May 26, 2004 filing of the '980 patent.

The '249 Patent

84.     The '249 Patent lists Gaal, a Qualcomm employee, as the only inventor.  That patent uses position location data classifications to determine a broadcast schedule.

85. The LS-GF IF Specification, dated December 15, 1999, which SnapTrack had in its possession, discloses the broadcasting of acquisition assistance information. A June 1999 letter discusses a location dependent simulcast of unique satellite data, and a September 1999 e-mail discusses a meeting about the immediate need for a broadcast data aging analysis.

86. Thus, Locate provided the details of the broadcast method claimed in the '249 Patent well prior to the July 10, 2001 filing of the patent.

The '402 Patent

87. The '402 Patent lists Vayanos, a Qualcomm employee, as the first-named inventor. Samir Soliman, another Qualcomm employee who was a member of the SnapTrack due diligence team, is also listed as an inventor.

88. The Locate paging network delivers acquisition assistance information either in a broadcast mode to all location pagers in a GPS zone or in a targeted mode to a targeted location pager in a single base station coverage area.

89. In addition, documents authored by Locate in 1999 disclose relevant information regarding the acquisition assistance information discussed in the '402 Patent. Specifically, claims of the '402 Patent recite limitations regarding the GPS code phase search range shown in the Locate documents.

90. Because Qualcomm was a member of a standard-setting subcommittee and because Vayanos represented Qualcomm on that committee, if Vayanos were truly the inventor of the '402 Patent, the patent should have been disclosed prior to the balloting and publication of the relevant standard.

91. However, Qualcomm did not make a declaration of intellectual property rights and licensing until after publication of the standard.

92.     Locate, as the sole inventor of this patent, may not have been obligated to declare the patent to the standard setting organization or to grant licenses under favorable terms to standard members.

The '786 Patent and the '436 Application

93.     The '786 Patent and the '436 Application list Krasner as the sole inventor and relate to a "method and apparatus for communicating emergency information using wireless devices."

94.     Locate documents that pre-date the filing of the '786 Patent and the '436 Application illustrate the triggering of an alert on the location pager and the transmission of an alert message to an emergency center.  Other Locate documents supporting inventorship include an internal e-mail and memorandum.

95.     Claims of the '786 Patent and the '436 Application recite limitations that are shown in these documents.

The '876 Patent

96.     Claim 1 of the '876 Patent, which has a priority date of August 26, 2002, is directed to a location services apparatus for providing location services to a mobile station. Qualcomm employees Jha and Grilli are listed as the inventors.

97.     The Sputnik document discloses the elements of Claim 1 and pre-dates the priority date of the '876 Patent.

The '277 Patent and the '856 Application

98.     Claim 1 of the '277 Patent, which has a priority date of February 5, 2004, is directed to a method of performing position determination in a network. Qualcomm employee Burroughs is listed as the inventor.

PLAINTIFFS' FOURTH AMENDED COMPLAINT                                            PAGE 20 of 33
Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 22 of 88

22

99.     Elements of the '277 Patent and the '856 Application are disclosed in the Sputnik document, the Locate document entitled "Location Message Handling Protocol" (LMHP), dated November 2002, and other Locate documents.

The '799 Application

100.    Claim 1 of the '799 Application, which has a priority date of October 17, 2002, is directed to a method of determining a position estimate for a wireless terminal. Leonid Sheynblat is listed as the inventor.

101.    Claim 1 encompasses a Locate method of improving the location estimation in the network and is disclosed in the Sputnik document.

The '062 Application

102.    Claim 1 of the '062 Application, which has a priority date of March 5, 2003, is directed to a method of providing location services.  Wang, Sheynblat, Agahse, Gollens, and Hsu are listed as the inventors on the '062 Application.

103.    The Sputnik document and other Locate documents describe the functionality discussed in the '062 Application.

The '409 Application

104.    The '409 Application relates to tracking lost and stolen mobile devices using unique equipment identifiers.  Anjali Jha, a Qualcomm employee, and Krasner are listed as the inventors.

105.    Claims in the '409 Application recite limitations regarding the tracking of a targeted mobile station based on status information.  These limitations were taught in various documents provided to SnapTrack by Locate.

1

The '986 Application

2

106.    The '986 Application establishes permission criteria to allow others to track the

3

location of a mobile device. Krasner and Sheynblat are listed as the inventors.

4

107.    Multiple Locate documents, which pre-date the filing of the '986 Application,

5

define creating permissions for users, and the claims of the '986 Application recite limitations

6

that are shown in those documents.

7

108.    The above-discussed patents and patent applications read on the following

8

Qualcomm/SnapTrack products and services:  the SnapTrack Position Determination Module

9

software, the Qualcomm QPoint server, the GlobalWARN system, the inGeo device, the Brew

10

Location Signature Solution server, the Qualcomm MedioFlo network, and/or any product

11

incorporating Qualcomm's gpsOne technology.

12

**Qualcomm Continues Its Wrongdoing.**

13

109.    Despite Qualcomm's protestations to Gabriel that Locate did not have people who

14

contributed to the inventions or the patents at issue, Gabriel learned that Qualcomm, through an

15

entity called Qualcomm Ventures, considered an investment in Locate and later pursued a buyout

16

of Locate, including all of Locate's hardware, software, key personnel (both current and former),

17

and intellectual property rights.    During the due diligence of that proposed transaction,

18

Qualcomm had access to Locate's financial information and other valuable company

19

information.  Qualcomm did not consummate the buyout nor did Qualcomm inform Locate of its

20

potential ownership interest in portions of the SnapTrack patent portfolio.

21

110.    After Qualcomm's failed attempt to buy Locate and its intellectual property

22

rights, in or around June 2004, SnapTrack and Qualcomm presented Trace, the successor-in-

23

interest to Locate's assets, with an Amended and Restated License Agreement.  The proposed

24

25

26

27

28

---

Amended and Restated License Agreement stated that it "supersedes and replaces in its entirety the prior License Agreement made and entered as of August 20, 1999, as amended, by and between [SnapTrack] and Trace Technologies LLC, as successor-in-interest to substantially all of the assets of Locate Networks, Inc."

111.    Neither SnapTrack nor Qualcomm informed Trace that they had filed patent applications incorporating Locate's intellectual property without listing Locate personnel as inventors.  To the contrary, representatives of SnapTrack and Qualcomm fraudulently concealed that information from Gabriel and falsely claimed that no Program Technology existed under the License Agreement.  Representatives of SnapTrack and Qualcomm further falsely claimed that the sole purpose of presenting the Amended and Restated License Agreement was to standardize the prior License Agreement to the form now used by Qualcomm.

112.    The provisions of the proposed Amended and Restated License Agreement were significantly different from the License Agreement entered into by SnapTrack and Locate.  First, the proposed Amended and Restated License Agreement deleted section 8(b) of the License Agreement which stated that "[a]ll Program Technology was jointly owned by the parties." Second, the proposed Amended and Restated License Agreement stated:

> Trace hereby grants, on behalf of itself and its Affiliates, to [SnapTrack] an irrevocable, perpetual, nonexclusive, paid-up, royalty-free, worldwide license under the Necessary IP of Trace and its Affiliates, without the right to sublicense (except to [SnapTrack]'s Affiliates, and by [SnapTrack] and/or its Affiliates to their direct and indirect customers) in order to use, make, have made, sell, offer to sell, lease, offer to lease, and import the Software.

113.    Necessary IP was defined in the proposed Amended and Restated License Agreement as "all Intellectual Property Rights which are essential or commercially necessary to the development, manufacture, use, sale or distribution of licenses or other rights to Software in

order to comply with the specifications of the location services portion of any wireless communications standard adopted for any air interface by any nation."

114.    By the deletion of the joint ownership provision of the License Agreement and the inclusion of a broadly-defined license from Trace to SnapTrack, SnapTrack and Qualcomm attempted to transfer Locate's existing intellectual property rights to themselves.

115.    As part of the proposed Amended and Restated License Agreement, SnapTrack and Qualcomm also requested that Trace pay approximately $342,000 in additional fees and costs.  Knowing quite well what they had done with Locate's intellectual property over the past few years, SnapTrack and Qualcomm kindly offered to waive these fees if Gabriel would just sign the Amended and Restated License Agreement.

116.    In April 2005, when Trace inquired as to whether any Program Technology or related intellectual property filings existed, Qualcomm's Senior Legal Counsel Phillip Fries responded that Qualcomm would only address those issues after Trace paid certain fees to SnapTrack or signed the proposed Amended and Restated License Agreement.   Although Qualcomm did agree that the change regarding joint ownership rights would only apply prospectively, Qualcomm still did not acknowledge or identify Locate's contributions.  In point of fact, Fries indicated that Locate was a "sales" team without engineering capability.

117.    In August 2005, counsel for Gabriel met with Greenhaus.  During that meeting, Greenhaus explained that he had been part of the original Qualcomm team involved in the valuation of SnapTrack and that as part of the acquisition, he knew SnapTrack's patent portfolio very well.  To begin that meeting, Greenhaus stated that Locate did not make any contribution to SnapTrack's patent portfolio.  By the end of the meeting, Greenhaus stated that he may have been wrong and that steps needed to be taken to verify several points.

Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 26 of 88

**26**

118.    After the meeting, Greenhaus, knowing at that time that Gabriel lacked needed capital, continued to conceal Krasner, SnapTrack, and Qualcomm's fraud and misappropriation by claiming that Locate did not contribute any technology and that no Program Technology existed. However, SnapTrack and Qualcomm did not provide Locate access to any inventor notebooks or other information exclusively in their possession regarding any inventions or patent filings.   Greenhaus had promised to do so and then purposefully delayed in the hopes of bankrupting Gabriel.

119.    In October 2005, Qualcomm Senior Director Brian Salisbury again requested that Trace sign the Amended and Restated License Agreement.   He also reiterated Qualcomm's position that no SnapTrack patents were jointly owned by Locate.

120.    Over a period of years, Krasner, SnapTrack, and Qualcomm failed to disclose and actively misled Locate about the existence of Program Technology and related intellectual property filings.   When Gabriel attempted to discover whether and what Program Technology existed, Qualcomm refused to provide any information regarding Program Technology or related intellectual property filings and outright claimed that no Program Technology existed.   To date, Qualcomm has refused to provide information regarding patent filings on the grounds that such information is confidential and/or privileged.

121.    Despite SnapTrack and Qualcomm's false representations about the existence of Program Technology or any patents or patent applications based on Program Technology, Trace refused to sign the proposed Amended and Restated License Agreement, which had been prepared by SnapTrack and Qualcomm in an attempt to have Trace waive its intellectual property rights.

122.    Instead, Trace only agreed to sign an Amended and Restated License Agreement which preserved its intellectual property rights and its rights that had accrued under the original license agreement from August 20, 1999 through the January 16, 2006 effective date of the Amended and Restated License Agreement.

123.    As of January 16, 2006, SnapTrack and Trace entered into the Amended and Restated License Agreement.  At the time that Trace entered into the Amended and Restated License Agreement, Trace was not aware that SnapTrack had misappropriated Locate intellectual property and technology.

124.    Because Trace did not intend to waive its intellectual property rights and ownership interest in Program Technology, the Amended and Restated License Agreement includes provisions regarding the parties' proprietary rights.  Paragraph 8(a) of the Amended and Restated License Agreement states:

> Each party shall retain ownership of its respective Intellectual Property Rights that (i) its employees have developed or may in the future develop or (ii) it has acquired or will acquire in the future from others.  The parties acknowledge that certain provisions existed in the Prior License that addressed the joint ownership by the parties of certain technology.  Those provisions are incorporated by reference herein to the same extent as if repeated in this Agreement, as to any Program Technology (as such term is defined in the Prior License) developed prior to May 31, 2004.  The deletion of such joint ownership provisions herein shall have prospective effect and apply only to potential activities the parties have conducted or may conduct on or after May 31, 2004, but shall not affect the parties' underlying ownership rights in or to the Program Technology developed prior to May 31, 2004, or their ability to use such Program Technology without any duty of accounting to the other as contemplated by the Prior License for such Program Technology developed prior to May 31, 2004.

125.    Thereafter, Gabriel retained intellectual property counsel to review published patents and patent applications filed worldwide by Krasner, SnapTrack, and Qualcomm to determine whether any were based on Program Technology.  SnapTrack is listed as an assignee on 55 patents.  Qualcomm has filed approximately 6,500 U.S. patent applications and is listed as

an assignee on approximately 2,345 issued domestic patents, of which almost 2,000 issued during the last eight years.

126.    Over time, as the patents and patent applications discussed above matured and were published and Gabriel obtained access to them, Gabriel began reviewing these documents. Because Locate was no longer in business, Gabriel interviewed people familiar with Locate and its business as well as the business relationship with SnapTrack. Gabriel also searched for documents relating to Locate that may discuss Locate technology or inventions. Gabriel then compared this information against the patent filings in an effort to determine whether Locate contributed to these filings.

127.    Even without access to SnapTrack's purported inventors' notebooks and other materials that are in the possession of Krasner, SnapTrack, and Qualcomm, Gabriel discovered certain patents that incorporate Locate's pre-existing technology and jointly-owned Program Technology. However, defendants have exclusive control of important information, and defendants have refused to provide such information to Gabriel. Upon information and belief, other patents and patent applications in addition to those identified thus far likely incorporate Locate's pre-existing technology and jointly-owned Program Technology. Upon information and belief, Gabriel has uncovered preliminary evidence that indicates that Krasner and SnapTrack may have misappropriated other parties' intellectual property rights in a manner very similar to that used against Locate.

128.    Gabriel presented information concerning its intellectual property claims to Qualcomm and its Board of Directors in June 2007. To the best of Gabriel's knowledge, Qualcomm has taken no steps to correct the inventorship issues or otherwise address the misappropriation of Locate's technology and intellectual property.

PLAINTIFFS' FOURTH AMENDED COMPLAINT                                          PAGE 27 of 33
Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 29 of 88

**29**

129.    All conditions precedent to recovery have occurred.  Furthermore, Locate and Trace's employees, agents, and representatives have assigned all right, title, and interest in the subject intellectual property to Locate and Trace.

130.    Gabriel's claims are timely filed because: (1) the applicable statutes of limitations have not expired; (2) the parties entered into multiple tolling agreements; and/or (3) the doctrines of fraudulent concealment, discovery rule, equitable tolling, and/or equitable estoppel preclude defendants from raising statutes of limitations as a defense.

## V.  CAUSES OF ACTION

### COUNT TWO: Breach of the Amended and Restated License Agreement

131.    Gabriel repeats and realleges the allegations above.

132.    Trace and SnapTrack entered into the Amended and Restated License Agreement.

133.    Trace performed under the Amended and Restated License Agreement and/or was excused from not performing because of SnapTrack's prior material breaches.

134.    SnapTrack breached the Amended and Restated License Agreement when it, among other things, (1) took ownership of Locate's patents, trade secrets, copyrights, and other Intellectual Property Rights; (2) took and destroyed Locate's joint ownership interest in Program Technology; (3) failed to maintain the confidentiality of Locate's trade secrets and other confidential and proprietary information; (4) failed to establish a process for identifying all Program Technology Intellectual Property Rights; (5) failed to establish a process for determining which intellectual property filings to make with respect to such Program Technology; and (6) filed patent applications and patents without listing Locate as an assignee or Locate personnel as inventors.

135.   SnapTrack breached the Amended and Restated License Agreement in secret by, among other things, not disclosing its patent filings relating to both Locate's technology and Program Technology. The harm flowing from SnapTrack's breaches was not reasonably discovered by Gabriel until a future time as discussed above.

136.   As a result of SnapTrack's breaches, Gabriel has suffered damages for which it seeks recovery.

**COUNT FIVE: Correction of Inventorship (Pursuant to 35 U.S.C. § 256)**

137.   Gabriel repeats and realleges the allegations above.

138.   As discussed above, Krasner and representatives of SnapTrack and Qualcomm applied for and were issued U.S. Patents based on the representation that they were the inventors.

139.   This representation was false, because Krasner, SnapTrack, and Qualcomm failed to disclose that representatives of Locate conceived of claims in the patents and were the true inventors.

140.   At all relevant times, the true inventors, including Crowson and Clise, were without deceptive intent and were unaware of and played no role in any deception by Krasner, SnapTrack, and Qualcomm.

141.   Pursuant to 35 U.S.C. § 256, the patents should be corrected to reflect that representatives of Locate/Gabriel are the sole inventors or, at the very least, co-inventors. Pursuant to assignments from and agreements with these true inventors, Gabriel would be an owner/assignee of intellectual property developed by such inventors, including the subject patents.

**COUNT SIX: Declaratory Judgment Of Ownership Interest In The Patents (Pursuant to 28 U.S.C § 2201)**

142.   Gabriel repeats and realleges the allegations above.

143.     Gabriel seeks a declaratory judgment that Gabriel has an ownership interest in and to the above-listed patents.

144.     There is a substantial and continuing justiciable controversy between Gabriel and Krasner, SnapTrack, and Qualcomm as to Gabriel's ownership interest in and to the patents.

145.     A valid case and controversy exists sufficient for this Court to declare the rights and remedies of the parties, because there is a dispute between the parties as to the ownership of valuable technology and related patents.

146.     This controversy is ripe for determination at this time because the parties dispute ownership of valuable technology and related patents and because those patents have been issued by the USPTO.

147.     Representatives of Gabriel conceived of such technology and assigned all right, title, and interest in such technology to Gabriel.  Thus, Gabriel has the requisite standing to request this declaration.

148.     Krasner, SnapTrack, and Qualcomm utilized these contributions made by Gabriel without payment and/or acknowledgment of inventorship and ownership rights.

149.     To resolve this controversy, Gabriel requests that the Court declare the respective rights and duties of the parties in this matter and, in particular, that Gabriel is the owner of certain technology and patents.

**COUNT EIGHT: Misappropriation (Pursuant to California Uniform Trade Secrets Act)**

150.     Gabriel repeats and realleges the allegations above.

151.     Locate's confidential and proprietary information as well as Program Technology derived independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use.

152.    Gabriel's trade secrets and other proprietary confidential information includes Program Technology, enabling technology discussed above that was incorporated into patent filings by defendants, and Locate's experience and expertise in the field of narrowband, including solutions to problems in the telecommunication industry.

153.    Locate took reasonable efforts under the circumstances to maintain the secrecy of its confidential and proprietary information, such as the inclusion of confidentiality provisions in the License Agreement.

154.    Krasner, SnapTrack, and Qualcomm misappropriated Locate's confidential and proprietary information as well as Program Technology by (i) acquiring the information by improper means and (ii) disclosing or using the information without Locate's consent.

155.    As the direct and proximate result of Krasner, SnapTrack, and Qualcomm's misappropriation, Gabriel suffered actual loss for which it seeks recovery and seeks recovery of the unjust enrichment caused by the misappropriation.   In the alternative, Gabriel seeks a reasonable royalty.

156.    Because Krasner, SnapTrack, and Qualcomm willfully and maliciously misappropriated Locate's confidential and proprietary information, Gabriel is entitled to an award of exemplary damages and attorneys' fees and costs.

157.    Because its remedy at law is inadequate, Gabriel seeks injunctive relief to enjoin defendants' misappropriation.

## VI.  JURY REQUEST

158.    Gabriel requests a jury trial on all issues so triable.

# VII.  REQUEST FOR RELIEF

159.    WHEREFORE Gabriel Technologies Corporation and Trace Technologies, LLC respectfully request that the Court:

A.    Enter judgment against Krasner, SnapTrack, and Qualcomm for actual, consequential, and compensatory damages suffered by Gabriel in an amount exceeding $1 billion;

B.    Enter judgment against Krasner, SnapTrack, and Qualcomm for exemplary damages;

C.    Enter judgment correcting ownership and inventorship of the patents and order the USPTO to so correct ownership and inventorship;

D.    Enter declaratory judgment that Gabriel is the owner of certain technology and patents discussed above;

E.    Enter judgment finding infringement by SnapTrack and/or Qualcomm of Gabriel's patents;

F.    Enter preliminary and permanent injunctive relief preventing Krasner, SnapTrack, and Qualcomm from using Gabriel's confidential and proprietary information, technology, and patents;

G.    Award Gabriel attorneys' fees and costs;

H.    Award Gabriel pre-judgment and post-judgment interest at the highest rates allowed by law; and

I.    Grant Gabriel such other and further relief to which it may be entitled at law or equity.

Dated: January 11, 2010                     Respectfully submitted,


                                            By: */s/ John van Loben Sels*
                                                John D. van Loben Sels
                                                State Bar No. 201354
                                                **WANG, HARTMANN, GIBBS & CAULEY, P.L.C.**
                                                2750 W. El Camino Real, Suite 440
                                                Mountain View, California 94040
                                                Telephone: (650) 209-1230
                                                Facsimile:  (650) 209-1231


                                                **COUNSEL FOR PLAINTIFFS GABRIEL
                                                TECHNOLOGIES CORPORATION AND
                                                TRACE TECHNOLOGIES, LLC**


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 11, 2010, a true and correct copy of Plaintiffs' Fourth Amended Complaint was served on Defendants' counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909, via the Court's CM/ECF system.


                                                */s/ John van Loben Sels*
                                                John D. van Loben Sels

1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  GABRIEL TECHNOLOGIES | CASE NO. 08 CV 1992 MMA (POR) |
| 12  CORPORATION and TRACE TECHNOLOGIES, LLC, | **ORDER GRANTING IN PART AND DENYING IN PART** |
| 13                          Plaintiffs, | **DEFENDANTS' MOTION FOR BOND** |
| 14            vs. | [Doc. No. 81] |
| 15  QUALCOMM INCORPORATED, SNAPTRACK, INC., and NORMAN | |
| 16  KRASNER, | |
| 17                          Defendants. | |

18          Currently before the Court is Defendants' motion for a bond pursuant to California Code of

19   Civil Procedure section 1030.  [Doc. No. 81.]  Plaintiffs filed an opposition to the motion on

20   August 2, 2010[1] [Doc. No. 90], and Defendants submitted their reply brief on August 23 [Doc. No.

21   105].  On September 7, the Court heard oral argument.  For the reasons set forth below, the Court

22   affirms its tentative decision to **GRANT IN PART** and **DENY IN PART** Defendants' motion for

23   a bond.

24

25   / / /

26

27          [1] Plaintiffs filed their memorandum of points and authorities in support of their opposition to
28   Defendants' motion for bond, under seal.  After careful review, the Court concludes the entire
     document need not be sealed.  Accordingly, the Clerk of Court is **INSTRUCTED** to **UNSEAL**
     Plaintiffs' opposition [Doc. No. 93], *except* for pages 2-5 and 13-15, which contain confidential
     information; these seven pages shall be redacted from the public version and remain under seal.

## BACKGROUND

1

2          This action arises out of events related to technology licenses and related joint ventures

3   between Plaintiffs and their predecessor in interest, and Defendants, commencing in 1998.

4   Plaintiff Gabriel Technologies Corporation ("Gabriel") is a publicly-traded corporation focused on

5   technologies related to asset tracking and physical security.  [Doc. No. 53, *Fourth Am. Compl.*

6   *("FAC")*, ¶12.]  Gabriel is organized pursuant to the laws of Delaware, with its principal place of

7   business in Omaha, Nebraska.  [*Id*. at ¶5.]  Gabriel and Loc8.net a/k/a Locate Networks, Inc.

8   ("Locate"),[2] a predecessor-in-interest to Gabriel, created Trace Technologies as a joint venture.

9   [*Id*. at ¶¶2, 14.]  Trace is a wholly-owned subsidiary of Gabriel, and is a limited liability company

10  organized under the laws of Nevada.  [*Id*. at ¶6.]

11         In late 1998, the founders of Locate, Richard Crowson and William Clise, started

12  discussing joint development projects with Defendants Norman Krasner and SnapTrack.  [*Id*. at

13  ¶15.]  Locate focused on location determining devices and location-based services; SnapTrack

14  developed broadband network and assisted Global Positioning System ("aGPS") technology.  [*Id*.

15  at ¶¶12, 19.]  On August 20, 1999, SnapTrack and Locate entered into a license agreement ("1999

16  Agreement").  [*Id*. at ¶23.]  The 1999 Agreement set forth the terms under which Locate obtained

17  from SnapTrack a license to use SnapTrack's aGPS software in exchange for paying SnapTrack

18  licensing and royalty fees.  [*Id*. at ¶25.]  The parties also agreed to jointly own "Program

19  Technology," defined as work product carried out by the parties in connection with the 1999

20  Agreement, and identified as Program Technology in the agreement.  [*Id*. at ¶¶23, 28.]  Plaintiffs

21  allege that SnapTrack and Krasner used the relationship created by the 1999 Agreement to obtain

22  millions of dollars from Locate to keep SnapTrack afloat while negotiating a billion dollar buyout

23  of SnapTrack.  [*Id*. at ¶2.]

24         In March 2000, Qualcomm acquired SnapTrack for $1 billion, stating in its press release

25  that "SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS

26  System."  [*Id*. at ¶46.]  Qualcomm is a Delaware corporation, with its principal place of business

27  in California.  [*Id*. ¶7.]

28

---

[2] Locate is a Washington corporation.  [*Id*. at ¶13.]

1    In 2004, Locate sold its assets to Trace, transferred its interest in Trace to Gabriel, and

2    went out of business.  [*Id*. at ¶14.]  Defendants then presented Trace, the successor in interest to

3    Locate's assets, with a proposed amended license agreement.  [*Id*. at ¶110.]  Defendants claimed

4    that no joint Program Technology existed under the 1999 Agreement.  [*Id*. at ¶11.]   As such, the

5    proposed amended license agreement deleted the relevant section of the 1999 Agreement which

6    stated that "[a]ll Program Technology was jointly owned by the parties."  [*Id*. at ¶112.]  On

7    January 16, 2006, Trace and Defendants entered into the amended license agreement ("2006

8    Agreement" or "Amended and Restated License Agreement").  [*Id*. at ¶123.]  Plaintiffs state that at

9    the time, Trace was not aware SnapTrack had misappropriated Locate's intellectual property and

10   technology.  [*Id*.]  Plaintiffs further assert that Krasner secretly filed and obtained numerous

11   patents based on Locate's technology, which he was able to access when the parties entered into

12   the 1999 Agreement.  [*Id*. at ¶111.]  Once Qualcomm acquired SnapTrack, Plaintiffs assert that

13   Qualcomm continued filing patents based on Locate's technology.  [*Id*. at ¶¶111, 120.]  Plaintiffs

14   allege that at least 92 U.S. and foreign patents and patent applications filed by Krasner and

15   Qualcomm should list Locate employees as the sole inventors, or at least joint inventors. [*Id*. at

16   ¶62.]

17   Over time, as the patents became publicly available, Plaintiffs discovered certain patents

18   that incorporate Locate's pre-existing technology and jointly owned Program Technology.   [*Id*. at

19   ¶126.]  Plaintiffs approached Qualcomm with these claims in June 2007, and were ignored by

20   Qualcomm's Board of Directors.  [*Id*. at ¶128.]  Upon continuing investigation, Plaintiffs filed this

21   lawsuit, seeking over $1 billion in damages.  [*Id*. at ¶159.]

22   In the Fourth Amended Complaint, Plaintiffs assert claims for: (1) Breach of the Amended

23   and Restated License Agreement; (2) Correction of Inventorship (pursuant to 35 U.S.C. § 256); (3)

24   Declaratory Judgment of Ownership Interest in the Patents (pursuant to 28 U.S.C. § 2201); and (4)

25   Misappropriation (pursuant to Cal. Uniform Trade Secrets Act).  On August 13, 2010, the Court

26   denied Plaintiffs' motion for leave to file a fifth amended complaint, which sought to add a

27   fraudulent concealment claim.  [Doc. No. 104.]

28   / / /

- 3 -                                                      08cv1992

1    On July 2, 2010, Defendants filed the pending motion for a cost bond under California

2  Code of Civil Procedure section 1030.  [Doc. No. 81.]  The Court also has authority under Civil

3  Local Rule 65.1.2(a) to require Plaintiffs to post a bond "where authorized by law and for good

4  cause shown."

5                              **LEGAL STANDARD**

6    The Federal Rules of Civil Procedure do not contain a provision governing cost bonds or

7  other means for securing costs.  *See generally* Fed. R. Civ. Proc.; *see also Simulnet East Assocs. v.*

8  *Ramada Hotel Operating Co*., 37 F.3d 573, 574 (9th Cir. 1994).  "However, the federal district

9  courts have inherent power to require plaintiffs to post security for costs. . . . Typically federal

10  courts, either by rule or by case-to-case determination, follow the forum state's practice with

11  regard to security for costs, as they did prior to the federal rules; this is especially common when a

12  non-resident party is involved."  *Simulnet*, 37 F.3d at 574 (9th Cir. 1994); *see also Plata v. Darbun*

13  *Enterprises, Inc.*, 2009 U.S. Dist. LEXIS 89608 *33-37 (S.D. Cal.) ("federal courts have inherent

14  authority to require plaintiffs to post security for costs").  Here, the forum state's statute regarding

15  imposition of a cost bond is California Code of Civil Procedure section 1030.  Under section 1030,

16  a defendant may move the court to issue a cost bond against a plaintiff who resides outside of

17  California, or, is a foreign corporation.  The defendant must also demonstrate that there is "a

18  reasonable possibility . . . [it] will obtain judgment in the action . . ."  Cal. Civ. Proc. Code § 1030.

19  California state courts describe the purpose of section 1030 as a way to assist California

20  defendants to "secure costs in light of the difficulty of enforcing a judgment for costs against a

21  person who is not within the court's jurisdiction."  *Shannon v. Sims Serv. Center*, 164 Cal. App. 3d

22  907, 913 (1985).

23    To determine whether imposition of a cost bond is appropriate under section 1030, courts

24  in the Ninth Circuit consider the following factors: "(i) the degree of probability/improbability of

25  success on the merits, and the background and purpose of the suit; (ii) the reasonable extent of the

26  security to be posted, if any, viewed from the defendant's perspective; and (iii) the reasonable

27  extent of the security to be posted, if any, viewed from the nondomiciliary plaintiff's perspective."

28  *Simulnet*, 37 F.3d at 576 (citations omitted).  Courts may also consider the absence of attachable

1   property within the district, the conduct of the parties, and the plaintiff's ability to post the bond.

2   *Id.* "While it is neither unjust nor unreasonable to expect a suitor 'to put his money where his

3   mouth is,' toll-booths cannot be placed across the courthouse doors in a haphazard fashion." *Id.*

4   (internal citation omitted).

5                                    **DISCUSSION**

6          Defendants assert a bond is warranted under section 1030 because they have a "reasonable

7   possibility" of defeating each of Plaintiffs' causes of action, and, they are concerned that Plaintiffs

8   will be insolvent by the time judgment is entered, prohibiting Defendants from recouping the fees

9   and costs to which they will be entitled.  Defendants describe Gabriel and its wholly-owned

10  subsidiary Trace as "shell companies with no business, no products, and no revenue." [Doc. No.

11  81 at p.1.]  Plaintiffs admit they are no longer operating. [Doc. No. 93, p.21.]  Defendants also

12  offer evidence that Plaintiffs have, to this point, financed this litigation by soliciting nearly six

13  million dollars from investors, which is now gone.  [*See* Doc. No. 81, p.3 (internal citations

14  omitted).]  Defendants further point out they have successfully defeated seven of Plaintiffs' claims

15  on motions to dismiss, and argue that Plaintiffs have yet to produce any facts during discovery to

16  support their remaining causes of action.  [*Id.* at p.1.]  Accordingly, Defendants seek a cost bond

17  under section 1030 so that they are not forced to spend millions of dollars defending against

18  Plaintiffs' meritless allegations, only to succeed against an insolvent company.

19         Plaintiffs oppose Defendants' motion on the ground that Gabriel is no longer an out-of-

20  state plaintiff, as it recently relocated its principal place of business to Northern California.  [Doc.

21  No. 93, p.8.]  In addition, Plaintiffs argue each of their claims is meritorious.  [*Id.* at p.9-10.]

22  **I.   PLAINTIFFS' RESIDENCY OR STATUS AS A FOREIGN CORPORATION**

23         The first requirement under California Code of Civil Procedure section 1030 is that the

24  plaintiff resides out-of-state, or, is a foreign corporation.  Cal. Civ. Proc. Code § 1030(a).  In the

25  FAC, Plaintiff Gabriel alleges it is a Delaware corporation, with its principal place of business in

26  Omaha, Nebraska.  [FAC, ¶5.]  Gabriel's formation and residency outside of California satisfies

27  the first requirement of section 1030.

28  / / /

1    Plaintiffs assert, however, that Gabriel recently relocated its primary place of business to

2    northern California on July 16, 2010, which takes Gabriel outside the reach of section 1030.  [Doc.

3    No. 93, p.8.]  Defendants argue Plaintiffs' purported relocation is a farce, as it did not take place

4    until after Defendants filed their motion for bond.  In response, Plaintiffs admit they moved

5    Gabriel's office while Defendants' motion was pending, but that Gabriel's board of directors

6    authorized the move in May 2010.  [*Id*.]  Plaintiffs provide minutes from that board of directors

7    meeting, during which Gabriel's board purportedly authorized the company to relocate its primary

8    place of business from Omaha, Nebraska to San Francisco, California.  [*Id*.; Doc. No. 90-6,

9    Affidavit of George Tingo, ¶7; Exhibit 2 (Minutes).]  The applicable portion of the minutes states,

10   "the next order of business was the authorization of the hiring of a contract administrative assistant

11   and leasing of an office space in San Francisco, California at the cost of no more than $2,500 per

12   month each for the administrative assistant and the office."  [Tingo Affidavit, Exhibit 2 at p.2.]

13   The minutes make no reference to relocating Gabriel's primary place of business.

14   In addition, Defendants correctly note that the lease agreement Plaintiffs provide as

15   evidence of the relocation is for a *residential* property.  [Tingo Affidavit, Exhibit 1.]  Indeed, the

16   express terms of the "Residential Tenancy Agreement" state that, "[t]he Premises shall be used as

17   a permanent, full-time dwelling for residential purposes only and for no other reason.  No retail or

18   commercial or professional use of the Premises shall be made unless such use conforms to

19   applicable zoning laws and the prior written consent of Owner is obtained in advance of such

20   proposed use."  [*Id*. at ¶11.]  At the hearing, Plaintiffs admitted they leased a residential unit to

21   house Gabriel's headquarters, but insisted they had obtained consent from the Owner to utilize the

22   space for commercial purposes.  [*Rough Transcript*, p.41]  Plaintiffs, however, did not provide

23   evidence of the alleged consent.  Defendants argue the board minutes and residential lease

24   agreement do not support Plaintiffs' assertion that Gabriel moved its primary place of business to

25   California.  The Court agrees.

26   Plaintiffs have not produced credible evidence that Gabriel relocated its primary place of

27   business to California.  At best, the board minutes suggest Gabriel was authorized to lease space

28   for an additional office to be located in San Francisco, as there is no mention of moving the

1   Omaha office, nor relocating Gabriel's headquarters.  The Court acknowledges that George

2   Tingo's declaration[3] states the board approved the decision to move Gabriel's headquarters to San

3   Francisco in May 2010.  [Tingo Affidavit ¶7.]  Yet, for the reasons discussed above, the minutes

4   themselves contradict this assertion.  In addition, copies of Gabriel's company website obtained on

5   August 18, 2010, indicate Gabriel was still publically representing that its corporate headquarters

6   was located in Omaha, more than one month after the alleged move.

7        Plaintiffs' also assert a bond is improper because Gabriel's presence in California is

8   inconsistent with section 1030's purpose, to protect California residents from being unable to

9   enforce judgments against out-of-state plaintiffs.  The Court disagrees.  Although Mr. Tingo's

10  declaration indicates that "substantially all of [Gabriel's] assets are located in California," he does

11  not identify any assets in the forum.  Thus, Gabriel has no known assets in California, and the

12  purpose of section 1030 remains relevant and weighs in Defendants' favor.  For purposes of the

13  pending motion, the Court concludes Gabriel is an out-of-state plaintiff within the meaning of

14  section 1030, and does not address whether Gabriel is also a foreign corporation.  In addition, the

15  Court notes Gabriel's residency is not dispositive, as it has inherent authority under Local Rule

16  65.1.2 to require Plaintiffs to post a bond if good cause is shown.

17  **II.    LIKELIHOOD OF SUCCESS ON THE MERITS**

18         **(A)    DEFENDANTS' BURDEN**

19        Next, the Court considers whether Defendants have demonstrated a reasonable possibility

20  of success on the merits.  *See* Cal. Civ. Proc. Code § 1030(b).  Plaintiffs argue that to satisfy this

21  burden, Defendants must "substantially refute" each of Plaintiffs' claims.  [Doc. No. 93, p.10.]

22  Plaintiffs are mistaken for two reasons.  First, the plain language of section 1030 states a defendant

23  moving to impose a cost bond must show that it has a "reasonable possibility" of obtaining a

24  judgment in its favor.  Cal. Civ. Proc. Code § 1030(b).  The higher burden proposed by Plaintiffs

25  contradicts the clear language of the statute.  Second, the term "substantially refute" appears only

26

27  ────────────────

28      [3] George Tingo is the Chief Executive Officer and President of Gabriel, and the manager of
    its subsidiary Trace.  [Tingo Affidavit, ¶7.]  Mr. Tingo is Gabriel's sole officer.  [*Id*. at ¶3.]

1   in a single case cited by Plaintiffs—*A. Farber & Partners, Inc. v. Garber*, 417 F. Supp. 2d 1143,

2   1148 (C.D. Cal. 2006)—which misquotes an unpublished opinion.

3           In *Farber*, the court denied the defendants' motion for a cost bond because they "presented

4   absolutely no competent evidence showing a 'reasonable possibility' they will obtain judgment in

5   this action." *Id*. at 1147.  There, the defendants asserted they had a reasonable possibility of

6   defeating plaintiff's claims because they raised an unclean hands affirmative defense in their

7   answer, the plaintiff was unable to obtain a temporary restraining order, and one of the defendants

8   took and passed a polygraph test.  *Id*. at 1147.  Such "evidence" was not sufficient.  The court

9   explained, "no reasonable inference regarding the merits of the . . . defendants' case can be drawn

10  from plaintiff's failure to obtain a temporary restraining order on an ex parte basis," plaintiff

11  survived a motion to dismiss which suggests "plaintiff has not acted vexatiously in bringing this

12  litigation," and it is unclear whether a polygraph would be admitted at trial because courts have

13  broad discretion to reject this type of evidence. *Id*. at 1146-48.  In closing, the court held: "For the

14  reasons discussed above, at this early stage of the trial proceedings, the court cannot conclude that

15  defendants have a reasonable possibility of obtaining a judgment on the merits because defendants

16  have not argued or offered evidence to ***substantially*** refute plaintiff's claims." *Id*. at 1148

17  (internal marks omitted) (emphasis added) (quoting *Ismart Int'l Ltd. v. I-DocSecure, LLC*, 2005

18  WL 588607 *9 (N.D. Cal.).  In the *Ismart* case, however, the court actually held that, "[a]t this

19  early stage of the trial proceedings, the court cannot conclude . . . defendants have a reasonable

20  possibility of obtaining a judgment on the merits because defendants have not argued or offered

21  evidence to ***substantively*** refute ISM's claims."  *Ismart*, 2005 WL 588607 at *9 (emphasis added).

22  Thus, the higher standard Plaintiffs urge this Court to apply is the result of an inadvertent

23  typographical error, not a deliberate decision to increase the burden imposed by California Code of

24  Civil Procedure section 1030.[4]

_____

26          [4] In addition, *Ismart* is factually inapposite, as the defendant brought its motion for bond in
    connection with a motion to dismiss.  *Id*. at *8.  The defendant sought a cost bond on the ground that
27  the plaintiff had not sufficiently pled a valid cause of action; the defendant did not offer evidence  to
    refute the plaintiff's allegations.  *Id*.  Conversely, here, Defendants do more than argue Plaintiffs'
28  claims are facially deficient; Defendants offer substantial affirmative evidence to rebut each of
    Plaintiffs' claims.

- 8 -                                    08cv1992

1    To satisfy the requirements of section 1030, Defendants must produce sufficient evidence

2    to demonstrate they have a "reasonable possibility" of defeating each of Plaintiffs' claims, but no

3    more.  Cal. Civ. Proc. Code § 1030(b); *Kourtis v. Cameron*, 358 Fed. Appx. 863, 866 (9th Cir.

4    2009).  The Court agrees with Plaintiffs that this burden requires Defendants to do more than

5    simply raise possible defenses.  However, Defendants have provided affirmative evidence in

6    support of each defense, which for the reasons explained below, is sufficient to demonstrate a

7    reasonable possibility of success on the merits.[5]

8

9    **(B)    CORRECTION OF INVENTORSHIP / DECLARATORY JUDGMENT OF OWNERSHIP INTEREST IN THE PATENTS (COUNTS FIVE AND SIX)**

10    Defendants assert they have a reasonable possibility of prevailing against Plaintiffs' claims

11    to correct the named inventors on approximately 92 patents, because the law presumes the named

12    inventors are correct, and Plaintiffs have offered no evidence to rebut this presumption.  [Doc. No.

13    81, p.5-7.]  "The Patent Act accords each patent a presumption of validity.  35 U.S.C. § 282.

14    Under this doctrine, each patent also receives the presumption that its named inventors are the true

15    and only inventors."  *Acromed Corp. v. Sofamor Danek Group*, 253 F.3d 1371 (Fed. Cir. 2001)

16    (citing *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)).

17    Therefore, to rebut the presumption, Plaintiffs must present "clear and convincing evidence that

18    the omitted individual actually invented the claimed invention."  *Id.* (citing *Environ. Prods. v.

19    Furon Co.*, 215 F.3d 1261, 1265 (Fed. Cir. 2000)).  To satisfy the clear and convincing standard,

20    Plaintiffs must offer more than the alleged co-inventor's testimony that he or she conceived the

21    technology at issue or otherwise contributed to the patent.  *Linear Tech. Corp. v. Impala Linear

22    Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004).  "Reliable evidence of corroboration preferably

23    comes in the form of records made contemporaneously with the inventive process."  *Id.*

24

25

26    _____

27    [5] Plaintiffs also argue *Plata v. Darbun Enterprises, LLC*, 2009 U.S. Dist. LEXIS 89608 (S.D. Cal.), *Farber*, 417 F. Supp. 2d 1143, and *Ismart*, 2005 WL 588607, require Defendants to demonstrate Plaintiffs' claims are frivolous to warrant imposition of a bond.  Plaintiffs are mistaken.  None of these

28    cases *require* defendants to demonstrate frivolousness as a prerequisite to a cost bond.  Rather, the courts acknowledged frivolousness and vexatiousness as factors that bear on the court's analysis.

1    Here, Plaintiffs direct the Court to their discovery responses in which they identify multiple

2    inventors whom Defendants allegedly omitted from several patents, including broad summaries of

3    the purported contributions by the omitted inventors.  [*See* Doc. Nos. 97-98, Declaration of

4    Gregory M. Williams, Exhibits 7, 8.]  Plaintiffs also submit a declaration from one of the allegedly

5    omitted inventors, William Clise, who is the co-founder of Locate and was its Chief Technology

6    Officer from 1999 through 2004.  [*See* Doc. No. 94, Declaration of William Clise.]  As Defendants

7    correctly note, however, Mr. Clise's declaration speaks in generalities regarding various purported

8    technological advancements achieved by Locate.  [Doc. No. 81, p.6.]  Mr. Clise does not state he

9    invented any of the inventions contained in the patents at issue, nor does he indicate when or how

10   he contributed to any specific claims in those patents.  [*See* Doc. No.  94.]  As such, in the absence

11   of evidence linking specific Locate technology to particular claims in the patents at issue, the

12   Court finds that Defendants have demonstrated a reasonable possibility of prevailing on the merits.

13   In other words, Plaintiffs have not provided evidence that suggests they will be able to meet their

14   burden at trial by rebutting the presumption that the inventors named on the patents are correct.

15   While Plaintiffs need not actually rebut the presumption at this stage of the case, they do need to

16   provide evidence that contains sufficient detail linking specific inventors to identifiable

17   technologies and claims in the patents, such that it is reasonable to infer Plaintiffs will be able to

18   rebut the presumption at trial.[6]  Plaintiffs' generalized descriptions of Locate technologies, coupled

19   with excerpts from only two of the more than 92 patents Plaintiffs desire to correct is not

20   sufficient.  Because the law imposes a presumption in Defendants' favor, and Plaintiffs have not

21   presented evidence that calls that presumption into question, Defendants have adequately shown

22   they have a reasonable possibility of defeating Plaintiffs' correction of ownership claims.

23          **(C)    BREACH OF AMENDED AND RESTATED LICENSE AGREEMENT (COUNT TWO)**

24   Plaintiffs allege Defendant SnapTrack breached the Amended and Restated License

25   Agreement when it: "(1) took ownership of Locate's patents, trade secrets, copyrights, and other

26   _____

27   [6] The Court further notes that although the parties are in a fairly early stage of discovery,
     Plaintiffs have been investigating and pursuing their claims against Defendants since at least late
28   2007; before filing the present action in October 2008, the parties entered a series of tolling
     agreements that ultimately expired in September 2008.

- 10 -                                                    08cv1992

1   Intellectual Property Rights; (2) took and destroyed Locate's joint ownership interest in Program

2   Technology; (3) failed to maintain the confidentiality of Locate's trade secrets and other

3   confidential and proprietary information; (4) failed to establish a process for identifying all

4   Program Technology Intellectual Property Rights; (5) failed to establish a process for

5   determining which intellectual property filings to make with respect to such Program

6   Technology; and (6) filed patent applications and patents without listing Locate as an assignee or

7   Locate personnel as inventors." [FAC, ¶134.]  Defendants argue they have a reasonable

8   possibility of defeating Plaintiffs' breach of contract claim for three reasons: (1) there was no

9   Program Technology so Defendants could not have breached a purported duty to establish a

10  process for determining which intellectual property filings to make with respect to non-existent

11  Program Technology; (2) even if Program Technology existed and Defendants breached their duty

12  to establish such a process, Plaintiffs waived their right to assert a breach when they entered the

13  2006 Agreement, which reaffirmed the challenged provisions; and (3) because Plaintiffs have not

14  identified evidence that demonstrates they invented or contributed to the Qualcomm patents at

15  issue, they necessarily cannot show that Defendants breached the 2006 Agreement by

16  misappropriating Plaintiffs' confidential and proprietary information.  [Doc. No. 81, p.6-10.]  The

17  Court addresses each of Defendants' arguments in turn.

18       First, Defendants assert the "[1999] Agreement does not state that Program Technology

19  did, in fact, exist.  Rather, the Agreement expressly provided and anticipated that *if Program*

20  *Technology items of work existed,* the parties would identify them in Exhibit B."  [*Id*. at p.8

21  (emphasis in original).]  Consequently, because no Program technology was ever identified in

22  Exhibit B, Defendants had no obligation to establish a process for determining which intellectual

23  property filings to make with respect to Program Technology.[7]  [*Id*.]  Plaintiffs interpret the terms

24  of the 1999 Agreement differently, arguing that the absence of any items specifically identified in

25  Exhibit B as Program Technology is inapposite.  Plaintiffs assert the 1999 Agreement defined

26

27

28      [7] Section 8(b) of the 1999 Agreement imposes a duty on the parties, not just Defendants, to "establish a process for identifying all Program Technology Intellectual Property Rights."  [Doc. No. 95.]

- 11 -

08cv1992

1  Program Technology as "work carried out by the parties in connection with this Agreement that

2  are identified as Program Technology in the Project Plan [Exhibit B] . . .[Thus, by] implication, the

3  technology to be developed that is discussed in the Project Plan[,] and not otherwise exempted[,] is

4  Program Technology."  [Doc. No. 93, p.17.]

5          When interpreting a contract, the Court first looks to the plain meaning of the language

6  used.  Cal. Civ. Code § 1638.  Here, the parties specifically define "Program Technology" on page

7  two of the 1999 Agreement as "those items of work carried out by the parties in connection with

8  this Agreement *that are identified as Program Technology* in the Project Plan." [*See* Doc. No. 95,

9  p.2 (emphasis added).]  The Project Plan (Exhibit B), identifies several broad categories or stages

10  of development largely dealing with the parties' respective obligations to test and accept certain

11  technologies.  [*Id*. at p.16-22.]  Nowhere, does the Project Plan identify any "items of work" as

12  "Program Technology."  Thus, applying the plain meaning of the definition created by the parties,

13  if there are no items of work identified as Program Technology in the Project Plan (Exhibit

14  B)—which there are not—there is no Program Technology.  Moreover, Plaintiffs' interpretation is

15  contrary to the definition of Program Technology provided in the agreement—"those items of

16  work carried out by the parties in connection with this Agreement *that are identified as Program*

17  *Technology* in the Project Plan."  [*Id*. at p.2 (emphasis added).]  If Plaintiffs' definition were

18  intended, the words "as Program Technology" would have been unnecessary; the definition,

19  instead, would have read, "those items of work carried out by the parties in connection with this

20  Agreement that are identified in the Project Plan."   Accordingly, Defendants have demonstrated a

21  reasonable possibility of defeating Plaintiffs' breach of contract claims based on Defendants'

22  alleged failure to develop processes with respect to the non-existent Program Technology.

23          Second, Defendants argue Plaintiffs waived any breach of contract claim based on Program

24  Technology when they entered the Restated and Amended License Agreement in 2006.  [Doc. No.

25  81, p.9-10.]  Plaintiffs summarily dismiss Defendants' waiver argument, stating only that it

26  "suffers from all the flaws of Defendants' initial contentions.  It rests on the faulty notion that the

27  parties did not identify any potential Program Technology and ignores both SnapTrack's

28  misrepresentations to Locate with respect to Program Technology and Plaintiffs' claims with

1    respect to Locate's confidential information." [Doc. No. 93, p.18.] The Court, however,

2    concludes Defendants' waiver argument has merit.

3           "California courts will find waiver when a . . . party's acts are so inconsistent with an intent

4    to enforce the right as to induce a reasonable belief that such right has been relinquished." *Waller*

5    *v. Truck Ins. Exchange*, 11 Cal. 4th 1, 33-34 (1995). In 2006, the parties entered the Amended and

6    Restated License Agreement, which explicitly incorporated the Project Plan (Exhibit B) from the

7    1999 Agreement. [Doc. No. 96, p.4.] In addition, the 2006 Agreement also explicitly

8    incorporated by reference the provisions of the 1999 Agreement regarding the Program

9    Technology. [*Id.* at ¶8.] Plaintiffs retained counsel prior to entering the 2006 Agreement. [*See,*

10   *e.g.,* FAC, ¶117.] Plaintiffs knew no Program Technology was identified in the 1999 Agreement,

11   and that the parties had not established a "procedure" for determining the intellectual property

12   rights in any such technology. [*See id.* at ¶116.] Indeed, Plaintiffs allege they inquired of

13   Defendants "whether any Program Technology or related intellectual property filings existed."

14   [*Id.*] Nevertheless, Plaintiffs executed the 2006 Agreement, which reaffirmed the provisions

15   Plaintiffs challenge now. These actions by Plaintiffs are inconsistent with their alleged belief that

16   Defendants did not meet their obligations with respect to Program Technology. Defendants have

17   demonstrated a reasonable possibility that Plaintiffs waived any such claim when they entered the

18   2006 Agreement.

19          Third, Defendants argue that to the extent Plaintiffs' breach of contract claim is based on

20   Defendants' failure to include Locate inventors on numerous patents, it must fail because Plaintiffs

21   have not identified evidence linking Locate inventors to the patent claims in any meaningful way.

22   [*Id.* at p.6-7.] The Court agrees. As discussed in more detail above, given the absence of evidence

23   demonstrating what specific Locate technology appears in Qualcomm's patents, Defendants have a

24   reasonable possibility of defeating a breach of contract claim based on misappropriation and

25   failure to protect Locate's confidential information.

26          **(D)    MISAPPROPRIATION (COUNT EIGHT)**

27          Plaintiffs allege Defendants utilized and disclosed Locate's confidential and proprietary

28   information, as well as jointly-owned Program Technology, without Locate's knowledge or

consent.  [FAC, ¶154.]  Defendants argue they have a reasonable possibility of defeating

Plaintiffs' misappropriation claims because they are barred by the applicable three-year statute of

limitation.  [Doc. No. 81, p.10-12.]

To state a cause of action for misappropriation of trade secrets under the California

Uniform Trade Secrets Act ("CUTSA"), Plaintiffs must establish two elements: (1) the existence

of a trade secret, and (2) misappropriation of the trade secret.  *AccuImage Diagnostics Corp. v.*

*Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003).  Misappropriation occurs if the

defendants utilize or disclose the plaintiff's trade secrets without the plaintiff's permission.  *See*

Cal. Civ. Code § 3426.1(b).  An action for misappropriation under CUTSA must be brought within

three years after the misappropriation is discovered, or by the exercise of reasonable diligence

should have been discovered.  *Id.* at § 3426.6.  The statute of limitation is triggered when the

plaintiff has reason to "suspect that a type of wrongdoing has injured him."  *Fox v. Ethicon Endo-*

*Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005).

Plaintiffs' misappropriation claims are based, in large part, on the allegation that

Defendants acquired Locate's confidential information and began to use it for their own benefit

during the co-development period in 1999 and 2000.  For example, the FAC asserts Defendants

misappropriated Locate's technology in March 1999.  [FAC, ¶55.]  In Plaintiffs' fifth amended

complaint, which has since been stricken, they elaborated on Defendants' misconduct during this

period, alleging that "at various times during the co-development period in 1999 to 2001, William

Clise . . . and other Locate employees inquired into the patentability of various innovations

conceived, collaborated, or otherwise developed as part of the co-development agreement between

Locate and SnapTrack.  In response to Locate's inquiries . . . Locate employees were told that the

innovations had already been disclosed in patents owned by SnapTrack."  [Doc. No. 72-2 (Exhibit

A), *Fifth Am. Comp.*, ¶160.]  Defendants argue that based on their alleged response to Locate's

inquiries regarding the patentability of certain technologies, Plaintiffs had reason to suspect

Defendants were misusing Locate's technology and confidential information for their own benefit

approximately nine years before Plaintiffs filed this action in late 2008.  [Doc. No. 81, p.11.]

Although the parties entered a series of tolling agreements before the complaint was filed, the

1   agreements only tolled the statute of limitation from November 30, 2007 to September 1, 2008; the

2   statute of limitation on Plaintiffs' misappropriation claim had already expired.  [*Id.*]

3        In response, Plaintiffs again summarily dismiss Defendants' statute of limitation argument,

4   asserting only that "[a]s explained previously, this [statute of limitation] argument is untenable,

5   resting entirely on a distortion of Plaintiffs' proposed Fifth Amended Complaint."  [Doc. No. 93,

6   p.18-19.]  Plaintiffs refer the Court to their reply brief submitted in support of their motion for

7   leave to file the fifth amended complaint.  [*Id.* at p.19.]  There, Plaintiffs argue the allegations

8   regarding inquiries by Locate "only state[] that Mr. Clise inquired at various times whether the

9   jointly-owned advancements achieved in the parties' 1999-2001 co-development program were

10  patentable and was informed that those inventions were already embodied in SnapTrack patents

11  obtained prior to working with Locate. . . . [At no time however, did Defendants inform] Mr. Clise

12  that SnapTrack and/or Qualcomm had taken information and filed patent applications regarding

13  the inventions arising from the co-development program without Locate's permission or

14  assistance."  [Doc. No. 89, p.3.]  In essence, Plaintiffs admit they asked Defendants whether

15  certain technology could be patented, and Defendants responded that they already owned and

16  patented the technology themselves.  Mr. Clise's question—whether the jointly-owned

17  advancements created during the co-development period in 1999 and 2001 was

18  patentable—indicates he assumed certain technology was jointly owned.  Thus, when Defendants

19  responded to Mr. Clise's inquiry by stating that the technology at issue had already been disclosed

20  in patents owned by Defendants, Mr. Clise had reason to suspect that Defendants were

21  misappropriating Plaintiffs' technology discussed during the co-development period.  That

22  Defendants did not inform Mr. Clise they were using the technology arising from the co-

23  development efforts without Locate's permission is immaterial.  The statute of limitation is

24  triggered when the plaintiff has reason to suspect wrongdoing.  Based on the current record, it

25  appears Plaintiffs had reason to suspect Defendants were misappropriating Locate's technology

26  during the co-development period in 1999-2001.  Thus, the Court finds that Defendants have a

27  reasonable possibility of defeating Plaintiffs' misappropriation claim.

28  / / /

III.   **REASONABLENESS OF BOND AMOUNT REQUESTED**

Because the Court finds Defendants have satisfied the requirements of California Code of Civil Procedure section 1030 by demonstrating Gabriel is an out-of-state plaintiff and Defendants have a reasonable possibility of defeating Plaintiffs' claims, the Court next considers whether the bond amount proposed by Defendants is reasonable.  Defendants request the Court require Plaintiffs to post a bond in the amount of $2.9 million; $1.9 million for costs and $1 million for attorneys' fees.  [Doc. No. 81, p.12.]  The Court considers the reasonableness of the bond from both the Defendants' and Plaintiffs' perspectives.  *Simulnet*, 37 F.3d at 576.  With respect to costs, Federal Rule of Civil Procedure 54 "creates a presumption in favor of awarding costs to the prevailing party."  *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1022 (9th Cir. 2003).  The Court may in its discretion, however, deny costs if an award would be "inappropriate or inequitable."  *Id.* (citation omitted).

Defendants argue $2.9 million is reasonable given the scope of this lawsuit in which Plaintiffs attempt to correct ownership on at least 92 patents and seek to recover over $1 billion in damages.  Further, Defendants have already expended over $1 million defending this action, and expect defense costs to exceed $5 million in attorneys' fees alone.  [Doc. No. 81, p.12-13.] Plaintiffs assert Defendants' cost estimate is unreasonable because they include non-taxable costs, they greatly inflated amounts for taxable items, and Defendants will not be entitled to attorneys' fees because Plaintiffs' claims are not vexatious or frivolous.  [Doc. No. 93, p.19-24.]

**(A)   COSTS**

Defendants provide a chart that identifies each cost item they expect to recover if they prevail, pursuant Rule 54 and Civil Local Rule 54.1.  [*See* Doc. No. 81, p.13-15.]  The chart estimates: (1) $10,000 for service of process and subpoenas; (2) $4,000 for reporter's transcripts; (3) $97,180 for an original and one copy of deposition transcripts (34 named witnesses); (4) $960 for witness fees at depositions; (5) $1,600 for witness fees at trial; (6) $28,820 for witness mileage, transportation and per diem expenses; (7) $220,800 for translators and interpreters; (8) $6,448 for costs of patent file wrappers and prior art patents; (9) $10,000 for copies provided to the Court or opposing counsel; (10) $18,000 for copies of exhibits admitted into evidence/attached to motions;

- 16 -

1  (11) $1,500,000 for a third-party consultant to assist with e-discovery requests from Plaintiffs; and

2  (12) $50,000 for costs to prepare demonstratives for use at trial.  With the exception of item 11,

3  each type of cost Defendants identify is taxable under Civil Local Rule 54.1(b).

4        Defendants assert the cost to engage a third-party consultant to review and manage

5  Defendants' electronic documents to respond to Plaintiffs' broad discovery requests is recoverable

6  under *CBT Flint Partners, LLC v. Return Path, Inc.*, 676 F. Supp. 2d 1376, 1381 (N.D. Ga. 2009).

7  In *CBT Flint*, the defendant retained an outside "computer consultant to collect, search, identify

8  and help produce electronic documents from [defendant's] network files and hard drives in

9  response to [plaintiff's] discovery requests."  Over plaintiff's objections, the District Court for the

10  Northern District of Georgia deemed the consultant's fee recoverable, and ordered the clerk to tax

11  costs in the amount $268,311.12 against plaintiff.  In doing so, the court acknowledged "[t]here is

12  a division of opinion as to whether these costs are recoverable," but ultimately concluded "[t]he

13  services are certainly necessary in the electronic age.  The enormous burden and expense of

14  electronic discovery are well known. Taxation of these costs will encourage litigants to exercise

15  restraint in burdening the opposing party with the huge cost of unlimited demands for electronic

16  discovery." *Id*.

17        The Ninth Circuit has not addressed this issue.  However, this circuit has held, that

18  "[n]otwithstanding the district court's discretionary authority under Federal Rule of Civil

19  Procedure Rule 54(d) to refuse to tax costs in favor of a prevailing party, a district court may not

20  rely on its 'equity power' to tax costs beyond those expressly authorized by [28 U.S.C. §] 1920."

21  *Romero v. Pomona*, 883 F.2d 1418, 1428 (9th Cir. 1989) (overruled in part on unrelated grounds)

22  (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (overruled in part on

23  unrelated grounds)).  In applying *Romero* and *Crawford*, the Ninth Circuit has limited recoverable

24  exemplification fees to those "for the physical preparation and duplication of documents, not the

25  intellectual effort involved in their production." *Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir.

26  1996).  Accordingly, for purposes of Defendants' motion for bond, the Court concludes the $1.5

27  million fee to engage a consultant to assist with e-discovery productions is not recoverable.

28  / / /

1    Next, the Court turns to the reasonableness of the remaining cost items.  Fees for service of

2   process and service of subpoenas are recoverable under Civil Local Rule 54.1(b)(1), whether

3   served by the United States Marshal or other persons authorized by Federal Rule of Civil

4   Procedure 4.  Defendants estimate an expense of $10,000 to serve 26 third-party document

5   subpoenas and 18 third-party deposition subpoenas; approximately $227 per subpoena.  The U.S.

6   Marshals Service charges $55 per hour for personal service of process and subpoenas.  *See* 28

7   C.F.R. § 0.114.  Although the Southern District does not prevent parties from recovering service

8   costs in excess of the rates charged by the U.S. Marshals, at this stage of the litigation where costs

9   are necessarily estimates and are not supported by invoices or other billing documents, the Court

10   concludes that $227 is excessive, and reduces this item to $55 per subpoena.  Accordingly, for

11   purposes of Defendants' bond, $2,420 for service is appropriate.

12    Defendants request $4,000 in costs for reporter's transcripts, including one copy and one

13   original, for matters occurring before, during and after trial.  These transcript costs are recoverable

14   under Civil Local Rule 54.1(b)(2), if approved by the presiding judge *before* the cost is incurred.

15   Here, the parties have not sought approval from the undersigned for any such transcripts.  For

16   purposes of a bond, this cost item is denied in its entirety.

17    Defendants estimate $97,180 in costs to obtain copies of deposition transcripts.  Costs

18   incurred for one original and one copy of deposition transcripts are generally taxable under Civil

19   Local Rule 54.1(b)(3)(a) and (b).  "Depositions need not be introduced in evidence or used at trial

20   to be taxable so long as at the time it was taken it could reasonably be expected that the deposition

21   would be used for trial preparation, rather than mere discovery."  S.D. Civ. L.R. 54.1(b)(a).  This

22   case is in the early stages of discovery, and few, if any, depositions have occurred.  In addition, it

23   is impossible for the Court to estimate the length of each deposition, which bears heavily on the

24   cost of the transcripts.  Thus, it is difficult for the Court to accurately evaluate the reasonableness

25   of this cost item.  Admittedly, if Defendants prevail they will be entitled to significant transcript

26   costs given the nature and scope of this action, but it is unreasonable to assume Defendants will

27   use all 44 witnesses identified by the parties for trial preparation, as opposed to mere discovery.

28   Accordingly, the Court reduces the estimated transcript expenses by approximately fifty percent to

1    $45,000. Defendants also seek $960 for deposition witness fees for 24 witnesses at the statutory

2    rate of $40 per day, per witness. S.D. Civ. L.R. 54.1(b)(3); *see* 28 U.S.C. § 1821. The Court finds

3    this amount can reasonably be included in the bond.

4        Defendants also assert they anticipate $1,600 in fees for witnesses' attendance at trial,

5    which are recoverable under Civil Local Rule 54.1(b)(4) and 28 U.S.C. § 1821. It is unreasonable

6    to assume Defendants will call all 44 witnesses at trial. Again, reducing this estimated cost by

7    fifty percent is appropriate given the likelihood that Defendants will not call every witness the

8    parties have identified. Presumably some witnesses will be deemed unnecessary for trial, and

9    others will be called by opposing counsel. Thus, the Court finds $800 in fees for witnesses at trial

10    is reasonable. Defendants also request $28,820 in additional costs related to witness expenses

11    including mileage, transportation and per diem costs, which are taxable under Civil Local Rule

12    54.1(b)(4). The Court finds these additional costs are too speculative at this stage given the

13    absence of evidence regarding the number of witnesses who will actually testify at trial, where any

14    witnesses are located, or how they expect to travel to the courthouse. This cost item will not be

15    included in the bond amount.

16        Defendants next assert they expect to incur $220,800 to have 92 foreign patents translated,

17    at a rate of $0.24 per word, and assuming 10,000 words per patent. Under Civil Local Rule

18    54.1(b)(4) "[t]he reasonable fee of a competent translator is taxable if the document translated is

19    necessarily filed, or admitted into evidence." The FAC identifies 76 foreign patents that allegedly

20    include information and technology misappropriated from Locate. [FAC, ¶¶63-64.] Assuming

21    each patent contains approximately 10,000 words, at $0.24 per word, the Court concludes

22    $182,400 is a more reasonable estimate for use in calculating an appropriate bond amount.

23        Defendants seek $6,448 in costs for patent file wrappers and prior art patents, which are

24    recoverable at the rate charged by the patent office. S.D. Civ. L.R. 54.1(b)(6)(a)(6).

25    Unfortunately, the Court cannot evaluate the reasonableness of this amount because Defendants

26    have not provided any information regarding the number of patent file wrappers or prior art

27    patents they expect to request, nor the amount charged by the patent office for such items.

28    Accordingly, this speculative item cannot be included for purposes of imposing a bond.

08cv1992

1    Defendants estimate they will incur approximately $10,000 in copy costs, at a rate of $0.20

2    per page for copies provided to the Court or opposing counsel "by court order, rule or statute."

3    *See* S.D. Civ. L.R. 54.1(b)(6)(a)(1).  Pursuant to the undersigned's chamber rules, parties must

4    provide a courtesy copy of any filings that exceed twenty pages in length to chambers.  Defendants

5    also estimate an additional $18,000 for copies "used as court exhibits, either admitted into

6    evidence, or attached to a motion" which are taxable under Civil Local Rule 54.1(b)(6)(a)(1).

7    Given the chambers rule requiring courtesy copies of lengthy filings, the Court finds these two

8    cost items are largely duplicative.  In the absence of evidence to the contrary, the Court will

9    consider only the first amount of $10,000 in determining an appropriate bond amount.

10    Lastly, Defendants request $50,000 for costs associated with preparing charts, diagrams,

11    videos and other visual aids.  Civil Local Rule 54.1(b)(7)(a) provides such costs are taxable if they

12    "are reasonably necessary to assist the jury or the court in understanding the issues at trial."  The

13    Court finds this estimate reasonable given the complex nature and number of technologies at issue

14    in this action.  Accordingly, the Court concludes it may consider $291,580 in anticipated costs

15    when setting an appropriate bond amount.[8]

16    **(B)   ATTORNEYS' FEES**

17    Defendants argue a portion of their attorneys' fees should also be incorporated into the

18    bond amount because attorneys' fees are permitted under CUTSA and the Patent Act, where the

19    action is "vexatious, unjustified and brought in bad faith."  [Doc. No. 81, p.15.]  CUTSA allows a

20    prevailing party to recoverable reasonable attorneys' fees if "a claim of misappropriation is made

21    in bad faith."  Cal. Civ. Code § 3426.4.  Similarly, under the Patent Act, the Court may award

22    reasonable attorneys' fees to the prevailing party in exceptional circumstances.  35 U.S.C. § 285.

23    _____

24    [8] Plaintiffs argue the bond amount Defendants request is excessive because it "exceeds many multiples the bonds granted in the cases on which Defendants rely."  [Doc. No. 93, p.21.] The cost

25    amounts awarded in other factually distinguishable cases are not an appropriate gauge to determine a reasonable bond in the present action. Taxable costs are necessarily unique to the scope, complexity,

26    duration and nature of an action.  *See, e.g., BigFix Asia PTE LTD v. BigFix, Inc.*, 2009 U.S. Dist. LEXIS 50470 (N.D. Cal.) (defendant requested $700,000 cost bond; court issued $200,000 bond).

27    Here, Plaintiffs have placed at least 92 patents at issue, which involve complex technologies.  In addition, the acts complained of span more than a decade, and Plaintiffs seek over a $1 billion in

28    damages from Defendants.  As such, the costs associated with this litigation can reasonably be expected to be significant.

1   Whether a case is exceptional is within the trial judge's discretion.  *Kemart Corp. v. Printing Arts*

2   *Research Laboratories, Inc.*, 269 F.2d 375, 394 (9th Cir. 1959).  Attorney fee awards, however,

3   are the exception in patent cases, not the rule.  "The exercise of discretion in favor of such an

4   allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the

5   losing party, or some other equitable consideration of similar force, which makes it grossly unjust

6   that the winner of the particular lawsuit be left to bear the burden of his own counsel fees which

7   prevailing litigants normally bear."  *Kemart*, 269 F.2d at 394 (quoting *Park-In-Theatres v. Perkins*,

8   190 F.2d 137, 421 (9th Cir. 1951)).  "Any wilful act with respect to the matter in litigation which

9   would be condemned and pronounced wrongful by honest and fair-minded men will be sufficient

10  to make the hands of plaintiff unclean" and warrant the imposition of attorneys' fees.  *Thermovac*

11  *Industries Corp. v. The Virtis Co., Inc.*, 159 U.S.P.Q. (BNA) 349 at *9 (S.D.N.Y. 1968).

12          Here, Defendants request the Court include $1 million in the bond amount for attorneys'

13  fees they have already incurred to defend against Plaintiffs' allegations.[9]  Defendants argue

14  Plaintiffs' claims objectively lack merit and are improperly being used to extort money from

15  Qualcomm.  Defendants point out that seven of Plaintiffs' causes of action have been dismissed,

16  Plaintiffs have yet to identify any affirmative evidence to support their claims, they recently

17  engaged in a "sham change of residence" to evade the requirements of section 1030, and email

18  correspondence among Gabriel insiders proves Plaintiffs know their claims are frivolous.  In

19  response, Plaintiffs argue that their remaining claims are meritorious, the relocation of their

20  primary place of business to California was not a sham because it was approved by Gabriel's

21  board of directors before Defendants filed their motion for bond, and the email correspondence is

22  inapposite because Defendants quote them out of context.

23

24

25          [9] Based on information collected by the American Intellectual Property Law Association, the

26  "average cost through trial of a trade secret misappropriation case where more than $25 million is at
    stake, is $5,967,000 in San Francisco, and approximately $3,500,000 country-wide."  [Doc. No. 81,

27  p. 13 (citing AIPLA, Report of the Economic Survey (2009), at 32, I-143, Kyle Decl., Exhibit 31)
    (information for Los Angeles and San Diego not available).] Defendants therefore estimate their

28  attorneys' fees will exceed $5 million to defend this action through trial.  Defendant have already
    incurred over $1 million.

1       At this stage, the Court does not decide whether this case will ultimately be deemed

2    "exceptional" within the meaning of 35 U.S.C. § 285.  However, Defendants have presented

3    significant, unrebutted evidence that Plaintiffs' lawsuit is likely unmeritorious, and brought in bad

4    faith to salvage Gabriel.  The Court will not go through each individual email correspondence

5    here, but will note that when read as a whole, the Court is convinced they create a logical inference

6    that Gabriel has suffered a long history of corrupt officers and directors who are not above taking

7    illegal and fraudulent actions to guarantee their own personal gain.[10]  Plaintiffs assert the emails

8    are nothing more than disgruntled employees' expressions of frustration with Gabriel's

9    management, and have no bearing on the merits of this case.  The Court disagrees.  Although the

10   emails indicate their authors are upset by how Gabriel has treated them, and alone, they do not

11   conclusively establish this action is without merit, the Court finds that when the emails are

12   considered in connection with Defendants' evidence demonstrating a reasonable possibility of

13   success on the merits, there is a strong likelihood Defendants will ultimately prove this case is

14   exceptional, and attorneys' fees will be warranted at the conclusion of the litigation.  The Court

15   recognizes at this stage of the litigation Plaintiffs do not have all the evidence they need to prove

16   their case.  But the Court is troubled by Plaintiffs' inability to draw any meaningful connection

17   between Locate's technology and the allegedly misappropriated information found in more than 92

18   patents.  The parties began working together approximately a decade ago, Plaintiffs assert they

19   suspected wrongdoing in approximately 2007, and they have been investigating their claims for

20   several years.  By now, Plaintiffs should have more than mere allegations to support their theory.

21   Thus, the $1 million in attorneys' fees Defendants have incurred to date may reasonably be

22   included in the Court's determination of an appropriate bond amount.

23

24       [10] In connection with their bond motion Defendants request the Court take judicial notice of a criminal judgment against Nicholas Fegen, a former Gabriel consultant, and a complaint filed in

25   bankruptcy court against Gabriel's former founder, president and chief operating officer, Keith Feilmeier, Exhibits 29 and 30 to the Kyle Declaration, respectively.  The Court **CONFIRMS** its

26   tentative ruling and **GRANTS** Defendants' request for judicial notice.  The Court, however, takes judicial notice of the existence of the documents, not the truth of the matters asserted therein.  *Ritchey*

27   *v. Upjohn Drug Co.*, 139 F.3d 1313, 1319 (9th Cir. 1998); *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001) (court may take judicial notice of existence of court opinion, but not "the truth

28   of the facts recited therein.").

- 22 -                                        08cv1992

**(C)   BOND AMOUNT**

At the beginning of the hearing on September 7, the Court indicated it was tentatively inclined to require a bond in the amount of $100,000 to $150,000. [*Rough Transcript*, p.4.] After hearing oral argument, however, the Court stated a more substantial bond was likely appropriate. [*Id*. at p.48.] Upon further review and consideration, the Court finds a bond in the amount of $1,291,580 is reasonable. This amount includes costs of $291,580, which reflects a significant reduction of the costs sought by Defendants. It also includes $1 million for the attorneys' fees Defendants have already incurred. The bond amount is further justified in light of the $1 billion in damages Plaintiffs have demanded.

Lastly, the Court considers Plaintiffs' ability to post security. Plaintiffs' opposition does not address their assets, nor their ability to post a bond of any amount. At the hearing, the Court questioned Plaintiffs about their financial condition and received little information. Specifically, Plaintiffs asserted a bond of approximately $100,000 or $150,000 "would be extremely detrimental and maybe kill this case." [*Rough Transcript*, p.53.] But Plaintiffs made no attempt to support this statement.

The Court appreciates that Gabriel is admittedly a non-operating company that appears to be financing this litigation by soliciting money from investors. This fact, however, cuts both ways. On the one hand, without any ongoing business, Gabriel's income and assets are necessarily limited, and posting a bond will likely be difficult. On the other hand, Gabriel has waged a significant litigation against Qualcomm, and the purpose of section 1030 is to protect defendants like Qualcomm from being unable to collect judgments against out-of-state plaintiffs like Gabriel. Gabriel's near insolvency demonstrates the importance of a bond to protect Defendants. Accordingly, although the Court believes a bond for $1,291,580 is reasonable, it will reduce the bond amount in light of Plaintiffs' financial condition, and require Plaintiffs to post a bond for $800,000. *See, e.g., Kourtis*, 358 Fed. Appx. 863 (reduced bond amount from $100,000 to $50,000 in light of plaintiffs' financial condition); *Hiraide v. Vast Systems Tech. Corp.*, 2009 U.S. Dist. LEXIS 71383 *38-41 (N.D. Cal.) (reduced requested bond from $150,000 to $50,000 to balance equities of the parties).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for bond.  Plaintiffs' shall post a bond in the amount of $800,000 within ninety (90) days of entry of this order.  If Plaintiffs are unable to post the required security within this time, their action may be dismissed.

**IT IS SO ORDERED.**

DATED:  September 20, 2010

Hon. Michael M. Anello
United States District Judge

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

10

SOUTHERN DISTRICT OF CALIFORNIA

11

12   GABRIEL TECHNOLOGIES              )   Civil No. 08cv1992 AJB (MDD)
     CORPORATION and TRACE             )
13   TECHNOLOGIES, LLC,                )
                                       )   ORDER GRANTING IN PART AND
14                   Plaintiff,        )   DENYING IN PART DEFENDANTS'
     v.                                )   MOTION FOR ATTORNEYS' FEES AS
15                                     )   TO PLAINTIFFS AND NON-PARTY
     QUALCOMM INCORPORATED,            )   WANG, HARTMAN, GIBBS & CAULEY,
16   SNAPTRACK, INC. and NORMAN        )   PLC
     KRASNER,                          )
17                                     )
                     Defendants.       )   (Doc. No. 332)
18                                     )
     _____ )

19

20        Before the Court is Defendants' Motion for Attorneys' Fees as to Plaintiffs and Non-Party

     Wang, Hartman, Gibbs & Cauley, PLC ("WHGC"), Plaintiffs' local counsel.[1]  (Doc. No. 332.)
21
     Plaintiffs and WHGC filed separate opposition briefs to Defendants' motion.  (Doc. No. 355 and 354,
22
     respectively.)   On January 17, 2013, the Court held a motion hearing and took the matter under
23

24

25

26   _____

     [1] Defendants' Motion for Attorneys' Fees originally sought fees from Plaintiffs' lead counsel,
27   Hughes, Hubbard & Reed ("Hughes Hubbard") as well.  However, Defendants and Hughes Hubbard
     reached a settlement on the issue of attorneys' fees prior to the hearing on this matter.  Accordingly,
28   Defendants and Hughes Hubbard filed a joint request to withdraw Defendants' Motion for Attorneys'
     Fees as to Hughes Hubbard.  (Doc. No. 366.)  Pursuant to the settling parties' agreement, the terms of
     the settlement are confidential, and the Court declined the parties' offer to divulge the settlement amount
     for the limited purpose of *in camera* review.

1 submission for further review.  (Doc. No. 367.)  For the reasons set forth below, Defendants' motion is

2 GRANTED IN PART and DENIED IN PART.

3                                  *Procedural Background*

4         On October 24, 2008, Plaintiffs filed this lawsuit, which initially contained eleven causes of

5 action against Defendants, including: (1) breach of the 1999 license agreement; (2) breach of the 2006

6 license agreement; (3) fraud/fraudulent inducement; (4) tortious interference with contract; (5)

7 correction of inventorship; (6) declaration of ownership; (7) equitable patent infringement; (8)

8 misappropriation of trade secrets pursuant to California's Uniform Trade Secrets Act ("CUTSA"); (9)

9 conversion; (10) unfair competition pursuant to Cal. Bus. & Prof. Code section 17200; and (11) unjust

10 enrichment.  (Doc. No. 1.)  Plaintiffs sought over $1 billion in damages.  (*Id.*)

11        On September 3, 2009, (Doc. No. 35), the Court granted in part and denied in part the Defen-

12 dants' motion to dismiss, and ordered Plaintiffs to file an amended complaint by September 14, 2009.  In

13 the September 3, 2009 Order, Judge Anello dismissed Plaintiffs' first, fourth, seventh, ninth, tenth, and

14 eleventh causes of action with prejudice and dismissed Plaintiffs' third cause of action with leave to

15 amend.  On September 14, 2009, Plaintiffs filed a Second Amended Complaint, which contained an

16 amended fraud and fraudulent inducement claim and incorrectly re-alleged claims that were previously

17 dismissed with prejudice.  (Doc. No. 36.)  On October 8, 2009, the Court held a telephonic status

18 conference with the parties and granted Plaintiffs leave to file a Third Amended Complaint that did not

19 include the claims previously dismissed with prejudice.  (Doc. No. 39.)  On October 9, 2009, Plaintiffs

20 filed their Third Amended Complaint, which included the amended fraud and fraudulent inducement

21 claims.  (Doc. No. 40.)  Defendants again moved to dismiss Plaintiffs' fraud claim.  (Doc. No. 41.)  On

22 December 14, 2009, the Court granted Defendants' motion and dismissed Plaintiffs' fraud and fraudulent

23 inducement claim with prejudice.  (Doc. No. 48.)  On January 11, 2010, Plaintiffs filed their Fourth

24 Amended Complaint ("FAC"), which did not contain any causes of action alleging fraud.  (Doc. No. 53.)

25 On August 13, 2010, the Court denied Plaintiffs' motion for leave to file a fifth amended complaint,

26 which sought to add a fraudulent concealment claim.  (Doc. No. 104.)

27        On July 2, 2010, Defendants filed a motion for bond pursuant to California Code of Civil

28 Procedure Section 1030.  (Doc. No. 81.)  Having reviewed all of the relevant evidence and the parties'

2

1    arguments, the Court granted in part and denied in part Defendants' motion for a bond on September 20,

2    2010.  (Doc. No. 110.)  The Court reduced the amount of the requested bond from $1,291,580

3    ($1,000,000 in fees and $291,580 in costs) to $800,000 in light of Plaintiff's financial condition at the

4    time.  (*Id.* at 23.)  Pursuant to this order, Plaintiffs posted the $800,000 bond in order to avoid dismissal

5    of their claims.  (Doc. No. 121.)

6             On September 27, 2011, Defendants filed a partial motion for summary judgment with regard to

7    Plaintiffs' claims for misappropriation of trade secrets and breach of contract, arguing the claims were

8    barred by the statute of limitations.  (Doc. No. 188.)  On March 13, 2012, the Court granted Defendant's

9    motion for summary judgment as to Plaintiff's eighth claim for misappropriation of trade secrets and

10   second claim for breach of contract on ground one as to trade secrets only and grounds two, three, four,

11   and five.  (Doc. No. 252.)  The Order denied partial summary judgment as to ground one and ground six

12   of Plaintiffs' second claim for breach of contract.  (*Id.*)

13            On August 10, 2012, Defendants filed a motion for summary judgment as to Plaintiffs' three

14   remaining claims, which were as follows: (1) Breach of the Amended and Restated License Agreement

15   in Ground One and Ground Six (COUNT TWO); (2) Correction of Inventorship (pursuant to 35 U.S.C.

16   § 256) (COUNT FIVE); and (3) Declaratory Judgment of Ownership Interest in the Patents (pursuant to

17   28 U.S.C. § 2201) (COUNT SIX). (Doc. No. 296.)  On October 1, 2012, the Court granted Defendants'

18   motion for summary judgment and directed the Clerk to enter judgment in favor of the Defendants.

19   (Doc. No. 328.)  Plaintiffs are appealing the judgment to the Federal Circuit.  (Doc. No. 340.)

20   Defendants filed the instant motion for attorneys' fees on October 12, 2012.  (Doc. No. 351.)

21   *I. Defendants' Motion for Attorneys' Fees as to Plaintiffs*

22            As support for the requested attorneys' fees award, Defendants contend that Plaintiffs pursued

23   objectively baseless patent and misappropriation claims in bad faith.  Accordingly, Defendants seek

24   attorneys' fees with regard to Plaintiffs' patent claims under 35 U.S.C. § 285 and with regard to

25   Plaintiffs' misappropriation claims under Section 3426.4 of CUTSA.   The Court addresses each

26   statutory basis for awarding attorneys' fees in turn.

27

28

Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 62 of
88
**62**

1

### A.  Attorneys' Fees Pursuant to 35 U.S.C. § 285

2       Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney fees to the

3  prevailing party" in a patent case.  Defendants argue that Plaintiffs pursued frivolous patent claims and

4  engaged in litigation misconduct such that attorneys' fees are warranted under 35 U.S.C. § 285.

5       Once it is determined that the party seeking fees is a prevailing party, determining whether to

6  award attorneys' fees under 35 U.S.C. § 285 is a two-step process.  *Highmark, Inc. v. Allcare Health*

7  *Mgmt. Sys., Inc*., 687 F.3d 1300, 1308 (Fed. Cir. 2012) (citing *Forest Labs., Inc. v. Abbott Labs.*, 339

8  F.3d 1324, 1327–28 (Fed. Cir. 2003)).  First, a prevailing party must establish by clear and convincing

9  evidence that the case is "exceptional."  *Id.* (citing *Forest Labs, Inc.*, 339 F.3d at 1327).  "A case is

10  exceptional under Section 285 if there has been some inappropriate conduct relating to the matter in

11  litigation."  *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1370 (citing *Brooks*

12  *Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005).  Cases may be

13  considered "exceptional" based upon a party's frivolous claims, inequitable conduct before the Patent

14  and Trademark Office, or misconduct during litigation.  *Id.* (citing *Beckman Instruments, Inc. v. LKB*

15  *Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989)).  Second, "if the case is deemed exceptional, a

16  court must determine whether an award of attorneys' fees is appropriate and, if so, the amount of the

17  award."  *Id.* (citing *Forest Labs.*, 339 F.3d at 1328).  "[T]he amount of the attorney fees [awarded]

18  depends on the extent to which the case is exceptional."  *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d

19  1340, 1344 (Fed. Cir. 2001).  The purpose of section 285, unlike that of Rule 11, is not to control the

20  local bar's litigation practices—which the district court is better positioned to observe—but is remedial

21  and for the purpose of compensating the prevailing party for the costs it incurred in the prosecution or

22  defense of a case where it would be grossly unjust, based on the baselessness of the suit or because of

23  litigation or Patent Office misconduct, to require it to bear its own costs.  *See Badalamenti v. Dunham's,*

24  *Inc.*, 896 F.2d 1359, 1364 (Fed. Cir. 1990); *Cent. Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d

25  1573, 1578 (Fed. Cir. 1983).

26            *1. Exceptional Case*

27       As noted above, the Court has either dismissed or granted summary judgment in Defendants'

28  favor as to all of Plaintiffs' claims, and thus considers Defendants to be the prevailing party in this

action.  Therefore, the first step when considering whether to award attorneys' fees under Section 285 is to determine whether the case is exceptional.  Here, Defendants argue that this case is exceptional based upon Plaintiffs' frivolous claims and misconduct during litigation.  Defendants offer the following as the primary evidence of the frivolousness of Plaintiffs' claims: (1) Plaintiffs originally alleged patent violations of 92 patents and ultimately reduced their claims down to violations of only 16 patents; (2) the majority of Plaintiffs' claims were dismissed at the pleadings stage; (3) Plaintiffs' remaining claims did not survive summary judgment because the Court found that Plaintiffs did not have sufficient evidence to create a triable issue of fact on the issue of inventorship; (4) emails between Plaintiffs' former employees suggest that Plaintiffs knew they had no case and pursued the claims anyway; and (5) Judge Anello required Plaintiffs' to post an $800,000 in order to proceed with the case after finding "a strong likelihood Defendants will ultimately prove this case is exceptional, and attorneys' fees will be warranted at the conclusion of the litigation."

First, the Court will determine whether the case is exceptional based upon the alleged frivolous-ness of Plaintiffs' claims.  Under Section 285, sanctions may be imposed for frivolous claims only if two separate criteria are satisfied: (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.  *Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012) (citing *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005)). In *Highmark, Inv. v. Allcare Health Mgmt. Sys.*, the Federal Circuit detailed the analysis afforded to these two factors as follows:

> The requirement that the litigation be objectively baseless "does not depend on the state of mind of the [party] at the time the action was commenced, but rather requires an objective assessment of the merits."  *Brooks Furniture Mfg.* 393 F.3d at 1382. "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits."  *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (internal quotation marks omitted). Furthermore, even if the claim is objectively baseless, it must be shown that lack of objective foundation for the claim "was either known or so obvious that it should have been known" by the party asserting the claim.  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007); *see also iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1377 (Fed. Cir. 2011).  This is known as the subjective prong of the inquiry.  This same objective/subjective standard applies for both patentees asserting claims of infringement and alleged infringers defending against claims of infringement. *See iLOR*, 631 F.3d at 1377.

*Id.* at 1308-09.

Case: 13-30340   Doc# 331   Filed: 08/11/16   Entered: 08/11/16 14:49:09   Page 64 of 88

64

1    Having reviewed the allegations of both parties and taking particular note of Judge Anello's

2  analysis in his bond decision, the Court concludes that Plaintiffs' claims in this case were objectively

3  baseless and brought in subjective bad faith.  Here, Plaintiffs could not have reasonably expected

4  success on the merits of the patent claims without knowing the identify of the allegedly omitted

5  inventors.  As this Court noted in its summary judgment order, there is a " 'presumption that the

6  inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and

7  convincing evidence.' "  (Doc. No. 328 at 6 (quoting *Fina Oil and Chem. Co. v. Ewen*, 123 F.3d 1466,

8  1472 (Fed. Cir. 1997)).  At no point during this case has Plaintiff been able to offer the evidence

9  necessary to overcome this presumption.  It is apparent that Plaintiffs did not know the identity of the

10  allegedly omitted inventors when they filed this action in 2008 or at any later point in the case.

11    Close to two years after the case's initial filing, Judge Anello described the obvious lack of an

12  objective foundation for Plaintiffs' claims in his bond order: "The parties began working together

13  approximately a decade ago, Plaintiffs assert they suspected wrongdoing in approximately 2007, and

14  they have been investigating their claims for several years.  By now, Plaintiffs should have more than

15  mere allegations to support their theory."  (Doc. No. 110 at 22.)  Despite this warning, Plaintiffs

16  prolonged the litigation for another two years.  In order to survive summary judgment, Plaintiffs

17  attempted late in the litigation to finally identify the allegedly omitted inventors; however, they were

18  never able to find individuals that would take credit for inventing any of the relevant patents or profess

19  knowledge of specifics relating to the patents.  Thus, the Court found in its summary judgment order

20  that Plaintiffs had failed to create a triable issue of fact regarding Plaintiffs' inventorship claims, proving

21  Judge Anello's earlier characterization of Plaintiffs' patent claims to be correct.  Throughout this case,

22  Plaintiffs pursued inventorship claims despite their inability to identity the allegedly omitted inventors.

23  Moreover, Plaintiffs continued to pursue these claims after Judge Anello pointed out the significant lack

24  of evidentiary support.  Based on the totality of the record, Plaintiffs' claims were objectively baseless.

25    For similar reasons, the Court finds that Plaintiffs' brought these claims in subjective bad faith.

26  It was readily apparent to Judge Anello in September 2010 that Plaintiffs' had maintained this action for

27  slightly less than two years with nothing more than "mere allegations" to support their claims.  Several

28  emails between Gabriel employees and former employees confirm this conclusion and suggest that

1   Plaintiffs knew they lacked the requisite evidence and opted to pursue their claims nonetheless.[2]  As

2   they did at the bond hearing before Judge Anello, Plaintiffs attempt to dismiss these emails as nothing

3   more than disgruntled employees' expressions of frustration with management and the inability to

4   recover necessary documents from previous counsel, Munck Carter PC ("Munck").  (*See* Doc. No. 110

5   at 22; Pls. Opp., Doc. No. at 9-11).  However, Judge Anello disagreed with Plaintiffs interpretation and

6   determined that the emails in combination with the lack of evidence supporting Plaintiffs' claims

7   suggested that the case would ultimately be considered exceptional.  (Doc. No. 110 at 22.)  This Court

8   agrees.  While the emails certainly express frustration towards Gabriel and Munck, the repeated

9   references to the utter lack of a case suggest that, not only did Plaintiff's not have the necessary

10  evidence to bring their claims against Defendants, they were aware of the evidentiary deficiencies

11  during the early stages of litigation.  (Pls. Opp., Doc. No. 355 at 10.)  Additionally, Plaintiffs' assertion

12  that the documents retained by Munck provided the "evidentiary support for its claims" is belied by the

13  record.  (Doc. No. 355 at 10.)  At the hearing regarding the instant motion, counsel revealed that

14  Plaintiffs reacquired these documents from Munck in early 2010.  Despite Plaintiffs' recovery of these

15  purportedly crucial documents, Plaintiffs could only produce "mere allegations" to support their claims

16  at the time of the bond hearing in September 2010.  (*See* Doc. No. 110 at 22.)  This suggests that the

17  documents were not the evidentiary key to Plaintiffs' claims that Plaintiffs represents them to be.

18          On the whole, the Court concludes that the lack of evidence supporting Plaintiffs' patent claims

19  was so obvious that it should have been known by Plaintiffs.  Significantly, the emails suggest that

20  Plaintiffs knew there was no evidentiary basis for their claims in early 2010, and Plaintiffs certainly had

21  notice that their claims lacked substantiation following Judge Anello's bond order in September 2010.

22  Accordingly, the Court concludes that Plaintiffs brought objectively baseless patent claims in subjective

23  bad faith.

24          Based simply on the frivolous nature of Plaintiffs' claims, the Court is inclined to classify the

25  case as exceptional under 35 U.S.C. § 285.  The Court is further persuaded by Defendants' arguments

26  regarding Plaintiffs' litigation misconduct.  Quite apart from a finding of frivolous claims, "an

27  _____

28          [2] Plaintiffs object to the Court's consideration of these emails; however, the emails have been
considered by the Court previously with regard to the bond motion and the Court finds them relevant to
its consideration of the instant motion.  Accordingly, Plaintiffs' evidentiary objections are overruled.

7                                                                08cv1992

1  exceptional case finding can also be supported by litigation misconduct." *Highmark, Inc.*, 687 F.3d at

2  1315 (citing *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012)).  Litigation

3  misconduct involves unethical or unprofessional conduct by a party or his attorneys, but may also

4  include "advancing frivolous arguments during the course of the litigation or otherwise prolonging

5  litigation in bad faith." *Id.*  The frivolous arguments must be shown to be objectively unreasonable at

6  the time they were made. *Id.* (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d

7  1314, 1339 (Fed. Cir. 2009)).

8        As discussed above, Plaintiffs brought and maintained claims without knowing the identity of

9  the allegedly omitted inventors, the most basic prerequisite for a successful correction of inventorship

10  patent claim.  Viewing the entirety of Plaintiffs' allegations, all of Plaintiffs' causes of action relate in

11  some way to the alleged theft of Plaintiffs' patents; however, Plaintiffs cannot provide sufficient

12  evidence to establish the rightful inventors of the patents.  The Court is particularly struck by Plaintiffs'

13  decision to pursue their claims further following Judge Anello's warning that the case would likely be

14  found exceptional based on the evidence before him at the bond hearing.  Plaintiffs nevertheless

15  continued with their claims despite Judge Anello's clear indication that there was a serious lack of

16  evidence regarding Plaintiffs' patent claims.  Over time, Judge Anello's assessment proved correct and

17  Plaintiffs' claims failed for the reasons he anticipated.  The Court finds that Plaintiffs' decision to

18  pursue their patent claims without knowing the identity of the allegedly omitted inventor for such a long

19  period of time, and particularly after Judge Anello's bond order, constitutes litigation misconduct.

20  Furthermore, Defendants' make a persuasive case for finding litigation misconduct based upon

21  Plaintiffs' less-than-honest actions throughout the case.[3]  Having already classified the case as

22

23  _____

        [3] Defendants suggest that the following actions should be considered litigation misconduct: (1)
24  Plaintiffs' filed sham affidavits in order to avoid summary judgment; (2) Plaintiffs served incomplete
     and unverified interrogatory responses without basic investigation regarding the actual identity of the
25  allegedly omitted inventors; (3) Plaintiffs granted a contingent interest in the litigation to a percipient
     witness; (4) Plaintiffs invited a biased *amicus* brief that was filed on their behalf; (5) Plaintiffs pursued
26  inventorship claims that had no evidentiary support; (6) Plaintiffs pursued claims against Defendants in
     order to garner outside investments in the litigation; (7) Plaintiffs misled the Court with regard to the
     location of their headquarters at the time of the bond hearing; (8) Plaintiffs attempted to reallege fraud
27  claims that had previously been dismissed with prejudice; and (9) Plaintiffs alleged 92 patent claims
     initially but required extensive discovery before narrowing their patent claims to 16.  While the Court
28  does not necessarily find that each of these items constitutes litigation misconduct of its own accord,
     items 2, 5, 6, 7, 8, and 9  raise significant concerns when considering the nature of Plaintiffs' conduct

1   exceptional based upon Plaintiffs' bad faith in pursuing objectively baseless claims that had no

2   reasonable expectation of success, the Court need not address these individual allegations of litigation

3   misconduct, but notes that the nature of the referenced incidents does not weigh in Plaintiffs' favor.  In

4   sum, the Court finds that Plaintiffs brought frivolous claims and engaged in litigation misconduct such

5   that this case is exceptional within the meaning of 35 U.S.C. § 285.

6                  *2.  Appropriate Amount of Attorneys' Fees*

7          Having deemed the case exceptional, the second step of the analysis requires the Court to

8   determine whether an award of attorneys' fees is appropriate, and, if so, the amount of the award.  *See*

9   *Forest Labs.*, 339 F.3d at 1328.  The authority to award attorneys' fees found in 35 U.S.C. § 285 is

10  limited to the patent side of the case.  *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical*

11  *Corp.*, 405 F.2d 288, 297-98 (9th Cir. 1969); *see also Stickle v. Heublein, Inc.*, 716 F.2d 1550, (Fed. Cir.

12  1983).  "Where an action combines both patent and nonpatent claims, the nonpatent issues may in some

13  instances be so intertwined with the patent issues that the evidence would, in large part, be material to

14  both types of issues."  *Stickle*, 716 F.2d at 1564.

15         In this instance, the Court finds that attorneys' fees are warranted under Section 285.  Plaintiffs

16  initially alleged 92 patent violations without the requisite evidence to support their claims, never

17  acquired the requisite evidence, and thus caused Defendants to incur several years worth of attorneys'

18  fees in order to oppose Plaintiffs' unsubstantiated claims.  For this reason, the Court finds that attorneys'

19  fees under 35 U.S.C. § 285 are appropriate in this instance and will now consider how to properly limit

20  the award of fees to those relating to the patent side of the case as required by the statute.

21         Plaintiffs' First Amended Complaint ("FAC") contains eleven causes of action.  (Doc. No. 14.)

22  Plaintiffs' fifth, sixth, and seventh causes of action for correction of inventorship, declaratory judgment

23  of ownership interest in the patents, and equitable patent infringement are patent claims for which

24  attorneys' fees may be imposed under 35 U.S.C. § 285.  (Doc. No. 14 at 30-32.)  However, having

25  reviewed the allegations offered as support for the non-patent causes of action, each of Plaintiffs' claims

26  depends upon Plaintiffs' patent-related allegations.  For reasons set forth in greater detail below, the

27  Court finds that Defendants are entitled to attorneys' fees under CUTSA for Plaintiffs' misappropriation

28  ────────────────

throughout this action.

9

1   claims, which means that the attorneys' fees associated with Plaintiffs' eighth cause of action need not

2   be separated from the patent fees as they are both independently recoverable.[4]  As to Plaintiffs'

3   remaining non-patent causes of action, the Court finds that these claims are so intertwined with

4   Plaintiffs' patent claims and patent-related evidence that the same evidence is material to all of the

5   issues.[5]  Therefore, the fees associated with these claims may be properly awarded under 35 U.S.C. §

6   285 as they are virtually inseparable from those fees accrued with regard to the purely patent claims.

7          Accordingly, the Court awards attorneys' fees associated with Plaintiffs' patent and patent-

8   related causes of action pursuant to 35 U.S.C. § 285.  The Court will consider the reasonable amount of

9   the award following the attorneys' fees analysis under CUTSA.

10  **B. Attorneys' Fees Pursuant to CUTSA, Cal. Civ. Code § 3426.4**

11         Under Section 3426.4 of the California Uniform Trade Secret Act ("CUTSA"), courts may

12  award reasonable attorneys' fees to the prevailing party if a claim of misappropriation is made in bad

13  faith.  Based upon much of the same evidence argued with regard to 35 U.S.C. § 285, Defendants

14

---

15         [4] The Court also notes that the discovery related to Plaintiffs' misappropriation claims overlaps
    significantly with Plaintiffs' patent claims.  Plaintiffs misappropriation claims suggest, among other
16  things, that Defendants incorporated the misappropriated trade secrets into their patent applications.  As
    a result, the discovery related to Plaintiffs' misappropriation claims required further investigation into
17  Defendants' patents. (*See* Doc. No. 160 at 1-2 (directing parties to designate up to two of Defendants'
    patents identified in the Fourth Amended Complaint that are allegedly based upon Plaintiffs' trade
18  secrets and directing Plaintiffs to identify its trade secrets that are allegedly incorporated in the
    designated patents).)
19
           [5] Plaintiffs' first cause of action alleges that SnapTrack breached the 1999 License Agreement
20  when it, among other things "took ownership of Locate's patents" and "filed patent applications and
    patents without listing Locate as an assignee or Locate personnel as inventors." (Doc. No. 14 at 27, ¶
21  132.) Similarly, Plaintiffs' second cause of action makes identical allegations in support for Plaintiffs'
    alleged breach of the 2006 license agreement claim. (*Id.* at 28, ¶ 138.) Plaintiffs' third cause of action
22  alleges fraud and fraudulent inducement based upon SnapTrack "misappropriating Locate's technology
    and filing patents and patent applications incorporating jointly-owned Program Technology as well as
23  Locate's technology." (*Id.* at 29, ¶ 142.) In Plaintiffs' fourth cause of action, Plaintiffs allege tortious
    interference with contract which alleges that Krasner and Qualcomm "intentionally caused SnapTrack to
24  breach the License Agreement" and, as discussed with the first and second cause of action, the breach of
    the license agreement claims are based in part upon the alleged patent violations. (*Id.* at 30.) Plaintiffs'
25  conversion claim in the ninth cause of action alleges that Defendants "--through their patent filings and
    other acts -- converted that technology, confidential information, and Program Technology for
26  themselves." (*Id.* at 34, ¶ 180.) Plaintiffs' tenth cause of action alleges unfair competition based upon
    Defendants' misappropriation of Locate's technology and filing "patents and patent applications
27  incorporating Locate's technology and jointly owned Program Technology." (*Id.* at 35, ¶ 184.) Lastly,
    Plaintiffs' eleventh cause of action claims unjust enrichment based upon Defendants misappropriation of
28  Locate's technology "by applying for and obtaining patents based on that technology." (*Id.* at 35, ¶
    191.)

1  contend that Plaintiffs pursued frivolous misappropriation claims and engaged in litigation misconduct

2  such that attorneys' fees are warranted under Section 3426.4 of CUTSA.

3          *1. Legal Standard*

4          Under Section 3426.4, a prevailing party may recover reasonable attorneys' fees if "a claim of

5  misappropriation is made in bad faith." Cal. Civ. Code § 3426.4.  Because CUTSA does not provide a

6  definition of "bad faith" to be used in the context of trade secret misappropriation, California courts

7  have developed a two-pronged standard for the evaluation of such claims. *See SASCO v. Rosendin*

8  *Elec., Inc.*, 207 Cal. App. 4th 837, 834 (Cal. Ct. App. 2012); *Smith v. Selma Cmty. Hosp.*, 188 Cal. App.

9  4th 1, 34 (Cal. Ct. App. 2010); *Gemini Aluminum Corp. v. CA Custom Shapes, Inc.*, 95 Cal. App. 4th

10  1249, 1261 (Cal. Ct. App. 2002).  The party seeking an award of attorney's fees under Section 3426.4

11  must show (1) the objective speciousness of opposing party's claim, and (2) the subjective bad faith of

12  the opposing party in bringing or maintaining the action, that is, for an improper purpose. *Gemini*

13  *Aluminum Corp.,* 95 Cal. App. 4th at 1261.

14          With regard to the first prong, objective speciousness "exists where the action superficially

15  appears to have merit but there is a complete lack of evidence to support the claim." *FLIR Sys., Inc. v.*

16  *Parrish*, 174 Cal. App. 4th 1270, 1276 (Cal. Ct. App. 2009).  Objective speciousness may be shown by,

17  among other factors, demonstrating that there was no misappropriation or threatened misappropriation

18  or that the opposing party could not have suffered any economic harm. *Id.*  The second prong requiring

19  subjective bad faith is satisfied when it may be inferred from the evidence that a party "intended to

20  cause unnecessary delay, filed the action to harass [the opposing party], or harbored an improper

21  motive." *FLIR Sys., Inc.*, 174 Cal. App. 4th at 1278 (citing *Gemini*, 95 Cal. App. 4th at 1263).  "Similar

22  inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are

23  revealed by opposing counsel." *Id.* (citing *Gemini*, 95 Cal. App. 4th at 1264).

24          *2. Analysis*

25          Based on its review of the record, the Court concludes Plaintiffs' misappropriation claims were

26  objectively specious and Plaintiffs brought and maintained their claims in subjective bad faith.  Here,

27  Plaintiffs did not simply fail to articulate the trade secrets with particularity as an initial matter.  Rather,

28  Plaintiffs made seven failed attempts to articulate their trade secrets, requiring Defendants' to participate

1   in extensive discovery and motion practice before Magistrate Judge Porter and then Magistrate Judge

2   Dembin.  (*See* Doc. No. 229.)  In Magistrate Judge Dembin's final order describing the lengthy

3   procedural history regarding Plaintiffs' trade secret designations, he notes that "[d]espite seven attempts,

4   Plaintiffs have failed to put forth a designation that provides reasonable notice of the issues for trial and

5   assist the Court in defining the scope of discovery."  (*Id.* at 8.)  Magistrate Judge Dembin found that

6   Plaintiffs' trade secret designation number one lacked "adequate specificity," and this failure

7   "condemn[ed] the designation to intolerable vagueness."  (*Id.* at 8.)  Trade secrets number two through

8   ten fared no better as they contained "even less information and more ambiguous terms."  (*Id.* at 9.)

9   Despite both Magistrate Judges concluding that "Plaintiffs had failed to designate their trade secrets

10  with sufficient particularity to justify compelling discovery from Defendants" and Judge Anello

11  predicting the misappropriation claims were likely barred by the statute of limitations in addition to

12  lacking the requisite evidentiary connection, Plaintiffs continued to pursue their misappropriation

13  claims.

14          Plaintiffs contend that failing to sufficiently articulate a trade secret for discovery purposes does

15  not constitute objective speciousness under CUTSA and cites *Pixion, Inc. v. PlaceWare Inc.* as support.

16  2005 WL 3955890, *2-3 (N.D. Cal. Apr. 22, 2005).  In *Pixion*, the defendant argued that, among other

17  things, plaintiff's failure to clearly articulate trade secrets at the pleading stage constituted subjective

18  misconduct.  *Id.*  The court in that case concluded that plaintiff's decision to maintain its position

19  regarding the adequacy of its trade secret disclosures despite the defendants' evidence otherwise was

20  "hardly evidence of improper motive."  *Id.* at *3.   Notably, the court in *Pixion* also found that the

21  record was "entirely devoid of evidence of subjective bad faith on plaintiff's part."  *Id.*  For example,

22  several of plaintiff's trade secrets survived summary judgment, and the court noted that the trade secrets

23  claims arose out of the same set of facts as plaintiff's breach of contract claim, which was clearly not

24  specious.  *Id.*  However, there are several reasons why the misappropriation claims considered in *Pixion*

25  are distinguishable from Plaintiff's misappropriation claims here.  As discussed above, Plaintiffs did not

26  simply fail to articulate trade secret claims at the pleading stage; rather, Plaintiffs unreasonably pursued

27  trade secret claims after having been notified of their evidentiary deficiencies by two magistrate judges

28  and one district court judge.  Additionally, Defendants argued, and Judge Anello agreed, that Plaintiffs'

12

08cv1992

1    claims were likely barred by the statute of limitations.  Despite these significant warnings, Plaintiffs

2    decided to go forward with their misappropriation claims without remedying the deficiencies identified

3    by Defendants, Judge Anello, and Magistrate Judge Dembin.  As predicted by Judge Anello, the Court

4    ultimately found that the misappropriation claims were barred by the statute of limitations and granted

5    summary judgment in Defendants' favor.  Additionally, unlike the plaintiff in *Pixion* that ultimately had

6    some success on claims that were clearly brought in good faith, the Court has concluded that Plaintiffs'

7    patent claims were objectively baseless and brought in subjective bad faith, and Plaintiffs' misappropria-

8    tion claims arise out of the same set of facts as the patent claims.  For these reasons, *Pixion* does not

9    compare favorably to the facts of this case.

10         Based on the facts set forth above, the Court concludes that Plaintiffs' misappropriation claims

11   were objectively specious and maintained in subjective bad faith.  Plaintiffs received more than

12   sufficient notice regarding the flaws in their claims from Defendants, Magistrate Judge Dembin, and

13   Judge Anello.  Knowing the specific shortcomings of their misappropriation claims, Plaintiffs made the

14   decision to go forward despite their inability to sufficiently articulate the alleged trade secrets or

15   overcome Defendants' statute of limitations argument.[6]  Accordingly, the Court finds that attorneys'

16   fees are warranted under Section 3426.4 of CUTSA.

17         **C. Reasonable Amount of Award as to Plaintiffs**

18         As discussed above, attorneys' fees are warranted with regard to Plaintiffs' patent and patent-

19   related claims under 35 U.S.C. § 285 and with regard to Plaintiffs' misappropriation claims under

20   Section 3426.4 of CUTSA.  Insomuch as each one of Plaintiffs' claims is covered under the ambit of one

21   of the statutes, the Court need not apportion Defendants' attorneys' fees to the particular cause of action

22   it addressed.  As such, the Court will determine the reasonable amount of the award using the lodestar

23   determination.

24         *1. Legal Standard*

25

26   _____

27         [6] " 'Bad faith may be inferred where the specific shortcomings of the case are identified by
     opposing counsel, and the decision is made to go forward despite the inability to respond to the
28   arguments raised.' "  *See Gemini Aluminum v. Cal. Custom Shapes*, 95 Cal. App. 4th 1249, 1264 (Cal.
     Ct. App. 2002) (quoting *Alamar Biosciences, Inc. v. Difco Lab., Inc.*, 1996 U.S. Dist. Lexis 18239, *3
     (E.D. Cal. Feb. 23, 1996)

1   The Supreme Court has developed a two-pronged approach to the calculation of a reasonable

2   attorney's fee. " 'The lodestar determination has emerged as the predominate element of the analysis' in

3   determining a reasonable attorney's fee award." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th

4   Cir. 1996) (quoting *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987)). Under this

5   approach, a court must first calculate a "lodestar" figure by "multiplying the number of hours reasonably

6   expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984);

7   *see also Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir. 1988), *cert. denied* 493 U.S.

8   1035 (1990). The lodestar figure is presumptively reasonable. *City of Burlington v. Dague*, 505 U.S.

9   557, 562 (1992). While this lodestar amount is presumed to represent an appropriate fee, under certain

10   circumstances a court may then adjust the award upward or downward to take into account special

11   factors. *Blum,* 465 U.S. at 897.

12           *2. Analysis*

13           Defendants request a total award of $13,465,331.01. This amount is reached by adding the

14   following amounts: $10,244,053 for attorneys fees attributable to lead counsel Cooley LLP ("Cooley");

15   $391,928.91 for attorneys' fees attributable to document review performed by Black Letter Discovery,

16   Inc. ("Black Letter"); and $2,829,349.10 for fees associated with a document review algorithm

17   generated by outside vendor H5. Neither Plaintiffs nor WHGC objected to the requested amount or the

18   reasonableness of the rates charged and hours spent on the case.[7]

19           With regard to the attorneys' fees attributable to Cooley, counsel spent 22,921.5 hours on this

20   case in the four years from September 2008 through September 2012. (Karr Decl., Doc. No. 322-2 at ¶

21   11; Ex. E, Doc. No. 336-1 at 388.) Based upon the nature of Plaintiffs' claims, the many patents

22   involved in the case, and the length and complexity of the litigation, the Court finds the requested

23   number of hours spent on this case by Cooley to be reasonable. As support for the reasonableness of the

24   rates charged by Cooley attorneys, counsel provided a PeerMonitor Standard Rate Analysis comparing

25

26           [7] Hughes Hubbard offered generalized objections to the requested amount of attorneys' fees in
    their opposition to Defendants' motion. However, Defendants withdrew their motion as to Hughes
27   Hubbard, and therefore Hughes Hubbard's objections are moot. To the extent that WHGC filed a notice
    of joinder in Hughes Hubbard's opposition more than a month after the opposition was filed, the Court
    finds this objection to be untimely. Regardless, Hughes Hubbard's objections did not provide specific
28   objections to the requested amount such that Court finds that the presumptively reasonable lodestar
    amount should be adjusted.

1    Cooley rates generally to those charged by their peers in Los Angeles, Silicon Valley, San Francisco,

2    and San Diego.  (Doc. No. 336.)  Overall, Cooley's rates are lower than those charged by comparable

3    firms in California.  (*Id.*)  Insomuch as neither of the remaining parties objects to the reasonableness of

4    the rates charged by Cooley and the rates appear to be in line with that of the community as supported

5    by the PeerMonitor analysis, the Court finds the requested rates to be reasonable.  Accordingly, the

6    requested amount of $10,244,053 represents an appropriate lodestar amount for Cooley's fees.

7           As to Black Letter, Defendants request $391,928.91 in attorneys' fees.  The Black Letter

8    attorneys billed a total of 6,949.5 hours of document review at rates of $55 to $67 per hour.  As

9    Defendants note in their motion, Plaintiffs' claims involved 92 patents resulting in voluminous

10   document production.  For this reason, Cooley reasonably decided to have Black Letter perform

11   document review in this matter.  Had Cooley performed the document review themselves, the resulting

12   attorneys' fees would have undoubtedly been exponentially higher than those charged on behalf of

13   Black Letter.  In light of the circumstances and the amount of discovery required, the Court concludes

14   that the rates charged and hours spent by Black Letter are reasonable and, thus, finds the resulting

15   lodestar amount of $391,928.91 to be reasonable as well.

16          The third aspect of Defendants' requested fees is $2,829,349.10 attributable to computer-

17   assisted, algorithm-driven document review.  Defendants provide the following explanation for the

18   resulting fees: "Over the course of this litigation, Defendants collected almost 12,000,000 records --

19   mostly in the form of Electronically Stored Information (ESI). . . .  Rather than manually reviewing the

20   huge volume of resultant records, Defendants paid H5 to employ its proprietary technology to sort these

21   records into responsive and non-responsive documents." (Defs. Mot., Doc. No. 332-1 at 26).  After the

22   algorithm determined whether documents were responsive or unresponsive to discovery requests, Black

23   Letter attorneys reviewed the responsive documents for confidentiality, privilege, and relevance issues.

24   (*Id.* at 26, n. 11.)  For this reason, the review performed by H5 and Black Letter accomplished different

25   objectives with the H5 electronic process minimizing the overall work for Black Letter.  Again, the

26   Court finds Cooley's decision to undertake a more efficient and less time-consuming method of

27   document review to be reasonable under the circumstances.  In this case, the nature of Plaintiffs' claims

28   resulted in significant discovery and document production, and Cooley seemingly reduced the overall

1   fees and attorney hours required by performing electronic document review at the outset.  Thus, the

2   Court finds the requested amount of $2,829,349.10 to be reasonable.

3          Although the Court finds that Defendants' requested lodestar amount reasonably reflects

4   Defendants' attorneys' fees incurred throughout the litigation, the Court may still exercise its discretion

5   in adjusting the overall award upward or downward to take into account special factors.  *See Blum,* 465

6   U.S. at 897.  As discussed above, the Court has determined that Plaintiffs pursued objectively baseless

7   claims against Defendants in bad faith.  In reaching this conclusion, the Court returned frequently to

8   Judge Anello's bond order issued September 20, 2010, and questioned Plaintiffs' inadvisable decision to

9   continue forward with their claims beyond that point.  Following this clear warning that their claims

10  lacked merit, the Court finds it particularly troubling that Plaintiffs maintained their claims for an

11  extended period of time without being able to remedy the evidentiary deficiencies accompanying their

12  claims.  Insomuch as the bond order weighed heavily in favor of the Court's decision to impose

13  attorneys' fees, the Court finds it appropriate to limit the imposition of fees to those incurred after the

14  entry of the bond order.  At the time of the bond hearing, Defendants' counsel had accrued $1,000,000

15  in attorneys' fees.  Accordingly, the Court reduces the requested amount of $13,465,331.01 by

16  $1,000,000.  This results in a total award of attorneys fees in the amount of $12,465,331.01 as against

17  Plaintiffs.

18  *II.  Defendants' Motion for Attorneys' Fees as to WHGC*

19         In addition to the statutory requests for attorneys' fees as against Plaintiffs, Defendants seek to

20  hold Plaintiffs' local counsel WHGC liable for Defendants' attorneys' fees as well.  Defendants asks

21  that the Court utilize Rule 11 of the Federal Rules of Civil Procedure, or alternatively exercise its

22  inherent authority, to impose sanctions against WHGC for its participation in the case.  Under this

23  authority, Defendants ask that WHGC be held jointly and severally liable for the total amount of

24  attorneys' fees requested.

25         **A.  Legal Standard**

26         Rule 11 of the Federal rules of Civil Procedure imposes a duty on attorneys to certify that all

27  pleadings are legally tenable and well-grounded in fact.  *See* Fed. R .Civ. P. 11; *Chambers v. NASCO,*

28  *Inc.*, 501 U.S. 32, 41 (1991).  Pursuant to Rule 11(b), attorneys must perform "an inquiry reasonable

1   under the circumstances" to ensure that they have reason to believe that their legal contentions are

2   "warranted by existing law" and that their factual contentions either "have evidentiary support or, if

3   specifically so identified, will likely have evidentiary support after a reasonable opportunity for further

4   investigation." Fed. R. Civ. P. 11(b).  When considering alleged Rule 11 violations, the Court utilizes

5   an objective standard of reasonable inquiry which does not mandate a finding of bad faith.  *Chambers*,

6   501 U.S. at 47.  Significantly, Rule 11 governs only papers filed with the Court and not alleged litigation

7   misconduct outside of court filings.  *See* Fed. R .Civ. P. 11.

8          However,  the court may impose sanctions for general litigation conduct falling outside of the

9   specific prohibitions of Rule 11 through the courts' inherent power.  *See Chambers*, 501 U.S. at 51

10  (finding reliance on inherent powers appropriate where "the conduct sanctionable under the Rules was

11  intertwined within conduct that only the inherent power could address"); *Primus Automotive Financial*

12  *Services, Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997).  "The inherent powers of federal courts are

13  those that 'are necessary to the exercise of all others.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752,

14  764  (1980) (quoting *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)).  The most common

15  utilization of inherent powers is the contempt sanction which serves to protect the due and orderly

16  administration of justice and maintain the authority and dignity of the court.  *Id.* (citing *Cooke v. U.S.*,

17  267 U.S. 517, 539 (1925).  Courts may exercise their inherent power to impose sanctions in form of

18  attorneys' fees when a losing party has acted "in bad faith, vexatiously, wantonly, or for oppressive

19  reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975) (quotation

20  omitted).

21         Before awarding sanctions under its inherent powers, the court must make an explicit finding

22  that counsel's conduct "constituted or was tantamount to bad faith." *Roadway Express*, 447 U.S. at 767;

23  *see also Primus*, 115 F.3d at 648.   "A finding of bad faith is warranted where an attorney 'knowingly or

24  recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an

25  opponent.' " *Id.* (quoting *In re Keegan*, 78 F.3d at 436 (citation omitted)).  The bad faith requirement

26  sets a high threshold. *Id.*; *see also Mendez v. County of San Bernardino,* 540 F.3d 1109, 1131-32 (9th

27  Cir. 2008).

28         **B.  Analysis**

1    As a general matter, the Court recognizes that local counsel plays a unique role in the litigation

2    process.  The local rules require out-of-state attorneys to acquire local counsel, and often local counsel

3    serves primarily in an administrative capacity for the limited purpose of filing documents with the

4    Court.  Thus, the reasonable inquiry required for local counsel under Rule 11 may not be the same as

5    that required for lead counsel in many situations.  However, Rule 11 remains applicable and sanctions

6    may be imposed against local counsel when appropriate under the circumstances.  While it may be

7    reasonable for attorneys to rely on the work conducted by other attorneys in some instances, that

8    determination depends upon whether its reasonable under the particular circumstances.[8]

9    Here, it is undisputed that WHGC served in a more limited capacity than either of the firms

10   serving as Plaintiffs' lead counsel, Munck Carter PC ("Munck") and subsequently Hughes Hubbard &

11   Reed LLP ("Hughes Hubbard").  WHGC offers the following description of its role in the case as

12   support for finding sanctions unwarranted.  As local counsel, WHGC "was asked to, and did, ensure that

13   Plaintiffs' papers met the requirements of the Court's Local Rules and physically filed the papers (either

14   electronically with the Court's ECF system or by hand when documents required under seal treatment)."

15   (WHGC Opp., Doc. No. 354 at 10.)  During the initial intake of Plaintiffs' case, WHGC performed legal

16   research to ensure that each of Plaintiffs' claims were properly pled under applicable law and relied

17   upon the assertions of Plaintiffs and Munck that there was a good faith basis for all of Plaintiffs'

18   allegations.  (*Id.*)  Throughout the case, "WHGC never had access to Plaintiffs' percipient witnesses or

19   to Plaintiffs' documents at the time it was retained to act as Plaintiffs' local counsel." (*Id.* at 11.)  Even

20   after Munck left the case and Hughes Hubbard took over as lead counsel, WHGC's role remained

21   unchanged.  (*Id.*)  WHGC never participated in discovery or motion practice regarding Plaintiffs'

22

23

---

24       [8] *See Qualcomm Inc. v. Broadcom Corp.*, 2008 WL 66932, *16 n. 14 (S.D. Cal. Jan. 7, 2008),
     *vacated in part by* 2008 WL 636108 (S.D. Cal. Mar. 5, 2008) (noting that sanctions may be imposed on
25   local counsel and that the reasonableness of local counsel's reliance on other attorneys is dependent on
     the circumstances of the case); *see also Coburn v. Optical Indus., Inc. v. Cilco, Inc.*, 610 F. Supp. 656,
26   660 n. 7 (D.C. N.C. 1985) (recognizing that "local counsel must be able to rely to some extent on the
     representations of reputable out of state attorneys, especially when local counsel has no independent
27   knowledge concerning the representations"). *But c.f. Val-Land Farms, Inc. v. Third Nat. Bank in
     Knoxville*, 937 F.2d 1110, (6th Cir. 1991) (determining that the text of Rule 11 "does not provide a safe
28   harbor for lawyers who rely on the representations of outside counsel" as counsel's obligations under
     the rule are nondelegable).

1    claims.  (*Id.* at 14.)  Based on these facts indicating WHGC's limited role in the proceedings, WHGC

2    contends that it performed an appropriate and reasonable inquiry under the circumstances.

3           In response, Defendants contend that WHGC unreasonably relied upon the representations of

4    lead counsel and Plaintiffs when determining whether Plaintiffs' claims had merit and were brought in

5    good faith.  Moreover, Defendants highlight the fact that WHGC is the sole signatory on the operative

6    Fourth Amended Complaint which WHGC filed to comply with the amendment deadline after Munck

7    left the case and prior to Hughes Hubbard taking over as lead counsel.  (*See* Doc. No. 53.)  Most

8    significantly, Defendants argue that WHGC should have reevaluated its role in the case after it

9    discovered the deficiencies in Plaintiffs' case as set forth by Judge Anello in his bond order some

10   months before.

11          In this instance, although WHGC may have justifiably relied upon Plaintiffs' and Munck's

12   representations as support for its filings prior to Judge Anello's bond order, WHGC has offered no

13   justification for its decision to continue filing documents on Plaintiffs' behalf after Judge Anello warned

14   of the substantial deficiencies in Plaintiffs' case.  As noted above, the order clearly indicated that

15   Plaintiffs' claims were likely unmeritorious, lacked any significant evidentiary support, and appeared to

16   be brought in bad faith.  (*See* Doc. No. 110 at 22.)  Once again, Judge Anello's bond order weighs

17   significantly in favor of the Court's decision to impose sanctions.  WHGC was represented at the

18   hearing, and received electronic notice of the subsequent order.  While WHGC may not have partici-

19   pated in discovery prior to that point, the evidence relevant to the bond order and the Court's interpreta-

20   tion of that evidence should have raised concern.  At that point in time, WHGC's obligation under Rule

21   11 increased as it thereafter became unreasonable to rely on the representations of Plaintiffs and lead

22   counsel when filing documents with the Court.  Even when serving in the more limited role of local

23   counsel, WHGC had an obligation to review Judge Anello's order and undertake a reasonable investiga-

24   tion into the merits of the case.  WHGC did not do so, and instead continued to file documents with the

25   Court without performing the requisite reasonable inquiry under the circumstances.  As such, every

26

27

28

08cv1992

1   WHGC filing after September 20, 2010, was in violation of Rule 11.  Accordingly, the Court finds

2   sanctions to be warranted under Rule 11.[9]

3           With regard to the appropriate amount of Rule 11 sanctions, the sanction must be "appropriate"

4   and "limited to what suffices to deter repetition of the conduct or comparable conduct by others

5   similarly situated."  Fed. R. Civ. P. 11(c)(1), (2).  Defendants ask that the Court hold WHGC jointly and

6   severally liable for the entire amount of Defendants' requested attorneys' fees.  The Court finds this

7   suggestion excessive based on the nature of WHGC's actions and their limited role as local counsel.  It

8   appears that WHGC initially performed a reasonable inquiry under the circumstances, and the basis for

9   finding a Rule 11 violation arises only after the issuance of Judge Anello's bond order.  For this reason,

10  the Court finds that joint and several liability for the entirety of Defendants' attorneys fees is dispropor-

11  tionate to WHGC's violation.  Alternatively, the Court considered limiting WHGC's joint and several

12  liability to those fees billed by Defendants' following the bond order, but concludes that this award

13  would also be excessive under the circumstances.  At the hearing on the instant motion for fees,

14  Defendants' counsel posed a more reasonable alternative.  In their opposition to Defendants' motion for

15  attorneys' fees, WHGC compared the requested $13,465,331.01 in Defendants' attorneys' fees to the

16  $64,316.50 in fees billed by WHGC from the time it was retained in February 2009 through September

17  28, 2012.  (Doc. No. 354 at 9.)  Referencing WHGC's billing total, Defendants suggest that the Court

18  impose sanctions in the amount of $64,316.50, which would, in essence, prevent WHGC from realizing

19  a profit for its services as local counsel in this case.  The Court finds this to be a reasonable method of

20  determining the proper amount of sanctions to be imposed.  This amount should deter local counsel from

21  filing documents without performing a reasonable inquiry under the circumstances, but it is also more

22  appropriate in this instance than basing the award upon Defendants' attorneys' fees incurred following

23  Judge Anello's order.  The lower award is appropriate considering the nature of the violation along with

24  WHGC's limited role in the case.  Accordingly, the Court imposes Rule 11 sanctions against WHGC in

25  the amount of $64,316.50.  This amount shall be awarded to Defendants as attorneys' fees.

26

27          [9] Insomuch as the Court finds sanctions appropriate under Rule 11, the Court need not consider
    the imposition of sanctions pursuant to its inherent authority.  However, he Court notes that there
28  appears to be little evidence to support finding bad faith on the part of WHGC sufficient to warrant
    sanctions under the Court's inherent authority.

1

### _Conclusion_

2      In sum, the Court awards Defendants' $12,401,014.51 in attorneys' fees as against Plaintiffs.

3 Accordingly, the $800,000 bond posted by Plaintiffs and any accrued interest will be distributed to

4 Defendants when this order becomes final.  (Doc. No. 121).   Plaintiffs will  pay the remaining amount

5 of $11,601,014.51 to Defendants.  Additionally, the Court awards $64,316.50 in attorneys' fees as

6 against WHGC to be paid to Defendants.

7      For the reasons set forth above, it is ORDERED that Defendants' Motion for Attorneys' Fees as

8 to Plaintiffs and WHGC be, and it hereby is, GRANTED IN PART and DENIED IN PART.  The Court

9 further ORDERS as follows:

10      1.  The Court directs the Clerk of Court to pay the $800,000 in funds and any accrued interest
           held in the Court's registry to Defendants when this order becomes final;

11

12      2.  Plaintiffs will pay $11,601,014.51 to Defendants within 60 days of this order; and

13      3.  WHGC will pay $64,316.50 to Defendants within 60 days of this order.

IT IS SO ORDERED.

14

15

DATED:  February 1, 2013

16

17                                      _____
                                        Hon. Anthony J. Battaglia
18                                      U.S. District Judge

19

20

21

22

23

24

25

26

27

28

560 Fed.Appx. 966
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. Fed. Cir. Rule 32.1.
United States Court of Appeals,
Federal Circuit.

GABRIEL TECHNOLOGIES CORPORATION, and
Trace Technologies, LLC, Plaintiffs–Appellants,

v.

QUALCOMM INCORPORATED, SnapTrack, Inc.,
and Norman Krasner, Defendants–Appellees.

No. 2013–1205.
|
March 18, 2014.

**Synopsis**
**Background:** Following dismissal of patent infringement
claim and summary judgment to defendant on claim
for trade secret misappropriation, both involving global
positioning system (GPS) technology, the United States
District Court for the Southern District of California,
2013 WL 410103, Anthony J. Battaglia, J., found the
case to be exceptional and awarded defendant attorney
fees under federal patent statutes and California
Trade Secrets Act (CUTSA). Plaintiff appealed.

**Holdings:** The Court of Appeals held that:

[1] case was exceptional, as would support award of
attorney fees under federal patent statute, and

[2] trade secret claims were objectively specious and
maintained in subjective bad faith.

Affirmed.

West Headnotes (2)

[1]    **Patents**

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  1

   Awards to competitors

Technology company's allegations of
patent infringement of global positioning
system (GPS) technology were objectively
unreasonable and claim was brought in
subjective bad faith, as required for award of
exceptional-case attorney fees to defendant;
plaintiff failed to provide facts or expert
witnesses in support of its contention that it
had made a specific inventive contribution to
any of defendant's GPS patents, as required
to support claim for joint ownership, and
continued to pursue its claims long after it
knew or should have known that they were
baseless. 35 U.S.C.A. § 285.

Cases that cite this headnote

[2]    **Antitrust and Trade Regulation**
   Costs and attorney fees

Trade secret misappropriation claims
advanced by technology company against
competitor concerning global positioning
system (GPS) technology were objectively
specious and maintained in subjective bad
faith, as required for award of attorney
fees under California Uniform Trade Secrets
Act (CUTSA); plaintiff made seven failed
attempts to articulate its trade secrets, but
was never able to identify specific secrets that
defendant had allegedly taken, and although it
became clear at an early point in the litigation
that the trade secret misappropriation claims
were time-barred, plaintiff continued to
pursue its claims. West's Ann.Cal.Civ.Code §
3426.4.

Cases that cite this headnote

*966 Appeals from the United States District Court for
the Southern District of California in No. 08–CV–1992,
Judge Anthony J. Battaglia.

EXHIBIT 4

81

**Attorneys and Law Firms**

Robert G. Knaier, Chapin Fitzgerald LLP, of San Diego, CA, argued for plaintiffs-appellants. With him on the brief were Kenneth M. Fitzgerald and Keith M. Cochran.

Steven M. Strauss, Cooley LLP, of San Diego, CA, argued for defendants-appellees. With him on the brief were Timothy S. Teter, Jeffrey S. Karr, and Lori R. Mason, of Palo Alto, CA.

**\*967** Before LOURIE, MAYER, and CHEN, Circuit Judges.

**Opinion**

PER CURIAM.

Gabriel Technologies Corporation ("Gabriel") and Trace Technologies, LLC ("Trace") appeal a final order of the United States District Court for the Southern District of California awarding Qualcomm Incorporated ("Qualcomm"), SnapTrack, Inc. ("SnapTrack"), and Norman Krasner attorneys' fees pursuant to 35 U.S.C. § 285 and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ.Code § 3426.4. *See Gabriel Techs. Corp. v. Qualcomm Inc.,* No. 08–CV–1992, 2013 WL 410103 (S.D.Cal. Feb. 1, 2013) ("*Attorneys' Fees Order* "). We affirm.

BACKGROUND

The district court provided a comprehensive account of the history of this case in its summary judgment decisions, *see Gabriel Techs. Corp. v. Qualcomm Inc.,* No. 08–CV–1992, 2012 WL 4574550, at \*1–3 (S.D.Cal. Oct. 1, 2012) ("*Inventorship Decision* "); *Gabriel Techs. Corp. v. Qualcomm Inc.,* 857 F.Supp.2d 997, 1000–02 (S.D.Cal.2012) ("*Trade Secrets Decision* "), and its *Attorneys' Fees Order,* 2013 WL 410103, at \*1–2, and we need only provide a brief summary here. William Clise and Michael Crowson founded Locate Networks, LLC ("Locate"), a company which sought to incorporate global positioning system ("GPS") technology into paging systems. *Trade Secrets Decision,* 857 F.Supp.2d at 1000. In 1999, Locate entered into a licensing agreement with SnapTrack, under which Locate obtained a license to use SnapTrack's GPS software. *Id.* The licensing agreement stipulated that the parties would share ownership in

technology which was jointly developed in connection with the licensing agreement. *Id.*

Qualcomm acquired SnapTrack in March of 2000. In 2004, Locate sold its assets to Trace, and then transferred its interest in Trace to Gabriel. Locate subsequently went out of business.

On October 24, 2008, Gabriel and Trace (collectively the "Gabriel plaintiffs") filed suit against Qualcomm, SnapTrack and Krasner (collectively the "Qualcomm defendants"), seeking more than $1 billion in damages. J.A. 206–39. Their complaint contained eleven causes of action, including claims for correction of inventorship, breach of the 1999 license agreement, fraud/fraudulent inducement, unfair competition, and misappropriation of trade secrets. J.A. 231–78. Each of these claims was grounded on the contention that individuals affiliated with Locate conceived of the inventions disclosed in several Qualcomm patents. The Gabriel plaintiffs asserted that "[o]ver time, Krasner, SnapTrack, and Qualcomm surreptitiously misappropriated Locate's valuable enabling technology and other ... intellectual property rights." J.A. 243.

In September 2009, the district court dismissed six of the Gabriel plaintiffs' eleven causes of action, concluding that they had failed to state a viable claim for breach of the 1999 license agreement, J.A. 492–95, and that their unfair competition claims were preempted under CUTSA because they were premised on the same conduct that gave rise to their trade secret misappropriation claims, J.A. 507. Three months later, the court dismissed the Gabriel plaintiffs' cause of action for fraudulent inducement, concluding that they had failed to plead that claim with the particularity required by Federal Rule of Civil Procedure 9(b). J.A. 616–18.

On September 20, 2010, the district court required the Gabriel plaintiffs to post a bond of $800,000 as a condition for continuing their suit. J.A. 2400–23. The **\*968** court determined that the bond was necessary because the Qualcomm defendants had "presented significant, unrebutted evidence that" the suit filed by the Gabriel plaintiffs was "likely unmeritorious, and brought in bad faith to salvage Gabriel." J.A. 2421. The court explained that although the Gabriel plaintiffs had "been investigating their claims for several years," they had failed "to draw any meaningful connection between

Locate's technology and the allegedly misappropriated information found in [Qualcomm's] patents." J.A. 2421. The court further noted that Gabriel had "a long history of corrupt officers and directors who [were] not above taking illegal and fraudulent actions to guarantee their own personal gain." J.A. 2421 (footnote omitted). According to the court, there was a "strong likelihood" that the Qualcomm defendants would be awarded their attorneys' fees pursuant to section 285 at the conclusion of the litigation. J.A. 2421.

The Gabriel plaintiffs then posted the required $800,000 bond, J.A. 2435–36, and the parties proceeded with discovery. In March 2012, the district court granted the Qualcomm defendants' motion for partial summary judgment, concluding that the trade secret misappropriation claims asserted by the Gabriel plaintiffs were timebarred. Trade Secrets Decision, 857 F.Supp.2d at 1002–10. Following additional discovery, the district court granted summary judgment against the Gabriel plaintiffs on their remaining inventorship claims, concluding that they had failed to produce any evidence that individuals affiliated with Locate made an inventive contribution to the disputed Qualcomm patents. Inventorship Decision, 2012 WL 4574550, at *4–9.

On February 1, 2013, the trial court issued an order declaring the case exceptional under section 285 and awarding the Qualcomm defendants more than $12 million in attorneys' fees. [1] The court held that the claims advanced by the Gabriel plaintiffs "were objectively baseless and brought in subjective bad faith," Attorneys' Fees Order, 2013 WL 410103, at *4, noting that they "brought and maintained [inventorship] claims without knowing the identity of the allegedly omitted inventors, the most basic prerequisite for a successful correction of inventorship patent claim," id. at *5. An award under section 285 was warranted because the Gabriel plaintiffs were well aware that they "lacked the requisite evidence" to support their claims, but "opted to pursue their claims nonetheless." Id. at *4 (footnote omitted). The court was "particularly struck by [the Gabriel plaintiffs'] decision to pursue their claims further following [its] warning that the case would likely be found exceptional based on the evidence before [it] at the bond hearing." Id. at *5. In addition, the court concluded that an award of fees and costs was appropriate under CUTSA, see Cal. Civ.Code § 3426.4, because the trade secret misappropriation claims advanced by the Gabriel plaintiffs "were objectively

specious and ... brought and maintained ... in subjective bad faith." Attorneys' Fees Order, 2013 WL 410103, at *7.

The Gabriel plaintiffs then filed a timely appeal challenging the district court's award of attorneys' fees under both section 285 and CUTSA. [2] We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## *969 DISCUSSION

### I. Standard of Review

The Supreme Court recently granted certiorari to determine whether a district court's determination that a party's litigation position was "objectively baseless" for purposes of a section 285 fee award is subject to de novo review on appeal. See Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc., 687 F.3d 1300, 1309 (Fed.Cir.2012), cert. granted, ––– U.S. –––, 134 S.Ct. 48, 186 L.Ed.2d 962 (2013). Here, even applying a more deferential standard—as opposed to de novo review—we conclude that the district court correctly determined that the claims advanced by the Gabriel plaintiffs were objectively baseless.

In contrast to the objective baselessness component of the exceptional case determination, the question of whether a litigant acted with subjective bad faith is reviewed for clear error. Id. at 1310. Furthermore, "[u]nlike the objective prong, which is a single retrospective look at the entire litigation, the subjective prong may suggest that a case initially brought in good faith may be continued in bad faith depending on developments during discovery and otherwise." Id. at 1311. We likewise conclude that the district court correctly determined that the Gabriel plaintiffs acted with subjective bad faith by stubbornly continuing to press their claims long after they realized that those claims were without evidentiary support.

### II. The Exceptional Case Determination

The determination as to whether to award attorneys' fees under section 285 is a two-step inquiry. Eon–Net LP v. Flagstar Bancorp, 653 F.3d 1314, 1323 (Fed.Cir.2011). First, a district court "determine[s] whether the prevailing party has proved by clear and convincing evidence that the

case is exceptional." *Id.* Second, if the court finds the case exceptional, it must decide whether the award of attorneys' fees is warranted. *Id.; see Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.,* 393 F.3d 1378, 1382 (Fed.Cir.2005) ("Even for an exceptional case, the decision to award attorney fees and the amount thereof are within the district court's sound discretion."). Under existing precedent, "[a]bsent misconduct in conduct of the litigation or in securing the patent, sanctions may be imposed [under section 285] only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Brooks Furniture,* 393 F.3d at 1381. [3]

### III. Objective Baselessness

**[1]** The record here amply supports the trial court's conclusion that the inventorship claims advanced by the Gabriel plaintiffs were objectively baseless. The Gabriel plaintiffs "did not know the identity of the allegedly omitted inventors when they filed [their] action in 2008 or at any later point in the case." *Attorneys' Fees Order,* 2013 WL 410103, at *4. Indeed, "they were never able to find individuals **\*970** that would take credit for inventing any of the relevant patents or profess knowledge of specifics relating to the patents." *Id.* Simply put, the Gabriel plaintiffs played a game of "inventor musical chairs," Defs.-Appellees Br. 23, repeatedly shifting positions as to which individuals from Locate were omitted inventors. In the end, none of the Gabriel plaintiffs' fact or expert witnesses provided support for the contention that individuals from Locate made a specific inventive contribution to any Qualcomm patent. [4] *See* J.A. 5618–42; 5775–98; 6410–12.

For example, the Gabriel plaintiffs asserted and maintained a claim for correction of inventorship on Qualcomm's 6,799,050 patent (the "#050 patent"), notwithstanding the dearth of evidence showing that any Locate employee contributed in a substantive manner to the conception of the invention disclosed in that patent. The #050 patent, which issued on September 28, 2004, listed Krasner as the sole inventor. J.A. 6178–92. When they filed their original interrogatory responses, the Gabriel plaintiffs failed to identify any individual associated with Locate who was a purported omitted inventor. *Inventorship Decision,* 2012 WL 4574550, at *4. They subsequently amended their interrogatory responses to assert that Philip DeCarlo, a Locate employee, was an

omitted inventor. *Id.* DeCarlo, however, "testified that he did not invent the #050 patent, never told anyone he should be a named inventor, and did not know why he was listed as an omitted inventor." *Id.* The Gabriel plaintiffs then once again revised their interrogatory responses, this time asserting that Clise was the sole inventor on the #050 patent. Clise, however, acknowledged that he did not conceive of important technologies disclosed in the #050 patent, and failed to produce any documentation or other credible evidence corroborating his claim of inventorship. *Id.* at *5. In fact, during his deposition Clise was unable to identify any specific information that he had provided to Krasner which might even arguably qualify him as an inventor on the #050 patent. J.A. 5899–900.

On appeal, the Gabriel plaintiffs "acknowledge that it took them some time to precisely identify all omitted inventors," but argue that "identification of omitted inventors and correlation of their efforts to specific patent claims [was] a difficult and time consuming task." In support, they note that "Locate developed its inventions in 1999 through 2001, ten years before discovery commenced," and that many potential omitted inventors "had relocated, requiring extensive travel by Plaintiffs' counsel." The problem for the Gabriel plaintiffs, however, is not that it took "some time" to identify the allegedly omitted inventors, but that even after nearly four years of litigation they were unable to produce any credible evidence that anyone affiliated with Locate made any specific inventive contribution to the relevant Qualcomm patents.

**\*971** The Gabriel plaintiffs further contend that the trial court imposed an unduly rigorous standard for joint inventorship. In their view, the trial court improperly "considered it dispositive that Locate inventors had not met the named inventors, repeatedly stressing direct communication as a necessary condition for a coinventorship claim." Contrary to the Gabriel plaintiffs' assertions, however, the trial court did not reject their joint inventorship claims simply because Locate employees had never met with the named inventors. Instead, the court properly concluded that Locate employees could not be deemed joint inventors because there was no evidence that anyone affiliated with Locate made any inventive contribution to the Qualcomm patents. *See Attorneys' Fees Order,* 2013 WL 410103, at *4. To qualify as a joint inventor, a party "must contribute in some significant manner to the conception of the invention." *Falana v. Kent*

*St. Univ.,* 669 F.3d 1349, 1357 (Fed.Cir.2012) (citations and internal quotation marks omitted).

### IV. Subjective Bad Faith

The Gabriel plaintiffs argue that the record contains strong evidence demonstrating their subjective good faith and that the trial court "committed clear error in ignoring it." In their view, their willingness to post the $800,000 bond required by the district court constitutes "powerful evidence that they believed in the merits of their claims." They further assert that the fact that their trial counsel, after performing "substantial due diligence," agreed to take on their case on a contingency fee basis "corroborated and strengthened [their] subjective good faith belief in their case."

We do not find this reasoning persuasive. In many cases, unearthing evidence sufficient to establish a litigant's subjective bad faith is challenging. *See Kilopass Tech., Inc. v. Sidense Corp.,* 738 F.3d 1302, 1311 (Fed.Cir.2013) (noting that "[s]ubjective bad faith is difficult to prove directly"). This is not such a case. The record contains emails demonstrating that the Gabriel plaintiffs maintained their suit long after they recognized that their claims were without merit. In January 2010, after Gabriel's original attorneys, Munck Carter PC ("Munck Carter"), withdrew, John Hall, a Gabriel board member, sent an email to Maurice Shanley, Gabriel's chief financial officer, which stated:

> [W]e are looking for financing, a new law firm, but with what[?] The cu [p]board is bare. The case [h]as never been developed beyond filing a complaint over something that happened 10 years ago. There is no package with the 20 most important documents and the narrative that supports the case. It doesn't exist....
>
> We have been turned down everywhere we go. Why would anyone invest a dime [?] Not even Guido will give us money and why would he[?] The case will cost $10 [million] all in, with half that to be spent the first year.
>
> There are only a few full contingency firms that can afford to take on a case of this size and complexity. *They won't touch this case because we have no case. Just a lot of talk.*

J.A. 5992 (emphasis added).

Likewise, in December 2009, Allan Angus, Gabriel's former chief technology officer, sent an email stating that he was "done with" Gabriel because "*[t]he real value was never there anyway.* The real value was always going to be ... in the fight ... how to respond to an opposing attorney's questions, how to make the case." J.A. 6006 (emphasis added). The Gabriel plaintiffs assert that these emails simply reflect frustration that Munck Carter had resigned and they were left with no collection of the key documents necessary **\*972** to pursue their case. The trial court properly rejected these assertions, however, explaining that "[w]hile the emails certainly express frustration towards ... [Munck Carter], the repeated references to the utter lack of a case suggest that, not only did [the Gabriel plaintiffs] not have the necessary evidence to bring their claims against [the Qualcomm defendants], they were aware of the evidentiary deficiencies during the early stages of litigation." *Attorneys' Fees Order,* 2013 WL 410103, at \*4.

The Gabriel plaintiffs' willingness to post the $800,000 bond required by the district court is insufficient to establish that they had a good faith belief in the merits of their claims. They raised the money for the cost of their lawsuit from outside investors. The fact that the Gabriel plaintiffs were willing to gamble with someone else's money does not establish that they had a bona fide belief in the viability of their claims. Nor does the fact that the Gabriel plaintiffs were, after considerable effort, able to locate a law firm that would agree to pursue their suit on a contingency basis preclude a finding of subjective bad faith. [5] Indeed, as discussed previously, one of Gabriel's board members recognized in January 2010 that most law firms would not agree to take on its suit "because [it had] no case. Just a lot of talk." J.A. 5992.

In the September 2010 order requiring the $800,000 bond, the trial court noted that although the Gabriel plaintiffs had "been investigating their claims for several years," they had been unable "to draw any meaningful connection" between Locate's technology and the inventions disclosed in Qualcomm's patents. J.A. 2421. The court made clear, moreover, that there was "a strong likelihood" that the Qualcomm defendants would be awarded fees under section 285 at the conclusion of the litigation. J.A. 2421. The Gabriel plaintiffs' obdurate refusal to abandon their suit—even after being specifically warned about the obvious shortcomings in their claims

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.      5

—strongly supports the trial court's conclusion that they maintained this litigation in bad faith. *See Kilopass,* 738 F.3d at 1311 (emphasizing that a "misguided belief, based on zealousness rather than reason, is simply not sufficient by itself to show that a case is not exceptional in light of objective evidence that [a litigant] has pressed meritless claims"); *Highmark,* 687 F.3d at 1309 (explaining that subjective bad faith can be established by showing that the "lack of objective foundation for the claim was either known or so obvious that it should have been known by the party asserting the claim" (citations and internal quotation marks omitted)); *see also Eon–Net,* 653 F.3d at 1327 (affirming a trial court's determination that a patentee "acted in bad faith by exploiting the high cost to defend complex litigation to extract a nuisance value settlement" from the accused infringers). Significantly, the trial court awarded attorneys' fees under section 285 only for the period after September 20, 2010, the date of the bond order which expressly notified the Gabriel plaintiffs of the evidentiary deficiencies in their claims. *Attorneys' Fees Order,* 2013 WL 410103, at \*10; *see Computer Docking Station Corp. v. Dell, Inc.,* 519 F.3d 1366, 1379 (Fed.Cir.2008) ("If the patentee prolongs litigation in bad faith, an exceptional finding may be warranted.").

## V. Litigation Misconduct

"[I]t is well-established that litigation misconduct and unprofessional behavior **\*973** may suffice, by themselves, to make a case exceptional under § 285." *MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907, 919 (Fed.Cir.2012) (citations and internal quotation marks omitted). Although the district court's exceptional case determination was grounded primarily on its conclusion that the claims advanced by the Gabriel plaintiffs were objectively baseless and brought in subjective bad faith, the court also held that the Qualcomm defendants had established "a persuasive case for finding litigation misconduct based upon [the Gabriel plaintiffs'] less-than-honest actions throughout the case." *Attorneys' Fees Order,* 2013 WL 410103, at \*5 (footnote omitted). We agree that the record contains significant evidence of litigation misconduct. For example, the Gabriel plaintiffs attempted to reassert fraud claims which had previously been dismissed with prejudice. Furthermore, in a ploy to avoid posting the $800,000 bond, Gabriel asserted that it had moved its principal place of business to a residential apartment in California. At the time, however, Gabriel's

own website stated that its corporate headquarters was in Omaha, Nebraska. *See Old Reliable Wholesale, Inc. v. Cornell Corp.,* 635 F.3d 539, 549 (Fed.Cir.2011) ("Litigation misconduct generally involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicative proceedings." (footnote omitted)).

## VI. The California Uniform Trade Secrets Act

CUTSA authorizes the award of reasonable attorneys' fees to the prevailing party in a trade secret misappropriation case. *See* Cal. Civ.Code § 3426.4. A party seeking fees under CUTSA must demonstrate that: (1) the trade secret claim was objectively specious; and (2) it was brought in bad faith or for an improper purpose. *See FLIR Sys., Inc. v. Parrish,* 174 Cal.App.4th 1270, 95 Cal.Rptr.3d 307, 313 (2009); *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.,* 95 Cal.App.4th 1249, 116 Cal.Rptr.2d 358, 367–69 (2002). An award of fees under section 3426.4 of CUTSA "is entrusted to the trial court's discretion and will not be overturned in the absence of a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence." *Yield Dynamics, Inc. v. TEA Sys. Corp.,* 154 Cal.App.4th 547, 66 Cal.Rptr.3d 1, 28 (2007).

**[2]** As the district court correctly determined, the trade secret misappropriation claims advanced by the Gabriel plaintiffs were objectively specious and maintained in subjective bad faith. Contrary to the Gabriel plaintiffs' assertions, the trial court did not assess fees under section 3426.4 because they failed, at the pleading stage, to specifically identify any trade secrets that had allegedly been misappropriated. Instead, attorneys' fees were assessed because the Gabriel plaintiffs "made seven failed attempts to articulate their trade secrets," but were never able to identify the specific secrets that the Qualcomm defendants had allegedly taken.[6] *Attorneys' Fees Order,* 2013 WL 410103, at \*7.

From an early point in the litigation, moreover, it became clear that the trade **\*974** secret misappropriation claims were time-barred. In January 2003, Clise, after viewing a publically-available SnapTrack presentation, sent an email stating that he thought SnapTrack had "rip[ped] off" Locate's technology. J.A. 4462. Likewise, Shanley testified that he became suspicious that Qualcomm

was attempting to misappropriate Locate's intellectual property in the summer of 2004 when Qualcomm proposed that Gabriel enter into an amended license agreement which deleted the "proprietary rights" section from the original licensing agreement. *See Trade Secrets Decision,* 857 F.Supp.2d at 1007. Because the Gabriel plaintiffs knew that they had a potential trade secret claim by the summer of 2004, at the very latest, [7] and yet failed to file suit within three years of that date, their suit was untimely. *See Cypress Semiconductor Corp. v. Superior Ct.,* 163 Cal.App.4th 575, 77 Cal.Rptr.3d 685, 692–94 (2008) (explaining that a claim for trade secret misappropriation must be brought within three years of the date a plaintiff knows, or should know, that proprietary information has been taken). The Gabriel plaintiffs acted with subjective bad faith when they obstinately refused to abandon their trade secret claims even in the face of unequivocal evidence that those claims were barred by CUTSA's three-year statute of limitations. *See FLIR,* 95 Cal.Rptr.3d at 319 (explaining that "[a] trade secrets claim could be brought in good faith but warrant attorney fees" when the claim is pursued beyond the point at which it becomes clear that the claim lacks merit).

CONCLUSION

Accordingly, the order of the United States District Court for the Southern District of California is affirmed.

**AFFIRMED**

**All Citations**

560 Fed.Appx. 966

Footnotes

1   In this appeal, the Gabriel plaintiffs challenge the merits of the district court's decision to award attorneys' fees under section 285 and CUTSA, but have not appealed the court's determination as to the appropriate quantum of fees.

2   The Gabriel plaintiffs also filed a separate appeal challenging the trial court's judgments on the merits of their inventorship and trade secret misappropriation claims. Today we affirm those judgments pursuant to Federal Circuit Rule 36. *See Gabriel Techs. Corp. v. Qualcomm Inc.,* No. 2013–1058, 558 Fed.Appx. 1028, 2014 WL 1013871 (Fed.Cir. Mar. 18, 2014).

3   The Supreme Court has also granted certiorari to consider whether a prevailing party seeking attorneys' fees under section 285 is required to establish *both* that the litigation was objectively baseless and that it was maintained in subjective bad faith. *See Icon Health & Fitness, Inc. v. Octane Fitness, LLC,* 496 Fed.Appx. 57, 65 (Fed.Cir.2012), *cert. granted,* ––– U.S. ––––, 134 S.Ct. 49, 186 L.Ed.2d 962 (2013).

4   The Gabriel plaintiffs argue that the declarations they submitted from "highly-credentialed experts" were sufficient to demonstrate that Locate "conceived of valuable contributions to the technology that was later included in [Qualcomm's] patents." We decline to discuss the particulars of these expert declarations since they were filed under seal in the district court and have been marked confidential on appeal. J.A. 2899–3087. We have reviewed these declarations, however, and conclude that they fail to adequately identify: (1) any specific inventive contribution that any particular Locate employee made to the Qualcomm patents; or (2) any specific trade secret that was misappropriated by the Qualcomm defendants.

5   The Qualcomm defendants also sought attorneys' fees from the Gabriel plaintiffs' lead trial counsel, Hughes Hubbard & Reed LLP ("Hughes Hubbard"). They subsequently entered into a confidential settlement agreement with Hughes Hubbard regarding the payment of fees. *See Attorneys' Fees Order,* 2013 WL 410103, at *1 n. 1.

6   The Gabriel plaintiffs complain that the trial court improperly limited the scope of discovery related to their trade secret misappropriation claims. We disagree. Although they were given multiple opportunities to specifically identify the trade secrets purportedly pilfered by the Qualcomm defendants, their trade secret designations were ultimately "condemn[ed] ... to intolerable vagueness." J.A. 5291. Because the Gabriel plaintiffs failed to identify their trade secrets with reasonable particularity, the trial court appropriately restricted discovery on their misappropriation claims. *See Herbert v. Lando,* 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (Discovery abuse can be prevented if "judges [do] not hesitate to exercise appropriate control over the discovery process."); *see also In re MSTG, Inc.,* 675 F.3d 1337, 1346 (Fed.Cir.2012) (emphasizing that "[c]ourts are required to limit the frequency or extent of discovery otherwise allowed" in situations where "the burden or expense of the proposed discovery outweighs its likely benefit" (citations and internal quotation marks omitted)); *Advanced Modular Sputtering, Inc. v. Superior Ct.,* 132 Cal.App.4th 826, 33 Cal.Rptr.3d 901, 907 (2005) (emphasizing that a plaintiff alleging trade secret misappropriation under CUTSA must "identify or designate the trade

secrets at issue with sufficient particularity to limit the permissible scope of discovery" (citations and internal quotation marks omitted)).

7    As the district court correctly noted, there was evidence that the Gabriel plaintiffs became aware that they had a potential trade secret misappropriation claim as early as 1999. J.A. 2414.

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.